No. 25-4047

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**UNITED FARM WORKERS of AMERICA, et al.,**

**Plaintiffs-Appellees,**

**v.**

**KRISTI NOEM, et al.,**

**Defendants-Appellants.**

---

On Appeal from an Interlocutory Order Issued by the U.S. District Court for the Eastern District of California (Civil Action No. 1:25-cv-00246-JLT-CDB)

_____

## DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD

---

**BRETT A. SHUMATE**
**Assistant Attorney General**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant**
**Attorney General**

**ELIANAS PEREZ**
**Assistant Director**

**TIM RAMNITZ**
**Senior Litigation Counsel**
**Office of Immigration**
**Litigation**
**Civil Division**
**U.S. Department of Justice**
**P.O. Box 878 Station**
**Ben Franklin Station**
**Washington D.C. 20044**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD ("ER")
## INDEX
*United Farm Workers, et al. v. Noem, et al., No. 25-4047*

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 1 of 3** | | | |
| Order Granting Plaintiffs' Preliminary Injunction and Provisional Class Certification | 4/29/2025 | 47 | 2-89 |

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 2 of 3** | | | |
| Motion to Enforce Preliminary Injunction | 8/30/2025 | 81 | 91-120 |
| Eduardo Cantu Declaration | 7/14/2025 | 64-4 | 121-123 |
| Second Muster | 6/29/2025 | 64-2 | 124-125 |
| Notice of Appeal | 6/26/2025 | 59 | 126-128 |
| Opposition to Preliminary Injunction; Exhibits | 4/4/2025 | 31 | 129-155 |

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 3 of 3** | | | |
| Memorandum in Support of Motion for Preliminary Injunction; Exhibits | 3/8/2025 | 15 | 157-360 |
| Complaint | 2/26/2025 | 1 | 361-431 |

No. 25-4047

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

**UNITED FARM WORKERS of AMERICA, et al.,**

**Plaintiffs-Appellees,**

**v.**

**KRISTI NOEM, et al.,**

**Defendants-Appellants.**

On Appeal from an Interlocutory Order Issued by the U.S. District Court for the Eastern District of California (Civil Action No. 1:25-cv-00246-JLT-CDB)

## DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD VOLUME 1 OF 3

**BRETT A. SHUMATE**
**Assistant Attorney General**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant**
**Attorney General**

**ELIANAS PEREZ**
**Assistant Director**

**TIM RAMNITZ**
**Senior Litigation Counsel**
**Office of Immigration**
**Litigation**
**Civil Division**
**U.S. Department of Justice**
**P.O. Box 878 Station**
**Ben Franklin Station**
**Washington D.C. 20044**

ER001

1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   UNITED FARM WORKERS, OSCAR            )  Case No.: 1:25-cv-00246 JLT CDB
     MORALES CISNEROS, WILDER MUNGUIA      )
12   ESQUIVEL, YOLANDA AGUILERA            )  ORDER GRANTING PLAINTIFFS' MOTION
     MARTINEZ, JUAN VARGAS MENDEZ, and     )  FOR PROVISIONAL CLASS CERTIFICATION
13   MARIA GUADALUPE HERNANDEZ             )  AND GRANTING PLAINTIFFS' MOTION FOR
     ESPINOSA,                             )  A PRELIMINARY INJUNCTION
14                                         )
                     Plaintiffs,           )  (Docs. 14, 15)
15                                         )
              v.                           )
16                                         )
     KRISTI NOEM, as Secretary of the Department )
17   of Homeland Security; PETE R. FLORES, as )
     Acting Commissioner of U.S. Border Patrol; )
18   MICHAEL W. BANKS, as Chief of U.S. Border )
     Patrol; and GREGORY K. BOVINO, as Chief )
19   Patrol Agent for El Centro Sector of the U.S. )
     Border Patrol,                        )
20                                         )
                     Defendants.           )
21   _____)

22        United Farm Workers, Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera

23   Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez filed a complaint for declaratory and

24   injunctive relief related to detentive stops and arrests by Border Patrol. Plaintiffs state claims against

25   the defendants—including Kristi Noem, in her official capacity as Secretary of the Department of

26   Homeland Security; Pete R. Flores, in his official capacity as Acting Commissioner of U.S. Border

27   Patrol; Michael W. Banks, in his official capacity as Chief of U.S. Border Patrol; and Gregory Bovino,

28   in his official capacity as Chief Patrol Agent for the El Centro Sector of the U.S. Border Patrol—for

                                              1

                                                                                    ER002

1  violations of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the Fourth Amendment, and the Fifth

2  Amendment.  (*See generally* Doc. 1.)

3      Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez seek

4  provisional class certification.  (Doc. 14.)  Plaintiffs also seek a preliminary injunction, "preliminarily

5  enjoining Defendants from continuing their practices of (1) detentive stops without regard to reasonable

6  suspicion that the person stopped is in the country unlawfully, and (2) warrantless arrests without

7  regard to probable cause that the person arrested is likely to escape before a warrant can be obtained."

8  (*See* Doc. 15 at 2.)  Defendants oppose both motions.  (Docs. 31, 32.)  The Court held a hearing on the

9  pending motions on April 28, 2025.  For the reasons set forth below, the motion for provisional class

10  certification is **GRANTED**, and the motion for a preliminary injunction is **GRANTED**.

**BACKGROUND**[1]

11

12  **I.      "Operation Return to Sender"**

13      The U.S. Border Patrol is "responsible for securing U.S. borders between ports of entry," and

14  "is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection."  (Doc. 1 at

15  12, ¶ 38; *see also* Doc. 15-2 at 103.)  Border Patrol agents launched "Operation Return to Sender" in

16  early January 2025, sending approximately 60 agents to the Central Valley region, which lies within

17  the Eastern District of California.  (*See* Doc. 1 at 2, ¶ 1; *see also* Doc. 15-2 at 72.)  Border Patrol

18  indicated to local news media that the Operation focused on alleged drug and human traffickers.  (*See*

19  Doc. 15-2 at 72.)

20      Plaintiffs contend the Operation was "a nearly weeklong sweep through predominantly Latino

21  areas of Kern County and the surrounding region to stop, detain, and arrest people of color who

22  appeared to be farm workers or day laborers, regardless of their actual immigration status or individual

23  circumstances."  (Doc. 1 at 2, ¶ 1; *see also id.* at 43-44, ¶¶ 235-236.)  Plaintiffs allege Border Patrol

24  took the following steps as part of "Operation Return to Sender":

25          **Step One: "Stop Regardless of Reasonable Suspicion."**  Plaintiffs allege
            that "Border Patrol relied on a practice of conducting detentive stops
26

---

27  [1] Defendants do not object to the declarations or exhibits submitted by Plaintiffs in support of the motions for
    provisional class certification and a preliminary injunction nor do they deny the factual allegations made in
28  Plaintiffs' evidence. The Court accepts this evidence as true for purposes of the motions now pending.

2

ER003

regardless of reasonable suspicion that a person was in the country unlawfully." (Doc. 1 at 3, ¶ 5.)

**Step Two: "Arrest Regardless of Flight Risk."** Plaintiffs assert that "Border Patrol agents also relied on a practice of escalating stops to warrantless arrests without evaluating whether the arrestee posed a flight risk." (Doc. 1 at 3, ¶ 8.) In addition, Plaintiffs contend that "when an arrestee affirmatively informed Border Patrol agents of facts showing they were *not* a flight risk, Border Patrol agents ignored them." (*Id.*, emphasis in original).

**Step Three: "Expel Without Explanation."** Plaintiffs contend, "Once Border Patrol agents transported the people they arrested to the El Centro Station… [they would] extract voluntary departure agreements from as many people as possible without explaining the consequences." (Doc. 1 at 4, ¶ 9.) Plaintiffs also contend "agents provided a slew of misinformation about voluntary departure." (*Id.* at 5, ¶ 11.)

(*See* Doc. 1 at 3-6, ¶¶ 5-15; *see also id.* at 43, ¶ 234.)

Plaintiffs observe that under the Fourth Amendment, Border Patrol agents are prohibited "from detaining a person, whether in a private vehicle or on foot, without reasonable suspicion that the person is in the country unlawfully." (Doc. 1 at 2, ¶ 2.) Plaintiffs note a detentive stop cannot be justified by "person's perceived race, ethnic background, or occupation" or "refusal to answer voluntary questions." (*Id.*) Plaintiffs assert that immigration officers— including Border Patrol agents—are prohibited "from making indiscriminate arrests without a warrant" without making a "finding that a person (1) is violating immigration law and (2) is a flight risk…." (*Id.*, citing 8 U.S.C. § 1357(a)(2) [emphasis omitted].) Plaintiffs claim also that "the Fifth Amendment prohibits Border Patrol agents from subjecting people in their custody to "voluntary departure"—a form of summary expulsion—unless they knowingly and voluntarily waive their right to an immigration court hearing." (*Id.*) According to Plaintiffs, "Operation Return to Sender" disregarded these legal rights "by design." (*Id.*, ¶ 3.)

Plaintiffs contend that during the Operation, Border Patrol agents from the United States/Mexico Border traveled approximately 300 miles north to the Bakersfield region. (Doc. 1 at 2, ¶ 1.) "Border Patrol agents roved Highway 99, the central artery of the agricultural heart of the San Joaquin Valley, and other roads in predominantly Latino neighborhoods and agricultural areas." (*Id.* at 44, ¶ 235.) The "agents tailed cars, flashing their lights, or pulled cars over from the shoulder; targeted people of color, people who appeared to be farm workers, and people who appeared to be day

3

ER004

1    laborers for stops; and did so without any basis to believe that anyone in the car was violating an

2    immigration law." (*Id.*)

3          Plaintiffs allege that during the Operation, "Border Patrol agents went to businesses in

4    predominantly Latino neighborhoods and areas where farm workers and day laborers gather." (Doc. 1

5    at 44, ¶ 236.) The "agents roved parking lots and blocked parked cars from behind with their own

6    vehicles to stop and detain people inside the cars." (*Id.*) "Border Patrol agents targeted people of color

7    parked in their cars without any basis to believe that anyone in the car was violating an immigration

8    law." (*Id.*) According to Plaintiffs, if a person on foot "verbally exercised their right to remain silent,

9    walked away, or otherwise declined to consent to questioning, Border Patrol agents escalated the

10   interaction to a detentive stop or arrest, conducted warrantless searches without consent, and did so

11   without any basis to believe the person was violating an immigration law." (*Id.*, ¶ 237.) "[W]hen a

12   person in a vehicle declined to answer Border Patrol agents' questions or consent to the encounter, the

13   agents similarly escalated the encounter by blocking the car in, smashing the car's windows, slashing

14   the car's tires, and/or ordering or physically pulling people out of vehicles and handcuffing them."

15   (*Id.*, ¶ 238.)

16         Plaintiffs allege Border Patrol agents arrested individuals without "probable cause to believe

17   that the person posed a risk of escape." (Doc. 1 at 44, ¶ 239.) Border Patrol agents did not "assess[] …

18   a person's flight risk or attempt to obtain a warrant before making an arrest." (*Id.*) Rather, the "agents

19   indiscriminately arrested people…, including people with pending immigration applications, no

20   criminal history, established residences in the community, steady employment, family in the United

21   States, or other community ties mitigating any purported flight risk." (*Id.* at 44-45, ¶ 239.)

22   **II.     Experiences of Named Plaintiffs**

23         The named plaintiffs contend they were each targeted as part of "Operation Return to Sender."

24   Plaintiffs allege that "Border Patrol targeted them"— and similarly situated individuals— "based on

25   their appearance, including their apparent race or ethnicity." (Doc. 1 at 57, ¶ 289.) Plaintiffs allege

26   that the Border Patrol agents lacked reasonable suspicion for the executed stops (*id.* ¶¶ 69, 88, 101,

27   126, 163) and that the agents lacked probable cause to believe the plaintiffs were likely to escape

28   before warrants could be obtained. (*Id.*, ¶¶ 70, 89, 102, 127, 164.)

### A.      Oscar Morales Cisneros

Oscar Morales Cisneros is 51 years old and works in maintenance and construction.  (Doc. 15-9 at 2, Decl. ¶¶ 2-3.)  He lived in Los Angeles County for approximately 15 years before moving to Bakersfield in 2021.  (*Id.*, ¶ 2.)  He has no criminal history.  (*Id.*)

Morales Cisneros asserts "Border Patrol agents stopped him" on January 7, 2025.  (Doc. 1 at 9, ¶ 27.)  He states that "after leaving work to head home," he stopped at a water filling station outside a liquor store "located in a predominantly Latino-populated neighborhood."  (Doc. 15-9 at 2, ¶ 4; *see also* Doc. 1 at 16, ¶ 49.)  While in the cab of his truck—which was registered under his name, had current registration, and no stickers or decals—an unmarked Chevy Tahoe pulled in behind his truck and "blocked him in the parking spot."  (*Id.*)  He "put the truck back in park and lowered [the] driver's side window."  (*Id.*)  Two agents wearing green "Border Patrol" uniforms stood outside his truck.  (*Id.*)

According to Morales Cisneros, a Spanish-speaking agent, later identified as "Officer Sanchez," asked if he "had papers and was here legally."  (Doc 15-9 at 2, ¶ 5.)  Morales Cisneros "exercised [his] right to remain silent and did not answer [the] questions."  (*Id.*)  However, he provided his driver's license upon the agents' request, which the agents took to their vehicle.  (*Id.*)  Morales Cisneros states that he called his daughter to tell her that Border Patrol agents stopped him.  (*Id.*)  Officer Sanchez asked for the call to be put on speaker, identified himself to Morales Cisneros' daughter, and informed her that Morales Cisneros "was being detained by Border Patrol for being here illegally without documents."  (*Id.* at 2-3, ¶¶ 5-6; *see also* Doc. 1 at 16-17, ¶¶ 52-53.)  Officer Sanchez then ended the call and asked Morales Cisneros to step out of the truck.  (*Id.* at 3, ¶ 6.)  Officer Sanchez handcuffed him and placed him in the Border Patrol vehicle.  (*Id.*)  The agents did not produce a warrant or explain why they stopped him, other than while on the phone with his daughter.  (*Id.*)  The agents did not ask about his "ties to the community," including his family members, work history, or how long he "lived in the neighborhood."  (*Id.*)  Thus, Plaintiffs contend the Border Patrol agents did not "undertake any other evaluation of whether [Morales Cisneros] posed a risk of flight."  (Doc. 1 at 17, ¶ 54.)

The Border Patrol agents drove around Bakersfield, with him handcuffed, for about two hours.  (Doc. 15-9 at 3, ¶ 6.)  "At one point, the agents stopped at a gas station and pulled up behind a vehicle

5

1    to block it in, like they had done to [him]." (*Id.*, ¶ 7.) Morales Cisneros "overheard one of the agents

2    say in English, 'We're doing our job.'" (*Id.*) The people "were let go and the agents returned to the

3    Chevy Tahoe." (*Id.*)

4        Morales Cisneros asserts the agents took him "to a station where he saw other people were

5    being detained and a bus was waiting." (Doc. 1 at 18, ¶ 56.) He was fingerprinted, photographed, and

6    his personal belongings were placed in a bag. (Doc. 15-9 at 3, ¶ 8.) He asked an agent if he could call

7    his daughter, and the request was granted, after which agents also took his cell phone. (*Id.*) Morales

8    Cisneros estimates there were "about 40 people on the bus" when it "left the station late in the

9    evening." (*Id.*, ¶ 9.) His bus arrived at the El Centro Station, a detention center in Imperial County,

10   "in the early morning hours" of January 8, 2025." (*Id.*; *see also* Doc. 1 at 17, ¶ 58.)

11       After processing, Morales Cisneros saw an agent who presented two options: (1) "agree to

12   voluntary departure" or (2) "wait to see a judge." (Doc. 15-9 at 4, ¶ 11.) Through the next two days,

13   Morales Cisneros maintained he wished to see a judge and speak to a lawyer. (*Id.* at 5, ¶ 17; *see also*

14   *id.* at 4-5 ¶¶ 13-14.) On January 10, 2025, an agent instructed Morales Cisneros "to sign [his] name on

15   a small electronic pad to be released." (*Id.*, ¶ 18.) He alleges the agent also indicated the signature

16   was required "to see a judge and be put on a monitoring device." (*Id.*) Morales Cisneros signed as

17   directed. (*Id.*) Morales Cisneros "was fitted with a monitoring device on [his] wrist," and released by

18   Border Patrol that evening. (*Id.* at 5-6, ¶¶ 18-19.)

19       According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Morales

20   Cisneros did not have reasonable suspicion that he was unlawfully present in the United States."

21   (Doc. 1 at 19, ¶ 69.) Plaintiffs also contend that Border Patrol "did not have probable cause to believe

22   he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 70.)

23       **B.    Wilder Munguia Esquivel**

24       Wilder Munguia Esquivel is 38 years old. (Doc. 15-10 at 2, Decl. ¶ 2.) He has lived in

25   Bakersfield for about 12 years with his brother and his family, all of whom are U.S. citizens. (*Id.*) He

26   is a licensed handyman and works as a day laborer. (*Id.*, ¶ 3.) Munguia Esquivel had "a pending

27   family petition" at the time of the relevant events. (*Id.*, ¶ 8.) He has no criminal history. (*Id.*)

28       He reports that on January 7, 2025, around 12:00 p.m., he was standing with a group of other

ER007

day laborers outside Home Depot on Ming Avenue in Bakersfield when "[s]everal unmarked vehicles pulled up." (Doc. 15-10 at 2, ¶ 4.)  At least 10 men—most of whom had "masks covering their faces, with holes only for their eyes"—got out of the vehicles and "aggressively swarmed" around the day laborers.  (*Id.*, ¶¶ 4-5.)  The men "wore civilian clothing and [he] did not see any badges."  (*Id.*)  Munguia Esquivel "first thought … [the men] might be terrorists mugging or kidnapping [the day laborers]."  (*Id.*, ¶ 5.)  He also wondered if he would be murdered.  (*Id.*)  He reports the men "wore civilian clothing and [he] did not see any badges."  (*Id.*)

The unidentified agents demanded the day laborers' "papers."  (Doc. 15-10 at 2, ¶ 5.)  The agents "did not seem to be targeting specific individuals."  (*Id.* at 3, ¶ 10.)  An agent asked Munguia Esquivel, "directly in Spanish, 'Do you have papers? Do you have identification? Where are you from?'"  (*Id.* at 2, ¶ 5.)  The agent questioning him wore a mask covering his face, hat, and thick sunglasses.  (*Id.*)  Munguia Esquivel had no idea who the man was, and he did not respond to the questioning.  (*Id.*)  They "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from.  (*Id.*)  Munguia Esquivel "began to slowly walk away," but the agent followed and continued yelling.  (*Id.*)  Munguia Esquivel "stayed quiet."  (*Id.*)  In Spanish, the agent then ordered him to "turn around" to be handcuffed.  (*Id.*)  According to Munguia Esquivel, "[i]t was around this time that [he] realized the men were federal immigration agents."  (*Id.*)

He told the agent, "I have the right to remain silent," but the agent ignored him.  (Doc. 15-10 at 2, ¶ 6.)  The agent directed Munguia Esquivel to pull out his wallet but, before he could comply, the agent "forcefully yanked [his] left arm" and removed the wallet from Munguia Esquivel's back pocket.  (*Id.* at 2-3, ¶¶ 6-7.)  Munguia Esquivel believes that "[t]he agent who arrested [him] did not know" who he was.  (*Id.* at 3, ¶ 10.)  The agent did not ask about his "community ties, such as [his] family, work history, or how long" Munguia Esquivel had been living in Bakersfield.  (*Id.*, ¶ 8.)

Munguia Esquivel was warned to call a family member to pick up his truck within 20 minutes from Home Depot, or the truck would be towed.  (Doc. 15-10 at 3, ¶ 7.)  He reports that when his sister-in-law and niece came to get the truck, they told Border Patrol agents that he "was in the process of regularizing [his] immigration status."  (*Id.*, ¶ 9.)  However, "[t]he agents did not care and said they were taking [him] anyway."  (*Id.*)

ER008

1    Border Patrol agents first drove Munguia Esquivel to the back lot of Home Depot, where he

2  "saw several vehicles and over ten people who had been detained, including some who were elderly."

3  (Doc. 15-10 at 3, Decl. ¶ 10.)  He estimates that after about 15 to 20 minutes, the agents transported

4  him "to a makeshift facility on 7th Standard Road in Bakersfield." (*Id.*)  He saw "[o]ne bus … already

5  full of people who had been detained," and "[a] second bus arrived." (*Id.*, ¶ 11.)  While at the facility,

6  agents fingerprinted and photographed Munguia Esquivel and ordered him to place belongings in a

7  bag.  (*Id.*, ¶ 12.)  He remained at the 7th Standard Road facility until the evening, at which time Border

8  Patrol agents placed him on a bus to "a detention facility in Imperial County."  (*Id.* at 4, ¶ 13.)

9    Munguia Esquivel reports that on January 10, an agent informed him that he could leave that

10  day, but he would "have conditions."  (Doc. 15-10 at 5, ¶ 17.)  However, he is unsure of the conditions

11  imposed.  (*Id.*, ¶¶ 17-18.)  He was released and returned to Bakersfield.  (*See id.*, ¶ 19; Doc. 1 at 22, ¶

12  86.)  This experience "was deeply traumatizing."  (*Id.* at 6, ¶ 20.)  He states that he feels terrified when

13  he goes near the Home Depot.  (*Id.*)  He asks himself "if it is really necessary" when he leaves the

14  house because he "fear[s] that immigration agents will stop, arrest, and detain [him] again."  (*Id.*)  He

15  also fears Border Patrol "will try again to pressure [him] to agree to deportation."  (*Id.*)

16    According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Munguia

17  Esquivel did not have reasonable suspicion that he was unlawfully present in the United States."  (Doc.

18  1 at 23, ¶ 88.)  Plaintiffs also contend the agents "did not have probable cause to believe he was likely

19  to escape before a warrant could be obtained for his arrest."  (*Id.*, ¶ 89.)

20    **C.    Yolanda Aguilera Martinez**

21    Yolanda Aguilera Martinez is 56 years old and has "lived in Kern County for close to 45

22  years."  (Doc. 15-11 at 2, Decl. ¶¶ 2-3.)  She immigrated to the United States "when [she] was around

23  six years old and became a lawful permanent resident at around 20 years old."  (*Id.*, ¶ 2.)  She has no

24  criminal history.  (*Id.*)

25    On January 8, 2025, around 4:30 p.m., Aguilera Martinez was driving when she saw two

26  unmarked vehicles pulled over to the right side of the road, with lights flashing, and "three men

27  standing near the vehicles."  (Doc. 15-11 at 2, ¶ 4.)  The license plate on her vehicle was current and

28  she "was not speeding" when a "man raised his hand to flag [her] down" and signaled for her to pull

8

ER009

over.  (*Id.*)  She "thought [the men] might be police officers," and pulled over.  (*Id.*, ¶¶ 4-5.)

When "[t]he man who flagged [her] down walked over … "[h]e did not identify himself or seem to know who she was."  (Doc. 15-11 at 2, ¶ 6; *see also* Doc. 1 at 23, ¶ 92.)  The agent said, "I need to see your papers."  (*Id.*)  Aguilera Martinez handed him a "valid, current, California driver's license." (*Id.*)  The agent looked at the license and said, "This shit is fuckin' fake."  (*Id.*)  The agent threw her license to her lap and ordered her to get out of the vehicle.  (*Id.*, ¶¶ 6-7.)  She "still did not know who these men were," but compiled because she "felt [she] had no choice."  (*Id.* at 2-3, ¶ 7.)  After she opened the door, the agent grabbed her arm, "pushed [her] down to the ground," and placed her in handcuffs.  (*Id.* at 3, ¶ 7.)  The agent then took her to an SUV and sat her in the backseat.  (*Id.* ¶¶ 7-9.)

When the agent returned to the SUV, Aguilera Martinez asked if she could contact someone to send a photo of her green card, and the agent agreed.  (Doc. 15-11 at 3, ¶ 10.)  He removed the handcuffs and Aguilera Martinez called a friend who sent a photo of the green card via text message. (*Id.*)  The agent "quickly scanned" the photo before telling her: "Get the fuck out of here."  (*Id.*)  She "got in [her] car and drove away."  (*Id.*)

Aguilera Martinez was "very stressed and in shock," and "did not know why [she] had been stopped, nor who those men were."  (Doc. 15-11 at 4, ¶ 11.)  She later saw "multiple videos and photos on social media of Border Patrol agents arresting people, including at Home Depot and along Highway 99."  (*Id.*)  She believes the men who stopped her, and the vehicles they used, "looked just like some of the Border Patrol agents and vehicles [she] saw on social media."  (*Id.*)  Thus, Plaintiffs contend that "[u]pon information and belief, the men were Border Patrol agents."  (Doc. 1 at 23, ¶ 91.)

Aguilera Martinez had bruises on her wrists from the handcuffs and bruises on her legs from being "shoved … to the ground."  (Doc. 15-11 at 4, ¶ 14.)  She now feels "extremely worried and nervous this could happen to [her] again," and when driving near where the location of the encounter, she feels queasy and her heart beats faster.  (*Id.* at 3-4, ¶ 12.)  She is unable to avoid driving to run errands, go to appointments, and attend church," but she tries to avoid the "areas where other people were arrested by Border Patrol" during the operation.  (*Id.*)

### D.    Juan Vargas Mendez

Juan Vargas Mendez is 37 years old and was a Kern County resident for approximately 20

ER010

1    years.  (Doc. 15-6 at 2, ¶ 2.)  He lived in Bakersfield with his wife and children, who are U.S. citizens.

2    (*Id.*)  Vargas Mendez reports he "worked as a farmworker at the same ranch for more than 10 years"

3    and "sometimes worked as a gardener."  (*Id.*, ¶ 3.)  He has no criminal history.  (*Id.*, ¶ 2.)

4            On the evening of January 8, 2025, Vargas Mendez left work as a passenger in a van with five

5    co-workers.  (Doc. 15-6 at 2, ¶ 4.)  They traveled along Maricopa Highway, which he describes as "a

6    central highway for farmworkers in southwest Kern County, especially to get to many orange and

7    almond fields."  (*Id.*)  While traveling toward home, he heard sirens.  (*Id.*, ¶ 5.)  He looked at the

8    speedometer and saw the vehicle was going "under 40 miles an hour, well within the speed limit."

9    (*Id.*, ¶ 5.)  An unmarked SUV forced the van to stop by stopping in front of the van, while another

10   SUV stopped behind it.  (*Id.*)  Vargas Mendez believed the people who stopped them "might be the

11   police because their vehicles had sirens and flashing lights."  (*Id.* at 2-3, ¶ 6.)  However, he now

12   knows they were Border Patrol agents.  (*Id.* at 4, ¶ 12.)

13           He states an agent approached the driver's window and "demanded the driver and front

14   passenger show their license and proof of residency."  (Doc. 15-6 at 3, ¶ 7.)  He reports that as an

15   agent reviewed the identification produced by the driver and front passenger, "two other agents flung

16   open the door on the right side of the van" without consent.  (*Id.*, ¶ 8.)  The agents shouted in Spanish

17   that they all needed to show their identification and to "tell the truth."  (*Id.*)

18           Vargas Mendez was not carrying any identification.  (Doc. 15-6 at 3, ¶ 9.)  Border Patrol

19   agents "dragged [him] out of the van" and demanded that he hand over personal belongings before

20   handcuffing him.  (*Id.*)  One of his coworkers was also dragged out of the van.  (*Id.*)  The agents

21   mocked them, calling them "Mexican bitches."  (*Id.*, ¶ 10.)  The Border Patrol agents did not explain

22   why they were being arrested or show them any warrants.  (*Id.*)  The agents did not ask about his ties

23   to Kern County, such as his family, employment, or how long he had lived there.  (*Id.*)  Vargas

24   Mendez reports: "I told him I have lived in the area for 20 years; I have a wife and four kids who are

25   all citizens; I have no criminal record."  (*Id.*, ¶ 11.)  However, he reports the agent "responded he did

26   not care and that [Vargas Mendez] was 'going to Mexico.'"  (*Id.*)

27           The agents drove them to "a large white warehouse with barbed wire."  (Doc. 15-6 at 4, ¶ 12.)

28   Agents photographed and fingerprinted him, and then transported him to a detention facility, where

10

1  they arrived around 1:00 a.m. on January 9.  (*Id.*, ¶¶ 12-14.)  The agents did not tell them where they

2  were, but other detainees later informed him it was the El Centro Station.  (*Id.*, ¶¶ 14, 16.)

3         Vargas Mendez reports an agent at El Centro said he was arrested because he was "illegal" and

4  would be deported.  (Doc. 15-6 at 4, ¶ 14.)  Vargas Mendez responded that he had been in the area for

5  20 years, had a family, was hardworking, and had no criminal record.  (*Id.*, ¶ 15.)  This agent said that

6  "he didn't care" and that Vargas Mendez "would be deported anyway."  (*Id.*)  Later that day, Vargas

7  Mendez electronically signed a document, but he did not know what he signed.  (*Id.* at 5, ¶¶ 18-19.)

8  About two hours after Vargas Mendez signed the tablet, Border Patrol drove him "to the border across

9  from Mexicali, Mexico."  (*Id.*, ¶ 20.)  At the time the complaint was filed, Vargas Mendez was still in

10  Mexico.  (*Id.* at 2, ¶ 2; Doc. 1 at 28, ¶ 125.)

11         Plaintiffs contend the Border Patrol agents "did not have reasonable suspicion that [Vargas

12  Mendez] or anyone else in the vehicle was unlawfully present in the United States."  (Doc. 1 at 28, ¶

13  126.)  Plaintiffs allege "the Border Patrol agents who arrested [him] did not have probable cause to

14  believe he was likely to escape before a warrant could be obtained for his arrest."  (*Id.*, ¶ 127.)

15     **E.    Maria Guadalupe Hernandez Espinoza**

16         Maria Guadalupe Hernandez Espinoza is 46 years old and "lived in Bakersfield for about 10

17  years."  (Doc. 15-8 at 2, Decl. ¶ 2.)  She has "worked in the agricultural sector for close to 20 years."

18  (*Id.*, ¶ 3.)  She has no criminal history.  (*Id.*, ¶ 2.)

19         On January 7, 2025, Hernandez Espinoza was a passenger in a car driven by her partner.  (Doc.

20  15-8 at 2, ¶ 4.)  The car was registered under her partner's name, "ha[d] no stickers or decals, and the

21  license plate and registration were current."  (*Id.*)  At about 5:30 p.m., they were on Highway 58,

22  heading toward Bakersfield with a coworker after working in Tehachapi.  (*Id.*)  Her partner did not

23  violate any traffic laws as he drove on the highway.  (*Id.*)  As they prepared to exit the highway, they

24  "were approached from behind by an unmarked white Ford pickup truck," which flashed its lights at

25  the car and activated a siren.  (*Id.*)

26         After her partner pulled over, "[a] man in a white shirt approached and instructed him to turn

27  off the car."  (Doc. 15-8 at 2, ¶¶ 4-5.)  Turing off the car automatically unlocked the doors, after which

28  the man opened the door and instructed the driver to exit the car.  (*Id.*, ¶ 5.)  "The man did not identify

ER012

himself, show a warrant, or ask [them] any questions" before escorting her partner to the truck.  (*Id.*)
Six unmarked vehicles pulled up behind the car, each with 3-4 armed individuals.  (*Id.*)  Hernandez
Espinoza and her coworker complied with a request to exit the car, after which they were asked to
produce identification and were asked "if [they] had papers, and if [they] were here legally."  (*Id.* at 3,
¶ 7.)  Hernandez Espinoza "did not answer their questions," and she did not produce any identification.
(*Id.*)  At this point, Hernandez Espinoza believed the individuals who stopped the vehicle were law
enforcement, but she "had no inkling they were affiliated with immigration."  (*Id.*, ¶ 9.)

The agents informed the trio that they "were under arrest," and transported them "to a
makeshift processing area on 7th Standard Road in Bakersfield."  (Doc. 15-8 at 3, ¶ 10.)  Hernandez
Espinoza first realized they were in Border Patrol custody while at the processing center.  (*Id.*)  She
saw "dozens of men and just one other woman," aside from her and her coworker.  (*Id.*)  She estimates
they were at the processing center for about an hour before boarding a bus, which "left Bakersfield in
the late evening."  (*Id.* at 4, ¶ 11.)  "About three hours into the drive, the bus stopped to switch
drivers," and she heard one of the drivers laugh and say, "'Vamos por mas mojados,' which means
'Let's go for more wetbacks.'"  (*Id.*)

Hernandez Espinoza reports their bus arrived at the El Centro Station early the next morning.
(Doc. 15 at 4, ¶ 11.)  She had "an initial interview" with a Latina Border Patrol agent, who informed
her that she "could either agree to voluntary departure or see a judge."  (*Id.*, ¶ 14.)  Hernandez
Espinoza "impulsively" agreed to a voluntary departure, though she later changed her mind and
attempted to convey this to Border Patrol agents.  (*Id.*, ¶¶ 14-15.)  On January 9, 2025, Border Patrol
informed Hernandez Espinoza that "they were sending [her] to Mexico."  (*Id.* at 5, ¶ 20.)  Border
Patrol transported her via a truck to Mexicali, Mexico.  (*Id.*)

### III.    Community Members

Plaintiffs also identify several other members of the community, including UWF members,
who they assert were stopped and/or arrested by Border Patrol during "Operation Return to Sender."

#### A.    Jesus Ramirez

Jesus Ramirez is 64 years old and reports he recently moved to Bakersfield, California, where
he rents a home.  (Doc. 15-5 at 2, ¶ 2.)  He is "the only living parent" to his daughter and son, and he

is the primary caretaker for his minor son.  (*Id.*)  Ramirez reports that he worked "as a day laborer, fixing roofs and sprinklers and mowing grass" in Bakersfield and San Mateo, where he previously lived.  (*Id.*, ¶ 3.)

Ramirez reports that on January 7, 2025, he "was standing with some other day laborers in the Home Depot parking lot when [they] were surrounded by Border Patrol agents."  (Doc. 15-5 at 2, ¶ 4.)  The "agents arrived in multiple vehicles, some of which had sirens," around 11:00 a.m.  (*Id.*)  Ramirez "knew they were Border Patrol agents because they had badges on their vests."  (*Id.*)  He reports he "was not doing anything unlawful" when the agents surrounded them, and they "could not go anywhere because there were many agents all around…."  (*Id.*)

The "Border Patrol agents repeatedly demanded" the day laborers "show [their] 'papers'." (Doc. 15-5 at 2, ¶ 5.)  Ramirez reports he pulled out his wallet, after which "an agent snatched" it from him and removed his ID.  (*Id.*)  Ramirez states the agent returned his wallet but kept the identification. (*Id.*)  It was "clear… the agents did not know [who] he was."  (*Id.*, ¶ 7.)  The agents "did not show [him] any document or have a warrant."  (*Id.*)  They "did not ask… any questions about [his] family or ties to the community."  (*Id.*, ¶ 6.)

Ramirez reports he "was loaded into a vehicle in the parking lot of Home Depot and transported behind the store, where [he] was loaded into a bigger vehicle" that "was full of other people."  (Doc. 15-5 at 2, ¶ 8.)  A Border Patrol agent said he "was going to be taken 'home,'" and Ramirez believed that meant he was "going to be taken to [his] own home in Bakersfield."  (*Id.* at 2-3, ¶ 8.)  It was not until they arrived at a processing station that he realized "immigration was formally arresting [him]." (*Id.* at 3, ¶ 9.)  He was at the processing station "for about 7 or 8 hours with about 12 other individuals." (*Id*, ¶ 10.)  Ramirez was then loaded onto a bus "filled with people," which transported him to El Centro.  (*Id.*, ¶ 12.)

He reports that at El Centro, "[a]n agent ordered [him] to sign a document and said it was required for a judge to review [his] case."  (Doc. 15-5 at 3, ¶ 12.)  This document was in English, which he does not read, and it "was not translated or explained."  (*Id.*)  Ramirez states he "requested an opportunity to make a phone call to a family member but was denied."  (*Id.*)  Border Patrol moved him from El Centro to Imperial Regional Detention Facility on January 9, 2025.  (*Id.*, ¶ 13.)  As of the

1    declaration date of February 13, 2025, Ramirez remained detained and had "one court date with an

2    immigration judge." (*Id.*, ¶¶ 13-14.)

3        **B.    Luis Perez Cruz**

4        Luis Perez Cruz is 28 years old and has lived in Bakersfield with his mother for two years.

5    (Doc. 15-7 at 2, ¶ 2.)  His cousins also live in Bakersfield, and Perez Cruz ran into two of them on

6    January 7, 2025, when he stopped by Home Depot on his way to work.  (*Id.*, ¶ 3.)

7        Perez Cruz reports that he "was chatting" with his two cousins in the parking lot when "[t]wo

8    men wearing civilian clothes walked up," announced they were with Border Patrol, and directed them

9    "to show … IDs saying that [they] were in the United States legally or had permits to be here."  (Doc.

10   15-7 at 2, ¶ 3.)  The agents "also asked … if [they] had open immigration cases."  (*Id.*)  After Perez

11   Cruz "remained silent," he states an agent then grabbed him, and said "whether or not" he showed

12   identification, he would be arrested.  (*Id.*)  Perez Cruz "felt that [he] had no choice," and showed the

13   agent his identification.  (*Id.*)  The agents "did not appear to have any idea who [he] was before they

14   demanded [his] ID," and reports they did not present any warrant.  (*Id.*)  The agents did not ask any

15   questions about his "family, community ties, work, or life in Bakersfield."  (*Id.*)

16       The agents drove Perez Cruz, "along with other people they were arresting, in a truck and

17   drove … behind the Home Depot."  (Doc. 15-7 at 2, ¶ 5.)  Behind the store, he was placed into a van,

18   and then transported to a station at 7th Standard Road.  (*Id.*)  At the 7th Standard station, agents took

19   his fingerprints and noted the names of his wife and children.  (*Id.*)  He was then forced to travel in "a

20   large bus that looked like a Greyhound bus," to the El Centro holding center.  (*Id.*)

21       Perez Cruz reports that at El Centro, he "refused to sign anything until [he] saw a judge."

22   (Doc. 15-7 at 2, ¶ 6.)  "After nearly four days, the agents … fitted [him] with a wrist monitor," gave

23   him information about immigration court, and released him.  (*Id.*)  He returned to Bakersfield and now

24   has "an immigration case" pending.  (*Id.* at 2-3, ¶¶ 7-8.)  He is afraid Border Patrol "will pick [him]

25   again and treat [him] even worse" with the immigration case pending.  (*Id.* at 2, ¶ 7.)

26       **C.    Ernesto Campos Gutierrez**

27       Ernesto Campos Gutierrez is 44 years old, and he is a citizen of the United States.  (Doc. 15-4

28   at 2, ¶ 2.)  He owns a home in Bakersfield, where he lives with his partner and children.  (*Id.*)  He

ER015

1    owns a "gardening and landscaping business," for which he "haul[s] a mini trailer containing

2    gardening equipment" behind his truck. (*Id.*, ¶¶ 2-3.)

3         On January 8, 2025, Campos Gutierrez was driving, with a passenger, on the way to a gardening

4    job around 9:40 a.m. (Doc. 15-4 at 3, ¶ 3.) The truck he was driving was registered under his name,

5    "had current license plates and registration, and had no stickers or decals." (*Id.*) He "was driving

6    within the speed limits" and pulling the mini trailer. (*Id.*) Campos Gutierrez noticed "[a]n unmarked,

7    white Chevrolet Tahoe follow … [him] for a couple minutes," after which it flashed lights, signaling

8    for him to pull over. (*Id.*, ¶ 4.)

9         The Tahoe pulled over behind him, and "[a] black male agent … wearing a vest that said the

10   word[] 'POLICE' in large letters" approached the driver's side door. (Doc. 15-4, ¶ 4.) The agent "tried

11   to pull open driver's side door, but the door was locked." (*Id.*) Through the closed window, the agent

12   asked for their IDs, and "called to another person and said he 'had two bodies.'" (*Id.*) The agent "did

13   not identify himself," show a warrant, or explain why the truck was pulled over. (*Id.*) Campos

14   Gutierrez lowered his window and asked the agent why he was pulled over, while handing over his

15   REAL ID driver's license. (*Id.*, ¶ 5.) The agent glanced at the identification and directed Campos

16   Gutierrez "to hand him the keys to [the] truck." (*Id.*) Campos Gutierrez refused, because the agent had

17   not said "who he was" or why the truck was pulled over. (*Id.*) The agent responded that he needed the

18   keys because Campos Gutierrez "was going to drive away." (*Id.*) However, the truck was turned off

19   and he "had no intention of driving away and leaving [his] driver's license behind." (*Id.*) "The agent

20   pulled out a knife and proceeded to slash both tires on the driver's side of [the] truck." (*Id.*, ¶ 6.)

21        Another truck arrived and blocked him in by parking right in front of the truck. (Doc. 15-4 at

22   3, ¶ 7.) He states that "[a] white male agent" stood next to his truck, "while the first agent returned to

23   his vehicle to check [his] license." (*Id.*) Campos Gutierrez reports:

24            The Black agent came back to the passenger side of my vehicle and ordered
              my passenger to lower his window and open the door. My passenger
25            lowered the window a few inches. The agent pulled out a handheld tool
              and threatened to break the window. He ordered my passenger to open the
26            window and open the door. My passenger complied. The agent forcibly
              grabbed my passenger out of the truck and handcuffed him. The agent
27            never asked my passenger any questions about his community ties. I told
              the agent he should not have slashed my tires. The agent said, "I'm not
28            going to argue with you, bro. You did what you did, I did what I did."

15

ER016

(*Id.*, ¶ 8.)  "A Hispanic agent arrived," who informed Campos Gutierrez that he "was under arrest for 'alien smuggling.'"  (*Id.*, ¶ 9.)  Campos Gutierrez reports he "tried to explain to the agent that [his] passenger had an open immigration case," but the agent did not respond.  (*Id.*)  Campos Gutierrez "videorecorded part of these interactions using [his] cell phone," which the agents took away and handcuffed him.  (*Id.*, ¶ 9-10.)

Campos Gutierrez and his passenger were transported "in the back of a truck that said 'Immigration'" on it "to a facility about 20 minutes away."  (Doc. 15-4 at 11, ¶ 11.)  Campos Gutierrez asked why he was arrested when he is a United States citizen, and the agents "said it was because [he] had been transporting someone without documents."  (*Id.*)  While at the facility, he asked for a phone to call his partner, and "[t]he Hispanic agent said [he] did not have the right to make a call."  (*Id.*, ¶ 12.)  "At one point, the Black agent told the Hispanic agent that he had slashed [the] tires because [Campos Gutierrez] had become aggressive and 'flipped' him off."  (*Id.*)  Campos Gutierrez "told the Hispanic agent that was a lie, and if he wanted to find out the truth he should review the body camera footage."  (*Id.*)  He was detained for about four hours, after which the agents drove him home and dropped him off.  (*Id.* at 3-4, ¶ 13.)

He reports that his partner "spent about $350 on the two tow trucks that towed [his] tuck and mini trailer home."  (Doc. 15-4 at 4, ¶ 14.)  He also spent about $500 to replace the two tires on his truck.  (*Id.*)  Campos Gutierrez believes Border Patrol stopped him "solely because of the color of [his] skin and [his] appearance."  (*Id.*, ¶ 15.)

### D.     UFW Members

Elizabeth Strater, National Vice President of the UFW, also provided a declaration reporting that "UFW members were harmed by 'Operation Return to Sender' and fear harm from future Border Patrol Operations."  (Doc. 15-3 at 5, emphasis omitted.)  She reports that through her role, "and in the ordinary course of UFW's business," she received reports of several UFW members who were impacted in different ways by the Operation, including "Alicia," "Benjamin," "Carlos," "Fernando" and "Gabriela."[2]  (*See id.* at 8, 11-12, Strater Decl. ¶¶ 25, 37, 42.)  Strater reports the following

---

[2] Ms. Strater indicated she used fictitious names "[t]o protect the privacy and security" of the UFW members. (Doc. 15-3 at 9, n.1.)

ER017

1    information—regarding Alicia, Benjamin, Carlos, Fernando, and Gabriela— from these reports.  (*See*

2    *id.* at 8-13, ¶¶ 24-44.)

3         Alicia and her husband Benjamin "lived and worked in Kern County for the past 10 years

4    working in berry, table grape, almond, and citrus agriculture."  (Doc. 15-3 at 8, Strater Decl. ¶ 25.)  On

5    January 7, 2025, around 2:00 p.m., Alicia and Benjamin were in a car with Carlos, her brother-in-law,

6    after leaving "the citrus orchards where they all worked together."  (*Id.*, ¶¶ 25-26.)  They traveled on

7    Highway 99, and "were traveling within the speed limit and obeying traffic laws."  (*Id.*, ¶ 26.)  "Alicia,

8    Benjamin, and Carlos all noticed one marked and two unmarked vehicles were parked on the shoulder

9    with police-style lights on the grill."  (*Id.*, ¶ 27.)  When their car passed the three vehicles, "the

10   vehicles left the shoulder, pulled up behind them, and signaled with their lights for them to pull over."

11   (*Id.* at 8-9, ¶ 27.)  After the driver complied, "[s]everal men approached the car and asked Alicia,

12   Benjamin, and Carlos if they had 'papers.'"  (*Id.* at 9, ¶ 27.)  The Border Patrol "agents did not appear

13   to know who was in the car, and did not appear to have any reason for pulling the car over, other than

14   to ask for 'papers.'"  (*Id.*)  The agents arrested Alicia, Benjamin, and Carlos; they did not present

15   warrants for their arrest and "did not ask any further questions."  (*Id.*, ¶ 28.)  After handcuffing Alicia,

16   "agents asked [her] if she had family."  (*Id.*, ¶ 29.)  "When she told them she had children, an agent

17   'offered' to go pick up the children so they could all be taken to Mexico together."  (*Id.*)  The agents

18   "did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment

19   of flight risk."  (*Id.*)  The agents transported the trio to a mobile processing center, but later released

20   Alicia after confirming with a daycare that her children were there.  (*Id.*, ¶ 30.)  Border Patrol agents

21   transported Benjamin and Carlos to El Centro, and ultimately deported them to Mexico.  (*See id.* at 9-

22   10, ¶¶ 31-34.)  Alicia continues to work in Kern County and "feels enormous stress and anxiety that …

23   Border Patrol agents will seize her again."  (*Id.* at 10, ¶ 35.)

24         Fernando is also a "farm worker and UFW member," and he "has lived in Kern County for

25   around 20 years."  (Doc. 15-3 at 11, Strater Decl. ¶ 37.)  On January 9, 2025, Fernando was a

26   passenger in a car that was "traveling within the speed limit and obeying traffic laws" while on a

27   highway "between Bakersfield and Mettler, California."  (*Id.*, ¶¶ 38-39.)  While on the route—which

28   is "commonly taken by agricultural workers when traveling between orchard worksites and farm

worker communities"— "a truck turned on flashing lights and signaled for their car to pull over."  (*Id.*,
¶ 38.)  After the car stopped, Border Patrol agents approached the vehicle, "grabbed the handles of the
locked car doors and pounded on the closed windows."  (*Id.*, ¶ 39.)  The agents warned that if they did
not open the windows, the agents would smash the glass.  (*Id.*)  "The passengers, including Fernando,
sat still and did not respond.  In Spanish, the Border Patrol agents began counting down backwards
from 'five.'  When they reached 'one,' they smashed the windows using a black baton-like stick,
causing shards of broken glass to fall all over the car's occupants."  (*Id.*)  "The agents reached through
the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out
of the car and onto the side of the highway."  (*Id.*, ¶ 40.)  Border Patrol arrested Fernando, and "did
not present a warrant for arrest or ask Fernando anything about his family, community ties,
employment, or other factors related to his likelihood of flight risk."  (*Id.* at 11-12, ¶¶ 40-41.)

       Gabriela is a farmworker "who has lived in Fresno for 22 years."  (Doc. 15-3 at 12, Strater
Decl. ¶ 42.)  She "has legal authorization to work in the United States," and "has worked as a farm
worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields
in the San Joaquin Valley for over 20 years."  (*Id.*)  She "cannot avoid traveling through and visiting
the types of locations that Border Patrol targeted," such as "agricultural areas, to commute to and from
work," and "businesses frequented by other farm workers."  (*Id.*, ¶ 43.)  Gabriela feels anxiety and fear
that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on
its threat to bring 'Operation Return to Sender' to her community in Fresno."  (*Id.*, ¶ 42.)

## IV.     U.S. Customs and Border Protection Statistics

       The U.S. Customs and Border Protection publishes data and statistics for Border Patrol.  A
spreadsheet titled "USBP Operation Return to Sender Arrests in January 2025"—from the official
website of the agency—indicates that 78 individuals were arrested during the Operation, including 62
on January 7, 2025; 12 on January 8, 2025; and 4 on January 9, 2025.  (Doc. 38-1 at 5-6.)  The
spreadsheet contains a column labeled "criminal history."  (*Id.*)  For 77 of the 78 arrested individuals,
the entry in this column reads "Criminal and/or immigration history was not known prior to the
encounter."  (*Id.*)  For one person, the criminal history indicates: "he had a final order of removal since
03/05/2024."  (*Id.* at 5.)

ER019

## V.    Border Patrol's Media Statements and Social Media

Following the Operation, U.S. Customs and Border Protection issued a media statement regarding the results.  (Braun Decl. Exh. 17; *see also* Braun Decl. Exh. 18 [Doc. 15-2 at 72, 74].)  The full statement was as follows:

> Border Patrol Agents with the El Centro Sector Border Patrol conducted an operation in and around the Bakersfield area in Kern County. Our operation focused on interdicting those who have broken U.S. federal law, trafficking of dangerous substances, non-citizen criminals, and disrupting the transportation routes used by Transnational Criminal Organizations. The U.S. Border Patrol is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento, as the now closed Livermore Border Patrol Sector regularly conducted enforcement operations over this area up to the mid 2000s. "The El Centro Sector takes all border threats seriously," said Chief Patrol Agent Gregory Bovino. "Our area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line."
>
> During this three day operation we had over 60 agents on the ground, using both marked and unmarked vehicles. The results of our operation, named "Return to Sender" are as follows:
>
> 78 arrests (all subjects unlawfully present in the U.S.) The nationality/citizenship of those arrested were from Peru, Guatemala, El Salvador, Honduras, Ecuador, Mexico, and China.
>
> One subject arrested was a convicted sex offender convicted of raping an 8 year old girl.
>
> Another subject had an active warrant from the Visalia Sheriff's Department for a sex offense against a child.
>
> One subject had a warrant for being a felon in possession of a weapon out of Tulare County. He was turned over to the Kern County Sheriff's Department for extradition to Tulare County. A detainer was placed on this subject so we can take him back into custody on pending federal charges.
>
> Three separate Marijuana seizures: 33.01 lbs., 3.1 lbs., and 30.7 grams of personal use.
>
> Four separate methamphetamine seizures totaling 7.1 grams.
>
> Multiple DUI convictions among those arrested, including some that included hit and run and injury enhancements.
>
> Other criminal histories of those arrested included: failure to appear, tampering with a vehicle, petty theft, felony drug possession, vandalism, burglary, inflicting injury on spouse, and child abuse convictions amongst others.

(Doc. 15-2 at 72.)

ER020

The U.S. Border Patrol El Centro Sector ("the Sector") maintains a social media account on Facebook. (*See* Braun Decl., Exhs. 1-11 [Doc. 15-2 at 11-32].)  In January 2025, the Sector commented that "what crosses the border doesn't stay at the border, making every U.S. city a border town." (*Id.* at 28 [Exh. 9].)  Later in January, the Sector commented: "What happens on the border, doesn't stay on the border. Bakersfield is now a dyed in the wool a border town." (*Id.* at 24 [Exh. 7].)

The Sector also made Facebook posts and comments regarding "Operation Return to Sender." (*See* Doc. 15-2 at 11-32.)  On January 9, 2025, the Sector called the Operation "an overwhelming success from day one," and indicated the Sector "continue[s] to field dozens of Border Patrol Agents in Kern County and surrounding area…" (*Id.* at 32 [Exh. 11].)  In another comment on the same date, the Sector stated: "We are planning operations for other locals such as Fresno and especially Sacramento." (*Id.* at 30 [Exh. 10].)  On January 12, 2025, in response to a comment stating, "Here in Bakersfield, you guys forgot to raid some people," the Sector stated: "We plan on coming back!!" (*Id.* at 16 [Exh. 3].)  In a comment thread later in January 2025, the Sector stated: "Although serious criminals will be the first to be tracked down and removed, anyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." (*Id.* at 12 [Exh. 1].)  An individual then commented "Return to sender round 2," to which the Sector replied, "You bet!" (*Id.*)

In February 2025, the Sector made a Facebook post—with accompanying photos— indicating that an "illegal alien … [r]efused to open [his] window during an immigration inspection" and "[g]ot his window shattered for an extraction." (Doc. 15-2 at 20 [Exh. 5].)  The Sector indicated the immigrant was then arrested and deported. (*Id.*)  In a responsive comment, the Sector stated this was "[fuck around, find out] in full effect." (*Id.* at 22 [Exh. 6].)

## VI.     Procedural History

Plaintiffs initiated this action by filing a complaint on February 26, 2025.  (Doc. 1.)  They contend their experiences, and those of community members, were "not unique." (*Id.* at 43, ¶ 234.)  Plaintiffs "seek to represent three classes of individuals who have been or will be subjected to the three unlawful practices this lawsuit alleges: "detentive stops regardless of reasonable suspicion of unlawful presence, arrests regardless of probable cause of flight risk, and voluntary departure without a knowing and voluntary waiver of rights." (*Id.* at 61-62, ¶ 312.)  Specifically, Plaintiffs identify the

following claims for relief: (1) warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2); (2) warrantless arrests without probable cause of flight risk in violation 8 C.F.R. § 287.8(c)(2)(ii); (3) stops without reasonable suspicion in violation of the Fourth Amendment; and (4) "voluntary departure without a knowing and voluntary waiver of rights" in violation of the Fifth Amendment. (*Id.* at 65-69.) In the prayer for relief, Plaintiffs seek declaratory and injunctive relief, enjoining further violations of their rights under the applicable statutes and amendments. (*Id.* at 69-70.)

On March 7, 2025, Plaintiffs filed the pending motion for provisional class certification (Doc. 14) and a preliminary injunction (Doc. 15). On April 7, 2025, Defendants filed briefs in opposition to provisional class certification and a preliminary injunction. (Docs. 31, 32.) Immigration Reform Law Institute filed an amicus curiae brief in support of Defendants' opposition to the preliminary injunction. (Doc. 33-1.) Plaintiffs filed their reply briefs on April 17, 2025. (Docs. 38, 39.) Each side filed supplemental evidence on April 25, 2025.[3] (Docs. 42-43, 45.)

## VII.    Border Patrol's Muster

On April 4, 2025, Border Patrol's El Centro Sector issued a "Muster" that identifies "the underlying laws and policies applicable to all arrests effected by El Centro Sector Border Patrol Agents under 8 U.S.C. § 1357(a)(2) /INA § 287(a)(2) in the Eastern District of California." (Doc. 31 at 15; Doc. 31-1 at 2.) The Muster indicates it "is to be interpreted consistent with all implementing regulations and controlling Supreme Court and Ninth Circuit case law." (*Id.*)

Border Patrol agents are informed that "[w]hen conducting enforcement actions," they "shall at the time of arrest or as soon as it is practical and safe to do so, identify themselves as immigration officers in accordance with 8 C.F.R. § 287.8(c)(2)(iii)." (Doc. 31-1 at 3.) The Muster also includes provisions regarding warrantless arrests and vehicle stops. (*Id.* at 2-4.)

For warrantless arrests, the Muster indicates Border Patrol agents may conduct an arrest without a warrant under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), "if there is reason to believe that the

---

[3] At the hearing, the Court inquired whether there were any objections to the additional evidence. Neither party opposed the supplemental evidentiary submissions. Accordingly, the respective motions to file supplemental evidence (Docs. 42, 45) are **GRANTED**.

alien to be arrested is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained for the arrest." (Doc. 31-1 at 3 [modifications adopted].) The Muster indicates, "The 'reason to believe' standard requires USBP Agents to have probable cause that an individual is in the United States in violation of U.S. immigration laws and probable cause that the individual is likely to escape before a warrant can be obtained for the arrest." (*Id.*) In addition, the Muster provides that in evaluating "likelihood of escape," factors may include an agent's "ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from a USBP Agent, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond." (*Id.* at 2-3.) The Muster also indicates that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be *obtained*." (*Id.* at 3 [emphasis in original].)

Agents are informed that after making a warrantless arrest, they "should document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable." (Doc. 31-1 at 3.) The documentation should state:

> (1) that the alien was arrested without a warrant; (2) the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area; (3) whether the alien is an employee of the business, if arrested at a place of business, or whether the alien is a resident of the residence, if arrested at a residential location; (4) the alien's ties to the community, if known at the time of arrest, including family, home, or employment …; (5) the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained; and (6) a statement of how "at the time of arrest, the designated immigration officer did, as soon as it was practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and stated that the person is under arrest and the reason for the arrest."

(*Id.* [modifications adopted].) Agents are also instructed that "[i]nformation learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest." (*Id.*)

The provision regarding vehicle stops applies to "all warrantless arrests under 8 U.S.C. § 1357(a) (2) / INA § 287(a)(2), including warrantless arrests resulting from vehicle stops." (Doc. 31-1

22

at 4.)  The Muster indicates Border Patrol "agents may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains an alien(s) who may be illegally in the country."  (*Id.*)  In addition to the documentation required for a warrantless arrest, an "agent also must document the facts and circumstances surrounding the vehicle stop that resulted in a warrantless arrest in the narrative section of the alien's I-213."  (*Id.*)  The documentation by Border Patrol agents "should include the specific, articulable facts that formed the basis for the USBP Agent's reasonable suspicion that an alien in the vehicle stopped was present within the United States in violation of U.S. immigration law."  (*Id.*)

Sergio Guzman, the Acting Executive Officer for the El Centro Sector of U.S. Border Patrol, reports that he "was involved with the various phases (planning, execution, and after action) of Operation Return to Sender."  (Doc. 31-2 at 2, ¶¶ 1, 3.)  Guzman reports the Sector "is committed to conducting enforcement operations within the Eastern District of California in compliance with the Fourth Amendment, 8 U.S.C. § 1357, and Supreme Court and Ninth Circuit case law."  (*Id.* at 3, ¶ 8.) He states that the Sector was issued "[i]n furtherance of this commitment."  (*Id.*, ¶ 9.)  Guzman indicates that the El Centro Sector "will endeavor to conduct refresher training sessions to ensure compliance with the muster within 60 Days for all ELC Border Patrol Agents (BPAs), supervisors, and Command Staff."  (*Id.*)  Guzman indicates the training topics will include:

> a.  Agents' authority to effect warrantless arrests within the Eastern District of California pursuant to 8 U.S.C. § 1357 including factors relevant to determining "reason to believe" an alien is in the United States in violation of law or regulation and the alien's likelihood of escape before a warrant can be obtained.
>
> b.  Agents' authority to effect vehicle stops within the Eastern District of California upon establishment of reasonable suspicion of a violation of law or regulation in compliance with the Fourth Amendment, Supreme Court, and Ninth Circuit case law.
>
> c.  Agents' authority to effect consensual encounters within the Eastern District of California in compliance with the Fourth Amendment, Supreme Court, and Ninth Circuit case law.
>
> d.  Report writing requirements including documentation of the facts and circumstances pertaining to warrantless arrests in the narrative section of an alien arrestee's Record of Deportable/Inadmissible Alien ("Form I-213").

ER024

1        e.   Report writing requirements including documentation of the facts
2    and circumstances pertaining to vehicle stops resulting in warrantless
     arrests in the narrative section of the alien arrestee's Form I-213.

3    (*Id.* at 4, ¶ 11.)

4    **JURISDICTION**

5        The federal courts "are courts of limited jurisdiction." *Royal Canin U.S.A., Inc. v. Wullschleger*,

6    604 U.S. 22 (2025) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U. S. 375, 377

7    (1994)).  District courts are limited not only by the Constitution, but as well as by statute.  *Id.*  As the

8    Supreme Court explained, "Congress determines, through its grants of jurisdiction, which suits

9    [district] courts can resolve."  *Id.*

10       As an initial matter, Defendants assert the district court lacks jurisdiction over the claims in

11   issue for the pending motions for provisional class certification and preliminary injunction.  (Doc. 31 at

12   11-15.)  Specifically, Defendants argue, "the Court lacks jurisdiction to review Plaintiffs' claims under

13   8 U.S.C. §§ 1252(a)(5) and (b)(9)."[4]  (*Id.* at 11 [emphasis omitted].)  Defendants also contend "this

14   Court lacks jurisdiction to issue an injunction to anyone other than the named plaintiffs" pursuant to 8

15   U.S.C. § 1252(f)(1).  (*Id.* at 14 [emphasis omitted].)  Because jurisdiction is "a threshold matter," the

16   Court first must determine whether it has jurisdiction over the claims in issue for the two pending

17   motions.  *See Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 94-95 (1998) ("The

18   requirement that jurisdiction be established as a threshold matter springs from the nature and limits of

19   the judicial power of the United States") (cleaned up); *see also Garland v. Gonzalez*, 596 U.S. 543, 548

20   (2022) (the "threshold question" was "whether the District Courts had jurisdiction to entertain

21   respondents' requests for class-wide injunctive relief").

22   **I.      Jurisdiction under Sections 1252(a)(5) and 1252(b)(9)**

23       The Immigration and Nationality Act provides limitations to the jurisdiction of the federal

24   courts, including review of removal proceedings and orders of removal.  Removal proceedings occur

25   before an immigration judge, and "are confined to determining whether a particular alien should be

26   deported."  *See Pereida v. Wilkinson*, 592 U.S. 224, 227 (2021); *Aguilar v. U.S. Immigration &*

27   _____

28   [4] The Immigration Reform Law Institute also contends in its amicus brief that the "Court lacks jurisdiction over
     Plaintiffs (sic) claims" pursuant to 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9). (Doc. 33-1 at 3.)

1   *Customs Enforcement Div. of the Dep't of Homeland Sec.*, 510 F.3d 1, 11 (1st Cir. 2007); *see also* 8

2   U.S.C. § 1229a(c)(1)(A) (an "immigration judge shall decide whether an alien is removable from the

3   United States").  Removal proceedings commence when the government files a charge, a "Notice to

4   Appear" in immigration court is served upon the alien, or the alien is served with a "Notice of Intent."

5   *See Pereida*, 592 U.S. at 227 ("Removal proceedings begin when the government files a charge against

6   an individual, and they occur before a hearing officer at the Department of Justice, someone the agency

7   refers to as an immigration judge"); *Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021) (a notice to

8   appear in the immigration court may be used to initiate removal proceedings); *see also* 8 C.F.R. §

9   238.1(b)(1)-(2) (expedited removal proceedings "commence" when an Issuing Service Officer

10  determines that sufficient evidence supports removal and serves the alien with a "Notice of Intent to

11  Issue a Final Administrative Deportation Order").

12      The INA sets forth jurisdictional limitations in Section 1252, entitled "Judicial review of orders

13  of removal."  *See* 8 U.S.C. § 1252.  Pursuant to Section 1252(a)(5), "a petition for review filed with an

14  appropriate court of appeals in accordance with this section shall be the sole and exclusive means for

15  judicial review of an order of removal entered or issued under any provision of [the] Act…"  8 U.S.C.

16  § 1252(a)(5).  In addition, Section 1252(b)(9) indicates: "Judicial review of all questions of law and

17  fact, including interpretation and application of constitutional and statutory provisions, arising from

18  any action taken or proceeding brought to remove an alien from the United States under this

19  subchapter shall be available only in judicial review of a final [removal] order under this section." 8

20  U.S.C. § 1252(b)(9).  Defendants assert that under these provisions, "the Court lacks jurisdiction to

21  review Plaintiffs' claims," and as a result the Suspicionless Stop Class and Warrantless Arrest Class

22  are unable "to establish a likelihood of success on the merits," as required for a preliminary injunction.

23  (Doc. 31 at 11 [emphasis omitted].)

24      Defendants contend that "if a claim challenges a 'decision to detain an alien in the first place or

25  seek removal,' a district court lacks jurisdiction to consider that claim and it instead must be reviewed

26  through the administrative process."  (Doc. 31 at 11, quoting *Jennings v. Rodriguez*, 138 S. Ct. 830,

27  841 (2018) [modification adopted].)  Defendants argue, "The stops and detentions that Plaintiffs

28  challenge were actions taken to remove them from the United States, that is, to detain them in the first

ER026

place and seek their removal." (*Id.* at 12 [citation omitted, modification adopted].)  According to

Defendants, "Plaintiffs challenge questions of law and fact behind these actions, specifically, whether

USBP had reasonable suspicion for the stops and probable cause for the arrests." (*Id.*)  Defendants

argue, "Because Plaintiffs challenge questions of law and fact arising from these actions taken to

remove them, 8 U.S.C. § 1252(a)(5) & (b)(9) require that they bring these claims in petitions for

review in the court of appeals." (*Id.*)

Defendants assert also the district courts are barred "from reviewing legal questions 'routinely

raised in petitions for review.'" (Doc. 31 at 12, quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1033 (9th

Cir. 2016).)  Defendants contend that "petitions for review commonly consider challenges related to

whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an

alien." (*Id.*, citing *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *J.E.F.M.*, 737 F.3d at 1033;

*Leal-Burboa v. Garland*, 2022 WL 17547799 (9th Cir. 2022).)  Defendants argue, "If the legal remedy

for unlawful stops and arrests is provided in removal proceedings, ipso facto these challenges are part

of the decision to remove an alien." (*Id.*)

Plaintiffs argue that the "Court should reject Defendants' jurisdictional arguments." (Doc. 38

at 11.)  Plaintiffs assert their "claims have nothing to do with class members' removal proceedings or

what immigration relief they may be eligible for." (Doc. 37 at 12.)  As such, Plaintiffs indicate they

are not challenging "actions taken to remove them, but instead "challenge Defendants' unlawful stop

and arrest practices … [and] *Jennings* did not hold that the INA bars review of such practices." (*Id.* at

11-12 [emphasis omitted].)  Plaintiffs also contend the Supreme Court later "resolved any …

ambiguity about § 1252(b)(9)'s ambit, holding that it 'certainly' 'does not present a jurisdictional bar'

to claims that 'are not challenging any removal proceedings.'" (*Id.*, quoting *Dep't of Homeland Sec. v.

Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).)  Plaintiffs note the decision in *J.E.F.M.* predated

*Jennings* and *Regents* and argue Defendants' reliance upon *J.E.F.M.* is misplaced for this reason. (*Id.*)

Further, Plaintiffs contend: "Many courts have held that claims like those asserted by Plaintiffs, which

challenge Defendants' conduct before removal proceedings begin, are collateral to the removal process

and reviewable in district court." (*Id.* at 13 [emphasis omitted], citing *Nava v. Dep't of Homeland

Sec.*, 435 F. Supp. 3d 892 (N.D. Ill. 2020); *Roy v. Cnty. of L.A.*, 2018 WL 914773, at *18 (C.D. Cal.

ER027

1    Feb. 7, 2018); *Medina v. U.S. Dep't of Homeland Sec.*, 2017 WL 2954719, at *11 (W.D. Wash. Mar.

2    14, 2017).)

3        The legal issues implicated by the pending request for a preliminary injunction are narrow.

4    Plaintiffs do not petition the Court for review of— or make any argument related to—any removal

5    order entered under Title 8 on behalf of the proposed Suspicionless Stop and Warrantless Arrest

6    Classes.  Thus, Defendants' arguments related to the jurisdictional bar of Section 1252(a)(5) are

7    unavailing.  In addition, the authorities cited by Defendants do not indicate the Court lacks jurisdiction

8    over the claims of the proposed Suspicionless Stop Class and Warrantless Arrest Class pursuant to

9    Section 1252(b)(9).

10        Defendants rely upon *Sanchez v. Sessions* to argue that this Court lacks jurisdiction over the

11   claims of the proposed classes because these claims are commonly raised in final removal

12   proceedings.  In *Sanchez*, the appellant argued the Coast Guard violated his rights under the Fourth

13   Amendment and under 8 C.F.R. § 287.8(b)(2).  *Id.*, 904 F.3d at 648-649.  He sought review of the

14   immigration judge's denial of an evidentiary motion made during his removal proceedings, which

15   ultimately resulted in a removal order.  *Id.*  The Ninth Circuit reviewed the final order of removal

16   pursuant to 8 U.S.C. § 1252.  *See id.* at 646-649.  The Ninth Circuit did not hold that an immigration

17   court was the *exclusive* forum for claims such as those raised by Sanchez, and the Court did not

18   address Section 1252(b)(9) or the jurisdiction of a district court over similar claims in a civil action.

19   *Sanchez* in no way suggests that a plaintiff is precluded from raising constitutional claims in the

20   district court when the claim does not arise from removal proceedings.  The Court declines to expand

21   the reach of the decision in *Sanchez* as Defendants would have it do.

22        Likewise, *J.E.F.M.* does not support Defendants' contention that the district court lacks

23   jurisdiction over the claims of the two proposed classes.  In *J.E.F.M.*, the Ninth Circuit addressed

24   whether "a district court [has] jurisdiction over a claim that indigent minor immigrants without counsel

25   have a right to government-appointed counsel in removal proceedings."  *Id.*, 837 F.3d at 1029.  The

26   Court described Section 1252(b)(9) as "vice-like in grip" over issues "arising from any removal related

27   activity."  *Id.* at 1032.  The Court observed that Section 1252(b)(9) "has built in limits," which

28   "exclude[] … any claim that does not arise from removal proceedings."  *Id.* Defendants contend that

ER028

1   jurisdiction is lacking under §1252(b)(9) whenever the claims at issue are "routinely raised in petitions

2   for review." (Doc. 31 at 13.)  *J.E.F.M.*, however, makes clear that "claims that are independent of or

3   collateral to the removal process do not fall within the scope of §1252(b)(9)." *Id.,* 837 F.3d at 1032.

4   (citing *Torres-Tristan v. Holder*, 656 F.3d 653, 658 (7th Cir. 2011); *Aguilar* 510 F.3d at 11).  In doing

5   so, the Ninth Circuit "distinguished between claims that 'arise from' removal proceedings under §

6   1252(b)(9)—which must be channeled through the PFR process—and claims that are collateral to, or

7   independent of, the removal process." *Id.* at 1032.  The Court explained that because "immigration

8   judges have an obligation to ask whether a petitioner wants counsel," the right to counsel claims were

9   "bound up in and an inextricable part of the administrative process." *Id.* at 1033.  Unlike the claims

10  considered in *J.E.F.M.*, the claims of the proposed classes here do not "arise from" removal

11  proceedings, but instead relate to issues which ripened before removal proceedings began. For example,

12  the proposed classes include the claims of members who are citizens and legal residents of the United

13  States, against whom there are no removal proceedings.  To the extent the classes include individuals

14  against whom proceedings have since commenced[5], the claims of the Suspicionless Class and

15  Warrantless Arrest Class are collateral to such removal proceedings and excluded from the

16  jurisdictional limits imposed by Section 1252(b)(9).

17      After *J.E.F.M.*, the Supreme Court considered the limits of Section 1252(b)(9) as a "potential

18  obstacle[]" to jurisdiction. *Jennings*, 583 U.S. at 292.  In *Jennings,* the Court addressed the prolonged

19  detention of individuals in custody while their removal proceedings were pending. *Id.*  The Court

20  observed that an "expansive interpretation" of Section 1252(b)(9) to actions not directly arising from

21  removal proceedings "would lead to staggering results." *Id.* at 293.  The Court explained:

22          Suppose, for example, that a detained alien wishes to assert a claim under
            *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 91 S. Ct.
23          1999, 29 L. Ed. 2d 619 (1971), based on allegedly inhumane conditions of
            confinement. *See, e.g., Ziglar v. Abbasi*, 582 U. S. 120, 146-149, 137 S. Ct.
24          1843, 198 L. Ed. 2d 290 (2017) (slip op., at 23-29). Or suppose that a
            detained alien brings a state-law claim for assault against a guard or fellow
25          detainee. Or suppose that an alien is injured when a truck hits the bus
            transporting aliens to a detention facility, and the alien sues the driver or

26

27  _____
    [5] The U.S. Customs and Border Protection data indicates that 77 of the 78 individuals arrested did not have any
28  known immigration history before their encounters with Border Patrol described in the complaint.  (*See* Doc. 38-
    1 at 5-6.) Thus, nearly all—if not all—had no removal proceedings started before Operation Return to Sender.

ER029

1
2
3

> owner of the truck. The "questions of law and fact" in all those cases could
> be said to "aris[e] from" actions taken to remove the aliens in the sense that
> the aliens' injuries would never have occurred if they had not been placed
> in detention. But cramming judicial review of those questions into the
> review of final removal orders would be absurd.

4    *Id.* The Court found that an interpretation of the phrase "arising from" in this manner "would also

5    make claims of prolonged detention effectively unreviewable." *Id.* Having reviewed the statutory

6    language[6], the Court then observed that the respondents were: (1) "not asking for review of an order of

7    removal," (2) not challenging their detention during the course of immigration proceedings, and (3)

8    "not even challenging any part of the process by which their removability will be determined."

9    *Jennings*, 583 U.S. at 294. The Supreme Court concluded, "Under these circumstances, §1252(b)(9)

10   does not present a jurisdictional bar." *Id.* Similarly, here, the Suspicionless Stop Class and

11   Warrantless Arrest Class do not seek review of final orders of removal, do not challenge detention by

12   the Attorney General pending removal proceedings, or challenge a part of the process by which

13   removability of putative class members may be determined.[7] Thus, as the Supreme Court found in

14   *Jennings*, Section 1252(b)(9) is not a jurisdictional bar to these claims.

15       Defendants do not address—or even acknowledge—the Supreme Court's decision in *Dep't of*

16   *Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 140 S. Ct 1891 (2020), in which the

17   Supreme Court revisited the scope of Section 1252(b)(9) and reiterated that it contained narrow,

18   "targeted language." *Id.*, 591 U.S. at 19. In *Regents*, the parties disputed the decision to rescind

19   Deferred Action for Childhood Arrivals (DACA) and the procedures taken to do so. *See id.* at 12-16.

20   Individual DACA recipients, states, and several organizations challenged the rescission, arguing that

21   the action "was arbitrary and capricious in violation of the [Administrative Procedure Act] and that it

22   infringed on the equal protection guarantee of the Fifth Amendment's Due Process Clause." *Id.* at 13.

23

---

24   [6] The Court also observed that "[a] neighboring provision of the Immigration and Nationality Act refers to 'any
     cause or claim by or on behalf of any alien *arising from* the decision or action by the Attorney General to

25   commence proceedings, adjudicate cases, or execute or execute removal orders against any alien under this
     chapter.'" *Id.* (quoting 8 U.S.C. §1252(g) [emphasis adopted].) The Court declined to "sweep any claim that can

26   technically be said to 'arise from' the three listed actions," but instead "read the language to refer to just those
     three specific actions themselves." *Id.* (citing *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482-
     483 (1998)).

27   [7] Indeed, the putative classes include individuals—including United States citizens, such as Campos Gutierrez,

28   and immigrants with green cards, such as Aguilera Martinez—against whom there are not any removal
     proceedings.

ER030

Three district courts "rejected the Government's threshold argument[] … that the INA deprived the court of jurisdiction." *Id.* at 13-14.  Before the Supreme Court, the Government again sought to invoke Section 1252(b)(9), arguing it was "an independent bar[]" to review by the Court.  *Id.* at 19. The Supreme Court rejected the Government's argument, stating: "As we have said before, §1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Id.* (quoting *Jennings* 583 U.S. at 294) (modifications adopted).  The Court held that Section 1252(b)(9) "is certainly not a bar where … the parties are not challenging any removal proceedings."  *Id.*

After *Jennings* and *Regents*, the Ninth Circuit considered whether the district court had jurisdiction over the claims of a class that sought injunctive relief for Fourth Amendment violations in *Gonzalez v. U.S. Immigration & Customs Enf't*, 975 F.3d 788, 810-811 (9th Cir. 2020).  The Government argued that "the district court lacked subject matter jurisdiction pursuant to 8 U.S.C. § 1252(b)(9)."  *Id.* at 810.  The Court rejected this assertion.  *Id.* at 810-811.  The Ninth Circuit acknowledged: "The Supreme Court has since [*J.E.F.M.*] instructed that § 1252(b)(9) is a 'targeted' and 'narrow' provision that "is certainly not a bar where … the parties are not challenging any removal proceedings." *Id.* at 811 (quoting *Regents*, 140 S. Ct. at 1907).  The Ninth Circuit followed *Regents* and found Section 1252(b)(9) was "not a bar to jurisdiction over the claims of any class members— noncitizen or U.S. citizens—because none asks for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." *Id.* (cleaned up).  The Ninth Circuit also determined "Section 1252(b)(9) is also not a bar to jurisdiction over noncitizen class members' claims because claims challenging the legality of detention pursuant to an immigration detainer are independent of the removal process."  *Id.* (citing *Aguilar*, 510 F.3d at 11).  Thus, the Ninth Circuit adopted the test identified by the Supreme Court and found Section 1252(b)(9) does not bar district court jurisdiction over class claims where the claims do not challenge removal proceedings.  *Id.*

The decision of the Ninth Circuit in *Gonzalez* is consistent with those of other circuit courts, which have also declined to find Section 1252(b)(9) barred district court jurisdiction over claims that were tangential to removal proceedings following *Regents*.  *See, e.g., Mukantagara v. United States*

30

1  *Dep't of Homeland Sec.*, 67 F.4th 1113, 1116 (10th Cir. 2023) (rejecting an "expansive interpretation"

2  of Section 1252(b)(9) and finding the district court erred in finding it lacked jurisdiction where the

3  "[p]laintiffs do not challenge their removal proceedings"); *Canal A Media Holding, LLC v. United*

4  *States Citizenship & Immigration Servs.*, 964 F.3d 1250, 1257 (11th Cir. 2020) (noting the "narrow

5  scope" of Section 1252(b)(9) under *Regents*, and finding the provision "is not intended to cut off claims

6  that have a tangential relationship with pending removal proceedings").

7        As Plaintiffs argue, the issues before the Court are like those addressed in *Nava v. Dep't of*

8  *Homeland Sec.*, 435 F. Supp. 3d 880 (N.D. Ill. 2020).  In *Nava*, the claims of the plaintiffs—including

9  individuals and two organizations— arose from "Operation Keep Safe," which was "a large-scale ICE

10  enforcement action that occurred in the Chicago area during a week-long period in May 2018." *Id.* at

11  885.  ICE reported the operation resulted in 156 arrests, including 106 people "for whom ICE lacked

12  an arrest warrant." *Id.* at 885 (modification adopted).  The plaintiffs alleged that "ICE arrested and

13  detained each [of them] 'without a warrant or an individualized determination that he is a flight risk,'

14  in violation of 8 U.S.C. § 1357(a)(2)." *Id.*  The plaintiffs stated a claim under the Fourth Amendment,

15  which was "based on ICE's traffic stops of four Individual Plaintiffs, which ultimately led to their

16  arrests and detention." *Id.* at 886.  The court observed:

17
18              According to [Plaintiffs], ICE officers stopped the Individual Plaintiffs
                without reasonable suspicion that they, or any other individuals in the
19              vehicles, had violated an immigration law. [Citation.] Plaintiffs allege,
                further, that the ICE officers stopped the Individual Plaintiffs' vehicles
                merely because the drivers and passengers therein appeared to be
20              Hispanic. [Citation.] And Plaintiffs allege that ICE's actions reflect a
                policy and practice of violating the Fourth Amendment while conducting
21              traffic stops. [Citation.]
                …
22              Plaintiffs seek declaratory relief, including an order stating that the
                challenged conduct violates the INA and the Fourth Amendment;
23              injunctive relief, including orders prohibiting Defendants from engaging
                in the challenged conduct and requiring them to adopt policies that will
24              ensure they follow the relevant laws; and attorneys' fees and costs.

25  *Id.* at 886, 887-88 (citations omitted).  The defendants moved to dismiss, arguing that the district court

26  lacked jurisdiction.  The court determined that "an illegal stop conducted before the government has

27  any legitimate reason to believe that the subject is removable cannot be an 'action taken to remove an

28  alien under' the INA." *Id.* at 890-91 (cleaned up).  The court also found: "The prescribed particularized

1    determination of a detainee's flight risk is not substantively related to the question whether a non-

2    citizen can lawfully be removed from the United States. Rather, Plaintiffs' INA-based claim raises

3    questions of law and fact that are quite remote from the issue of the Individual Plaintiffs'

4    removability." *Id.* at 891-92. Finally, the court noted the ICE practices "cause at least some U.S.

5    citizens (or lawful permanent residents) to be stopped and/or detained … and the government would

6    not commence removal proceedings against them." *Id.* at 894. Thus, the court rejected the defendants'

7    arguments and concluded Sections 1252(a)(5) and 1252(b)(9) did not deprive the district court of

8    jurisdiction. *Id.* at 895, 904.

9        In *Bogomazov v. United States Dep't of Homeland Sec.*, the district court found it had

10   jurisdiction over claims related to alleged unlawful conduct prior to the commencement of removal

11   proceedings. *Id.*, 2022 WL 769801 (S.D. Fl. Feb. 27, 2022). Vitaly Bogomazov filed the action "to

12   challenge his unlawful seizure and related treatment by ICE and DHS agents." *Id.*, 2022 WL 769801 at

13   *4 (modifications adopted). Bogomazov was lawfully admitted to the United States on a visitor's visa

14   and filed an asylum application. *Id.* at *1. He later appeared at a U.S. Citizenship and Immigration

15   Services office with his wife and daughter for "adjustment of status interviews." *Id.* at *2. After the

16   interview, ICE officers "entered the interview room and arrested [Bogomazov] without a warrant." *Id.*

17   Bogomazov alleged his removal proceedings began after the arrest. *Id.* He was released after his first

18   appearance before an immigration judge. *Id.* However, Bogomazov was arrested a second time on his

19   way to another interview with the USCIS. *Id.* at *3. Bogomazov sought to hold ICE and DHS liable

20   for violations of his rights, including unconstitutional seizure under the Fourth Amendment. *Id.* at *4.

21   The defendants argued the court lacked jurisdiction under 8 U.S.C. §§ 1252(g) and 1252(b)(9). *Id.* at

22   *5. The district court rejected these contentions to the extent Bogomazov based his claims on the *first*

23   arrest. *Id.* at *9. The court observed: "the alleged wrongful conduct here stemming from the first arrest

24   occurred *before* [Bogomazov] was served the Notice to Appear and, therefore, *before* removal

25   proceedings were initiated." *Id.* at *10 (emphasis in original). The court also noted that Section

26   1252(b)(9) "should be narrowly construed," and found the provision was inapplicable to the "claims

27   stemming from the first arrest because [Bogomazov] does not seek review of an order of removal, the

28   decision to seek removal or the process by which removability is determined." *Id.* at *11 (citing

32

*Regents*, 140 S. Ct. at 1907).  Consequently, the court found Sections 1252(g) and 1252(b)(9) did not

bar the claims concerning the first arrest, which occurred prior to the removal proceedings, although

claims concerning the second arrest—after removal proceedings commenced— were barred.  *Id.*, 2022

WL 769801, at **8-11, *adopted in full*, 2022 WL 767104 (S.D. Fl. Mar. 14, 2022).

As in *Nava* and *Bogomazov*, Plaintiffs seek to hold the defendants liable for violations of their

Fourth Amendment rights and failure to comply with obligations under 8 U.S.C. § 1357(a)(2).  The

claims of the Suspicionless Stop Class and Warrantless Arrest Class relate to conduct *before* any

removal proceedings were commenced against putative class members as a result of "Operation

Return to Sender."[8]  The claims of the two proposed classes—who assert that Border Patrol did not

have reasonable suspicion to perform investigative stops and did not perform required flight risk

evaluations during the Operation— are "not substantively related to the question of whether [putative

class members] can lawfully be removed from the United States."  *See Nava*, 435 F. Supp. 3d at 891-

892.  Moreover, the putative classes include individuals against whom there can be no removal

proceedings, including U.S. citizens and legal residents who have been or will be subjected to

unlawful practices.  Ultimately, the two proposed classes "are not asking for review of an order of

removal, the decision to seek removal, or the process by which removability will be determined."  *See

Regents*, 591 U.S. at 19 (modifications adopted); *see also Jennings*, 583 U.S. at 294.  Consequently,

Section 1252(a)(5) and Section 1252(b)(9) do not bar district court jurisdiction over Plaintiffs' claims

on behalf of the Suspicionless Stop and Warrantless Arrest Classes.  *Regents*, 591 U.S. at 19 (holding

Section 1252(b)(9) "is certainly not a bar where, as here, the parties are not challenging any removal

proceedings"); *see also Nava*, 435 F. Supp. 3d at 890-895; *Bogomazov*, 2022 WL 769801, at *11.

## II.    Limitations to Injunctive Relief under Section 1252(f)(1)

The Court has limits upon its jurisdiction and authority to grant injunctive relief for classes

imposed by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party
> or parties bringing the action, no court (other than the Supreme Court) shall
> have jurisdiction or authority to enjoin or restrain the operation of the

---

[8] As noted above, government records indicate 77 of the 78 individuals arrested did not have any immigration
proceedings prior to "Operation Return to Sender."  (Doc. 38-1 at 5-6.)

1
2

> provisions of part IV of this subchapter, as amended by the Illegal
> Immigration Reform and Immigrant Responsibility Act of 1996, other than
> with respect to the application of such provisions to an individual alien
> against whom proceedings under such part have been initiated.

3   *Id.*  The identified "provisions of part IV of [the] subchapter" include §§ 1221-1232, which "charge

4   the Federal Government with the implementation and enforcement of the immigration laws governing

5   the inspection, apprehension, examination, and removal of aliens."  *Garland v. Gonzalez,* 596 U.S.

6   543, 549-50 (2022).  The Supreme Court explained that Section 1252(f)(1) "prohibits lower courts

7   from entering injunctions that order federal officials to take or to refrain from taking actions to

8   enforce, implement, or otherwise carry out the specified statutory provisions."  *Id.* at 550.

9       Defendants contend that Section 1252(f)(1) "bars the court from granting Plaintiffs' request to

10  preliminarily enjoin USBP's detention and removal operations."  (Doc. 31 at 14.)  Defendants observe,

11  "8 U.S.C. § 1226, a covered statute, concerns the apprehension and detention of aliens" and "8 U.S.C.

12  § 1229, another covered statute, concerns the initiation of removal proceedings against an alien."  (*Id.*)

13  According to Defendants, "To the extent Plaintiffs allege they are seeking to enjoin 8 U.S.C. § 1357,

14  the actions under this statute cannot be untangled from apprehension and removal operations."  (*Id.* at

15  14-15.)  Therefore, Defendants argue that "Plaintiffs' request to restrain USBP's allegedly unlawful

16  detention and removal operations necessarily seeks to enjoin operation of provisions covered by 8

17  U.S.C. § 1252(f)(1)."  (*Id.* at 15.)

18      As Defendants acknowledge, the provision of the INA at issue—Section 1357(a)(2), which is

19  contained in Part IX—is not one of the specified provisions in Section 1252(f)(1).  *See* 8 U.S.C. §

20  1252(f)(1); *Garland,* 596 U.S. at 549-50.  Consequently, the limiting language of Section 1252(f)(1)

21  does not apply to the pending request for injunctive relief.  *Gonzalez,* 975 F.3d at 814 ("§ 1357(d) is

22  not located in Part IV, and thus § 1252(f)(1)'s limitations do not apply"); *see also State of Texas v.*

23  *U.S. Dept. of Homeland Sec.*, 123 F.4th 186, 209-210 (5th Cir. 2024) ("because § 1357(a)(3) is not

24  one of the statutes referenced in § 1252(f)(1), the injunction [sought] is not barred"); *Reno v.*

25  *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms… [Section

26  1252(f)] prohibits federal courts from granting classwide injunctive relief against the operation of §§

27  1221-1231").  The Ninth Circuit explained, "by specifying only 'the provisions of Part IV' and

28  reinforcing its focus on only '*such* provisions,' … the statute's plain text makes clear that its

1    limitations on injunctive relief do *not* apply to *other* provisions of the INA." *Gonzalez*, 975 F.3d at 813

2    (emphasis in original, citation omitted).

3          Notably, the "detention" statutes on which Defendants rely relate to custodial detentions in a

4    facility and not to the detention of individuals for investigative stops on the streets, such as those at

5    issue here. *See* 8 U.S.C. § 1226(a) (indicating that "[o]n a warrant issued by the Attorney General, an

6    alien may be arrested and detained pending a decision on whether the alien is to be removed"); 8

7    U.S.C. § 1226(c) (addressing "detention of criminal aliens" and when the Attorney General shall take

8    an alien into custody); 8 U.S.C. § 1226(d) (directing the Attorney General to "devise an implement a

9    system" to identify criminal aliens after arrests).  The obligations under Section 1226 are distinct from

10   the authority of immigration officers to perform investigative, detentive stops and the obligation to

11   evaluate flight risk prior to a warrantless arrest.  *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 986

12   (C.D. Cal. 2024) ("There is a clear distinction between the authority to issue warrants under § 1226(a)

13   and the one to execute arrests under § 1357").  Furthermore, as discussed above, the Suspicionless

14   Class and Warrantless Arrest Class do not seek to challenge removal proceedings, such that the

15   provisions of 8 U.S.C. § 1229 are implicated.  Thus, Defendants' argument that an injunction related

16   to Section 1357 would necessarily enjoin obligations under the covered statutes is frivolous.

17         Courts maintain authority to enter injunctions addressing other provisions of the INA *even if*

18   there may be collateral effects upon a provision covered by Section 1252(f)(1).  *See, e.g., Gonzales v.*

19   *DHS,* 508 F.3d 1227, 1233 (9th Cir. 2007) (holding that Section 1252(f)(1) did not prohibit an

20   injunction directly implicating adjustment of status—which is not among the statutory provisions

21   specified in Section 1252(f)(1)—despite a collateral effect on removal); *State of Texas*, 123 F.4th at

22   210 (where injunctive relief related to conduct under Section 1357 would "at most have only a

23   collateral effect on the operation of the covered statutes, (specifically §§ 1225 and 1226)" the

24   injunction was not barred); *Kidd*, 734 F. Supp. 3d at 985 ("Section 1252(f) … does not directly impede

25   the Court's authority to issue injunctive relief to ensure that ICE executes warrants in a manner

26   consistent with the United States Constitution").  Even in *Al Otro Lado v. Exec. Office of Immigr.*

27   *Rev*., 120 F.4th 606 (9th Cir. 2024)—a case cited by Defendants (Doc. 31 at 14)—the Ninth Circuit

28   recognized that it "has repeatedly held that § 1252(f)(1) does not prohibit an injunction simply because

of collateral effects on a covered provision." *Al Otro Lado*, 120 F.4th at 627.  Thus, even if an injunction could have a collateral effect on the provisions identified by Defendants, the Court has the jurisdiction and the authority to issue an injunction.

### III.    Conclusion

Based upon the foregoing, 8 USC §§ 1252(a)(5), 1252(b)(9), and 1252(f) do not bar this Court's jurisdiction over the claims of the proposed Suspicionless Stop Class and Warrantless Arrest Class— for violations of the Fourth Amendment, 8 U.S.C. § 1357(a)(2), and 8 C.F.R. § 287.8(c)(2)(ii) —or its authority to enter class-wide injunctive relief.[9]

### EVIDENCE BEFORE THE COURT

The "Federal Rules of Evidence do not strictly apply in the preliminary injunction context." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1189-90 (9th Cir. 2024); *see also Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings"). As the Supreme Court observed, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The Court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."  *Flynt v. Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  For example, the Court may consider declarations that include hearsay statements or information in news articles.  *See, e.g., Flathead*, 98 F.4th at 1190 (finding "no error in the district court's consideration of [a] news article" in addressing a motion for a preliminary injunction); *Fellowship of Christian Athletes v. San Jose Unifed Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) ("a court may exercise its discretion to accept hearsay and make inferences in ruling on a preliminary injunction").

The Ninth Circuit determined that inadmissibility "is not a proper basis to reject evidence submitted in support of class certification."  *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1004

---

[9] The Court makes no findings regarding its jurisdiction over other claims raised in the complaint.

1   (9th Cir. 2018). Instead, "[o]n a motion for class certification, the court may consider evidence that

2   may not be admissible at trial." *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610 (C.D. Cal. 2008)

3   (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (describing a court's determination of

4   class certification as based on "tentative findings, made in the absence of established safeguards" and

5   indicating certification is "not accompanied by the traditional rules and procedures applicable to civil

6   trials"); *see also Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) ("courts

7   have held that on a motion for class certification, the evidentiary rules are not strictly applied and

8   courts can consider evidence that may not be admissible at trial") (citation omitted).

9          Even still, Defendants do not object to the evidence submitted by Plaintiffs. For purposes of

10  the motions now at issue, the Court will consider Plaintiffs' anecdotal evidence and exhibits to

11  evaluate the pending requests for provisional class certification and injunctive relief.

12                         **MOTION FOR PROVISIONAL CLASS CERTIFICATION**

13         A "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of

14  the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting

15  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Class certification is governed by the Federal

16  Rules of Civil Procedure, which provide: "One or more members of a class may sue or be sued as

17  representative parties on behalf of all members" under certain circumstances. Fed. R. Civ. P. 23(a).

18  Pursuant to Rule 23, a court must determine whether to certify a class "[a]t an early practicable time

19  after a person sues … as a class representative." Fed. R. Civ. P. 23(c)(1)(A). As such, nothing

20  precludes class certification at an early stage in the proceedings.

21  **I.      Legal Standards**

22         Plaintiffs seek "provisional class certification," which applies only to the related motion for a

23  preliminary injunction. *See Ger Chong Ze Chang v. Count of Siskiyou*, 2024 WL 4581687, at *9 (E.D.

24  Cal. Oct. 24, 2024) ("provisional class certification" may be for the purpose of "an order that applies

25  to a preliminary injunction, as opposed to a final injunction or judgment"). The Ninth Circuit

26  expressly indicated the Court has discretion to grant provisional class certification while considering a

27  preliminary injunction. *Meyer v. Portfolio Recovery Assocs., LLC*, 708 F.3d 1036, 1041 (9th Cir.

28  2012) (finding the district court "did not abuse its discretion by granting provisional class

                                                    37

certification" in an order also addressing a request for a preliminary injunction); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings.").

### A.      Rule 23(a) Prerequisites

A party seeking provisional certification "has the burden of meeting the threshold requirements" of Rule 23(a).  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (2012) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 2551 (2011)).  Pursuant to Rule 23(a), a class action is proper if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are often referred to as numerosity, commonality, typicality, and adequacy of representation, and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 155-56 (1982) (citing *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980)).

### B.      Rule 23(b) Certification

When a proposed class satisfies the prerequisites of Rule 23(a), the Court must determine whether the class is maintainable under Rule 23(b).  *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1232 (9th Cir. 2024) (noting if the Court finds a class satisfies the requirements of Rule 23(a), it must next determine the class "fit[s] into at least one of three categories outlined in Rule 23(b)").  Under Rule 23(b)(1), a class is maintainable if there is a risk of inconsistent or varying adjudications from "prosecuting separate actions by or against individual class members."  *Id.*  The Court may certify a class if "adjudications with respect to individual class members … would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).

A class is maintainable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding

ER039

1   declaratory relief is appropriate responding the class as a whole." Fed. R. Civ. P. 23(b)(2).  The

2   Supreme Court explained, "Rule 23(b)(2) applies only when a single injunction or declaratory

3   judgment would provide relief to each member of the class.  It does not authorize class certification

4   when each individual member would be entitled to a *different* injunction or declaratory judgment

5   against the defendant." *Wal-Mart*, 564 U.S. at 360.

6          Class certification under Rule 23(b)(3) allows for class certification in cases "in which class-

7   action treatment is not clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." *Amchem Prods.,*

8   *Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  Thus, a class is maintainable under Rule 23(b)(3) where

9   "questions of law or fact common to the members of the class predominate over any questions affecting

10  only individual members," and where "a class action is superior to other available methods for fair and

11  efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

12         **C.     Burden of Proof**

13         The Supreme Court explained, "Rule 23 does not set forth a mere pleading standard.  A party

14  seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he

15  must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law

16  or fact, etc." *Wal-Mart*, 564 U.S. at 350 (emphasis in original).  Consequently, is not enough for the

17  Court to assume the Rule 23 factors can be satisfied.

18         The Court must conduct a "rigorous analysis," which may require the Court "to probe behind

19  the pleadings before coming to rest on the certification question." *Wal-Mart*, 564 U.S. at 350-51

20  (quoting *Falcon*, 457 U.S. at 160-61).  Parties seeking certification bear the burden of demonstrating

21  "by a preponderance of the evidence" that Rule 23 is satisfied.  *White v. Symetra Assigned Benefits*

22  *Serv.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (citing *Olean Wholesale Grocery Coop., Inc. v. Bumble*

23  *Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022)).  In other words, the district court must "find that

24  the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."

25  *Wolff v. AETNA Life Ins. Co.*, 77 F.4th 164, 174 (3rd Cir. 2023) (citation omitted).

26  **II.     Standing**

27         Before evaluating Plaintiffs' proposed provisional classes under Rule 23, the Court must

28  determine whether Plaintiffs have standing to assert their claims.  As the Ninth Circuit explained,

39

1    standing "is a jurisdictional element that must be satisfied prior to class certification." *LaDuke v.*

2    *Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985). Consequently, the Court should address the issue of

3    standing prior to certifying any class. *See Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004).

4         "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold

5    requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City*

6    *of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To satisfy the "case or controversy" requirement, a

7    plaintiff must establish standing under Article III to bring suit. *Human Life of Wash., Inc. v.*

8    *Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*,

9    506 F.3d 832, 938 (2007) ("standing is an essential and unchanging part of the case-or-controversy

10   requirement of Article III"). In a proposed class action, "if none of the named plaintiffs purporting to

11   represent a class establishes the requisite of a case or controversy with the defendants, none may seek

12   relief on behalf of himself or any other member of the class." *Lierboe v. State Farm Mut. Auto. Ins.*

13   *Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003). To establish standing—and thus that there is an actual case

14   or controversy—a plaintiff "must demonstrate (1) an injury-in-fact, (2) causation, and (3) a likelihood

15   that the injury will be redressed by a decision in the plaintiff's favor." *Human Life*, 624 F.3d at 1000

16   (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

17        "[J]urisdiction is to be assessed under the facts existing when the complaint is filed." *Lujan*,

18   504 U.S at 570 n. 4 (1992). Consequently, "[t]he requisite personal interest"—standing— "must exist at

19   the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*,

20   528 U.S. 167, 214 (2000) (citation omitted); *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832,

21   850 (9th Cir. 2007) ("Standing is determined at the time of the lawsuit's commencement, and we must

22   consider the facts as they existed at that time the complaint was filed"); *see also Perry v. Village of*

23   *Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("Because standing goes to the jurisdiction of a

24   federal court to hear a particular case, it must exist at the commencement of the suit").

25        Defendants note that the El Centro Sector issued a "Muster" on April 4, 2025. (Doc. 32 at 14,

26   citing Exh. A [Doc. 31-1; Doc. 32-1].) They report that the Border Patrol is "taking steps to

27   implement training on the Muster," and "endeavor to conduct training sessions to ensure compliance

28   with the Muster[,] … compliance with the Fourth Amendment and 8 U.S.C. § 1357, and compliance

40

ER041

1    with Supreme Court and Ninth Circuit law on conducting vehicle stops, consensual encounters, and

2    warrantless arrests." (*Id.* at 15, citing Ex. B at ¶¶ 13-19[10] [Doc. 31-2 at 3-4; Doc. 32-2 at 3-4].)

3    According to Defendants, "in light of these actions and commitments," Plaintiffs lack standing for

4    injunctive relief. (*Id.* at 15.)

5         Defendants do not argue that Plaintiffs failed to show an injury-in-fact and causation, as

6    required to establish Article III standing. (*See* Doc. 32 at 11, 14-15.) Thus, Defendants concede the

7    individual plaintiffs allege facts sufficient to support a conclusion that each suffered violations of their

8    rights under the Fourth Amendment during "Operation Return to Sender," and that Defendants did not

9    perform required flight risk assessments prior to arresting the proposed class representatives.

10   Defendants also do not dispute that a clear causal connection exists between the alleged injuries and the

11   challenged conduct by Border Patrol. The injuries of the three proposed class representatives—Oscar

12   Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez— who seek declaratory

13   and injunctive relief in the complaint for the claims in issue related to the proposed Suspicionless Stop

14   and Warrantless Arrest Classes, would likely be "redressed by a decision in … [their] favor." *See*

15   *Human Life*, 624 F.3d at 1000. Towards this end, the proposed class representatives establish Article

16   III standing for their claims, sufficient for the Court to proceed with its analysis under Rule 23.[11]

17   **III.    Class Definitions**

18        In evaluating whether classes are suitable for certification, the Court must consider the proposed

19   class definitions. *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) ("[a]lthough

20   there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the

21   class must be adequately defined … before a class action may proceed") (citation omitted). Plaintiffs

22   seek provisional certification of two classes to challenge the actions of Border Patrol as a

23   "discriminatory and unlawful campaign against people of color in Kern County." (Doc. 14-1 at 7.)

24

25   [10] Although Defendants cite to Exhibit B ¶¶ 13-19, the exhibit—a declaration from Sergio Guzman, the Acting
     Executive Officer of El Centro Sector—includes only 12 paragraphs. (*See* Docs. 31-2, 32-2.) Based upon the
26   information provided, it appears the relevant paragraphs are correctly identified as numbers 8 through 11. (*See
     id.* at 3-4; *see also* Doc. 31-2 at 3-4, ¶¶ 8-11.)

27   [11] To the extent Defendants assert that Plaintiffs "lack standing" "because the issues raised in their Complaint
28   have been resolved" (Doc. 32 at 14), the Court addresses the mootness argument in its analysis regarding the
     motion for a preliminary injunction.

ER042

Plaintiffs defined the provisional classes as:

    1.   **Suspicionless Stop Class**: All persons who, since January 6, 2025, have been or will be subjected to a detentive stop by Border Patrol in this district pursuant to a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

    2.   **Warrantless Arrest Class**: All persons whom Border Patrol, since January 6, 2025, has arrested or will arrest without a warrant in this district.

(*Id.* at 8; *see also* Doc. 1 at 62-63, ¶¶ 313, 316.)

Defendants contend these two class definitions are fatally flawed. (Doc. 32 at 15-16.) According to Defendants, "the proposed classes cannot be certified because they are impermissibly defined as 'fail-safe' classes and the Warrantless Arrest Class is impermissibly overbroad." (*Id.* at 15 [emphasis omitted, cleaned up].) Plaintiffs dispute these assertions but propose modifying the Warrantless Arrest Class if the Court agrees the original definition is overbroad. (Doc. 37 at 13-14.)

          1.      "Fail-safe" Classes

"A fail-safe class is commonly defined as limiting membership to plaintiffs described by their theory of liability in the class definition such that the definition presupposes success on the merits." *Melgar v. CSK Auto, Inc.*, 681 Fed. Appx. 605, 607 (9th Cir. 2017) (citing William B. Rubenstein, *Newberg on Class Actions* § 3:6 (5th ed. 2016)). A class definition does "not presuppose its success" when the plaintiffs will be "required … to prove more facts to establish liability than are referenced in the class definition." *Id.* Consequently, the Ninth Circuit explained that a fail-safe definition is one where the class "is defined in a way that precludes membership *unless* the liability of the defendant is established." *Kamar v. RadioShack Corp.*, 375 Fed. Appx. 734, 736 (9th Cir. 2010) (emphasis added).

Defendants argue the proposed Suspicionless Arrest and Warrantless Arrest Classes "are prime examples of impermissible 'fail-safe' classes because they can only be certified upon a determination of the merits." (Doc. 32 at 15.) Defendants assert the Suspicionless Stop Class membership "depends on whether Plaintiffs can prove the Defendants had a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion for an individual," and the Warrantless Arrest Class membership "depends on whether Plaintiffs can prove that Defendants

ER043

1   [have] arrested or will arrest an individual without a warrant in this district." (*Id.*) Therefore,

2   Defendants assert that liability "is necessary in order to have membership in either [class]," and

3   certification must be denied. (*Id.*, citing *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7

4   (9th Cir. 2016).)

5        Plaintiffs argue the two proposed definitions do not result in fail-safe classes, because "class

6   membership relies on 'factual questions and requires no impermissible preliminary determination of

7   liability.'" (Doc. 37 at 13, quoting *Pena v. Taylor Farms Pacific, Inc.*, 305 F.R.D. 197, 213 (E.D. Cal.

8   2015) [modification adopted].) Plaintiffs also contend this Court's decision in "*Willis v. Enterprise*

9   *Drilling Fluids, Inc.* is instructive." (*Id.*, citing *Willis*, 2015 WL 6689637 (E.D. Cal. Oct. 28, 2015).)

10  Plaintiffs observe:

11          [*Willis*] involved a subclass of members who were not timely paid their
            wages, and where the defendant allegedly "had a 'policy and practice' of
12          failing to pay ... the wages due." *Id.* at *6–7. The Court held the proposed
            subclass was not fail-safe because "[i]f Plaintiff succeeds in establishing
13          *the existence of unlawful policies or practices common to all the class
            members*, the Court would not be required to determine the legal merits of
14          each class members' claims...." *Id.* at *7 (emphasis added).

15  (*Id.*) Plaintiffs contend the same is true here, because membership in the proposed classes requires

16  answering factual questions regarding the Border Patrol's patterns and practices. (*Id.* at 13-14.) They

17  assert, "Ascertaining membership in the Suspicionless Stop Class[] involves answering ... (1) whether

18  Border Patrol stopped the person in this District since January 6, 2025, and (2) whether Border Patrol

19  has a pattern or practice of not conducting an individualized assessment of reasonable suspicion prior

20  to a stop." (*Id.* at 13 [footnote omitted].) Plaintiffs contend "ascertaining membership in the

21  Warrantless Arrest Class[] requires answering only factual questions: (1) whether Border Patrol

22  arrested the person without a warrant in this District since January 6, 2025, and (2) whether Border

23  Patrol has a pattern or practice of not conducting an individualized assessment of flight risk prior to an

24  arrest." (*Id.* at 13-14.) Plaintiffs argue that after the classes are ascertained, "the Court may consider

25  the legality of the challenged pattern or practice, and class members will be bound by that judgment

26  whether they win or lose." (*Id.* at 13, citing *Willis*, 2015 WL 6689637, at *7; *see also id.* at 14.)

27       The Court finds the proposed class definitions for the Suspicionless Stop and Warrantless

28  Arrest classes do not preclude membership unless liability is established. For example, membership in

ER044

1    the Suspicionless Stop Class is not precluded unless Defendants are liable for violating the Fourth

2    Amendment.  Instead, as Plaintiffs argue, membership in the proposed class requires: (1) the person be

3    subjected to an investigatory, detentive stop by Border Patrol during the relevant period; and (2) the

4    Court's finding that Border Patrol had a pattern or practice of conducting stops without warrants and

5    without assessments of reasonable suspicion.  Similarly, membership in the Warrantless Arrest Class

6    is not precluded unless Defendants are liable for violations of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. §

7    287.8(C)(2)(ii).  Put another way, membership for both the classes may be known *without* a

8    determination of Defendants' liability on the claims in issue, and liability is not presupposed with the

9    proposed definitions.  Accordingly, the two proposed Suspicionless Stop and Warrantless Arrest

10   Classes are not "fail-safe" classes.

11            2.      Scope of the Warrantless Arrest Class Definition

12            When a proposed class definition "include[s] a great number of members who for some reason

13   could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too

14   broadly to permit certification."  *Olean*, 31 F.4th at 669 n.14 (quoting *Messner v. Northshore Univ.*

15   *HealthSystem*, 669 F.3d 802, 826 n.15 (7th Cir. 2012)).  The Ninth Circuit determined "a court must

16   consider whether the possible presence of uninjured class members means that the class definition is

17   fatally overbroad." *Id.*; *see also Mazur v. eBay, Inc.,* 257 F.R.D. 563, 567 (N.D. Cal. 2009) (rejecting a

18   class definition as imprecise and overbroad where it included individuals who were not harmed);

19   *Wolph*, 272 F.R.D. at 482-83 (finding a class definition was overbroad where the proposed class

20   included individuals who had already received a remedy and were not damaged).

21            The Court has discretion to cure defects of a proposed class definition, including modifying a

22   definition when the class is overbroad.  *See Ruiz Torres*, 835 F.3d at 1139 (indicating the district court

23   may narrow a class definition); *see also Powers v. Hamilton County Public Defender Comm'n*, 501

24   F.3d 592, 619 (6th Cir. 2007) ("district courts have broad discretion to modify class definitions"); *In re*

25   *Monumental Life Ins.* Co., 365 F.3d 408, 414 (5th Cir. 2004) ("district courts are permitted to limit or

26   modify class definitions to provide the necessary precision"); *Victorino v. FCA US LLC*, 326 F.R.D.

27   282, 301-02 (S.D. Cal. 2018) ("district courts have the inherent power to modify overbroad class

28   definitions"). The Court may also consider proposals to change a class definition first raised in a reply

1   brief on a motion for class certification.  *See*, *e.g.*, *Cruz v. MM 879, Inc.*, 329 F.R.D. 639, 649-50 (E.D.

2   Cal. 2019) (where the defendants identified class definition flaws, the plaintiffs proposed amended

3   class definitions in their reply brief and "the Court exercise[d] its discretion to adopt [the] proposed

4   amendments"); *Guzman v. Polaris Inds. Inc.*, 345 F.R.D. 174, 182, 184 (C.D. Cal. 2023) (observing the

5   plaintiffs narrowed the proposed class definition in their reply brief and considering whether the

6   modified class satisfied the Rule 23 requirements); *see also Conant v. McCaffrey*, 172 F.R.D. 681, 683

7   (N.D. Cal. 1997) (finding the plaintiffs "substantially alleviated" the problem resulting from an overly

8   broad class definition by "revising the class definition in their reply brief").

9           Defendants contend the definition of the Warrantless Arrest Class "is impermissibly overly

10  broad."  (Doc. 32 at 16.)  Defendants argue that a class must not be "defined so broadly as to include a

11  great number of members who for some reason could not have been harmed by the defendant's

12  allegedly unlawful conduct."  (*Id.*, quoting *Ruiz Torres*, 835 F.3d at 1138.)  Defendants note that

13  "[a]rresting someone without a warrant is not necessarily unlawful conduct," and the proposed class

14  may encompass individuals who were lawfully arrested "and could not have been harmed."  (*Id.*,

15  citing *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *20 (E.D. Cal. Jan. 3, 2012).)  Defendants

16  contend that the class "should … not be certified" given the overly broad definition.  (Doc. 32 at 16.)

17  However, the Ninth Circuit indicated that when a class definition is overly broad, the problem "can

18  and often should be solved by refining the class definition rather than by flatly denying class

19  certification on that basis."  *Olean*, 31 F.4th at 669, n.14 (quoting *Messner*, 669 F.3d at 825 (when

20  there are "minor overbreadth problems …, the better course is *not* to deny class certification entirely

21  but to amend the class definition as needed to correct for the overbreadth" [emphasis added]).

22          If the Court agrees that the definition is overly broad, Plaintiffs request that "the Court narrow

23  its definition … to clarify the intended scope" of the Warrantless Arrest Class.  (Doc. 37 at 14 n.10,

24  citation omitted.)  Plaintiffs propose that the definition could be modified to indicate the arrests were

25  "pursuant to a practice of conducting arrests without warrants and without an individualized assessment

26  of probable cause that the person is likely to flee before a warrant can be obtained."  (*Id.*)  Plaintiffs

27  contend this modification "would address Defendants' overbreadth concern but would not create a fail-

28  safe class for the reasons addressed in *Willis*."  (*Id.*)

### 3.    Final Class Definitions

The Court finds it is necessary to modify the definitions, both for clarity and to ensure the scope of the classes are sufficiently narrowed to the theories of liability raised in the complaint.  *See Ruiz Torres*, 835 F.3d at 1139 (indicating "the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability").  For purposes of the pending motion for provisional class certification, the Court considers the following definitions:

> **Suspicionless Stop Class**: All persons since January 6, 2025, who have been or will be subjected to a detentive stop by Border Patrol in this district without a pre-stop, individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

> **Warrantless Arrest Class**: All persons since January 6, 2025, who have been arrested or will be arrested in this district by Border Patrol without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

These modified definitions do not create fail-safe classes, because Plaintiffs retain the burden to prove that Border Patrol had (1) a pattern or practice of performing detentive stops without warrants and without reasonable suspicion assessments, and (2) a pattern or practice of placing individuals under arrest without a warrant, without first performing a flight risk assessment to find probable cause.

## IV.    Analysis of Rule 23 Requirements

Plaintiffs contend the requirements of Rule 23(a) and Rule 23(b) are satisfied for the provisional Suspicionless Stop and Warrantless Arrest Classes.  (Doc. 14-1 at 15-22.)  Defendants argue the Court should deny certification because "the Proposed Classes are not sufficiently numerous, encompass dissimilarly situated individuals whose claims are not common, whose injuries are not typical, and who differ in their ability to challenge their claims through the administrative process."  (Doc. 32 at 1.)

### A.    Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific threshold, generally "courts find the numerosity requirement satisfied when a class

46

1    includes at least 40 members." *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010); *see also*

2    *Water v. Leprino Foods Co.*, 670 F. Supp. 3d 1035, 1047 (E.D. Cal. 2023) (same).  Even a class of 20

3    members—though a "jurisprudential rarity"—may satisfy the numerosity requirement where joinder

4    of all is impracticable.  *See Rannis*, 380 Fed. Appx. at 651-52.  Importantly, "Plaintiffs need not state

5    the exact number of potential members nor identify all the members of the class so long as the putative

6    class is not amorphous." *Foon v. Centene Mgmt. Co., LLC*, 2023 WL 1447922, at *4 (E.D. Cal. Feb.

7    1, 2023) (quoting *Arnold v. United Artists Theater Cir., Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994)).

8           Plaintiffs contend that "where only declaratory or injunctive relief is sought, 'the numerosity

9    requirement is relaxed and plaintiffs may rely on reasonable inferences arising from plaintiffs' other

10   evidence that the number of unknown and future members' makes joinder impracticable."  (Doc. 14-1

11   at 15, quoting *C.R. Educ. & Enf't Center. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016)

12   [alterations adopted].)  In finding there was a relaxed standard, the Northern District court cited *Arnott*

13   *v. U.S. Citizenship & Immigration Servs.*, 290 F.R.D. 579, 586 (C.D. Cal. 2012), which, in turn, relied

14   upon *Sueoka v. United States*, 101 Fed. Appx. 649, 653 (9th Cir. 2004).  In *Sueoka*, the Ninth Circuit

15   observed: "where 'only injunctive or declaratory relief is sought, some courts have held that the

16   numerosity requirement is relaxed so that even speculative or conclusory allegations regarding

17   numerosity are sufficient to permit class certification.'" *Id.*, 101 Fed. Appx. at 653 (quoting 5 Moore's

18   Federal Practice § 23.22[3][b] (3d ed. 2003)).  After the Ninth Circuit issued *Sueoka,* the Supreme

19   Court decided *Wal-Mart*, which expressly held that a party seeking certification cannot rely simply on

20   the pleadings, but "must be prepared to prove that there are *in fact* sufficiently numerous parties…."

21   *Wal-Mart*, 564 U.S. at 350 (emphasis in original).  The Supreme Court later reiterated that a party

22   seeking certification "must actually *prove*—not simply plead—that their proposed class satisfies each

23   requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S 258, 275 (2014)

24   (emphasis in original).  It does not appear the Ninth Circuit has applied the relaxed standard for the

25   numerosity requirement after the decisions in *Wal-Mart* and *Halliburton*.  Consequently, the Court

26   declines to follow *Sueoka* and its progeny and finds that Plaintiffs must prove by a preponderance of

27   the evidence that they have satisfied the numerosity requirement.

28          Plaintiffs argue that "the numerosity requirement is easily met" because both proposed classes

47

1    are "currently comprised of at least dozens of people." (Doc. 14-1 at 16 [emphasis omitted].)

2    Plaintiffs observe that "Border Patrol claims its agents arrested 78 people in Kern or Tulare counties

3    between January 7 and 10, 2025." (*Id.*, citing Braun Decl. Exhs. 17, 18, 22 [Doc. 15-2 at 72, 74, 94-

4    95].) Plaintiffs also allege that "local reports estimate the number of arrested individuals may have

5    been higher." (*Id.*, citing Doc. 1 ¶¶ 4, 322.) Plaintiffs argue, "Even if Border Patrol's number is

6    correct, the Warrantless Arrest Class is currently comprised of approximately 78 people, and the

7    Suspicionless Stops Class is even larger, as not all suspicionless stops were escalated to arrests." (*Id.*)

8    Defendants argue the proposed classes "are not so numerous that they render joinder of all

9    members impracticable." (Doc. 32 at 16, cleaned up.) Defendants contend that "Plaintiffs do not

10   attempt to even estimate the number of aliens who will prospectively be 'subjected to [Border Patrol's]

11   challenged practices or patterns.'" (*Id.* at 16-17, quoting Doc. 14-1 at 10.) Defendants also assert that

12   "Plaintiffs point to only a dozen[] examples" to support the numerosity requirement. (*Id.* at 17.)

13   However, Defendants do not address—or even acknowledge—any other evidence related to the

14   number of putative class members, such as information contained in the media statements from Border

15   Patrol or the Sector's social media. (*See id.* at 16-17.)

16   Evidence before the Court shows Border Patrol itself reported the Operation "led to 78 arrests."

17   (Doc. 15-2 at 72; *see also id.* at 74.) The U.S. Customs and Border Protection later indicated that for

18   77 of the 78 individuals arrested, Border Patrol did not have any information on their criminal history

19   before their arrests. (Doc. 38-1 at 5-6.) Thus, it appears that for at least 77 individuals, Border Patrol

20   did not have warrants authorizing arrest.

21   Munguia Esquivel reports that when Border Patrol transported him behind the Home Depot, he

22   saw "over ten people who had been detained." (Doc. 15-10 at 3, ¶ 10.) Upon transport to the 7th

23   Standard Road facility in the afternoon of January 7, 2025, Munguia Esquivel saw a "bus… already

24   full of people who had been detained," and a second bus arrived. (*Id.* at 11.) Morales Cisneros, who

25   was detained after work, estimated that his bus was filled with "about 40 people" when departing the

26   7th Standard Road facility around 10 or 11 p.m. on January 7, 2025. (Doc. 15-9 at 3, ¶ 9.) This

27   undisputed evidence supports a conclusion that Border Patrol arrested enough people to fill two buses

28   on January 7, 2025 alone, and the Operation continued for two more days. Plaintiffs also present

evidence that Border Patrol did not make required flight risk assessments before making these arrests during the Operation.

As Plaintiffs argue, "not all suspicionless stops were escalated to arrests" for which flight risk assessments would be required. For example, Morales Cisneros reports while he was handcuffed in a Border Patrol vehicle, agents pulled behind another vehicle at a gas station and blocked it in, as they had done to him. (Doc. 15-9 at 3, Morales Cisneros Decl. ¶ 7.) He observed the agents get out, talk to a person in the vehicle, and say, "We're doing our job." (*Id.*) Morales Cisneros reports the agents returned to the vehicle and did not arrest the unidentified individual. (*Id.*) Vargas Mendez reports that although he was in a van with five other individuals when Border Patrol stopped the van, the driver and front passenger produced identification when an agent "demanded … their license[s] and proof of residency." (Doc. 15-6 at 3, Vargas Mendez Decl. ¶ 7.) Vargas Mendez states that Border Patrol arrested him and "one of [his] coworkers." (*See id.*, ¶¶ 9-10.) There is no indication the other four individuals in the van were arrested. (*See id.*) This evidence supports the conclusion that the Suspicionless Stop Class also includes individuals who were not arrested following the stop.

Harmonizing Border Patrol's media report with the undisputed anecdotal evidence, the Court finds Plaintiffs have met their burden of establishing by a preponderance of the evidence that joinder of all members is impracticable, and both the Suspicionless Stop and Warrantless Arrest Classes satisfy the numerosity requirement.[12]

### B.    Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class representatives must "demonstrate that the class members have suffered the same injury." *Wal-Mart*, 564 U.S. at 350. Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the

---

[12] Both the proposed Suspicionless Stop and Warrantless Arrest Classes include "future" members. (*See* Doc. 14-1 at 8; Doc. 37 at 14, n.10.) The inclusion of future members supports the Court's finding that both classes satisfy the requirement of Rule 23(a)(1). *See A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (explaining that when a class includes future members—which "is not itself unusual or objectionable"— this "makes joinder of every class member all the more impracticable").

ER050

1    "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to

2    common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza*, 666 F.3d

3    at 588 (internal quotation marks, citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th

4    Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs]

5    present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class

6    members do not impede the generation of common answers to those questions, and the capacity of

7    classwide proceedings to drive the resolution of this litigation cannot be doubted").

8        Plaintiffs observe, "In the Ninth Circuit, commonality is satisfied where … Plaintiffs are

9    'challeng[ing] a system-wide practice or policy that affects all of the putative class members.'"  (Doc.

10    14-1 at 17, quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).)  Plaintiffs also note the

11    Ninth Circuit "held that 'Fourth Amendment claims concerning government policies, practices or

12    procedures for probable cause determinations are plainly suitable for classwide resolution.'"  (*Id.*,

13    quoting *Gonzalez*, 975 F.3d at 812.)  According to Plaintiffs, "This logic applies with equal force to

14    reasonable suspicion determinations, which are also governed by the Fourth Amendment."  (*Id.*)

15    Plaintiffs argue their two proposed classes meet the commonality requirement "because they present

16    common questions of law and fact for all class members."  (*Id.*)  Plaintiffs assert "each class member

17    has, or will be, subjected to the same practices that Border Patrol employs, which has affected each

18    class member."  (*Id.* at 17-18.)  Plaintiffs contend a "determination as to the legality of those common

19    policies will resolve-class wide claims 'in one stroke.'"  (*Id.* at 18, quoting *Cruz v. MM 879, Inc.*, 329

20    F.R.D. 639 (E.D. Cal. 2019).)

21        Defendants argue the Suspicionless Stop and Warrantless Arrest classes "lack commonality for

22    three reasons": (1) "the evidence belies Plaintiffs' argument that a systemic policy, pattern, or practice

23    in violation of the Fourth Amendment and 8 U.S.C. § 1357 exists, or that such pattern or practice

24    occurred during 'Operation Return to Sender;'" (2) the proposed classes "simply cannot address the

25    many factors that are involved in making an assessment of probable cause and flight risk;" and (3)

26    "there are various facts and circumstances concerning each alleged detention," and "some of the

27    individuals who were detained allege that they were being detained for being in the United States

28    without any legal status where at least one individual was told he was being detained because of a

50

ER051

1    crime." (*See* Doc. 32 at 18-19.)

2         Defendants contend: "Plaintiffs aver that 'all class members in each Proposed Class are bound

3    together by common questions of fact and law focused on the nature of Border Patrol's policies or

4    practices and whether those policies or practices are unlawful.'  However, this justification is an

5    insufficient basis for establishing commonality under Fed. R. Civ. P. 23(a)(2)."  (Doc. 32 at 18,

6    quoting Doc. 14-1 at 8.)  For example, Defendants note the Supreme Court held in *Falcon* that "a class

7    action 'may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites

8    of Rule 23(a) have been satisfied.'"  (*Id.*, quoting *Falcon*, 457 U.S. at 161 [emphasis omitted].)

9    Defendants observe:

10        In *Falcon*, a district court certified a class in a plaintiff-employee's Title VII
          action against his employer where the plaintiff claimed, without offering any
11        evidence, that the company had a policy of racial discrimination.  *Id.* at 149-
          52.  The Court of Appeals for the Fifth Circuit affirmed the class
12        certification.  *Id.* at 147.  The Supreme Court, however, reversed the Court
          of Appeals order affirming the class certification and held that there was "a
13        wide gap" between (1) an individual claim of discrimination and an
          unsupported allegation that a company had a policy of discrimination, and
14        "(2) the existence of a class of persons who have suffered the same injury as
          that individual, such that the individual's claim and the class claims will
15        share common questions of law or fact." *Id.* at 157.

16   (Doc. 32 at 18, citing *Falcon*, 457 U.S. at 147, 149-152, 157.)  Defendants contend the "[s]ame [is

17   true] here."  (*Id.*)  According to Defendants, "As in *Falcon*, Plaintiffs' unsupported allegations of

18   Border Patrol's unlawful policies or practices are insufficient absent a rigorous analysis of those

19   claims, particularly because … whether Border Patrol agents have reasonable suspicion to effectuate

20   investigative stops and probable cause to effectuate arrests is an inherently fact-specific and

21   individualized inquiry."  (*Id.*)

22        Defendants observe that in *U.S. v. Rodriguez*, 975 F.2d 592 (9th Cir. 1992)*,* the Ninth Circuit

23   held: "Reasonable suspicion is an individualized inquiry that must be founded upon a particularized

24   and objective basis for suspecting the particular person stopped."  (Doc. 32 at 19, citing *Rodriguez*,

25   975 F.2d at 595.)  Defendants argue there are "various facts and circumstances concerning each

26   alleged detention":

27        For instance, some Border Patrol agents were wearing plain clothes and
          some were wearing uniform.  *E.g., compare* Mendez Decl. ¶ 6 stating that
28        the Border Patrol agents were wearing plain clothing *with* Gutierrez Decl.,

                                        51

                                                                    ER052

¶ 4, which states the Border patrol agent was wearing a vest that said "POLICE." Another example is that some of the individuals who were detained presented the Border Patrol agents with identification whereas some individuals did not. *E.g., compare* Mendez Decl. ¶ 9 (where Mendez states he did not present his identification) *with* Ramirez Decl. ¶ 7 (where Ramirez asserts the Border Patrol agent took his identification). Furthermore, some of the individuals were detained for several hours or days whereas other individuals were released at the site of the alleged detention. *E.g., compare* Ramirez Decl. ¶ 10 (where he asserts he was detained for seven or eight hours) *with* Martinez Decl. ¶ 10 (where Martinez states she was released after she presented her green card to the agents). [S]ome of the individuals who were detained allege that they were being detained for being in the United States without any legal status where at least one individual was told he was being detained because of a crime. *Compare* Cisneros Decl. ¶¶ 5-6 (where Cisneros asserts the agent stated the agent arrested him after telling him that he was in the United States illegally) *with* Gutierrez Decl., ¶ 9 (where Gutierrez states the agent detained him for "alien smuggling"). Similarly, some of the individuals were stopped while driving in a vehicle while other individuals were stopped while at a Home Depot. *Compare* Cisneros Decl., ¶ 5-6 (where he states he was stopped while in a vehicle) *with* Esquivel Decl., ¶¶ 4-5 (where he states he was stopped at a Home Depot).

(*Id.* at 19-20.) Defendants contend this shows a "lack of commonality between the investigative stops," and "undermine[s] Plaintiffs' claim that USBP engaged in a pattern or practice of unlawful stops." (*Id.* at 20, citing *Wal-Mart*, 546 U.S. at 348.) Defendants argue the class members will also have "widely varying" personal facts that "are important to the flight risk determination," such as "familial ties, employment status, and other community connections." (*Id.* at 20-21.) They argue these differences "defeat[] class certification." (*Id.* at 21.) Ultimately, Defendants maintain the two classes "encompass a broad range of individuals with differing unique set of circumstances as bases for their claims." (*Id.*)

Defendants' reliance upon *Falcon* to show the proposed classes "lack commonality" is misplaced. Falcon filed suit against his employer and sought to represent a class of similarly situated individuals who suffered discrimination by the employer. The Supreme Court considered whether Falcon, "who complained that petitioner did not promote him because he is a Mexican-American, was properly permitted to maintain a class action on behalf of Mexican-American applicants for employment whom petitioner did not hire." *Id.*, 457 U.S. at 149. The district court found the employer "had not discriminated against [Falcon] in hiring, but that it did discriminate against him in its promotion practices." *Id.* at 152. The Supreme Court noted it "repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the

1    class members." *Id*. (quotation marks, citation omitted).  The Court observed also:

2
> Conceptually, there is a wide gap between (a) an individual's claim that he
3
> has been denied a promotion on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination,
> and (b) the existence of a class of persons who have suffered the same
4
> injury as that individual, such that the individual's claim and the class
> claims will share common questions of law or fact and that the individual's
5
> claim will be typical of the class claims. For [Falcon] to bridge that gap,
> he must prove much more than the validity of his own claim.

6

7    *Id*. at 157.  The Court explained that although Falcon presented evidence of discrimination when he

8    was passed over for a promotion, such evidence did "not necessarily justify … additional inferences,"

9    including that discriminatory treatment was typical of the employer's "promotion practices," or that

10   discrimination was "reflected in … other employment practices, such as hiring, in the same way it is

11   manifested in the promotion practices." *Id*. at 158.  The Supreme Court concluded, "The District

12   Court's error in [the] case… is the failure to evaluate carefully the legitimacy of the named plaintiffs'

13   plea that he is a proper class representative under Rule 23(a)." *Id*. at 160.  Therefore, the Supreme

14   Court remanded the action for further proceedings.  *Id*. at 161.

15        The matter now pending before the Court is distinguishable from *Falcon*.  That action involved

16   only one plaintiff who had a claim for discrimination in *promotion* practices but sought to represent a

17   class who suffered discrimination in *hiring* practices.  Falcon was not a proper class representative for

18   such a class, because he was not even a member of the class.  In contrast, here, Individual Plaintiffs are

19   members of the two proposed classes.  Plaintiffs do not rely *only* on evidence of their own claims—in

20   contrast to Falcon—but instead present additional anecdotal evidence regarding the experiences of

21   putative class members during "Operation Return to Sender."  Nevertheless, the Court must determine

22   whether Plaintiffs carry the burden to show by a preponderance of the evidence that each proposed

23   class has a common question of law or fact.  *See* Fed. R. Civ. P. 23(a)(2); *Wal-Mart*, 564 U.S. at 350;

24   *Wolff*, 77 F.4th at 174.  Anecdotal evidence from class members that bridges the gap between the

25   claims of the representatives and the claims of the class members may constitute a sufficient form of

26   proof.  *Wal-Mart*, 564 U.S. at 358.

27        1.    Suspicionless Stop Class

28        Plaintiffs contend, "Except at the border and its functional equivalents, the Fourth Amendment

53

ER054

1  prohibits Defendants from conducting a detentive stop to investigate a person's immigration status

2  without reasonable suspicion that a person is a noncitizen unlawfully in the United States." (Doc. 1 at

3  68, ¶ 341.) Plaintiffs allege that "Defendants have a policy, pattern, and/or practice of traveling outside

4  the border and its functional equivalents and stopping individuals without regard to reasonable

5  suspicion that they are unlawfully in the United States." (*Id.*, ¶ 343.)  Morales Cisneros, Munguia

6  Esquivel, and Aguilera Martinez—the three proposed class representatives—assert they were stopped

7  "without reasonable suspicion that any of them was a noncitizen unlawfully in the United States." (*Id.*,

8  ¶ 342.)  Plaintiffs identify putative class members who they assert suffered violations of their Fourth

9  Amendment rights.  (*See id.*)  Plaintiffs explain that "[t]he Suspicionless Stop Class does not challenge

10  *whether every stop* was justified by reasonable suspicion, but rather whether Defendants' *practice* of

11  conducting stops without conducting *any individualized assessment* of reasonable suspicion violates the

12  law." (Doc. 37 at 7 [emphasis in original].)

13        Plaintiffs assert the following are "common questions of law and fact" for the proposed

14  Suspicionless Stop Class:

15
16
    • Whether Border Patrol has a pattern or practice of conducting stops
      without regard to whether reasonable suspicion exists that the person
      (1) is engaged in an offense against the United States or (2) is a
      noncitizen unlawfully in the United States; and

17
18
19
20
    • Whether Border Patrol's pattern or practice of conducting stops
      without regard to whether reasonable suspicion exists that the person
      (1) is engaged in an offense against the United States or (2) is a
      noncitizen unlawfully in the United States violates the Fourth
      Amendment.

21  (Doc. 14-1 at 18.)  The first question identified goes to the burden associated with the pending motion.

22  *See Ellis*, 657 F.3d at 983 ("If there is no evidence that the entire class was subject to the same

23  [unlawful] practice, there is no question common to the class"); *see also Black Lives Matter L.A. v.

24  City of Los Angeles*, 113 F.4th 1249, 1264 (9th Cir. 2024) ("plaintiffs cannot simply allege that a

25  policy applies class-wide—they have to present evidence that it does"); *Gonzalez v. Millard Mall

26  Service, Inc.*, 281 F.R.D. 455, 462 (N.D. Cal. 2012) (observing courts have denied class certification

27  where "a plaintiff failed to show common proof" of a practice).  Thus, the Court must determine

28  whether Plaintiffs have shown by a preponderance of the evidence that Border Patrol had a "pattern or

54

ER055

1    practice" of conducting detective stops without reasonable suspicion.

2            Proposed class representative Wilder Munguia Esquivel reports that he was standing with a

3    group of day laborers outside Home Depot when several unmarked vehicles arrived, and agents

4    "aggressively swarmed" around the day laborers.  (Doc. 15-10 at 2, ¶¶ 4-5.)  Munguia Esquivel states

5    the agents "did not seem to be targeting specific individuals," but demanded "papers" from the group.

6    (*Id.*, ¶ 4.)  He states that an agent directly asked him in Spanish: "Do you have papers? Do you have

7    identification? Where are you from?"  (*Id.*, ¶ 5.)  When Munguia Esquivel did not respond, the agents

8    "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from.

9    (*Id.*)  When he did not respond and attempted to walk away, the agent followed and then ordered him

10   to "turn around" to be handcuffed.  (*Id.*)  Munguia Esquivel believes the agent who arrested him did

11   not know who he was, and that they were "targeted at Home Depot because many day laborers gather

12   to get work there.  (*Id.*, ¶ 10.)

13           Putative class members Jesus Ramirez and Luis Perez Cruz—who were also detained by

14   Border Patrol agents in the parking lot of Home Depot—echo the claims of Munguia Esquivel.  (*See*

15   Doc. 15-5 at 2, Ramirez Decl. ¶ 3; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 3.)  Ramirez asserts that he "was

16   not doing anything unlawful" when the agents arrived and surrounded the group of day laborers.

17   (Doc. 15-5 at 2, ¶ 4.)  Ramirez also asserts the Border Patrol agents demanded they show "papers,"

18   and Ramirez pulled out his identification from his wallet.  (*Id.*, ¶ 5.)  Ramirez reports the agent took

19   his identification and believes "[i]t was clear … the agents did not know who [he] was."  (*Id.*, ¶¶ 5-6.)

20   Perez Cruz reports that he was talking to his cousins in the Home Depot parking lot when two agents

21   walked up to them, said they were from Border Patrol, and directed the group "to show … IDs saying

22   that [they] were in the United States legally or had permits to be here."  (Doc. 15-7 at 2, ¶ 3.)  Perez

23   Cruz also believes the agents "did not appear to have any idea who [he] was before they demanded

24   [his] ID."  (*Id.*, ¶ 4.)

25           Yolanda Aguilera Martinez, a proposed class representative, reports she was driving in her car

26   when she "saw two vehicles pulled over to the right side of the road and three men standing near the

27   vehicles."  (Doc. 15-11 at 2, Aguilera Martinez Decl. ¶ 4.)  She states that one of the men "raised his

28   hand to flag [her] down and signaled for [her] to pull over," which she did.  (*Id.*)  Aguilera Martinez

1    reports that she "was not speeding," and her car's registration and license plate were current.  (*Id.*)

2    She asserts the Border Patrol agent who approached her vehicle "did not seem to know who [she]

3    was," and said, "I need to see your papers."  (*Id.*, ¶ 6.)

4            Named plaintiffs, and putative class members, Juan Vargas Mendez and Maria Guadalupe

5    Hernandez Espinoza each report they were passengers in vehicles that Border Patrol stopped while

6    they were driving home after work.  Like Aguilera Martinez, they report the drivers of the vehicles

7    were not speeding or breaking traffic laws.  (Doc. 15-6 at 2, Vargas Mendez Decl. ¶ 4; Doc. 15-8 at 2,

8    Hernandez Espinoza Decl. ¶ 4.)  Hernandez Espinoza states her partner was driving his vehicle and

9    "not breaking any traffic laws" when Border Patrol pulled them over.  (Doc. 15-8 at 2, ¶ 4.)  She

10    reports agents approached the car and directed the occupants to get out.  (*Id.*, ¶¶ 5-6.)  Hernandez

11    Espinoza reports, "The agents asked us for our IDs, if we had papers, and if we were here legally.  I

12    did not answer their questions, and I did not produce an ID because I was not carrying one with me.

13    The agents did not explain why they had pulled us over."  (*Id.* at 3, ¶ 7.)  Similarly, Vargas Mendez

14    reports he was a passenger in a van that Border Patrol stopped.  (Doc. 15-6 at 2, ¶ 4.)  He reports that

15    when he heard sirens, he "looked at the speedometer and saw [they] were driving under 40 miles an

16    hour, well below the speed limit."  (*Id.*, ¶ 5.)  Vargas Mendez states agents opened the van door, and

17    "shouted in Spanish that [they] needed to show him [their] IDs, and warned [the passengers] had better

18    'tell the truth.'"  (*Id.*, ¶ 8.)  Vargas Mendez states he did not produce identification because he was not

19    carrying it, and the agents "dragged" him out of the van and handcuffed him.  (*Id.*, ¶¶ 9-10.)

20            Ernesto Campos Gutierrez was driving his truck—with a passenger in the front seat—and

21    towing a mini trailer with gardening equipment when Border Patrol stopped him on January 8, 2025.

22    (Doc. 15-4 at 3, ¶ 3.)  He reports he was driving the speed limit and his truck "had current license

23    plates and registration, and had no stickers or decals."  (*Id.*)  Campos Gutierrez pulled over when

24    directed, and a Border Patrol agent asked for his identification through the window, which remained

25    closed.  (*Id.*, ¶ 4.)  Campos Gutierrez heard the agent tell another person that that he "had two bodies"

26    before Campos Gutierrez lowered the window and provided his REAL ID driver's license.  (*Id.*)

27            UFW members also reported being pulled over in a vehicle "traveling within the speed limit

28    and obeying traffic laws."  (Doc. 15-3 at 8, ¶ 26.)  Alicia, Benjamin, and Carlos passed Border Patrol

1    vehicles that were parked on the shoulder of a road, after which Border Patrol left the shoulder and

2    signaled for them to pull over.  (*Id.*, ¶¶ 26-27.)  Agents "approached the car and asked Alicia,

3    Benjamin, and Carlos if they had 'papers.'"  (*Id.* at 9, ¶ 27.)  They believe that "[t]he agents did not

4    appear to know who was in the car, and did not appear to have any reason for pulling the car over,

5    other than to ask for 'papers.'"  (*Id.*)

6         Oscar Morales Cisneros, also one of the three proposed representatives, reports that while in his

7    truck outside a liquor store "located in a predominantly Latino-populated neighborhood," Border Patrol

8    agents pulled behind his vehicle—which had current registration and no stickers or decals on it—and

9    blocked him in.  (Doc. 15-9 at 2, ¶ 4.)  The agents approached his truck and asked if he "had papers and

10   was here legally."  (*Id.*, ¶ 5.)  He did not answer the questions but provided his driver's license when

11   asked.  (*Id.*)  After the agents arrested Morales Cisneros, they drove around Bakersfield.  (*Id.* at 3, ¶ 7.)

12   He reports that at one point, the agents stopped at a gas station where they "pulled up behind a vehicle

13   to block it in," as they had done to him, and spoke to a person in the vehicle.  (*Id.*)  Morales Cisneros

14   heard an agent say "We're doing our job" before they let the unidentified person go.  (*Id.*)

15        Plaintiffs provide news articles regarding the Operation, which include statements by Sara

16   Fuentes.  (Doc. 15-2 at 68, 98.)  Fuentes is not a putative class member, but she witnessed Border

17   Patrol agents in action during the Operation, as manager of a gas station where Border Patrol agents

18   detained the station's customers.  (*Id.*)  She saw agents arrive in civilian clothes and unmarked

19   vehicles.  (*Id.* at 98.)  At first, Fuentes thought the agents were serving a warrant, but then she noticed

20   "it was only Hispanics and field workers that they were putting aside."  (*Id.* at 68.)  Fuentes saw that

21   the agents "didn't stop people with FedEx uniforms, they were stopping people who looked like they

22   worked in the fields."  (*Id.* at 98.)  Fuentes witnessed the agents approach customers, ask about their

23   immigration status, and arrest individuals.  (*Id.*; *see also id.* at 7, ¶ 17.)  Fuentes saw Border Patrol

24   agents parked behind a woman's car to block her in, but the agents "allowed the woman to leave"

25   when a local news entity arrived at the gas station.  (*Id.*; *see also id.* at 69.)

26        Plaintiffs and putative class members report facts indicating they were engaged in ordinary

27   activities—such as talking with family members and others or driving home from work in vehicles that

28   were not violating traffic laws—when Border Patrol stopped them, demanded their "papers" and

ER058

1   questioned them about whether they were in the country legally.  Collectively, Plaintiffs present

2   evidence that is "more likely than not" Border Patrol agents engaged in a practice of performing

3   detentive stops without knowledge of who they were stopping, and without reasonable suspicion to

4   perform the stop.  Although Defendants contend there were "various facts and circumstances

5   concerning each detention" (Doc. 32 at 19), the circumstances identified by Defendants constitute a

6   distinction without a difference. Whether Border Patrol agents wore uniforms or plain clothes does not

7   change whether the agents had reasonable suspicion to perform the stops.  Whether a person handed

8   over identification while being detained does not address whether the Border Patrol agents engaged in

9   a practice of performing stops without reasonable suspicion.  Ultimately, there is no substantive

10   conflict in the evidence regarding the alleged practice.

11        With the anecdotal evidence—from named Plaintiffs, putative class members, and a third

12   party—Plaintiffs have met their burden of establishing by a preponderance of the evidence that putative

13   class members "suffered the same injury" imposed by Border Patrol, which engaged in a practice of

14   performing detentive stops without individualized assessments of reasonable suspicion during

15   "Operation Return to Sender."  Furthermore, whether the practice violated the rights of the class

16   members under the Fourth Amendment is a question that "can be answered 'yes' or 'no' in one stroke

17   as to the entire class."  *See Parsons*, 754 F.3d at 684; *see also Kidd*, 343 F.R.D. at 438-439 (finding the

18   commonality requirement was satisfied where the plaintiffs challenged practices of ICE in conducting

19   home arrests, noting "[t]hese practices and policies affect all putative class members because the

20   classes themselves are defined as those who have experienced or will experience the effects of these

21   practices and policies").  Therefore, the Court finds Plaintiffs have satisfied the commonality

22   requirement for the Suspicionless Stop Class.

23             2.     Warrantless Arrest Class

24        Plaintiffs contend that Defendants had a "policy, pattern, and/or practice of using warrantless

25   arrests during sweeps of areas where people of Latino descent, farm workers, and day laborers live,

26   work, drive, and gather."  (Doc. 1 at 65, ¶ 328.)  According to Plaintiffs, "Defendants' policy, pattern,

27   and/or practice of making warrantless arrests without the required individualized flight risk analysis is

28   'final agency action' that is 'in excess of statutory jurisdiction, authority, or limitations' under 8 U.S.C.

1  § 1357(a)(2) … [and] 8 C.F.R. § 287.8(c)(2)(ii)."  (*Id.* at 66-67, ¶¶ 331, 338.)  Specifically, 8 U.S.C. §

2  1357(a)(2) provides that an immigration officer has the power, without a warrant:

3  > to arrest any alien who in his presence or view is entering or attempting
> to enter the United States in violation of any law or regulation made in
4  > pursuance of law regulating the admission, exclusion, expulsion, or
> removal of aliens, or to arrest any alien in the United States, if he has
5  > reason to believe that the alien so arrested is in the United States in
> violation of any such law or regulation and is likely to escape before a
6  > warrant can be obtained for his arrest… .

7  *Id.*  Similarly, 8 C.F.R. § 287.8(c)(2)(ii) indicates that an immigration officer "shall" obtain a warrant

8  of arrest "except when the designated immigration officer has reason to believe that the person is

9  likely to escape before a warrant can be obtained."  *Id.*

10       Plaintiffs assert the following are "the common questions of law and fact" for the proposed

11  Warrantless Arrest Class:

12  - Whether Border Patrol has a pattern or practice of conducting
    warrantless arrests without probable cause that an individual is likely
13    to escape before a warrant can be obtained for the arrest;

14  - Whether Border Patrol's pattern or practice of conducting warrantless
    arrests without probable cause that an individual is likely to escape
15    before a warrant can be obtained for the arrest violates 8 U.S.C. §
    1357(a)(2); and
16

17  - Whether Border Patrol's pattern or practice of conducting warrantless
    arrests without probable cause that an individual is likely to escape
    before a warrant can be obtained for the arrest violates 8 C.F.R. §
18    287.8(C)(2)(ii).

19  (Doc. 14-1 at 18.)  Again, the first question identified by Plaintiffs implicates their burden associated

20  with the pending motion.  *See Ellis*, 657 F.3d at 983; *Black Lives Matter L.A.*, 113 F.4th at 1264.

21  Consequently, the Court must evaluate whether Plaintiffs demonstrate by a preponderance of the

22  evidence that Border Patrol had a pattern or practice of conducting warrantless arrests without probable

23  cause that an individual is likely to escape before a warrant can be obtained.  Put another way, Plaintiffs

24  must present evidence Defendants had a pattern or practice of not performing flight risk assessments to

25  find probable cause prior to their arrests without a warrant.  *See Mountain High Knitting, Inc. v. Reno*,

26  51 F.3d 216, 218 (9th Cir. 1995) (holding that an arrest under § 1357(a)(2) requires an individualized

27  determination of flight risk).

28       The three proposed class representatives report they were placed under arrest, without a warrant,

ER060

1    and without Border Patrol agents asking any information to assess their flight risk.  (Doc. 15-9 at 3,

2    Morales Cisneros Decl. ¶ 6; Doc. 15-10 at 2-3, Munguia Esquivel Decl. ¶¶ 6-8; Doc. 15-11 at 3,

3    Aguilera Martinez Decl. ¶ 8.) Morales Cisneros reports the agents told his daughter that he "was

4    detained by Border Patrol for being here illegally without documents."  (Doc. 15-9 at 3, ¶ 6.)  He states,

5    "[Agents] did not ask about my ties to the community, such as my family members, my work history,

6    or how long I have lived in the neighborhood."  (*Id.*)  Munguia Esquivel also asserts the Border Patrol

7    agent did not "ask me about my community ties, such as my family, work history, or how long I have

8    been living here."  (Doc. 15-10 at 3, ¶ 8.)  Likewise, Aguilera Martinez reports, "The agent never asked

9    me about my community ties to Kern County, like how long I have lived and worked here and all the

10   family members I have who live here."  (Doc. 15-11 at 3, ¶ 8.)

11        Elizabeth Strater reports that when UFW Members Alicia, Benjamin, and Carlos were arrested,

12   Border Patrol agents asked for their "papers" and "did not present a warrant for arrest … [or] ask any

13   further questions."  (Doc. 15-3 at 9, Strater Decl. ¶ 28.)  Strater reports, "After they had handcuffed

14   [Alicia], the agents asked Alicia if she had family.  When she told them she had children, an agent

15   'offered' to go pick up the children so they could all be taken to Mexico together.  The men did not

16   ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight

17   risk."  (*Id.*)  Strater also reports that when UFW Member Fernando was arrested, "The agents did not

18   present a warrant for arrest or ask Fernando anything about his family, community ties, employment,

19   or other factors related to his likelihood of flight risk."  (*Id.* at 12, ¶ 41.)

20        The other putative class members uniformly report that Border Patrol agents arrested them

21   without warrants and without asking any questions to assess their individual flight risk.  (Doc. 15-6 at

22   3, Vargas Mendez Decl. ¶ 10 ["They did not show us any warrants. They never asked about my

23   community ties to Kern County, such as how long I had lived there, my family, or my employment."];

24   Doc. 15-7 at 2, Perez Cruz Decl. ¶ 4 ["None of the agents asked me anything about my family,

25   community ties, work, or life in Bakersfield. The agents did not present me with a warrant of any kind

26   and did not appear to have any idea who I was before they demanded by ID."]; Doc. 15-8 at 3,

27   Hernandez Espinoza Decl. ¶ 7 ["The agents never asked me questions about my community ties, such

28   as the many years I lived here, my work history, or my children and grandson."]; Doc. 15-5 at 2,

1   Ramirez Decl. ¶¶ 6-7 [reporting the agent did not have a warrant and "[t]he agent did not ask me any

2   questions about my family or ties to the community. If he had asked, I would have told him I have

3   family in Bakersfield and elsewhere in California. I would have told him my children live in

4   California, and my son is still a minor."].)

5        Even when information regarding family and community ties was volunteered to Border Patrol

6   agents following arrests of putative class members, the agents expressly disregarded it.  For example,

7   Munguia Esquivel reports that his family members spoke to Border Patrol when they came to get his

8   truck and said Munguia Esquivel "was in the process of regularizing [his] immigration status."  (Doc.

9   15-10 at 3, ¶ 9.)  He states, "The agents did not care and said they were taking me anyway."  (*Id.*)

10  Similarly, Vargas Mendez reports what while in the Border Patrol vehicle after his arrest: "I told [an

11  agent] I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no

12  criminal record."  (Doc. 15-6 at 3, ¶ 11.)  The agent "responded he did not care and that [Vargas

13  Mendez] was 'going to Mexico.'"  (*Id.*)

14       Although Defendants contend "the determination[s] of whether an alien is a flight risk … are

15  inherently individualized determinations" (Doc. 32 at 20), this argument misses the mark.  Plaintiffs do

16  not contend Border Patrol erred in assessing flight risks; they contend that the probable cause

17  determinations were not performed *at all*.  (*See* Doc. 1 at 65-76; Doc. 37 at 7.)  Towards this end,

18  Defendants' assertions regarding the differences in circumstances, including the length of detentions by

19  Border Patrol, are unavailing.

20       Plaintiffs present evidence regarding 11 arrests during "Operation Return to Sender"—

21  including the arrests of proposed class members and putative class members— where the individuals

22  report Border Patrol arrested them without performing an assessment of whether the individuals were

23  likely to escape before a warrant could be obtained.  This number is not insignificant given the fact

24  that Border Patrol reported a total of 78 arrests during the Operation.  (Doc. 38-1 at 5-6, *see also* Doc.

25  15-2 at 72.)  Indeed, the Supreme Court has held that anecdotal evidence that included "roughly one

26  account for every eight members of the class" was a "significant" support for a "pattern and practice"

27  claim.  *See Wal-Mart*, 56 U.S at 358 (comparing the evidence before the Court in *Wal-Mart* with the

28  evidence presented in *Teamsters v. United States*, 431 U.S. 324 (1977)).  Because Plaintiffs present

ER062

1    significant anecdotal evidence—comparable to the amount presented in *Teamsters*—Plaintiffs have

2    met their burden of establishing that the class members suffered "the same injury" from the alleged

3    Border Patrol practice.  Whether this practice was unlawful or violated the class members' rights may

4    be answered at one time. Therefore, the commonality requirement is satisfied for the Warrantless

5    Arrest Class.

6        **C.    Typicality**

7        This requirement demands that the "claims or defenses of the representative parties are typical

8    of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality ensures "the interest[s] of

9    the named representative align[] with the interests of the class."  *Torres v. Mercer Canyons Inc.*, 835

10   F.3d 1125, 1141 (9th Cir. 2016) (citation omitted).  A claim or defense is not required to be identical,

11   but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at

12   1020.  "The test of typicality is whether other members have the same or similar injury, whether the

13   action is based on conduct which is not unique to the named plaintiffs, and whether other class

14   members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d

15   497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Torres*, 835 F.3d at 1020

16   (identifying the same as "[m]easures of typicality").

17       Individual Plaintiffs contend their claims "are typical of those of the members of the Proposed

18   Classes, because they all arise from Border Patrol's illegal immigration policies, practices, or patterns

19   pertaining to suspicionless stops and warrantless arrests in this District."  (Doc. 14-1 at 19.)  Plaintiffs

20   assert the immigration policies and practices they challenge "are 'not unique' to the Individual

21   Plaintiffs."  (*Id.*, quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).) They indicate that "[a]ll

22   members of the Proposed Classes they seek to represent have been, or will be, injured by the same

23   course of conduct."  (*Id.*, internal quotation marks omitted.)  Plaintiffs argue, "The fact that some

24   putative class members experienced different *outcomes* flowing from Border Patrol's unlawful actions

25   because of their differing immigration status does not defeat typicality because *all* class members have

26   suffered, or will suffer, the same harms."  (*Id.* [emphasis in original].)

27       Defendants argue Plaintiffs do not show "the claims of the proposed class representatives or

28   other named Plaintiffs are typical of the members of the Proposed Classes."  (Doc. 32 at 22.)

1    Defendants contend there are "wildly differing underlying factual circumstances necessary to the

2    determination of probable cause and flight risk" for the putative class members.  (*Id.*)  For example,

3    Defendants observe:

4            [A]ll three proposed class representatives provided the agents with their
             identification. *See* Cisneros Decl. at ¶ 5, Esquivel Decl. at ¶¶ 7-9, Martinez
5            Decl. at ¶¶ 6,12. In contrast, the other Plaintiffs did not provide their
             identification to the agents. Mendez Decl. at ¶ 9, Espinoza Decl. at ¶ 7.
6

7    (*Id.*)  According to Defendants, "This alone shows that the proposed putative class representatives'

8    claims or defenses cannot be typical of the members of the Proposed Classes."  (*Id.*)  Defendants also

9    argue individualized assessments are necessary for the Court to determine "whether class members

10   have the same or similar injury: unlawful stop and arrest."  (*Id.* at 22 [emphasis omitted].)  Defendants

11   contend that "a flight risk determination may include factors such as whether individuals are eligible

12   for relief from removal, have criminal convictions which bar them from relief, or have final removal

13   orders or have been previously removed, in addition to the circumstances of their warrantless arrests."

14   (*Id.* at 22-23.)  Defendants conclude, "Because these individualized circumstances are relevant to a

15   court's consideration of whether class members share similar injury—because they are necessary to

16   the probable cause and flight risk analysis—Plaintiffs proposed putative classes fail to meet the

17   typicality requirement."  (*Id.* at 23.)

18          Once again, Plaintiffs are not asserting Border Patrol made *incorrect* reasonable suspicion

19   findings or *incorrectly* considered factors related to flight risk.  Plaintiffs are asserting that Border

20   Patrol agents did not make reasonable suspicion determinations related to the detentive stops and did

21   not make flight risk assessments before effecting the warrantless arrests.  Factual differences related to

22   the circumstances of the detentive stops and arrests—such as whether the proposed class

23   representatives and putative class members provided agents with identification—do not preclude a

24   finding of typicality, because the proposed representatives and putative class members were subjected

25   to the same practices of Border Patrol.  *See Boley v. Universal Health Servs.*, 36 F.4th 124, 134 (3rd

26   Cir. 2022) (explaining that "even relatively pronounced factual differences will generally not preclude a

27   finding of typicality" when the "cause of the injury remains the same").

28          The evidence shows the proposed class representatives were subjected to the same practices of

63

ER064

1    Border Patrol as the putative class members and suffered the same injuries: detentive stops without

2    reasonable suspicion and arrests without the agents performing individual assessments of flight risk to

3    find probable cause to find they were likely to escape before a warrant could be obtained.  Because the

4    class representatives were subject to the same practices, their claims are typical of the putative class

5    members.  *See Hanon*, 976 F.2d at 508; *see also Torres*, 835 F.3d at 1020.  Therefore, Plaintiffs have

6    met their burden of satisfying the typicality requirement for both the Suspicionless Stop and

7    Warrantless Arrest Classes.

8          **D.    Adequacy of Representation**

9          Absentee class members must be adequately represented for judgment to be binding upon them.

10   *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  This prerequisite is satisfied if the representative party

11   "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Supreme

12   Court explained, "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest

13   between named parties and the class they seek to represent."  *Amchem*, 521 U.S. at 625.  Resolution of

14   the adequacy issue requires the Court to address two questions: "(1) do the named plaintiffs and their

15   counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and

16   their counsel prosecute the action vigorously on behalf of the class?"  *Kim v. Allison*, 87 F.4th 994,

17   1000 (9th Cir. 2023) (quoting *Hanlon*, 150 F.3d at 1020).

18             1.    Proposed class representatives

19         Plaintiffs seek the appointment of Oscar Morales Cisneros, Wilder Munguia Esquivel, and

20   Yolanda Aguilera Martinez as the class representatives for both the Suspicionless Stop and

21   Warrantless Arrest Classes.  (Doc. 14-11 at 8.)  Defendants argue that "the named plaintiffs are not

22   shown to be adequate representatives."  (Doc. 32 at 23 [emphasis omitted].)  Defendants contend that

23   "[t]he three proposed class representatives and other named Plaintiffs here will fail to fairly and

24   adequately protect the class interests because, like the discussion in the commonality and typicality

25   requirements, the Proposed Classes encompass a broad range of individuals with different factual

26   bases for their claims, different avenues of possible relief, etc."  (*Id.*)  This assertion ignores the proper

27   test for evaluating adequacy.  *See Kim*, 87 F.4th at 1000.  Moreover, as discussed above, the proposed

28   class representatives were subjected to the same Border Patrol practices and suffered the same injuries

as the putative class members, and different circumstances regarding their detentive stops and arrests do not defeat certification.

There is no evidence that Morales Cisneros, Munguia Esquivel, or Aguilera Martinez have any conflict of interests with the two proposed classes. To the contrary, their interests are aligned with those of putative class members: to obtain declaratory and injunctive relief. Morales Cisneros, Munguia Esquivel, and Aguilera Martinez all attest to their understanding that as class representatives, they "represent the interests of everyone in the class," not only themselves. (Doc. 15-9 at 6, Morales Cisneros Decl. ¶ 23; Doc. 15-10 at 6, Munguia Esquivel Decl. ¶ 21; Doc. 15-11 at 15, Aguilera Martinez Decl. ¶ 15.) Each also states: "I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was." (*Id.*) Morales Cisneros, Munguia Esquivel, and Aguilera Martinez commit to staying informed regarding what is happening in this case, remaining in contact with counsel, and providing the attorneys with "information they need." (*Id.*) Thus, each committed to vigorously prosecuting the action on behalf of the class. (*See id.*; *see also* Doc. 14-1 at 20.) Plaintiffs carry the burden to show the proposed class representatives satisfy the adequacy requirement of Rule 23(a)(4). *See Kim*, 87 F.4th at 1000; *Hanlon*, 150 F.3d at 1020.

### 2.    Proposed class counsel

Plaintiffs request the appointment of 12 attorneys as class counsel: (i) from the ACLU Foundation of Northern California- Bree Bernwanger, Michelle (Minju) Y. Cho, Lauren Davis, and Shilpi Agarwal; (ii) from the ACLU Foundation of Southern California- Mayra Joachin, Eva Bitran, and Oliver Ma; (iii) from the ACLU Foundation of San Diego and Imperial Counties- Brisa Velazquez Oatis; and (iv) from the law firm of Keker, Van Nest & Peters LLP- Ajay S. Krishnan, Franco Muzzio, Zainab O. Ramahi, and Julia L. Greenberg. (*See* Doc. 1 at 69, ¶ 3; *see also id.* at 70-71.)

Plaintiffs assert the proposed class counsel satisfy the adequacy requirement, because they are "experienced civil rights attorneys and practitioners in federal constitutional litigation, class actions, and complex litigation involving immigrants' rights." (Doc. 14-1 at 20, citing Bernwanger Decl. ¶¶ 2, 4-13 [Doc. 14-3 at 2-9], Krishnan Decl. ¶¶ 3-5, 7-13 [Doc. 14-2 at 2-5].) Plaintiffs also assert "counsel have adequately and thoroughly investigated the claims prior to bringing this suit, and they will

1    vigorously prosecute this action on behalf of the Proposed Classes." (*Id.*) Defendants do not dispute

2    these assertions or argue that the proposed class counsel fail to satisfy the adequacy requirement. (*See*

3    *generally* Doc. 32 at 12-24.)

4         Bree Berwanger reports that she is a senior staff attorney at the ACLU Foundation of Northern

5    California (ACLUF-NC) and has "been involved in all aspects of this case." (Doc. 14-3 at 2, ¶ 2.) She

6    states that the ACLUF-NC, the ACLU Foundation of Southern California (ACLUF-SC), the ACLU

7    Foundation of San Diego and Imperial Counties (ACLUF-SDIC) all "have extensive experience in

8    class litigation and immigrants' rights litigation and, collectively, have served as lead counsel in dozens

9    of civil rights class actions, including before this Court." (*Id.*, ¶ 3.) Bernwanger notes that she

10   personally has "extensive experience litigating complex civil litigation to defend and advance the rights

11   of immigrants in the United States," and with representing "noncitizen plaintiffs or petitioners in a

12   several non- class cases raising complex issues." (*Id.*, ¶¶ 5-6.) She also describes the litigation

13   experience and bar admission status for each of the identified attorneys from ACLUF-NC, ACLUF-SC,

14   and ACLUF-SDIC. (*Id.* at 4-9, ¶¶ 7-13.) Bernwanger reports that counsel intend to "zealously

15   represent the interests of the class to the best of [their] collective ability." (*Id.* at 10, ¶ 14.) Finally,

16   Bernwanger reports that she is "not aware of any conflicts between ACLUF-NC, ACLUF-SC, ACLUF-

17   SDIC, and any members of the potential class." (*Id.*, ¶ 16.)

18        Ajay Krishnan, from the law firm of Keker, Van Nest & Peters LLP, also provides a

19   declaration in support of the motion for provisional class certification. (Doc. 14-2.) He indicates the

20   law firm "has significant experience handling civil rights cases and litigation to vindicate the rights of

21   underserved populations." (*Id.* at 2, ¶ 3.) Krishnan reports that "[i]n partnership with the American

22   Civil Liberties Union offices, [his] law firm has conducted extensive identification and investigation

23   of potential class claims, both prior and subsequent to filing the present action." (*Id.* at 3, ¶ 5.)

24   Krishnan describes his personal litigation experience, as well as those of the other attorneys at the firm

25   who will be assisting on the matter. (*Id.* at 3-5, ¶¶ 7-13.) Krishnan reports that "Keker, Van Nest &

26   Peters has no conflict with the proposed class members that would compromise its ability to represent

27   the class." (*Id.* at 3, ¶ 6.)

28        Based upon the declaratory evidence provided, proposed class counsel have significant

experience and are dedicated to vigorously prosecuting this action on behalf of the class.  There are also no known conflicts between proposed class counsel and class members that would preclude or impede representation of the classes in this action.  Accordingly, the Court finds the identified attorneys satisfy the adequacy requirement.

### E.     Certification under Rule 23(b)(2)

Once the requirements of Rule 23(a) are satisfied, the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Amchem Prods*, 521 U.S. at 614; *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  Plaintiffs assert certification of the provisional classes is appropriate under Rule 23(b)(2), under which a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Ninth Circuit observed that "the primary role" of Rule 23(b)(2) "has always been the certification of civil rights class actions."  *Parsons*, 754 F.3d at 686; *see also Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 632 (C.D. Cal. 2007) ("[o]riginally designed for civil rights cases, Rule 23(b)(2) class actions are limited to those class actions seeking primarily injunctive or corresponding relief") (citation omitted).

Plaintiffs observe that under Rule 23(b)(2), certification is appropriate "when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole."  (Doc. 14-1 at 21, quoting *Parsons*, 754 F.3d at 688.)  According to Plaintiffs, the Suspicionless Stop and Warrantless Arrest Classes "are quintessential Rule 23(b)(2) classes" for two reasons:

> *First*, Border Patrol has acted on grounds generally applicable to each class because they have subjected, or will subject, all members of the Proposed Classes to the same unlawful policies or practices— namely, the ways in which Border Patrol conducts suspicionless stops and warrantless arrests. [Citation.] *Second*, the prospective forms of relief Plaintiffs request for each Proposed Class for the preliminary injunction are appropriate for each class as a whole, because they all target Border Patrol's central and systemic failures.

(*Id.* at 21 [emphasis in original].)  Therefore, Individual Plaintiffs request the Court provisionally certify the Suspicionless Stop and Warrantless Arrest Classes under Rule 23(b)(2).

ER068

1    Defendants argue that "Plaintiffs cannot satisfy the requirements for an injunctive-relief class

2    under Rule 23(b)(2)." (Doc. 32 at 23 [emphasis omitted].)  Defendants maintain that "[c]lasswide relief

3    would not be appropriate" because "each alien detained by USBP has a unique set of circumstances and

4    unique avenues for seeking relief." (*Id.* at 24.)  Defendants argue that "because there is no pattern and

5    practice of failure to comply with the Fourth Amendment's probable cause requirements and 8 U.S.C. §

6    1357 flight risk assessment, Plaintiffs cannot show that the government has "acted or refused to act on

7    grounds that apply generally to the class." (*Id.*)  According to Defendants, "classwide relief is not

8    suitable for making Plaintiffs whole." (*Id.*)  The evidence contradicts Defendants' assertions, because it

9    shows agents engaged in a "pattern and practice" of violating Fourth Amendment rights and failing to

10   perform flight risk assessments.

11    The Ninth Circuit observed that the inquiry under Rule 23(b)(2) "does not require an

12   examination of the viability or bases of the class members' claims for relief, does not require that the

13   issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a

14   finding that all members of the class have suffered identical injuries." *Parsons*, 754 F.3d at 688

15   (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010)).  The Court found that Rule 23(b)(2)

16   is "unquestionably satisfied" when "members of a putative class seek uniform injunctive or

17   declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K.*

18   *ex rel. Tinsley v. Snyder,* 922 F.3d 957, 971 (9th Cir. 2019).  For example, the Court certified a class of

19   immigrant detainees under Rule 23(b)(2) because "relief from a single practice [was] requested by all

20   class members." *Rodriguez*, 591 F.3d at 1126.  Similarly, the Court found certification under Rule

21   23(b)(2) was appropriate in *Parsons* where the members of the putative class were exposed to

22   centralized "policies and practices" that violated their constitutional rights, even if the putative class

23   members were not all affected "in exactly the same way." *Id.*, 754 F.3d at 688.

24    As discussed above, Plaintiffs contend that Defendants' practices of conducting detentive stops

25   without reasonable suspicion and warrantless arrests without flight risk assessments detrimentally

26   affected the named plaintiffs and putative class members, and they seek injunctive relief to enjoin these

27   practices.  (*See* Doc. 1 at 70, Prayer ¶¶ 8-9.)  Plaintiffs do not seek relief related to immigration relief or

28   removal proceedings on behalf of the Suspicionless Stop and Warrantless Arrest Classes.  Instead, the

1   class-wide injuries relate to "the harm of being subjected to the unconstitutional or unlawful

2   practice[s]." (*See* Doc. 37 at 12.)  Even if the class members were not all affected by Border Patrol

3   practices in the same manner—because some were not taken into custody following the detentive stops,

4   while others were arrested and then released—Plaintiffs identify Border Patrol's practices that they

5   contend violated their constitutional rights.  This is sufficient to satisfy Rule 23(b)(2), because relief

6   from these practices "is requested by all class members."  *See Rodriguez*, 591 F.3d at 1126; *see also*

7   *Gonzalez*, 975 F.3d at 812 (affirming certification under Rule 23(b)(2) because "a determination about

8   the lawfulness of [a] policy under the Fourth Amendment and corresponding injunctive or declaratory

9   relief would provide relief to the entire class").

10         Injunctive relief would apply to all members of the Suspicionless Stop and Warrantless Arrest

11   Classes, because Defendants' practices "apply generally to the class[es]." *See* Fed. R. Civ. P. 23(b)(2).

12   Defendants' assertions to the contrary are undermined by their argument that the "claims have been

13   resolved" because the El Centro Sector of Border Patrol issued its "Muster" with guidance on

14   reasonable suspicion, flight risk assessments, and documenting facts and circumstances on warrantless

15   arrests.  (*See* Doc. 31 at 15; *see also id.* at 9.)  In making this argument, Defendants implicitly

16   acknowledge that injunctive and declaratory relief *can* apply to the claims of the two proposed classes.

17   The Court finds certification is appropriate under Rule 23(b)(2) for both the Suspicionless Stop Class

18   and the Warrantless Arrest Class.  *See Parsons*, 754 F.3d at 688; *Gonzalez*, 975 F.3d at 812.

19         **F.     Appointment of Class Counsel**

20         Pursuant to the Federal Rules of Civil Procedure, any "order that certifies a class action…must

21   appoint class counsel under Rule 23(g).  Fed. R. Civ. P. 23(c)(1)(B).  Under Rule 23(g), the Court is

22   directed to consider:

23           (i) the work counsel has done in identifying or investigating potential
24           claims in the action;

25           (ii) counsel's experience in handling class actions, other complex
     litigation, and the types of claims asserted in the action;

26           (iii) counsel's knowledge of the applicable law; and

27           (iv) the resources that counsel will commit to representing the class.

28   Fed. R. Civ. P 23(g)(1)(A).

69

Based upon the information provided from Bree Bernwanger and Ajay Krishnan—and the evidence submitted with the pending matters—it is clear that proposed counsel engaged in significant investigation regarding the claims in this action, including identifying and investigating the circumstances of the detentive stops and arrests for not only the class representatives but also many class members. Proposed counsel describe extensive experience with class actions and complex litigation. (*See* Doc. 14-2 at 2-5, Krishnan Decl. ¶¶ 3-4, 7-13; Doc. 14-3 at 2-9, Bernwanger Decl. ¶¶ 4-13.) Proposed counsel also exhibit the requisite knowledge of constitutional law and the relevant provisions of the INA. Finally, counsel have the necessary resources to represent the claims of the two classes and are committed to expending such resources on this matter. (*See* Doc. 14-2 at 3, Krishnan Decl. ¶ 5; Doc. 14-3 at 10, Bernwanger Decl. ¶ 14.) Accordingly, the factors identified under Rule 23(g) weigh in favor appointment of the proposed class counsel for the provisional classes.

**V.    Conclusion**

Plaintiffs have met the burden to show by a preponderance of the evidence that the Suspicionless Stop and Warrantless Arrest Classes satisfy the requirements of Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. Accordingly, class certification is appropriate, and the motion for provisional class certification is **GRANTED**.

### MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs move for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Local Rule 231, seeking an order to ensure that Border Patrol agents comply with the Fourth Amendment and their statutory obligations when performing operations within the Eastern District. (*See* Doc. 15.)

**I.    Governing Legal Standards**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). In general, preliminary injunctions are intended to "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. --, 145 S.Ct. 659, 667 (2025) (citations omitted).

When seeking a preliminary injunction, plaintiffs must establish: (1) they are "likely to succeed

ER071

1    on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a

2    preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in

3    the public interest." *Winter*, 555 U.S. at 20; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 339-

4    40 (2024) (reiterating the court must consider the *Winter* test with a request for a preliminary

5    injunction).  The moving party has the burden to "make a showing on all four prongs" of the *Winter*

6    test to obtain a preliminary injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

7    (9th Cir. 2011).  Thus, the moving party has "the burden of persuasion." *Mazurek v. Armstrong*, 520

8    U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023).

9         The Court may weigh the request for a preliminary injunction with a sliding-scale approach.

10   *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Flathead*, 98

11   F.4th at 1190 (indicating the sliding scale test remains viable after *Winter*, and the district court did not

12   err in applying it).  Accordingly, a stronger showing on the balance of hardships may support the

13   issuance of a preliminary injunction where there are "serious questions on the merits … so long as the

14   plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the

15   public interest." *Id.*; *see also Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1057-58

16   (9th Cir. 2007) (explaining "the relationship between success on the merits and irreparable harm [is] a

17   sliding scale in which the required degree of irreparable harm increases as the probability of success

18   decreases," but that "a moving party must, at an 'irreducible minimum' demonstrate some chance of

19   success on the merits").

20   **II.    Nature of the Requested Injunction**

21        Preliminary injunctions may be mandatory or prohibitory.  *N.D. v. Reykdal*, 102 F.4th 982, 992

22   (9th Cir. 2024).  A mandatory injunction is one that orders a party to "take action," while a prohibitory

23   injunction is one that "restrains" a party from further action and "aims at simply maintaining the status

24   quo." *N.D.*, 102 F.4th at 992; *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996).  The Ninth

25   Circuit observed that "courts should be extremely cautious about issuing a preliminary injunction"

26   when the requested mandatory relief "goes well beyond maintaining the status quo." *Stanley v.

27   University of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (citation omitted).  Thus, parties seeking a

28   mandatory injunction must establish "the law and facts *clearly favor* [their] position, not simply that

ER072

1   [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (emphasis in

2   original). Given the "heightened standard" upon a party seeking a mandatory injunction, the Court

3   must first determine the nature of the preliminary injunction requested by Plaintiffs. *See Master Tax*

4   *LLC v. Ultimate Software Grp.*, 770 Fed. Appx. 386, 387 (9th Cir. 2019); *see also Stanley*, 13 F.3d at

5   1320 (indicating the Court's "first task is to determine whether [the moving party] requested a

6   prohibitory injunction or a mandatory injunction").

7           In their prayer, Plaintiffs indicate they seek a preliminary injunction enjoining violations of the

8   Suspicionless Stop Class's rights under the Fourth Amendment of the Constitution and the

9   Warrantless Arrest Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). (Doc. 1

10  at 70, Prayer for Relief ¶¶ 8-9.) Plaintiffs now indicate:

11                  Plaintiffs request a preliminary injunction to ensure that, when Border
                    Patrol conducts operations in this District, it complies with its
12                  constitutional and legal duties to refrain from (1) detentive stops without
                    reasonable suspicion that the person stopped is in the country unlawfully,
13                  and (2) warrantless arrests without regard to probable cause that the
                    arrestee is likely to escape before a warrant can be obtained.
14

15  (Doc. 15-1 at 8-9.) Thus, Plaintiffs request injunctive relief preventing Defendants from future

16  violations of established constitutional and statutory rights. (*Id.*; Doc. 1 at 70, ¶¶ 8-9.) Notably, the

17  Ninth Circuit determined that an injunction that "prevents future constitutional violations [is] a classic

18  form of prohibitory injunction." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017); *see also*

19  42 Am. Jur. 2d *Injunctions* § 5 (2017) ("An injunction is considered prohibitory when the thing

20  complained of results from present and continuing affirmative acts and the injunction merely orders

21  the defendant to refrain from doing those acts"). Consequently, the Court finds the requested relief—

22  which maintains the status quo—is prohibitory.

23  **III.     Discussion and Analysis**

24          Plaintiffs seek to: (1) enjoin Border Patrol agents "from conducting detentive stops in this

25  district unless there is reasonable suspicion that the person stopped is a noncitizen present within the

26  United States in violation of U.S. immigration law, as required by the Fourth Amendment of the

27  United States Constitution"; (2) enjoin Border Patrol agents "from effecting warrantless arrests in this

28  district unless there is probable cause that the noncitizen being arrested is likely to escape before a

ER073

warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2)"; (3) direct compliance with DHS's "Broadcast Statement of Policy" when making warrantless arrests in this district, "including documenting the probable cause that underlies those arrests"; (4) direct agents to "document the facts and circumstances surrounding the stop in narrative form," including the facts supporting reasonable suspicion for vehicle stops and stops on foot; (5) direct "Defendants to provide that reasonable suspicion and probable cause documentation to Plaintiffs' counsel on a regular schedule"; (6) direct Defendants to develop "a directive setting forth guidance to Border Patrol agents concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in this District"; and (7) direct training of "Border patrol agents who have performed or will perform … operations in this District."  (*See* Doc. 15-1 at 2-3; Doc. 14-1 at 21-22.)

Defendants note that "on April 4, 2025, the El Centro Sector USBP issued a 'Muster' to all Sector employees that is in all material respects identical to the Broadcast…".  (Doc. 31 at 15, *comparing* Exh. A [Doc. 31-1 at 2-4] *with* Appendix A [Doc. 15-2 at 111-113].)  Defendants argue that "Plaintiffs' claims are moot in light of new guidance issued by USBP," which Defendants contend provides "nearly all the relief Plaintiffs seek in their injunction."  (*Id*.)  As a result, Defendants contend Plaintiffs are unable to show a likelihood of success on the merits (*id*. at 15-16) and "cannot demonstrate that they will be irreparable harmed absent a preliminary injunction."  (*Id*. at 17.)

### A.    Likelihood of Success on the Merits

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury."  *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023); *see also N.D.*, 102 F.4th at 992.  Plaintiffs bring three claims on behalf of the Suspicionless Stop Class and Warrantless Arrest Class: (1) warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357(a)(2); (2) warrantless arrests without probable cause of flight risk in violation of 8 C.F.R. § 287.8(c)(2)(ii); and (3) stops without reasonable suspicion in violation of the Fourth Amendment.  (Doc. 1 at 65-68.)  Plaintiffs seeking a preliminary injunction need only show that success on the merits is likely for one claim, not all claims, to satisfy this requirement for injunctive relief.  *See Fin. Express LLC v. Nowcow Corp.*, 546 F. Supp. 2d 1160, 1169 (C.D. Cal. 2008).  If a moving party fails to meet this "threshold inquiry," the Court need not reach the other

73

1   factors. *Baird*, 81 F.4th at 1041; *Disney Enters. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017).

2               1.     Unlawful detentive stops and arrests

3          The Fourth Amendment provides: "The right of the people to be secure in their persons…

4   against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

5   upon probable cause, supported by Oath or affirmation, and particularly describing … the persons or

6   things to be seized." *U.S. Constitution, amend. IV*.  A person is seized when an officer, "by means of

7   physical force or show of authority, terminates or restrains his freedom of movement," *Brendlin v.*

8   *California*, 551 U.S. 249, 254 (2007), such that "a reasonable person would have believed that he was

9   not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The Supreme Court

10  explained that a person's liberty is restrained when "taking into account all of the circumstances

11  surrounding the encounter, the police conduct would 'have communicated to a reasonable person that

12  he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501

13  U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).  There are

14  generally two kinds of seizures: investigative stops and arrests.  *Allen v. City of Portland*, 73 F.3d 232,

15  235 (9th Cir. 1995).

16         An investigative stop occurs when a police officer detains a person for a limited duration to ask

17  questions.  *Terry v. Ohio*, 392 U.S. 1, 27 (1968). To make such a stop, the officer must have reasonable

18  suspicion that the person is engaged in criminal activity.  *Id*.; *see also Navarette v. California*, 572 U.S.

19  393, 396 (2014).  To constitute reasonable suspicion, the officer's belief that "criminal activity is afoot"

20  must be supported by "specific and articulable facts which, taken together with rational inferences from

21  those facts, reasonably warrant the intrusion."  *Id*. at 21, 30; *see also Navarette*, 572 U.S. at 396 (an

22  officer must have "a particularized and objective basis for suspecting the particular person stopped of

23  criminal activity").  An officer cannot rely only upon generalizations that "would cast suspicion on

24  large segments of the law abiding population." *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th

25  Cir. 2006).  The Supreme Court has long held—about 50 years ago now—that these requirements apply

26  in the immigration context, when officers seek to enforce the INA.  *United States v. Brignoni-Ponce*,

27  422 U.S. 873, 884 (1975) ("[T]he Fourth Amendment forbids stopping vehicles at random to inquire if

28  they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for

1   questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

2   *Brignoni-Ponce* held also that mere belief that a person is of Mexican descent, is sufficient to "justify

3   neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other

4   aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the

5   physical characteristics identified with Mexican ancestry, and even in the border area a relatively small

6   proportion of them are aliens. [Footnote.] The likelihood that any given person of Mexican ancestry is

7   an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not

8   justify stopping all Mexican-Americans to ask if they are aliens." *Brignoni-Ponce* at 886–887. The

9   Ninth Circuit has held for 25 years that "Hispanic appearance is of little or no use in determining which

10  particular individuals among the vast Hispanic populace should be stopped by law enforcement

11  officials on the lookout for illegal aliens." *United States v. Montero-Camargo*, 208 F.3d 1122, 1134

12  (9th Cir. 2000).

13      An arrest is a more significant intrusion on liberty than a detentive stop.  To determine whether

14  a seizure is an arrest, the Court examines whether a reasonable person under the circumstances would

15  feel free to leave after questioning.  *Allen*, 73 F.3d at 235 (citing *United States v. Delgadillo-*

16  *Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988)).  "Under the Fourth Amendment, a warrantless arrest

17  requires probable cause."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Under this

18  objective standard, "officers must have knowledge or reasonably trustworthy information sufficient to

19  lead a person of reasonable caution to believe that an offense has been or is being committed by the

20  person being arrested."  *Id.* (citation omitted).  "[M]ere suspicion, common rumor, or even [a] strong

21  reason to suspect" are insufficient to establish probable cause. *Id.* (quoting *McKenzie v. Lamb*, 738

22  F.2d 1005, 1008 (9th Cir. 1984).)

23      In the immigration context, 8 C.F.R § 287.8(b)(2) also requires an immigration officer to have

24  reasonable suspicion to perform a detentive stop:

> If the immigration officer has a reasonable suspicion, based on specific
> articulable facts, that the person being questioned is, or is attempting to
> be, engaged in an offense against the United States or is an alien illegally
> in the United States, the immigration officer may briefly detain the
> person for questioning.

28  *Id.*  The Ninth Circuit observed that 8 C.F.R. § 287.8(b) "was intended to reflect constitutional

75

ER076

1   restrictions on the ability of immigration officials" and, given the reasonable suspicion requirement,

2   offers "at least as much protection as the Fourth Amendment." *Perez Cruz v. Barr*, 926 F.3d 1128,

3   1137 (9th Cir. 2019). If placing someone under arrest without a warrant, an immigration officer must

4   have probable cause that a person is "likely to escape before a warrant can be obtained for his arrest."

5   8 U.S.C. § 1357(a)(2); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995). Put

6   another way, a warrantless arrest requires an individualized assessment of the person's flight risk. *See*

7   *id.*; *see also Nava*, 435 F. Supp. 3d at 891-92.

8   　　As discussed above, Plaintiffs' anecdotal evidence establishes a pattern and practice of agents

9   performing detentive stops without reasonable suspicion in this District. In addition, the evidence

10  shows a pattern and practice of warrantless arrests without Border Patrol agents performing

11  individualized flight risk assessments to have probable cause for the arrest as required. This evidence

12  of the identified patterns and practices also shows a likelihood of success on the merits for the claims

13  of the Suspicionless Stop Class and Warrantless Arrest Class. *See Zepeda v. United States*

14  *Immigration & Naturalization Service*, 753 F.2d 719, 727 (9th Cir. 1983) (finding the plaintiffs

15  "demonstrated probable success on the merits by providing evidence of a pattern of INS violations of

16  the fourth amendment" under the court's prior test for preliminary injunctions).

17  　　　　　　2.　　Whether the matter is moot

18  　　Defendants do not challenge the sufficiency of Plaintiffs' evidence to show a likelihood of

19  success on the merits. (*See generally* Doc. 31 at 11-17.) Instead, Defendants argue that Plaintiffs fail

20  to show a likelihood of success for three reasons: (1) the Court lacks jurisdiction under 8 U.S.C. §

21  1252(a)(5) and (b)(9); (2) the Court lacks jurisdiction to issue a class-wide injunction pursuant to 8

22  U.S.C. § 1252(f)(1); and (3) the claims are moot. As discussed above, the jurisdictional arguments are

23  without merit. Accordingly, the Court turns to whether the matter is moot.

24  　　A case is rendered moot "when the issues presented are no longer 'live' or the parties lack a

25  legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)

26  (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). However, the Supreme Court has repeatedly

27  indicated that "a defendant cannot automatically moot a case simply by ending its unlawful conduct

28  once sued." *Id.* (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also*

*Friends of the Earth, Inc. v. Laidlaw Env'l. Services (TOC), Inc.,* 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.") (internal quotation marks omitted). The Court explained that if voluntary cessation could simply render a matter moot, a defendant would be free to "resum[e] … the challenged conduct." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012).

The party asserting mootness has a "'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.'" *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)). The Supreme Court explained: "Voluntary cessation of challenged conduct moots a case … only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand*, 528 U.S. at 222 (emphasis in original, citation omitted); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449, 457 n.1 (2017) ("voluntary cessation of a challenged practice does not moot a case unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur") (cleaned up).

When the government asserts mootness because of a policy change, the court will "presume that it acts in good faith." *Fikre*, 904 F.3d at 1033 (citing *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010)). Nevertheless, "the government must still demonstrate that the change in its behavior is 'entrenched' or 'permanent.'" *Id.* (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)); *see also Rosebrock v. Mathis,* 745 F.3d 963, 971 (9th Cir. 2014). The Ninth Circuit determined that a government "policy change not reflected in statutory changes or even in changes in ordinances or regulations will not *necessarily* render a case moot." *Rosebrock*, 745 F.3d at 971 (citation omitted, emphasis added). The Court indicated:

> [M]ootness is more likely if (1) the policy change is evidenced by language that is broad in scope and unequivocal in tone; (2) the policy change fully addresses all of the objectionable measures that the Government officials took against the plaintiffs in the case; (3) the case in question was the catalyst for the agency's adoption of the new policy; (4) the policy has been in place for a long time when we consider mootness; and (5) since the policy's implementation the agency's officials have not engaged in conduct similar to that challenged by the plaintiff.

ER078

1   *Id.* (cleaned up, citations omitted).  On the other hand, the court is "less inclined to find mootness

2   where the 'new policy … could be easily abandoned or altered in the future.'" *Id.* (quoting *Bell v. City*

3   *of Boise*, 709 F.3d 890, 901 (9th Cir. 2013)).

4       Defendants argue the claims are moot based upon the Muster, which includes guidance on: (1)

5   "the requirement for reasonable suspicion for traffic stops conducted throughout the Eastern District of

6   California," (2) "assessing flight risk using factors such as 'family, home, or employment' (that is,

7   community ties);" and (3) "documenting the facts and circumstances surrounding a warrantless arrest in

8   an alien's Form I-213 as soon as practicable."  (Doc. 31 at 15.)  Defendants also contend the El Centro

9   Sector is "taking steps to implement training using on the Muster."  (*Id.* at 16, citing Exh. B [Doc. 31-

10  2].)  According to Defendants, Border Patrol's "issuance of guidance and commitment to training

11  thereon constitutes a change in circumstances forestalling a 'substantial controversy of sufficient

12  immediacy and reality.'"  (*Id.*, quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975) [cleaned up].)

13  Defendants contend the Muster and training are "more than a mere voluntary cessation of allegedly

14  illegal conduct where USBP is free to return to their old ways."  (*Id.* [citation omitted, cleaned up].)

15  Defendants assert the "prompt and responsive actions in light of Plaintiffs' complaint forcefully

16  demonstrates its commitment to forestall similar alleged violations in the future."  (*Id.* at 17.)  They

17  contend "this is the relief Plaintiffs requested," and as a result "[t]here is now no reasonable expectation

18  that the alleged wrong will be repeated."  (*Id.*, quoting *Preiser*, 422 U.S. at 402 [as modified].)

19      Plaintiffs dispute that their claims are moot based upon Defendants' actions.  (Doc. 38 at 7,

20  emphasis omitted.)  Plaintiffs contend, "[T]he Muster does not address most of the unlawful conduct

21  on which Plaintiffs seek relief.  For example, by its own terms, the Muster addresses only 'arrests

22  effected by' Border Patrol agents and 'Vehicle Stops.'"  (*Id.* at 8, quoting Doc. 31-1 at 2.)  Plaintiffs

23  report Defendants also declined to "commit[] to keep the Muster in place … until Plaintiffs' detentive

24  stop and warrantless arrest claims are finally resolved," which Plaintiffs believe "suggest[s] the Muster

25  is not long term."  (*Id.*, citing Greenberg Decl. ¶¶ 3-4 [Doc. 38-1 at 2].)  Plaintiffs also argue that the

26  timing of the Muster—which was issued "just one business day before Defendants filed their

27  opposition"— "merits skepticism from the Court."  (*Id.* at 8, citing *R.W. v. Columbia Basin Coll.*, 77

28  F.4th 1214, 1226 (9th Cir. 2023).)  Plaintiffs contend there is "no evidence the Muster will cause a

ER079

1    change in conduct," because the practices in "Operation Return to Sender" were contrary to "well-

2    defined legal requirements" and "prior trainings on the same issues apparently failed to prevent El

3    Centro Border Patrol from engaging in these blatantly unlawful practices." (*Id.*)  Finally, Plaintiffs

4    assert that "Defendants have done nothing to explicitly recognize 'the wrongful nature' of their

5    practices," and the lack of recognition weighs against finding Border Patrol made a "bona fide change

6    in policy." (*Id.* at 9-10, citing *U.S. v. W. T. Grant Co*., 345 U.S. 629, 633 (1953); *S.E.C. v. Murphy*,

7    626 F.2d 633, 655 (9th Cir. 1980).)

8            Reviewing the language of the Muster, the Court is unable to find it is "broad in scope." *See*

9    *Rosebrock*, 745 F.3d at 971 (quoting *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000).)  Sergio

10   Guzman reports the area of responsibility for the El Centro Sector includes the "70 linear miles along

11   the U.S. and Mexico border from the Jacumba Mountains in the west to the Imperial Sand Dunes in the

12   east," and "inland areas of California extending all the way to the Oregon State Line, including

13   Bakersfield, California." (Doc. 31-2 at 3, Guzman Decl. ¶ 6.)  This encompasses the Northern, Central,

14   Southern, and Eastern Districts of California.  However, the Muster indicates that it is applicable only

15   to "arrests effected by El Centro Sector Border Patrol Agents … *in the Eastern District of California*."

16   (Doc. 31-1 at 2 [emphasis added].)  The Muster is clearly narrow in scope and designed to address only

17   the local district.  In contrast, the DHS Broadcast indicates that it was "applicable to all arrests effected

18   under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2)," without any geographical limitations.  (Doc. 15-2 at

19   111.)  The Muster does not mention detentive stops by foot patrols, or the necessary reasonable

20   suspicion for such stops, which are encompassed in the claims of the Suspicionless Stop Class.  The

21   language used in the Muster is permissive, indicating that an agent "*should* document the facts and

22   circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as

23   practicable" and what information the document "*should* include." (Doc. 31-1 at 3 [emphasis added].)

24   Thus, the language of the Muster is neither broad in scope nor unequivocal in tone,[13] and does not

25

26   _____

27   [13] This differs from the DHS Broadcast, which contains mandatory language and provides that agents "*must*
     document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-
     213 as soon as practicable" and identifies what information that the documentation "*must* include." (Doc. 15-2 at
28   112 [emphasis added].)

1    support a finding of mootness.[14]

2        The timing of the Muster does not support a finding of mootness.  Border Patrol issued the

3    Muster a single business day before the deadline for Defendants to oppose the pending request for a

4    preliminary injunction.  The exceedingly short duration between the Muster issuance and the hearing

5    renders it impossible for the Court to find the terms of the Muster are now "entrenched" in the practices

6    of Border Patrol's El Centro Sector.  *See Fikre*, 904 F.3d at 1033.  Even policies in existence for

7    *months* do not support a finding of mootness.  *See, e.g., A.O. v. Cuccinelli*, 457 F.Supp.3d 777, 7889

8    (N.D. Cal. 2020) (where a policy was implemented for six months, this duration "weigh[ed] against a

9    finding of mootness"); *Irvine Community News & Views, LLC v. City of Irvine*, 2016 WL 11744976, at

10   *5 (C.D. Cal. June 15, 2016) (finding a policy in place for "only about four months" did not support a

11   conclusion that the plaintiffs' claims were rendered moot).

12       The Court also considers Defendants' ability to withdraw the Muster to evaluate whether the

13   matter is moot.  *See Rosebrock*, 745 F.3d at 971; *Bell*, 709 F.3d at 900.  For example, in *Bell*, the

14   Court considered whether a "Special Order" issued to a police department mooted the plaintiffs'

15   claims concerning constitutional violations.  The Court observed that the Special Order was an

16   "internal policy" issued by the chief of police "that purported to curb the discretion of officers."  *Id.*

17   The Court observed: "Even assuming Defendants have no intention to alter or abandon the Special

18   Order, the ease with which the Chief of Police could do so counsels against a finding of mootness."

19   *Id.* (citing *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 928 (9th Cir. 1991)).  As in *Bell*, the Muster

20   appears to be an "internal policy" issued to the El Centro agents.  Sergio Guzman reports that the El

21   Centro Sector "intends to keep this muster in place without revision."  (Doc. 45-1 at 3, ¶ 6.)  However,

22   there is nothing to show the Muster could not be withdrawn or altered in the future.  There is also

23   nothing to suggest that the training could not be abandoned before completion.[15]  Consequently, "the

24

25   ───────────────

     [14] Defendants fail to explain why the Muster is needed at all. The law on the topics encompassed by the Muster is
26   clear and has been for more than 50 years.  The Court is stymied by the apparent position of the government that
     until the Muster issued, the El Centro officers were unaware of their obligations under the Fourth Amendment,
27   the Supreme Court's decisions, including *Brignoni-Ponce*, and the Ninth Circuit authorities dating back decades.

28   [15] The El Centro Sector includes "975 agents and 149 support personnel."  (Doc. 31-2 at 3, Guzman Decl. ¶ 7.)
     At the hearing, Defendants' counsel reported that 207 agents received training on Wednesday, April 23, 2025.

ER081

1   ease with which" the Muster could be withdrawn or revised at any time weighs against mootness. *See*

2   *Bell*, 709 F.3d at 900.

3       Notably, the Ninth Circuit explained that "the government's unambiguous renunciation of its

4   past actions can compensate for the ease with which it may relapse into them." *Fikre*, 904 F.3d at 1039

5   (finding the plaintiff's due process claims were not moot where there the government could easily re-

6   take the same alleged wrongful action and there was not "any renouncement by the government of its

7   prerogative and authority to do so"). In *W.T. Grant*, the Supreme Court also indicated that to evaluate

8   mootness, one factor may be a defendant's profession to discontinue the wrongful conduct. *Id.*, 345

9   U.S at 633. The Court later explained that "[w]hat matters is not whether a defendant repudiates its

10  past actions, but what repudiation can prove about its future conduct." *FBI v. Fikre*, 601 U.S. 234

11  (2022). Here, Defendants *do not* repudiate the alleged wrongful actions. At the hearing, Defendants

12  indicated that they were not focused on addressing the allegations—or the past conduct of Border

13  Patrol agents— but instead repeatedly stated they were focused on the *remedy* requested by Plaintiffs.

14  Defendants did not make any "unambiguous renunciation" of the actions taken during "Operation

15  Return to Sender." To the contrary, they continued to repeat that The statements by Defendants do not

16  compensate for the ease for which the Muster may be withdrawn, and there is no showing that future

17  violations of the well-established laws are unlikely based upon the issuance of the Muster.

18  Consequently, this factor weighs against finding the matter is moot.

19      Finally, by Defendants' own admission, the Muster does not "*fully* address[] *all* of the

20  objectionable measures" alleged by Plaintiffs. *See Rosebrock*, 745 F.3d at 971 (emphasis added).

21  Though Defendants repeatedly indicate the guidance provides "nearly all the relief Plaintiffs seek"

22  (Doc. 31 at 15, 17), "nearly all" is not *all*. *Compare with White*, 227 F.3d at 1243. As discussed above,

23  there is nothing to address Plaintiffs' concerns regarding detentive stops by Border Patrol agents on

24  foot patrols—or the reasonable suspicion requirement for such stops—because the Muster focuses upon

25  "vehicle stops." This also weighs against mootness determination. *See Bell*, 709 F.3d at 900 (finding a

26  policy did not moot the plaintiffs' claims where it "fail[ed] to fully address" the plaintiffs' allegations

27  in their amended complaint).

28      Ultimately, Defendants fail to meet their "heavy burden" to establish "it is *absolutely* clear that

the allegedly wrongful behavior could not reasonably be expected to recur." *Fikre*, 904 F.3d at 1037; *Adarand*, 528 U.S. at 222 (emphasis in original). The training of Border Patrol agents regarding the terms of the Muster also offers little support to find mootness. Indeed, the evidence before the Court is that Border Patrol agents under DHS authority engaged in conduct that violated well-established constitutional rights *despite* the DHS Broadcast containing similar language as the Muster. On this record, the Court is unable to find the request for a preliminary injunction is moot. *See Rosebrock*, 745 F.3d at 971; *Bell*, 709 F.3d at 901.

### 3.    Conclusion

Plaintiffs demonstrate a likelihood of success on the merits for the claims of the Suspicionless Stop and Warrantless Arrest Classes given the significant anecdotal evidence —which Defendants do not dispute or rebut—regarding the detentive stop and arrest practices of Border Patrol. Defendants' arguments regarding the lack of jurisdiction and mootness are without merit. Accordingly, this factor supports granting a preliminary injunction.

### B.    Imminent, Irreparable Harm

The Ninth Circuit observed that if a plaintiff who brings a claim for a constitutional violation shows a likelihood of success on the merits, "that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird*, 81 F.4th at 1040. Indeed, "it is well-established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). Consequently, violations of the Fourth Amendment show an irreparable harm that supports a request for injunctive relief. *Melendres*, 695 F.3d at 1002 (affirming the district court's finding that, in the absence of an injunction, the plaintiffs faced irreparable harm where it was likely they would be unlawfully detained in violation of the Fourth Amendment); *see also Brown v. Greene Cty.,* 717 F. Supp. 3d 689, 696 (S.D. Oh. 2024) ("courts have found that violations of the Fourth Amendment constitute irreparable harm sufficient to justify injunctive relief" [cleaned up]).

A preliminary injunction will not remedy past harms. Instead, a preliminary injunction is "to protect … from irreparable injury that will surely result without their issuance." *Schrier v. Univ. Of Co.,* 427 F.3d 1253, 1267 (10th Cir. 2005). Nevertheless, "[p]ast harms can tend to show the threat of a

82

1   repeated injury." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).  The threat of

2   injury "must be imminent, not remote or speculative" to support a request for a preliminary injunction.

3   *FDIC v. Garner*, 125 F.3d 1272, 1279 (9th Cir. 1997) *cert. denied*, 523 U.S. 1020 (1998); *see also*

4   *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016).

5          The uncontroverted evidence shows the El Centro Sector repeatedly expressed an intent to

6   perform additional operations in the Eastern District of California, including Bakersfield, Fresno, and

7   Sacramento.  On January 9, 2025, the El Centro Sector indicated it "continue[s] to field dozens of

8   Border Patrol Agents in Kern County and surrounding area…"  (Doc. 15-2 at 32.)  The same date, the

9   Sector stated: "We are planning operations for other locals such as Fresno and especially Sacramento."

10  (*Id.* at 30.)  On January 10, 2025, the Sector stated, "we will try and catch even more next time."  (*Id.*

11  at 18.)  On January 12, 2025, in response to a comment stating, "Here in Bakersfield, you guys forgot

12  to raid some people," the Sector stated, "We plan on coming back!!"  (*Id.* at 16.)  Later in January

13  2025, an individual commented "Return to sender round 2," to which the Sector replied, "You bet!"

14  (*Id.* at 12.)  Again, on January 29, 2025, the Sector expressed that the Border Patrol agents would go

15  "wherever the threats and crime take us, whether that's #SanBernardino #LosAngeles #Riverside

16  #Barstow *#Bakersfield or beyond*."[16]  (*Id.* at 14 [emphasis added].)  The evidence of the practices

17  employed by Border Patrol agents during "Operation Return to Sender"— including detentive stops on

18  foot patrols and vehicular stops without reasonable suspicion—the plans of Border Patrol to perform

19  additional, similar operations in this District and the seeming position of the government that Border

20  patrol agents are not currently trained on their obligations under the Fourth Amendment, demonstrates

21  imminent, irreparable harm to the Suspicionless Stop Class.

22         Furthermore, in expressing the intent to perform future operations, the Sector stated: "*anyone*

23  *we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested*."  (Doc.

---

[16] Plaintiffs' supplemental evidence discusses an operation performed by Border Patrol in Pomona, California, on Tuesday, April 22, 2025.  Reports on the Pomona operation indicate that agents went to a Home Depot parking lot where day laborers were gathered and arrested 9 individuals.  (*See* Doc. 43-1 at 4-5.)  Though recognizing the lack of detail as to the reasons for the detentive stops and arrests, on its face, the Pomona operation bears a striking similarity to "Operation Return to Sender" with the Home Depot detentive stops described by Plaintiff Wilder Munguia Esquivel and Class Members Jesus Ramirez and Luis Perez Cruz. Although the Pomona operation occurred beyond the relevant geographical area, the fact that the operation occurred reinforces the expressed intent of Border Patrol to perform additional operations in this district.

1    15-2 at 12 [emphasis added].)  Similarly, Gregory Bovino, Chief Patrol Agent for the El Centro

2    Sector, stated in a social media post: "Undocumented means just that. I recommend returning to the

3    country of origin, obtaining proper documents, and doing it the right way.  If not, *we will arrest*."  (*Id.*

4    at 36 [emphasis added].)  These statements show Border Patrol agents from the El Centro Sector do

5    not intend to comply with the requirements to perform flight risk assessments for probable cause in the

6    forthcoming operations—including in this District— but to perform warrantless arrests without

7    probable cause.  Consequently, Plaintiffs have shown imminent, irreparable harm to the Warrantless

8    Arrest Class.

9         **C.     Balancing of Equities and Public Interest**

10         Plaintiffs must demonstrate that "the balance of equities tips in [its] favor" and a preliminary

11    injunction "is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d at 1127 (quoting *Winter*, 555

12    U.S. at 20).  Because the government is a party, the Court considers these two factors together.  *Nken*

13    *v. Holder*, 556 U.S. 418, 435 (2009); *Baird*, 81 F.4th at 1040.  In weighing equities, the Court "must

14    balance the competing claims of injury and must consider the effect on each party of the granting or

15    withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted).  When determining the

16    public interest, the Court "primarily addresses impact on non-parties rather than parties." *League of*

17    *Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir.

18    2014).  When the alleged action by the government violates federal law, the public interest factor

19    generally weighs in favor of the plaintiffs. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th

20    Cir. 2013).

21         The Ninth Circuit observed: "A plaintiff's likelihood of success on the merits of a

22    constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird*, 81

23    F.4th at 1036.  The Court explained, "public interest concerns are implicated when a constitutional

24    right has been violated, ... all citizens have a stake in upholding the Constitution." *Id.* (quoting

25    *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).  In other words, "it is always in the public

26    interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Riley's Am. Heritage*

27    *Farms v. Elsasser*, 32 F.4th 707, 732 (9th Cir. 2022)).  The government also "cannot reasonably assert

28    that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."

1  *Zepeda*, 753 F.2d at 727.

2          Because Plaintiffs show a likelihood of success on the merits of the claims for the

3  Suspicionless Stop and Warrantless Arrest Classes, the balance of equities tip in their favor and an

4  injunction is in the public interest.  As the Ninth Circuit explained, it is within the public interest to

5  uphold the Fourth Amendment rights in issue.  *See Baird*, 81 F.4th at 1036; *see also Fellowship of*

6  *Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (2023) ("it is always in the

7  public interest to prevent the violation of a party's constitutional rights") (citation omitted).  Finally,

8  the government will not be harmed by being enjoined from engaging in practices that violate the

9  Constitution and which fail to comply with decisional and statutory responsibilities.  *See Zepeda*, 753

10  F.2d at 727.  Consequently, the third and fourth *Winter* factors support Plaintiffs' request for a

11  preliminary injunction.

12          **D.      Posting of a Bond**

13          Plaintiffs carry the burden to show the *Winter* factors support the issuance of a preliminary

14  injunction.  Pursuant to the Federal Rules of Civil Procedure, "the court may issue a preliminary

15  injunction … only if the movant gives security in an amount that the court considers proper to pay the

16  costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed.

17  R. Civ. P. 65(c).  The Ninth Circuit observed that "[d]espite the seemingly mandatory language, 'Rule

18  65(c) invests the district court with discretion as to the amount of security required, *if any*.'" *Johnson*

19  *v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919

20  (9th Cir. 2003) [emphasis in original]).  Therefore, the court "may dispense with the filing of a bond

21  when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

22  conduct." *Id.*

23          Defendants face "no realistic likelihood of harm" from the injunctive relief ordered, which

24  directs compliance with constitutional provisions and the statutory obligations of Border Patrol agents.

25  *See Zepeda*, 753 F.2d at 727.  Therefore, the Court will not require Plaintiffs to post a bond.

26  ///

27  ///

28  ///

ER086

# **ORDER**

Based upon the foregoing, the Court **ORDERS**:

1.     Plaintiffs' motion for provisional class certification (Doc. 14) is **GRANTED**, and the classes are defined as:

> **Suspicionless Stop Class**: All persons since January 6, 2025, who have been or will be subjected to a detentive stop by Border Patrol in this district without a pre-stop, individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

> **Warrantless Arrest Class**: All persons since January 6, 2025, who have been arrested or will be arrested in this district by Border Patrol without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

2.     Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez are **APPOINTED** as class representatives for both the Suspicionless Stop and Warrantless Arrest Classes.

3.     Bree Bernwanger, Michelle (Minju) Y. Cho, Lauren Davis, and Shilpi Agarwal, Mayra Joachin, Eva Bitran, and Oliver Ma, Brisa Velazquez Oatis, Ajay S. Krishnan, Franco Muzzio, Zainab O. Ramahi, and Julia L. Greenberg are **APPOINTED** as Class Counsel for the provisional classes.

4.     Plaintiffs' motion for a preliminary injunction (Doc. 15) is **GRANTED**, as follows:

a.     Border Patrol is enjoined from conducting detentive stops in this District unless, pre-stop, the detaining agent has reasonable suspicion that the person to be stopped is a noncitizen who is present within the United States in violation of U.S. immigration law, as required by the Fourth Amendment of the United States Constitution.

b.     Border Patrol is enjoined from effecting warrantless arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the noncitizen being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

c.     Any Border Patrol agent who conducts a detentive stop in this District **SHALL**, as soon as practicable, document the facts and circumstances surrounding the stop in a

ER087

narrative form. This documentation **SHALL** include the specific, particularized facts that supported the agent's reasonable suspicion, which was formed in advance of the stop, that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law. The documentation **SHALL** include the date and time that the agent completed the detentive stop and the date and time the agent completed the documentation.

d.      Any Border Patrol agent who conducts a warrantless arrest in this District **SHALL** comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2), including but not limited to the requirement that as soon as practicable after an arrest, agents **SHALL** document in writing "the facts and circumstances surrounding the warrantless arrest" and the "specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained."

**Within 60 days and every 60 days thereafter** until this litigation is terminated or the Court rules otherwise, Border Patrol **SHALL** release to Plaintiffs' counsel the documentation describing Border Patrol's detentive stops and warrantless arrests within this District, or if requested by Plaintiffs' counsel concerning specific individual detentive stops or warrantless arrests, no later than seven days after the request.

e.      **Within 60 days of this order**, Defendants **SHALL** serve to Plaintiffs' counsel a directive setting forth the guidance given to Border Patrol agents concerning how they should determine whether "reasonable suspicion" exists when conducting detentive stops, including vehicle stops, in this District.  This guidance shall include, among other things, that refusal to answer questions does not, without more, constitute a basis for reasonable suspicion to justify a detentive stop.

f.      **Within 90 days of this order and every 30 days thereafter** until all agents associated with the El Centro Sector and those who are charged with making detentive stops and warrantless arrests in this District have been trained, Defendants **SHALL**

ER088

serve to Plaintiffs' counsel documentation showing that they have trained the Border Patrol agents who have performed, or will perform, operations in this District on the requirements articulated above.

IT IS SO ORDERED.

Dated:   **April 29, 2025**

UNITED STATES DISTRICT JUDGE

ER089

No. 25-4047

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED FARM WORKERS of AMERICA, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

_____

On Appeal from an Interlocutory Order Issued by the U.S. District Court
for the Eastern District of California (Civil Action No. 1:25-cv-00246-JLT-
CDB)

_____

DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 OF 3

_____

**BRETT A. SHUMATE**
**Assistant Attorney General**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant**
**Attorney General**

**ELIANAS PEREZ**
**Assistant Director**

**TIM RAMNITZ**
**Senior Litigation Counsel**
**Office of Immigration**
**Litigation**
**Civil Division**
**U.S. Department of Justice**
**P.O. Box 878 Station**
**Ben Franklin Station**
**Washington D.C. 20044**

ER090

1   BREE BERNWANGER - # 331731
    bbernwanger@aclunc.org
2   MICHELLE (MINJU) Y. CHO - # 321939
    mcho@aclunc.org
3   LAUREN DAVIS - # 357292
    ldavis@aclunc.org
4   SHILPI AGARWAL - # 270749
    sagarwal@aclunc.org
5   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN
6   CALIFORNIA
    39 Drumm Street
7   San Francisco, CA 94111
    Telephone: (415) 621-2493
8
    MAYRA JOACHIN - # 306065
9   mjoachin@aclusocal.org
    EVA BITRAN - # 302081
10  ebitran@aclusocal.org
    AMERICAN CIVIL LIBERTIES UNION
11  FOUNDATION OF SOUTHERN
    CALIFORNIA
12  1313 West 8th Street
    Los Angeles, CA 90017
13  Telephone: (213) 977-5000

    BRISA VELAZQUEZ OATIS - # 339132
    bvoatis@aclu-sdic.org
    AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
    P.O. Box 87131
    San Diego, CA 92138-7131
    Telephone: (619) 398-4199

    AJAY S. KRISHNAN - # 222476
    akrishnan@keker.com
    JASON GEORGE - # 307707
    jgeorge@keker.com
    JULIA L. GREENBERG - # 333864
    jgreenberg@keker.com
    REAGHAN E. BRAUN - # 340526
    rbraun@keker.com
    KEKER, VAN NEST & PETERS LLP
    633 Battery Street
    San Francisco, CA 94111-1809
    Telephone:   415 391 5400
    Facsimile:   415 397 7188

    *Attorneys for Plaintiffs*

14

15                  UNITED STATES DISTRICT COURT

16                  EASTERN DISTRICT OF CALIFORNIA

17                         FRESNO DIVISION

18  UNITED FARM WORKERS, et al.,          Case No. 1:25-cv-00246-JLT-CDB

19                    Plaintiffs,         **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN SUPPORT OF**
20         v.                             **MOTION TO ENFORCE PRELIMINARY**
                                          **INJUNCTION**
21  KRISTI NOEM, IN HER OFFICIAL
    CAPACITY AS SECRETARY OF THE          Date:    October 7, 2025
22  DEPARTMENT OF HOMELAND                Time:    9:00 a.m.
    SECURITY; et al.,                     Dept.:   Courtroom 4, 7th Floor
23                                        Judge:   Hon. Jennifer L. Thurston
                      Defendants.
24                                        Date Filed: February 26, 2025

25                                        Trial Date:  None set

26
                                          PUBLIC REDACTED VERSION
27

28

## **Table of Contents**

**Page(s)**

I.    INTRODUCTION ................................................................................1

II.    BACKGROUND .................................................................................2

    A.    El Centro Border Patrol conducts immigration raids in Kern County pursuant to an unlawful pattern and practice. ...................................2

    B.    The Court granted the motion for preliminary injunction. ....................3

    C.    Defendants issue a Muster regarding reasonable suspicion that fails to comply with the Court's order. ..............................................4

    D.    Border Patrol's unlawful conduct in a raid on a Home Depot in Sacramento.................................................................................6

        1.    Defendants produce boilerplate documentation of arrests.........................7

        2.    Plaintiffs' investigation reveals multiple falsehoods in Defendants' documentation. ........................................................9

III.    LEGAL STANDARD .......................................................................11

IV.    ARGUMENT ...................................................................................12

    A.    Defendants violated the Court's preliminary injunction........................12

        1.    Border Patrol's Reasonable Suspicion Muster violates the Court's preliminary injunction..............................................12

        2.    Border Patrol has violated the preliminary injunction by continuing to engage in unlawful stops and arrests. ...................................16

            a.    The Sacramento stops violated the Fourth Amendment. ...............16

            b.    Border Patrol agents conducted warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357. .......20

        3.    Defendants have failed to comply with the preliminary injunction's requirement for documenting stops and arrests. .........................21

    B.    The Court should require Defendants to remedy their breach and follow the Court's preliminary injunction order. ................................23

V.    CONCLUSION................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*A&M Recs. Inc. v. Napster, Inc.*,

5      284 F.3d 1091 (9th Cir. 2002) ...................................................................12

6    *Alaniz v. City of L.A.*,
     2014 WL 12694157 (C.D. Cal. May 21, 2014) ........................................19

7

8    *Armstrong v. Brown*,
     857 F. Supp. 2d 919 (N.D. Cal. 2012) ................................................11, 19

9
     *Barker v. U.S. Bancorp*,
10     2017 WL 4358116 (S.D. Cal. Oct. 2, 2017) ............................................19

11   *California v. U.S. Dep't of the Interior*,
     2020 WL 1496278 (N.D. Cal. Mar. 16, 2020)..........................................12
12
     *City & Cnty. of S.F. v. Trump*,
13     2025 WL 1358492 (N.D. Cal. May 9, 2025) ............................................12

14   *Dep't, AFL-CIO v. Wright*,
     364 U.S. 642 (1961)....................................................................................11
15

16   *Fraihat v. U.S. Immigr. & Customs Enf't*,
     2020 WL 2758553 (C.D. Cal. May 15, 2020) ..........................................11
17
     *Illinois v. Wardlow*,
18     528 U.S. 119 (2000).............................................................................15, 16

19   *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
     774 F.3d 935 (9th Cir. 2014) ...............................................................12, 13
20
     *Nat'l Org. For Reform of Marijuana L. (NORML) v. Mullen*,
21     608 F. Supp. 945 (N.D. Cal. 1985)............................................................24

22   *Nat'l Org. For Reform of Marijuana L. (NORML) v. Mullen*,
     796 F.2d.276 (9th Cir. 1986) .....................................................................24
23

24   *Nava v. Dep't of Homeland Sec.*,
     435 F. Supp. 3d 880 (N.D. Ill. 2020) ........................................................20
25
     *Nicacio v. U.S. I.N.S.*,
26     797 F.2d 700 (9th Cir. 1985) .....................................................................16

27   *Shaw v. Jones*,
     683 F. Supp. 3d 1205 (D. Kan. 2023)........................................................25
28

*Smagin v. Yegiazaryan*,
    2020 WL 1652347 (C.D. Cal. Apr. 1, 2020) ........................................................12

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) .............................................................................................14

*United States v. Brown*,
    925 F.3d 1150 (9th Cir. 2019) .......................................................................15, 19

*United States v. Christie Indus., Inc.*,
    465 F.2d 1002 (3d Cir. 1972) ..............................................................................12

*United States v. Manzo-Jurado*,
    457 F.3d 928 (9th Cir. 2006) .........................................................................13, 14

*United States v. Mendenhall*,
    446 U.S. 544 (1980) ..........................................................................................5, 15

*United States v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) .......................................................................13, 17

*United States v. Rodriguez*,
    976 F.2d 592 (9th Cir. 1992) ...............................................................................17

*United States v. Rodriguez Sanchez*,
    23 F.3d 1488 (9th Cir. 1994) ........................................................................17, 18

*United States v. Sigmond-Ballesteros*,
    285 F.3d 1117 (9th Cir. 2002) .............................................................................14

*United States v. United Shoe Mach. Corp.*,
    391 U.S. 244 (1968) ............................................................................................12

*Vasquez Perdomo v. Noem*,
    2025 WL 2181709 (9th Cir. Aug. 1, 2025)............................................... *passim*

**Federal Statutes**

8 U.S.C. § 1357..............................................................................................16, 20

8 U.S.C. § 1357(a)(2)......................................................................................20, 21

8 U.S.C. §§ 1357(a)(4), (a)(5).................................................................................16

**Rules**

Fed. R. Civ. P. 62(c)(1)...........................................................................................12

**Constitutional Provisions**

Fourth Amendment ......................................................................................5, 6, 16

iii

## I.    INTRODUCTION

1
2    In "Operation Return to Sender" earlier this year, more than sixty Border Patrol agents
3    traveled northward, where they indiscriminately detained and arrested people of color in and
4    around Kern County. Border Patrol made these detentions and arrests—including of U.S. citizens
5    and lawful permanent residents—on assumptions about skin color or occupation and without the
6    individualized assessments that the Constitution and federal law require. To address these
7    unlawful practices, this Court issued a preliminary injunction prohibiting Border Patrol from
8    conducting detentive stops without reasonable suspicion and from making warrantless arrests
9    without probable cause that the individual is likely to escape before a warrant can be obtained.
10    Dkt. 47 at 86-87. The Court further ordered Defendants to issue new guidance to Border Patrol
11    agents on the legal standards for reasonable suspicion, required Border Patrol agents to document
12    all stops and arrests, and required training of Border Patrol agents on the legal requirements set
13    forth in the Court's order. *Id.*

14    Border Patrol has violated the Court's preliminary injunction in at least three ways. ***First,***
15    Defendants' guidance to Border Patrol agents is wholly deficient: it does not stop agents from
16    targeting individuals based on "broad profiles," like skin color and occupation, and encourages
17    reliance on factors only relevant at or near the border, which this District is not. ***Second***, Border
18    Patrol agents unlawfully stopped and arrested people *en masse* in July in a raid of a Sacramento
19    Home Depot parking lot without particularized reasonable suspicion and without adequately
20    assessing flight risk in violation of the Constitution, federal law, and the Court's order. This raid
21    occurred mere days after a court in the Central District issued an injunction barring these tactics
22    in that district. *Vasquez Perdomo v. Noem*, --- F. Supp. 3d ---, 2025 WL 1915964, at *1 (C.D.
23    Cal. 2025). ***Third***, the incomplete, inaccurate, and boilerplate documentation Border Patrol agents
24    used to describe the Sacramento stops and arrests violate the preliminary injunction's
25    documentation requirements.

26    Border Patrol's actions require this Court's intervention. The Court can and should
27    exercise its inherent authority to enforce its preliminary injunction and issue a further order to
28    enforce, clarify, or modify it to ensure that its purpose is carried out.

## II.    BACKGROUND

### A.    El Centro Border Patrol conducts immigration raids in Kern County pursuant to an unlawful pattern and practice.

This lawsuit challenges the unlawful policies, patterns, and practices of U.S. Border Patrol in the Eastern District of California as shown by the El Centro Border Patrol Sector ("El Centro Border Patrol") raid referred to as "Operation Return to Sender." In that operation in January 2025, over sixty El Centro Border Patrol agents traveled hundreds of miles north of the border to conduct mass stops and arrests of people in Kern County. Dkt. 15-2, Exs. 17, 18; Dkt. 15-3 ¶ 15. Border Patrol's unlawful practices, as shown by that operation, are to stop people without reasonable suspicion that they are unlawfully in the country; to conduct warrantless arrests without probable cause that the person arrested was likely to escape before a warrant could be obtained; and to coerce people into accepting voluntary departure without a knowing and voluntary waiver of their right to a removal hearing. *See* Dkts. 15-2 to 15-12.

Plaintiffs moved for a preliminary injunction of the first two unlawful practices, and submitted nearly a dozen accounts of conduct during "Operation Return to Sender" demonstrating Border Patrol's pattern and practice of performing unlawful stops without reasonable suspicion and warrantless arrests without probable cause of flight risk. *See* Dkts. 15-2 to 15-12.

Unlawful Stops: The evidence Plaintiffs submitted demonstrated that Border Patrol's practice is to stop people based on categorical race- and occupation-based assumptions rather than individualized reasonable suspicion. For stops on foot, Border Patrol consistently targeted people of color in Latino neighborhoods and at businesses where farm workers and day laborers shop and eat, including multiple people in Home Depot parking lots. Dkt. 15-1 at 11-12; Dkt. 47 at 5-17, 55-58. Patrol agents surrounded people of color with multiple agents or blocked them in with cars, such that it was not possible to leave. Dkt. 15-1 at 11-12; Dkt. 47 at 5-17, 55-58. Each of these stops occurred without prior knowledge of who was being stopped, nor reasonable suspicion particularized to the individual, as agents blocked them in, grabbed them, or aggressively demanded papers based on nothing but their appearance. Dkt. 15-1 at 9-12; Dkt. 47 at 5-17, 55-58. And when people did not respond or attempted to go about their business by walking away, Border Patrol escalated the stop by grabbing, handcuffing, or arresting them. Dkt.

2

47 at 7. In vehicle stops, Border Patrol repeatedly and consistently targeted moving vehicles driven by people of color in agricultural areas and Latino neighborhoods. *See* Dkt. 15-1 at 10-11; Dkt. 47 at 5-17, 55-58. The Border Patrol agents conducting these stops did not know who was in the vehicles when the agents stopped them, and stated no reason for the stops other than to demand "papers" from vehicle occupants. *See* Dkt. 47 at 5-17.

Unlawful Warrantless Arrests: The evidence submitted also showed that Border Patrol made no individualized assessments of flight risk when conducting warrantless arrests during "Operation Return to Sender." Dkt. 15-1 at 17-19; Dkt. 47 at 59-61. For example, agents arrested Plaintiff Juan Vargas Mendez without asking any questions about his ties to Kern County. Dkt 15-6 ¶ 11; Dkt. 47 at 61. When Mr. Vargas Mendez pleaded that he had lived in the area for twenty years, had a wife and four children who are all citizens, and that he had no criminal record, an agent responded that he "did not care" and that Mr. Vargas Mendez "was going to Mexico." Dkt 15-6 ¶ 11; Dkt. 47 at 61. Border Patrol agents repeatedly failed to ask people questions about their community ties, such as family, work history, and length of residency, or disregarded any such ties without consideration. Dkt. 15-1 at 17-19; Dkt. 47 at 59-61. These indiscriminate arrest practices aligned with El Centro Border Patrol's statement: "[A]nyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." Dkt. 15-2, Ex. 1.

### B.    The Court granted the motion for preliminary injunction.

On April 29, 2025, the Court granted Plaintiffs' motion and issued a preliminary injunction. Dkt. 47.[1] The Court found that "there is no substantive conflict in the evidence regarding the alleged practice" of stopping people without reasonable suspicion. *Id.* at 58. That finding relied on the submitted evidence showing that Border Patrol targeted "Hispanics and field workers," including by stopping vehicles carrying Hispanic people, "aggressively swarm[ing]" people standing in Home Depot and other parking lots, and escalating stops to arrests when people walked away or refused to answer questions. *Id.* at 54-58. The Court likewise found a pattern and practice of warrantless arrests without an individualized assessment of flight risk

---

[1] The Court also granted Plaintiffs' motion for provisional class certification. *See* Dkt. 47.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

ER097

3016066

based on Border Patrol agents' failure to ask questions about community ties or consider any of the factors relevant to flight risk. *Id.* at 59-61.

Based on this evidence, the Court issued a preliminary injunction enjoining Border Patrol in the Eastern District of California from conducting detentive stops without reasonable suspicion that the person is unlawfully in the country and from effecting warrantless arrests without probable cause that the noncitizen being arrested is likely to escape before a warrant can be issued. Dkt. 47 at 86. The Court's injunction imposed additional specific remedies, requiring

- That any Border Patrol agent who conducts a detentive stop in the Eastern District to "document the facts and circumstances surrounding the stop in a narrative form" as soon as practicable, and "include the specific, particularized facts that supported the agent's reasonable suspicion" and "the date and time of both the stop and when the agent completed the documentation," i*d.* at 86-87;

- That any Border Patrol agent who conducts a warrantless arrest to document that arrest as soon as practicable, including "the facts and circumstances surrounding the warrantless arrest and the specific, particularized facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained," *id.*;

- That Defendants provide this documentation to Plaintiffs' counsel every 60 days or upon request, within seven days after the request, i*d.*;

- That Border Patrol, within 60 days, issue guidance for "Border Patrol agents concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in this District," *id.*; and

- That El Centro Border Patrol carry out training until every agent is trained on the principles of law set forth in the Court's order, and to provide Plaintiffs documentation proving that training occurred, *id.*

**C.    Defendants issue a Muster regarding reasonable suspicion that fails to comply with the Court's order.**

As purported compliance with the Court's order requiring that Defendants issue guidance to Border Patrol agents "concerning how they should determine whether 'reasonable suspicion' exists when conducting detentive stops . . . in this district," Defendants issued a "Muster" on June

4

27, 2025 (the "Reasonable Suspicion Muster" or the "Muster"). Dkt. 64-2. The Muster states that it provides the "underlying laws and policies applicable to investigative detentions initiated by El Centro Sector Border Patrol Agents pursuant to the Fourth Amendment in the Eastern District of California." *Id.* The Muster indicates that "investigative detentions" are also known as "detentive stops, *Terry* stops, or roving patrol stops," but does not state the standard for when such a stop has occurred, that is, when a "reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980).

The Muster states that these (undefined) investigative detentions require reasonable suspicion, and that Border Patrol agents "must identify specific, articulable facts, that when taken together with rational inferences from those facts, would lead a reasonable, objective [Border Patrol agent] to believe that the person stopped is, was, or is about to be, engaged in a violation of a law the [Border Patrol agent] has the authority to enforce." Dkt. 64-2 at 2. The Muster does not define what "violations" Border Patrol agents have the authority to enforce, and provides no guidance specific to the civil immigration violations at issue in this case. *Id.* The Muster does not explain how the training of even a "reasonable, objective [Border Patrol agent]" is the appropriate standard, when such agents' training and experience presumably is oriented toward the border. *Id.*

Although the Muster correctly states that reasonable suspicion requires an analysis of the totality of the circumstances, it then provides a skewed list of factors with no guidance for their application in this District. As discussed in detail below, the Muster encourages Border Patrol agents to rely on factors, such as "proximity to the border," "recent . . . border crossings in the area," and whether a particular "type of vehicle" could be used for smuggling without any explanation about how such factors would apply in the interior of the country. *See* Dkt. 64-2 at 2-3. And the Muster encourages reliance on factors, such as characteristics indicating that a person is a "foreign national," without explaining that such factors have minimal or zero probative value when shared with a significant number of people lawfully in the country. *Id.*

Soon after the issuance of the Muster, Plaintiffs contacted Defendants' counsel and identified the Musters' deficiencies by email on July 11, 2025. Declaration of Jason George ("George Decl."). ¶ 4 & Ex. C. On July 14, 2025, Defendants filed their motion to dismiss and

argued that this case has been mooted in its entirety based on the issuance of the Reasonable

Suspicion Muster and other musters. *See* Dkt. 64. On July 17, 2024, in a meet-and-confer over

videoconference, Defendants did not agree that the Muster violated the Court's preliminary

injunction order. George Decl. ¶ 4. Defendants maintained the same position regarding the

Muster in a meet-and-confer regarding this Motion held on August 26, 2025. *Id.* ¶ 10.

### D.    Border Patrol's unlawful conduct in a raid on a Home Depot in Sacramento.

Before and after the issuance of the Reasonable Suspicion Muster, Border Patrol's

unlawful pattern and practice of unlawful stops and warrantless arrests continued. Starting in

June, Border Patrol, along with ICE and other federal agencies, conducted a series of immigration

raids across Central California which federal officials described as "the largest Mass Deportation

Operation . . . in History." *Vasquez Perdomo v. Noem*, --- F.4th ---, No. 25-4312, 2025 WL

2181709, at *3 (9th Cir. Aug. 1, 2025). As part of the operation (dubbed "Operation at Large"),

federal agents in "roving patrols"—with El Centro Sector's Chief Gregory K. Bovino apparently

"in charge," George Decl. Ex. F—unlawfully stopped, detained, and arrested Latinos, including

U.S. citizens, throughout Los Angeles and the surrounding region. *See Vasquez Perdomo*, 2025

WL 2181709, at *4-6. These incidents follow the same patterns as "Operation Return to Sender,"

as Border Patrol agents admitted that they targeted certain types of businesses, like Home Depot

and car washes, "because past experiences have demonstrated that [noncitizens] utilize or seek

work at these locations." *Id.* at *16.

After a lawsuit was filed in the Central District of California, the district court, on July 11,

2025, held that Border Patrol and ICE engaged in rampant violations of the Fourth Amendment

by stopping people without individualized reasonable suspicion, and instead relying on a "broad

profile." *Vasquez Perdomo*, 2025 WL 1915964, at *25. The district court issued a temporary

restraining order against such conduct, *id.* at *28,[2] and the Ninth Circuit has denied the

defendants' request to stay that injunction, *see Vasquez Perdomo*, 2025 WL 2181709, at *1.[3]

---

[2] It appears that this unlawful conduct by federal agents in the Central District is ongoing, as demonstrated in a recent filing in that matter. *See* George Decl. Ex. I.

[3] The government has applied for a stay to the Supreme Court, which remains pending. *See Noem v. Vasquez Perdomo*, No. 25A169, Application to Stay (U.S. Sup. Ct., filed Aug. 7, 2025).

6

1   Upon being enjoined from this conduct in the Central District on July 11, 2025,

2   Defendants expanded "Operation at Large" to this District a few days later with the same

3   unlawful conduct. On July 17, 2025, Border Patrol targeted Latinos in and around a Home Depot

4   parking lot in Sacramento. *See* Dkts. 74-3, 74-4. As in prior operations, Border Patrol agents

5   targeted individuals based on their apparent ethnicity, apparent occupation, and presence at or

6   near a Home Depot with no reason to believe the specific individuals they stopped were in the

7   country unlawfully, and arrested them without assessing flight risk.

8                    **1.    Defendants produce boilerplate documentation of arrests.**

9   Upon learning of this raid, Plaintiffs immediately requested documentation of the stops

10  and arrests pursuant to the preliminary injunction. George Decl. ¶ 6 & Ex. D. In response,

11  Defendants served Form I-213s (the standard form for Border Patrol immigration arrests) for

12  eleven arrestees on July 25, 2025. *Id.* Ex. E. The I-213s revealed that the raids were carried out by

13  Border Patrol agents from at least the El Centro and El Paso Border Patrol Sectors. *Id.* at 0003,

14  0009, 0013, 0018, 0023, 0029, 0038, 0043, 0048, 0053. Defendants did not serve any record

15  reflecting people who were detained, but not arrested. *See generally id.* Ex. E; Dkt. 74-9,

16  Declaration of Filiberto de Jesus Rivera-Molina ("Rivera-Molina Decl.") ¶ 2 (discussing people

17  who were detained, but then released once they provided their papers).[4]

18  The Form I-213s Defendants provided appear to be made-for-litigation documents

19  composed almost entirely of boilerplate copy-and-pasted descriptions. The boilerplate nature is

20  clear, not only from the identical language used in many of the I-213s, but also the occasional use

21  of "X" as a placeholder for the names of locations or detained individuals, which were not filled

22  in. *See* George Decl. Ex. E at 0003 ("I … was conducting immigration enforcement operations in

23  the city of X, CA"), 0040 ("I determined that X was likely to escape…"), 0055 ("I determined

24  that X was likely to escape…"). Each of the I-213s includes an identical preamble, which

25  ─────────────────────

26  [4] When asked, Defendants' counsel stated that the documents "reflect all immigration-related
    stops and warrantless arrests on July 17, 2025, at or around the Home Depot located at 4641
    Florin Road, Sacramento, CA 95823, including the parking lot." George Decl. ¶ 7 & Ex. D.

27  Although media outlets widely reported a U.S. citizen had been arrested, Defendants' counsel
    claimed that his arrest "did not involve a stop or an arrest for an immigration violation," and

28  asserted that the preliminary injunction did not require disclosure of information about that arrest.
    *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

3016066

purports to justify the stops of people at the Home Depot parking lot because, supposedly:



, George Decl. Ex. E at 0003, 0010, 0014, 0018, 0024, 0029, 0039, 0044, 0049, 0054;

*id.* at 0004, 0010, 0014, 0018, 0024, 0029, 0039, 0044, 0049, 0054;

*id.* at 0004, 0010, 0014, 0019, 0024, 0029, 0039, 0044, 0049, 0054;

*id.*

The I-213s also repeatedly adopt boilerplate language assuming that day laborers are—by definition—undocumented, stating that it is "common knowledge to Border Patrol agents that [undocumented noncitizens] congregate at locations such as Home Depot to solicit cash paying day labor jobs," and that undocumented noncitizens "work these jobs . . . to avoid paying taxes and to avoid detection by law enforcement." *Id.* at 0004, 0010, 0014, 0019, 0024, 0039, 0044, 0054. In the I-213s, Border Patrol agents also described "loitering in stationary locations" and not being a "shopp[er]" as "indicative of day laborers and possible [undocumented noncitizens]." *Id.* at 0004, 0011, 0015, 0019, 0030, 0039, 0045, 0055.

Then, almost every I-213 includes an identical or near-identical statement that the arrestee ran away from the Border Patrol agents, that Border Patrol agents chased and immediately apprehended them, and that Border Patrol agents did not learn the identities of the people they arrested until after the arrest. *Id.* at 0011, 0013, 0019, 0030, 0034, 0040, 0045, 0050, 0055.[5] In nearly every I-213, a Border Patrol agent states (sometimes twice) that "this unprovoked flight from law enforcement led me to believe that these individuals were involved in an active crime or

_____

[5] Only one of the eleven I-213s includes any information about the purported flight other than these boilerplate statements. George Decl. Ex. E at 0005-0006.

were likely present in the United States without authorization." *Id.* at 0004, 0011, 0015, 0019, 0030, 0034, 0040, 0045, 0050, 0055.

As with the accounts of stops, the accounts of arrests in the I-213s include identical or near-identical statements that the person being arrested was likely to escape before a warrant could be obtained based on "flight from law enforcement," "ignor[ing] agent commands," and "illegal presence in the United States." *Id.* at 0011, 0015, 0020, 0030, 0040, 0045, 0050, 0055. In some instances, the Border Patrol agent appears to have justified a warrantless arrest because the person arrested "was located in California, which is a sanctuary state." *Id.* at 0006, 0025, 0035.

In general, the I-213s do not document any inquiries made by Border Patrol agents to determine whether, based on the factors required by this Court, the people being arrested posed a flight risk from immigration authorities. Instead, the I-213s generally state that the person being arrested "made no claims" to having a "domicile" or "owning a home." *Id.* at 0020, 0025, 0030, 0035, 0055. No I-213 includes any discussion of community or family ties.

### 2. Plaintiffs' investigation reveals multiple falsehoods in Defendants' documentation.

Immediately after receiving the I-213s on July 25, Plaintiffs' counsel searched for witnesses, including the arrested class members in ICE's custodial databases. George Decl. ¶ 7. Although they had been arrested less than two weeks prior, only two of the eleven persons were still in ICE custody on July 29, suggesting that they had already been deported. *Id.*

All three of the class members Plaintiffs' counsel located have submitted declarations. *See* Dkt. 74-9, Rivera-Molina Decl.; Dkt. 74-8, Declaration of Isael Lopez Mazariegos ("Mazariegos Decl."); Declaration of Selvin Osbeli Mejia Diaz ("Diaz Decl.").[6] Their experiences contradict the cookie-cutter accounts of the Sacramento raid that Border Patrol agents wrote in their I-213s. *See* George Decl. Ex. E at 0008 (Rivera-Molina), 0016 (Diaz), 0027 (Mazariegos). Their declarations describe how armed, masked Border Patrol agents corralled a group of people at the entrance to the Home Depot with about 10 unmarked cars. Dkt. 74-9, Rivera-Molina Decl. ¶ 2.

---

[6] One of the three has already been removed to Guatemala. Dkt. 74-8, Mazariegos Decl. ¶ 6. Defendants' I-213s make clear that at least some arrestees were immediately processed for voluntary departure. George Decl. Ex. E at 0041, 0051.

9

The agents yelled in Spanish, saying not to move, making it clear that no one was free to leave. *Id.* ¶ 2. After surrounding the group and ordering people not to leave, agents began asking for "papers." *Id.* Some of the people the agents surrounded showed documentation and were permitted to leave. *Id.* Agents grabbed Filiberto de Jesus Rivera-Molina, asked him if he had "papers," and when he answered no, immediately arrested him. *Id.* Masked agents also grabbed Isael Lopez Mazariegos before knowing who he was. Dkt. 74-8, Mazariegos Decl. ¶ 3. When the agent demanded Mr. Mazariegos' ID, Mr. Mazariegos inquired why he was being asked to show ID, and the agent responded that he "must be an immigrant," took his wallet from his pocket, and handcuffed him. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. Agents did not ask any questions about family, work, or community ties. *Id.* ¶ 4; Dkt. 74-9, Rivera-Molina Decl. ¶¶ 2-3. Yet they were longtime Sacramento residents: Mr. Rivera-Molina has lived in the Sacramento area for eight years and has close relatives there, Dkt 74-9, Rivera-Molina Decl. ¶ 2, and Mr. Mazariegos has lived and worked in Sacramento for 12 years, Dkt. 74-8, Mazariegos Decl. ¶¶ 1-2.

Border Patrol agents also arrested Selvin Osbeli Mejia Diaz, an 18-year-old rising senior at Valley High School. Declaration of Francisca Delfina Mejia Castanon ("Castanon Decl.") ¶¶ 2-5, Ex. A (high school registration); Diaz Decl. ¶¶ 1-2. He had entered the United States the prior year after fleeing violence in his home country and was processed as an unaccompanied minor. Castanon Decl. ¶¶ 2-3; Diaz Decl. ¶ 1. After an initial detention, immigration officials released Selvin to his aunt, Francisca Delfina Mejia Castanon, as his sponsor. Castanon Decl. ¶ 3; Diaz Decl. ¶ 1. Selvin has lived with Ms. Castanon and her family ever since. *Id.* He enrolled in school and was active in his church. *See* Diaz Decl. ¶ 2; Castanon Decl. ¶ 5, Ex. A (high school registration), Ex. B (church certificate). He was in full compliance with ongoing immigration court proceedings. Castanon Decl. ¶ 4.

In their account in the I-213, Border Patrol agents describe Selvin using identical language as other arrestees, stating that he was a day laborer in the Home Depot parking lot who ran away. *Compare* George Decl. Ex. E at 0016 ("Occupation": "Laborer"), 0019, *with id.* at 0011, 0025, 0030, 0034, 0055. But Selvin does not work as a day laborer. Diaz Decl. ¶ 2; Castanon Decl. ¶ 5. He was not at Home Depot; he was on his way to a Ross clothing store in a different shopping

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

complex near the Home Depot to buy a shirt for a family event. Diaz Decl. ¶ 3; Castanon Decl. ¶ 6. An unmarked Chevy truck passed Selvin as he was walking from a residential area toward a bridge that crosses a creek behind the Ross shopping area. Diaz Decl. ¶ 3; George Decl. ¶ 12 & Ex. G (map showing bridge with red arrow). The truck turned around, and a masked agent dressed like a soldier jumped out of the truck and began to chase Selvin. Diaz Decl. ¶ 3. The agent tackled Selvin and handcuffed him. *Id.* He did not have a warrant and did not ask any questions until after he handcuffed Selvin, brought him into the truck, and began to transfer him to a processing center. *Id.* ¶ 4. Agents refused to allow Selvin to call his aunt for days. *Id.* ¶ 5. The I-213 describing Selvin's arrest states—as does nearly every I-213—that he was likely to escape "based on his flight from law enforcement, the fact that he ignored agent commands, [and] his illegal presence in the United States." George Decl. Ex. E at 0020. The I-213 also states—as does nearly every I-213—that Selvin "made no claims to owning a home, owning other assets, or having a steady and legal income." *Id.* But no agent asked Selvin questions about his family or community ties before arresting him, such as that he lived with his aunt and cousins, not even when he asked to call his aunt. Diaz Decl. ¶¶ 2-4, 6. The I-213 includes further boilerplate language that Selvin is a flight risk "due to his illegal presence in the United States, his willful disregard for . . . immigration and criminal laws, [and] his ability to disappear into the millions of people living in the Sacramento County area." George Decl. Ex. E at 0020. But Selvin was in compliance with his immigration court obligations and has no criminal history. Castanon Decl. ¶ 6; Diaz Decl. ¶ 6; *see also* George Decl. Ex. E at 0017 (noting no criminal history).

### III.    LEGAL STANDARD

"Courts have inherent authority to monitor and enforce their prior orders." *Fraihat v. U.S. Immigr. & Customs Enf't*, 2020 WL 2758553, at *3 (C.D. Cal. May 15, 2020). If a defendant fails to comply with the terms of an injunction, the plaintiff may move for an order mandating compliance. *See Armstrong v. Brown*, 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012) (holding that "a further enforcement order is necessary to ensure compliance with the terms of" prior order); *see also Sys. Fed'n No. 91, Ry. Emps.' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("[A]n injunction often requires continuing supervision by the issuing court and always a continuing

1   willingness to apply its powers and processes on behalf of the party who obtained that equitable

2   relief."). The Court has the power to "construe and interpret the language" of its prior order.

3   *California v. U.S. Dep't of the Interior*, 2020 WL 1496278, at *3 (N.D. Cal. Mar. 16, 2020). "In

4   deciding whether an injunction has been violated it is proper to observe the objects for which the

5   relief was granted." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935,

6   949 (9th Cir. 2014); *see also United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir.

7   1972) ("The language of an injunction must be read in the light of the circumstances surrounding

8   its entry: the relief sought by the moving party . . . and the mischief that the injunction seeks to

9   prevent."). A party thus cannot evade a finding of noncompliance by "hewing to the narrow letter

10  of the injunction" while "simultaneously ignoring its spirit[.]" *City & Cnty. of S.F. v. Trump*,

11  2025 WL 1358492, at *3 (N.D. Cal. May 9, 2025).

12      "A district court has discretion to clarify the scope of an injunction" in response to a

13  motion to enforce. *Smagin v. Yegiazaryan*, 2020 WL 1652347, at *3 (C.D. Cal. Apr. 1, 2020); *see*

14  *also City & Cnty. of S.F.*, 2025 WL 1358492, at *3 (clarifying injunction). A district court

15  likewise has discretion to modify a previously issued injunction if it is necessary to "achieve the

16  purposes" of the injunction, *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249, 251

17  (1968), or if there has been an intervening change in fact or law, *A&M Recs. Inc. v. Napster, Inc.*,

18  284 F.3d 1091, 1098 (9th Cir. 2002). The Court retains jurisdiction to enforce and modify its

19  injunctions during the pendency of an interlocutory appeal. *Id.* at 1099; Fed. R. Civ. P. 62(c)(1).

20  **IV.    ARGUMENT**

21      **A.    Defendants violated the Court's preliminary injunction.**

22          **1.    Border Patrol's Reasonable Suspicion Muster violates the Court's
                   preliminary injunction.**

23      The Court's preliminary injunction order required Defendants to issue a "a directive

24  setting forth the guidance given to Border Patrol agents concerning how they should determine

25  whether 'reasonable suspicion' exists when conducting detentive stops, including vehicle stops, in

26  this District." Dkt. 47 at 73. The Reasonable Suspicion Muster issued by El Centro Border Patrol

27  on June 27, 2025, however, violates this requirement because it does not accurately reflect the

28  law and fails to provide guidance that would remedy the violations at issue in this case. The

12

1    Muster thus violates both the letter of the preliminary injunction and undermines its purpose, by

2    failing to provide guidance that would correct the unlawful Border Patrol patterns and practices

3    that this Court enjoined. *Inst. of Cetacean Rsch.*, 774 F.3d at 949.

4        ***First***, the Muster provides no guidance that Border Patrol agents regarding improper use

5    of broad profiles to stop people. As this Court previously held, relying on Ninth Circuit authority,

6    "an officer cannot rely solely on generalizations that 'would cast suspicion on large segments of

7    the law-abiding population.'" Dkt. 47 at 75 (quoting *United States v. Manzo-Jurado*, 457 F.3d

8    928, 935 (9th Cir. 2006)). This means that if a "substantial number of people" who are lawfully in

9    the country share a characteristic, "that characteristic is of ***little or no probative value*** in such a

10   particularized and context-specific [reasonable suspicion] analysis." *United States v. Montero-*

11   *Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (emphasis added); *see also Vasquez Perdomo*,

12   2025 WL 2181709, at *17 (holding that it is improper to stop people based solely on factors that

13   "describe only a broad profile").

14       Despite the fact that "Operation Return to Sender" involved this exact kind of unlawful

15   profiling, the Muster says nothing about the bar on use of generalizations or characteristics that

16   would apply to "large segments" or a "substantial number" of law-abiding people. The Muster,

17   instead, improperly encourages use of such factors. The Muster states that "indicators that an

18   individual is a foreign national based on mode of dress or haircut may be considered" with "other

19   relevant factors." Dkt. 64-2 at 2. But the Muster does not explain that such "indicators" are "of

20   little or no probative value" if common to people lawfully in the country. *Manzo-Jurado*, 457

21   F.3d at 935. The Muster correctly states that "in areas where Hispanic individuals are

22   common, . . . apparent Hispanic race or ethnicity is not a relevant factor," Dkt. 64-2 at 2, but the

23   Muster offers no guidance on the fact that much of the Eastern District of California ***is such an***

24   ***area***. *See, e.g.*, Dkt. 15-2 Ex. 25 at 108 (census showing that over the majority of Kern County

25   residents are "Hispanic or Latino"). The Muster's failure to provide clear and unambiguous

26   guidance on these issues is inappropriate, and has had real-world consequences, as Border Patrol

27   has continued the same "Operation Return to Sender" playbook in "Operation At Large," relying

28   solely on "broad profile" characteristics such as a person's "occupation" and "location" to stop

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

1  them. *Vasquez Perdomo*, 2025 WL 2181709, at *18; *see infra* Section IV.A.2.a.

2       ***Second***, the Muster inappropriately treats this District as if it were on the border. It is not.

3  For example, the Muster states that reasonable suspicion must be judged by a "reasonable,

4  objective [Border Patrol agent]." Dkt. 64-2 at 2. But the judgment of an agent with training and

5  experience primarily aimed at the ***border*** should not be the litmus in this District, where the

6  implications of a person's conduct may completely differ. *See* George Decl. Ex. E at 0035

7  (Border Patrol agent invoking experience "at and near the border" for why running from masked

8  men with guns justified a stop in Sacramento). The Muster also emphasizes factors that are

9  developed for use "***in the border area***," *United States v. Brignoni-Ponce*, 422 U.S. 873, 884

10  (1975) (emphasis added), with no explanation that they are irrelevant or weigh against reasonable

11  suspicion in this District. The Muster does not explain, for example, that because this District is

12  "within this country's interior," *Manzo-Jurado*, 457 F.3d at 936, and far from any border, the

13  "proximity to the border" factor weighs ***against*** reasonable suspicion here. Nor does it explain

14  that "recent border crossings in the area" are irrelevant because the Eastern District shares no

15  border with a foreign country—a factor that is likely to be given improper weight when El Centro

16  Border Patrol has designated towns like Bakersfield "dyed in the wool border town[s]." Dkt. 15-2

17  Ex. 7 at 24. And the Muster offers no guidance on how "characteristics of the area," "previous

18  travel patterns of the area," and the "time of day" could contribute to reasonable suspicion in the

19  interior of the country. Similarly, whether a "type of vehicle" is "frequently used to transport

20  contraband or illegal aliens" or whether the vehicle is "heavily loaded with passengers," Dkt. 64-

21  2 at 2-3, has no probative value in this District, where many types of vehicles are driven and

22  where a heavily loaded vehicle is unlikely to connote an immigration violation. *United States v.*

23  *Sigmond-Ballesteros*, 285 F.3d 1117, 1125 (9th Cir. 2002) (identifying vehicle as a truck with a

24  camper "not particularly probative" in an area where driving trucks was common). The Muster

25  must explain or omit these border-centric factors.

26       ***Third***, the Muster provides inadequate guidance on the import of "flight" in the

27  reasonable suspicion analysis. The Muster states that an agent may consider "evad[ing] law

28  enforcement" through "flight on foot" when developing reasonable suspicion. Dkt. 64-2 at 2. But

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

the Muster does not explain that a person has "a right to ignore the police and go about his business," *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (citing *Florida v. Royer,* 460 U.S. 491, 498 (1983))—a factor especially relevant where "Operation Return to Sender" involved the unlawful stop of someone who "slowly walk[ed] away" from Border Patrol agents. Dkt. 15-10 ¶¶ 5-8. Nor does the Muster address the fact that Border Patrol agents' common use of aggressive tactics, unmarked vehicles, masks, and violent weapons undermines any inference that "flight" supports a finding of reasonable suspicion. *Vasquez Perdomo*, 2025 WL 1915964, at *23 n.30 (finding no showing of reasonable suspicion based on flight from "unidentified masked men with guns exiting from tinted cars without license plates"). Indeed, as the Ninth Circuit has observed, the "racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight." *United States v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019). These limitations on "flight" from law enforcement are not addressed in the Muster.

**Fourth**, the Muster does not provide sufficient guidance to Border Patrol agents on when its requirements apply. It states that it applies to "all investigative detentions," alternatively defined as a detentive, *Terry*, or roving patrol stop, but offers no guidance on how to identify that an interaction is or will be a stop or detention. Dkt. 64-2 at 2-3. Clear precedent states that a stop occurs when "a reasonable person would have believed that he was not free to leave," including due to "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554-55. In light of Border Patrol agents' practice in "Operation Return to Sender"—and repeated in the Sacramento raid—of seizing groups of people *en masse* in parking lots by surrounding them without individualized suspicion, Defendants must provide their agents much clearer guidance about when the Fourth Amendment's reasonable suspicion requirements apply. *See, e.g.*, Dkt. 15-5 ¶ 5-6; Dkt. 15-10 ¶¶ 4-6.

**Fifth**, the Muster fails to address the reasonable suspicion requirement for the civil immigration violations at issue in this case. For such violations, as this Court held in its preliminary injunction order, Border Patrol agents must have reasonable suspicion that the person

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

**ER109**

1    stopped is unlawfully in the country. Dkt. 47 at 87. Yet the Muster does not mention that standard

2    at all. Instead, it states that it is sufficient to have reasonable suspicion "that the person stopped is,

3    was, or is about to be, engaged in a violation of a law the BPA has the authority to enforce"

4    without defining the scope of that "authority." Dkt. 64-2 at 2. The Muster does not explain, for

5    example, that such authority only includes felonies under federal law, not state traffic or criminal

6    laws. *See* 8 U.S.C. §§ 1357(a)(4), (a)(5). This overbreadth adds ambiguity to the reasonable

7    suspicion analysis—for example, the Muster lists "association of an area with criminal activity"

8    as a factor relevant to reasonable suspicion, perhaps because certain crimes are within Border

9    Patrol's authority to enforce. *See id.* But an area's association with "criminal activity" does not

10   increase the likelihood that someone is in the country without authorization.[7]

11          Overall, the Muster is insufficient because it does not accurately portray the well-

12   established Fourth Amendment reasonable suspicion analysis necessary in this District and fails

13   to provide guidance that would remedy the unlawful practices alleged in the complaint. Border

14   Patrol's failure to issue accurate "guidance" on these principles violates the Court's preliminary

15   injunction order and, as discussed in Section IV.B, below, requires the issuance of a new Muster.

16          **2.      Border Patrol has violated the preliminary injunction by continuing to
                      engage in unlawful stops and arrests.**

17

18          Border Patrol has also violated the Court's preliminary injunction order by continuing its

19   unlawful conduct in this District. On July 17, 2025, as part of Border Patrol's raid on a

20   Sacramento Home Depot parking lot, Border Patrol violated the Fourth Amendment and 8 U.S.C.

21   § 1357—and in violation of this Court's preliminary injunction order—by stopping people

22   without reasonable suspicion and conducting warrantless arrests without any individualized

23   assessment of flight risk.

24          **a.      The Sacramento stops violated the Fourth Amendment.**

25          The Court's preliminary injunction order forbids detentive stops in this District "unless,

26

27   ---

     [7] The Muster also fails to explain that "presence in an area of expected criminal activity, standing
28   alone, is not enough to support" reasonable suspicion. *Illinois*, 528 U.S. at 124. Likewise, for civil
     immigration enforcement, a person's "presence in an area where illegal aliens frequently travel
     [is] not enough to justify a stop to interrogate the occupants of a vehicle. More is required."
     *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 703 (9th Cir. 1985).

16

1    pre-stop, the detaining agent has reasonable suspicion that the person to be stopped is a noncitizen

2    who is present within the United States in violation of U.S. immigration law." Dkt. 47 at 86. As

3    discussed above, such stops cannot be based "on broad profiles which cast suspicion on entire

4    categories of people without any individualized suspicion of the particular person to be stopped."

5    *United States v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994). Nor can reasonable

6    suspicion be based on criteria "likely to sweep many ordinary citizens into a generality of

7    suspicious appearance." *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992).

8        During the July operation at the Sacramento Home Depot, Border Patrol agents violated

9    these requirements by indiscriminately stopping people without individualized, reasonable

10   suspicion. For example, Messrs. Rivera-Molina and Mazariegos were standing in the Home

11   Depot parking lot when approximately twenty masked Border Patrol agents arrived in unmarked

12   vehicles and surrounded them, and demanded that day laborers provide their papers. Dkt. 74-9,

13   Rivera-Molina Decl. ¶ 2. Mr. Rivera-Molina did not feel free to leave. *Id.* A few day laborers

14   were able to show the agents their documents after the demand for papers, and were allowed to

15   leave once they did so. *Id.* Two agents then grabbed Mr. Rivera-Molina and asked if he had

16   papers, and arrested him when he answered. *Id.* Mr. Mazariegos was similarly grabbed by Border

17   Patrol agents, who snatched his wallet out of his pocket when he asked why they were asking for

18   his ID, and handcuffed him. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. Far from the Home Depot

19   parking lot, while Selvin Osbeli Mejia Diaz was walking to a clothing store in a different

20   shopping center, a "masked man dressed like a soldier" jumped out of a Chevy truck and began

21   chasing him. Diaz Decl. ¶ 3; George Decl. ¶ 12 & Ex. G (red arrow showing bridge Selvin was

22   approaching). Selvin turned to flee from this unknown assailant and was tackled. Diaz Decl. ¶ 3.

23       These stops were based on an indiscriminate policy, pattern, and practice of conducting

24   group stops and arrests of "day laborers" in Home Depot parking lots—in other words, the

25   "wholesale seizure of miscellaneous persons." *Montero-Camargo*, 208 F.3d at 1132. Border

26   Patrol agents told Mr. Rivera-Molina that they had been ordered to do raids on Home Depot and

27   Walmart stores. Dkt. 74-9, Rivera-Molina Decl. ¶ 3. The I-213s produced by Defendants support

28   that account. *See* George Decl. Ex. E. After making general statements that Sacramento is a "city

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

**ER111**

1   where many illegal aliens are known to stay, live and work" and that ███████
2   ███████████████████████████████████████████████, *see id.* at 0003, 0010, 0014, 0018,
3   0024, 0029, 0039, 0044, 0049, 0054, the I-213s focus on a "broad profile" for day laborers who
4   wait for work in Home Depot parking lots based on pure generalizations. For example, the I-213s
5   state that it is "common knowledge" that "illegal aliens congregate at locations such as Home
6   Depot" and "work cash paying jobs to avoid paying taxes and to avoid detection by law
7   enforcement," and that unlike shoppers who move "with an identified purpose" in Home Depot
8   parking lots, people who "loiter[] in stationary locations" are "day laborers and possible illegal
9   aliens." George Decl. Ex. E at 0004, 0010-0011, 0014-0015, 0019, 0024, 0030, 0039, 0044-0045,
10  0054-0055. But these broad statements are insufficient for reasonable suspicion—they reflect a
11  "broad profile" that cast suspicion on *any* person standing in a Home Depot parking lot.
12  *Rodriguez Sanchez*, 23 F.3d at 1492. Indeed, Defendants stopped people during the operation
13  based on this broad profile but released them when they produced their "papers," Dkt. 74-9,
14  Rivera-Molina Decl. ¶ 2, presumably because they were not subject to immigration arrest.[8]

15          The I-213s provide little to no information specific to the individuals apprehended.
16  Rather, the I-213s include identical, vague assertions that each person was "loitering" in the
17  Home Depot parking lot and that the person then "ran away" from the Border Patrol agents in
18  "unprovoked flight."[9] George Decl. Ex. E at 0004, 0011, 0013, 0019, 0030, 0034, 0040, 0045,
19  0050, 0055. But these statements lack credibility and the required particularity, and should be
20  rejected. Mr. Rivera-Molina, for example, said he stood frozen when Border Patrol agents piled
21
22  _____
    [8] Defendants have not provided any record of these stops, despite the preliminary injunction's
23  requirement that such stops be documented. Dkt. 47 at 86-87. Border Patrol agents also stopped
    and arrested a U.S. citizen, Jose Castillo, but Defendants refused to provide the record for that
24  arrest, claiming that it "did not involve a stop or an arrest for an immigration violation" and
    asserting, as a result, that the Court's preliminary injunction did not require disclosure of
25  information about that stop and arrest. George Decl. ¶ 8 & Ex. D; *see also* Dkt. 74-3 at 4-5
    (article addressing Castillo's arrest). Plaintiffs seek relief, as discussed below, for the failure to
26  provide documentation regarding purported non-immigration stops and arrests.
    ████████████████████████████████████████████████████████████████████████
27  ███████████████████████████████████ George Decl. Ex. E at 0004, 0010, 0014, 0018, 0024,
    0029, 0039, 0044, 0049, 0054. But there is no indication that █████████████████████████
28  ████████████████████████████████████████████████████

                                             18

1    out of unmarked vans and surrounded him and others. Dkt. 74-9, Rivera-Molina Decl. ¶ 2. And

2    Mr. Mazariegos was grabbed by Border Patrol agents as soon as he saw them, and had no chance

3    to run. Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4. And though Selvin stated he ran from the masked man

4    in soldier gear who jumped out of truck and chased him, his I-213 is false in multiple ways,

5    casting doubt on the accounts in the other I-213s. For example, Selvin's I-213 asserts that he is a

6    "laborer" who was "loitering" in the Home Depot parking lot. George Decl. Ex. E at 0016, 0019.

7    But Selvin, an 18-year-old high school student, was walking to a clothing store, not in the vicinity

8    of the Home Depot parking lot, when agents grabbed him. *See* Diaz Decl. ¶ 3; George Decl. ¶ 12

9    & Ex. G. Even absent the contradicting evidence, the descriptions of people "loitering" and

10   "unprovoked flight" are not credible because they are in almost every case copy-and-pasted

11   boilerplate descriptions. *See Alaniz v. City of L.A.*, 2014 WL 12694157, at *5 (C.D. Cal. May 21,

12   2014) (finding that use of "boilerplate" calls into question the credibility of declarations); *Barker*

13   *v. U.S. Bancorp*, 2017 WL 4358116, at *4 (S.D. Cal. Oct. 2, 2017) (same). These non-credible

14   accounts cannot justify reasonable suspicion.

15         Even if a person ran from Border Patrol agents, that is inadequate for reasonable suspicion

16   here. While flight might be suggestive of wrongdoing in certain circumstances, "racial dynamics

17   in our society—along with a simple desire not to interact with police—offer an 'innocent'

18   explanation of flight." *Brown*, 925 F.3d at 1157. And where other claimed bases for reasonable

19   suspicion are weak (such as in *Brown*, where there was an anonymous tip and no clear inference

20   of wrongdoing), flight does not provide a basis for finding reasonable suspicion. *Id.* Based on this

21   authority, another district court found that running from immigration agents did not create

22   reasonable suspicion because there was no showing that "fleeing upon seeing unidentified

23   masked men with guns exiting from tinted cars without license plates raises suspicion." *Vasquez*

24   *Perdomo*, 2025 WL 1915964, at *23 n.30. The same is true here. For Selvin, it was reasonable

25   and not suspicious to start running when a masked man jumped out of an unmarked Chevy truck

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

3016066                                                                              ER113

and started to chase him. Diaz Decl. ¶ 3.[10] Likewise, even if Messrs. Mazariegos and Rivera-Molina ran away from officers (they did not), it would have been reasonable for them to react with fear (whether by freezing or running) when twenty masked men with guns exited unmarked SUVs and vans to surround them. As Border Patrol's entire basis for its mass arrests at the Sacramento Home Depot was based on an insufficient "broad profile," Border Patrol cannot rely on fear-based flight inspired by its own aggressive tactics to manufacture reasonable suspicion.

**b.    Border Patrol agents conducted warrantless arrests without probable cause of flight risk in violation of 8 U.S.C. § 1357.**

The Court's order forbids "warrantless arrests in this District unless, pre-arrest, the arresting agent has probable cause to believe that the noncitizen being arrested is likely to escape before a warrant can be obtained." Dkt. 47 at 86; *see also* 8 U.S.C. § 1357(a)(2). To develop probable cause, there must be an "individualized assessment of the person's flight risk," Dkt. 47 at 76, based on the totality of the circumstances, including an individual's community ties (such as their family, home, or employment), an individual's prior escapes or evasions of immigration authorities, and the immigration officer's ability to determine the individual's identity, *Nava v. Dep't of Homeland Sec.*, 435 F. Supp. 3d 880, 891-92 (N.D. Ill. 2020); Dkt. 64-1 at 2-4 (Border Patrol muster); Dkt. 15-2 at 111-13 (*Nava* Broadcast Statement of Policy).

In the Sacramento raid, however, Border Patrol agents arrested people without conducting the necessary individualized analysis prior to the arrest. Border Patrol agents did not, for example, ask any of the people arrested about their community ties. Selvin was tackled, handcuffed, and placed in a truck, and only asked to provide his name and date of birth—they thus arrested him without knowing that he is a rising senior at local high school, lives with his aunt, uncle, and cousins, attends a local church, and had complied with all the conditions required of him in his pending immigration case. Diaz Decl. ¶¶ 1-2, 4, 6; Castanon Decl. ¶¶ 3-5 & Exs. A, B. Border Patrol agents likewise did not ask about the community ties of Messrs. Lopez Mazariegos and

---

[10] The fact that Selvin did not match the "broad profile" of suspected day laborers loitering near Home Depot further demonstrates that he was targeted based solely on race and physical appearance, and undermines the credibility of any claim that the basis of the stop was based on reasonable reaction. Notably, Selvin had no reason to run from Border Patrol agents for any "suspicious" reason as he was released to his aunt's custody pending his immigration case and was complying with the requirements of his immigration case. Castanon Decl. ¶ 6.

1  Rivera-Molina, both of whom had worked in Sacramento around a decade (12 years and 8 years,

2  respectively) and have family in the United States. Dkt. 74-8, Mazariegos Decl. ¶ 1; Dkt. 74-9,

3  Rivera-Molina Decl. ¶ 1.

4        The I-213s also demonstrate that the required analysis of flight risk did not occur. The

5  flight risk "findings" are composed of copy-and-pasted boilerplate, often word-for-word,

6  undermining any claim that they were based on an individualized assessment. *See, e.g.* George

7  Decl. Ex. E at 0011, 0015, 0020, 0030, 0040, 0045, 0050, 0055. Two separate I-213s even

8  includes an "X" placeholder for the person's name in the boilerplate flight risk finding. *Id.* at

9  0040, 00055 (stating that "that X was likely to escape before a warrant could be obtained"). There

10  is *no mention* of community or family ties in the records, underscoring that Border Patrol agents

11  never asked about such ties. *See, e.g.*, *id.* at 0019-0020. And many of the I-213s say that the

12  people arrested "made no claims" to owning a home, other assets, or steady income, *see, e.g.*, *id.*,

13  but notably do *not* claim that the agents affirmatively asked about these topics, an omission

14  further confirmed by the accounts of those arrested, *see* Diaz Decl. ¶¶ 3-4; Dkt. 74-8, Mazariegos

15  Decl. ¶¶ 3-5; Dkt. 74-9, Rivera-Molina Decl. ¶¶ 2-3. Each of the documents rely on generic

16  statements about the "flight" by the person, the purported "willful disregard" of immigration

17  laws, and the purported ability to "disappear into the millions of people living in the Sacramento

18  County area." *See, e.g.*, George Decl. Ex. E at 0020. But as already discussed above, claims of

19  "flight" in these documents lack credibility and "mere presence within the United States in

20  violation of U.S. immigration law is not, by itself, sufficient." Dkt. 64-1 at 2. These boilerplate

21  documents offer no evidence that an individualized assessment of flight risk occurred.

22        The Border Patrol agents' failure to ask basic questions of the people arrested and to

23  engage in an actual individualized assessment of flight risk violates § 1357(a)(2) and the Court's

24  order. *See* Dkt. 47 at 86.

25        **3.    Defendants have failed to comply with the preliminary injunction's
           requirement for documenting stops and arrests.**

26  Lastly, Defendants have also failed to comply with the preliminary injunction's

27  requirement for documenting detentive stops and warrantless arrests. The Court's order requires

28  Border Patrol agents to "document the facts and circumstances surrounding" each stop in this

1   District "in a narrative form," and to describe the factual basis for reasonable suspicion for that

2   stop. Dkt. 47 at 86-87. It also requires Border Patrol agents to "document in writing the facts and

3   circumstances surrounding [each] warrantless arrest and the specific, particularized facts

4   supporting the conclusion that the [individual] was likely to escape before a warrant could be

5   obtained." *Id.* at 87. Defendants must provide Plaintiffs this documentation upon request. *Id.*

6   Border Patrol agents, however, have violated these requirements.

7        ***First***, Border Patrol agents' use of boilerplate language results in violations of the

8   preliminary injunction. Rather than provide an account of the stop or arrest at issue, Border Patrol

9   agents have instead used copy-and-pasted language that does not accurately describe each

10  individual's stop and arrest or the individualized bases justifying reasonable suspicion and

11  probable cause of flight risk. As noted above, there are myriad falsehoods in the I-213s, including

12  claims that Selvin was a laborer in a Home Depot parking lot when he is in fact a high school

13  student who was walking to a clothing store, and claims that Messrs. Rivera-Molina and

14  Mazariegos ran away when they did not. Diaz Decl. ¶¶ 1-3; Dkt. 74-8, Mazariegos Decl. ¶¶ 3-4;

15  Dkt. 74-9, Rivera-Molina Decl. ¶ 2. The boilerplate process used to generate these documents

16  results in unreliable accounts that thus violate the letter and the spirit of the Court's preliminary

17  injunction.

18       ***Second***, Defendants assert that they are not required to create or provide documentation of

19  stops and warrantless arrests in this District that are not based on "immigration violations."

20  George Decl. ¶ 8 & Ex. D. As a result, Defendants have refused to provide documentation of a

21  U.S. citizen arrested during the Sacramento Home Depot raid. *Id.* But the Court's order does not

22  limit itself to alleged immigration violations, but encompasses all detentive stops and warrantless

23  arrests conducted by Border Patrol in this District. *See* Dkt. 47 at 86-87. Indeed, Plaintiffs'

24  motion for preliminary injunction sought relief in part based on evidence that Border Patrol

25  arrested a U.S. citizen on the pretextual basis that he was "alien smuggling" for driving with a

26  passenger who allegedly was in the United States without authorization. Dkt. 15-4 ¶ 9.

27  Defendants cannot evade reporting of stops and arrests based solely on their say-so that an

28  immigration violation was not at issue, as such a rule would undermine the reporting requirement

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

3016066

and incentivize agents to classify any stop or arrest of U.S. citizens, legal permanent residents, or others authorized to be in the United States as not involving an immigration violation. The preliminary injunction avoids such issues by requiring documentation of all Border Patrol stops and warrantless arrests in this District. Defendants' refusal to provide documentation of the arrest of a U.S. Citizen in the Sacramento Home Depot raid violates this requirement.

**B.    The Court should require Defendants to remedy their breach and follow the Court's preliminary injunction order.**

Border Patrol's ongoing violations of law and failure to comply with the Court's preliminary injunction warrants this Court's intervention. As set forth in the concurrently filed proposed order, Plaintiffs respectfully request the Court provide the following relief:

*First*, the Court should order Border Patrol to issue a new Muster or directive providing adequate guidance on the standard for reasonable suspicion. That Muster should correct the deficiencies identified above, including by providing guidance that (1) characteristics, profiles, or generalizations that are shared with a substantial number of people who are lawfully in the country have minimal probative value and are insufficient alone or in combination to create reasonable suspicion; (2) the reasonable suspicion analysis differs between the border and the Eastern District, including by removing a "reasonable Border Patrol agent" as the standard for formation of reasonable suspicion, and explaining that many factors are relevant only at or near the border and, in fact, weigh against a finding of reasonable suspicion in this District; (3) "flight" is not a relevant reasonable suspicion factor based on current Border Patrol tactics and exercising the right to walk away from agents is never a relevant factor; (4) detail the analysis for when an interaction is a detentive stop, that is, when "a reasonable person would have believed that he was not free to leave"; and (5) explain the limitations on the "violations" Border Patrol agents are allowed to enforce and how they limit the development of reasonable suspicion, and expressly state the standard for reasonable suspicion for civil immigration stops. Plaintiffs respectfully request that the Court order Defendants to serve the new Muster or directive on Plaintiffs within 14 days of the Court's order, for the parties to meet and confer, and for objections to be raised and resolved, as necessary, within 21 days of service of the Muster or directive.

*Second*, the Court should require additional procedures regarding training for reasonable

23

1  suspicion and warrantless arrests in light of the ongoing issues identified above. Defendants have

2  asserted, including in discovery responses, that the unlawful conduct in Operation Return to

3  Sender and in the July 17, 2025 raid on the Sacramento Home Depot occurred despite over 100

4  hours of legal training and "periodic refreshers," George Decl. Ex. H, showing the ineffectiveness

5  of current training. The Court should order Defendants to provide training on the new reasonable

6  suspicion Muster or directive, and require that training include examples of the unlawful conduct

7  addressed by the Court's preliminary injunction order and an explanation why that conduct was

8  unlawful. The Court should require Defendants to serve on Plaintiffs the training materials that

9  they plan on using regarding the new Muster or directive within 14 days of the Court's order. The

10 Court should also order Defendants to serve on Plaintiffs the training materials they have been

11 using, or will use, for warrantless arrests on the same timeframe. The parties should then meet

12 and confer, and raise objections as necessary within 21 days of service of the training materials.

13       The Court should require training of all Border Patrol agents who have or will participate

14 in operations in this District within 60 days after the resolution of objections regarding the new

15 Muster or directive and the training materials. *See* Dkt. 31-2 ¶ 10 (Border Patrol declaration

16 claiming that training could occur within 60 days). Thereafter, the Court should require that any

17 Border Patrol agent receive the same training prior to participating in any operation in this

18 District.

19       For the specific Border Patrol personnel who planned and carried out the Sacramento

20 operation on July 17, due to their failure to follow the Court's preliminary injunction order, the

21 Court should (1) require Defendants to produce a list of those personnel to Plaintiffs within seven

22 days of the Court's order and (2) bar such personnel from participating in operations in this

23 District until those agents and personnel are provided the above-referenced training. If those

24 agents have already received training on reasonable suspicion and warrantless arrests, the Court

25 should require that they be re-trained prior to carrying out any operations in this District. Courts

26 have held that bars on actions by personnel pending such training are appropriate to ensure

27 compliance with a preliminary injunction. *Nat'l Org. For Reform of Marijuana L. (NORML) v.*

28 *Mullen*, 608 F. Supp. 945, 966 (N.D. Cal. 1985) (barring additional activities until training on

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

3016066

1   preliminary injunction was completed), *aff'd in part and remanded in part on other grounds at*

2   796 F.2d 276, 276 (9th Cir. 1986). The Court should provide that same relief here.

3          ***Third***, the Court should bar Border Patrol agents from using boilerplate or copy-and-

4   pasted language when describing (1) the factual basis for individualized reasonable suspicion for

5   a detentive stop; and (2) the individualized assessment of flight risk required for warrantless

6   arrests, as required under the Court's preliminary injunction order. *Compare Shaw v. Jones*, 683

7   F. Supp. 3d 1205, 1261 (D. Kan. 2023) (requiring state troopers to "use accurate and specific

8   descriptive language and not rely on boilerplate or 'pat' language"). To the extent other factual

9   material is included in a document, the Court should require that the bases for individualized

10  reasonable suspicion and individualized assessment of flight risk be demarcated in the document

11  and easily identified.

12         ***Fourth***, the Court should require Border Patrol agents to document all detentive stops and

13  warrantless arrests they conduct in this District, regardless of whether the stop or warrantless

14  arrest was based on an alleged "immigration violation." As discussed above, the preliminary

15  injunction already requires this relief, and allowing Defendants to avoid reporting because they

16  decide that the stop or arrest did not involve an immigration violation would undermine the

17  reporting requirement and leave Plaintiffs with incomplete information.

18         ***Finally***, while the preliminary injunction currently requires Defendants to serve

19  documentation of stops and warrantless arrests within 7 days of a request, Dkt. 47 at 87, Plaintiffs

20  respectfully request the Court require service within 4 days of a request. For the Sacramento

21  Home Depot raids, by the time Plaintiffs received the I-213s from Defendants and were able to

22  investigate the facts, Plaintiffs could not locate most of the people arrested (8 out of 11 people)

23  because they were not in immigration custody and presumably had already been deported. George

24  Decl. ¶ 7. For effective access to witnesses and enforcement of the preliminary injunction,

25  Plaintiffs respectfully request documentation of stops and arrests on a faster timeframe.

26  **V.    CONCLUSION**

27         For the foregoing reasons, the Court should grant Plaintiffs' motion, and order further

28  relief as set forth above, and in the concurrently filed proposed order.

1   Dated: August 29, 2025                      AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF NORTHERN
2                                               CALIFORNIA

3                                               */s/ Bree Bernwanger* (as authorized August
                                                29, 2025)
4                                        By:
                                                BREE BERNWANGER
5                                               MICHELLE (MINJU) Y. CHO
                                                LAUREN DAVIS
6                                               SHILPI AGARWAL

7

8   Dated: August 29, 2025            By:       AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF SOUTHERN
9                                               CALIFORNIA

10                                              */s/ Mayra Joachin* (as authorized August
                                                29, 2025)
11                                              MAYRA JOACHIN
                                                EVA BITRAN
12

13

14  Dated: August 29, 2025            By:       AMERICAN CIVIL LIBERTIES UNION
                                                FOUNDATION OF SAN DIEGO &
15                                              IMPERIAL COUNTIES

16                                              */s/ Brisa Velazquez Oatis* (as authorized
                                                August 29, 2025)
17                                              BRISA VELAZQUEZ OATIS

18                                              Attorneys for Plaintiffs

19
    Dated: August 29, 2025                      KEKER, VAN NEST & PETERS LLP
20
                                         By:    */s/ Ajay S. Krishnan*
21                                              AJAY S. KRISHNAN
                                                JASON GEORGE
22                                              JULIA GREENBERG
                                                REAGHAN E. BRAUN
23
                                                Attorneys for Plaintiffs
24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO ENFORCE
Case No. 1:25-cv-00246-JLT-CDB

3016066                                                                  ER120

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

UNITED FARM WORKERS, et al.,

    Plaintiffs,

        v.

KRISTI NOEM, SECRETARY OF
HOMELAND SECURITY, et al.,

    Defendants.

No. 1:25-cv-00246-JLT-CDB

## DECLARATION OF EDUARDO CANTU

I, Eduardo Cantu, based upon my personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, hereby declare the following:

1.     I am the Deputy Chief Patrol Agent ("DCPA") charged with oversight of U.S. Customs and Border Protection's ("CBP") United States Border Patrol Academy, located at the Federal Law Enforcement Training Center (FLETC) in Artesia, New Mexico. I have served in this position since September 2024. I have been employed with CBP's U.S. Border Patrol ("USBP") since 2006. Among other roles, I have served as a Supervisory Border Patrol Agent with oversight of USBP's Tactical Unit ("BORTAC") within the Rio Grande Valley Sector, BORTAC Commander of the Del Rio Sector, and Patrol Agent in Charge of Del Rio Sector's Special Operations Detachment. BORTAC members are specially trained to deploy throughout the United States and abroad when needed in furtherance of USBP's mission. In addition, I have served as Deputy Patrol Agent in Charge of the Rio Grande Valley Sector and as Division Chief of the Operations West Corridor within the Law Enforcement Operations Directorate at USBP Headquarters.

2.     As DCPA of the USBP Academy, I have personal knowledge and access to official files and records that demonstrate the training provided to all Border Patrol

Agents ("BPAs") during the BPA Basic Training program. I also have personal knowledge of legal training provided to BPAs based on my previous roles.

3.     I am familiar with Plaintiffs' complaint in the above-captioned litigation and their claims therein. I submit this declaration in support of the Government's Motion to Dismiss and to explain the legal training new BPAs receive related to Plaintiffs' claims.

4.     The actions undertaken by Border Patrol Agents are informed by their experience and the comprehensive training they receive at various stages of their careers.

5.     During BPA Basic Training at the USBP Academy in Artesia, New Mexico, trainees receive approximately six months of extensive operational, tactical, and legal training. Trainees learn the technical requirements of their job and demonstrate their ability to employ these skills through numerous interactive scenarios that replicate situations they will routinely encounter in the field. They receive feedback regarding their performance during these scenarios.

6.     During their time at the Border Patrol Academy, trainees receive approximately 110 hours of legal training presented by attorneys employed by CBP's Office of Chief Counsel. This training is designed to ensure that BPAs have the framework necessary to recognize violations of the laws they enforce and take appropriate law enforcement actions. Legal topics covered include criminal law, criminal procedure, courtroom testimony, customs law, forfeiture, immigration law, use of force, nationality law, and report writing.

7.     During their time at the Border Patrol Academy, trainees receive instruction on the following topics:

        a.     The requirements for engaging in warrantless arrests, the scope of their authorities and constraints on their authorities, and best practices in carrying out their authorities, including training on applicable policies such as applicable policies regarding non-discrimination.

b.   Technical and legal requirements applicable to assignments including linewatch, transportation checks, roving patrols, and city patrols, to include enforcement of the laws that BPAs are authorized to enforce upon individuals in conveyances or on foot.

c.   The definition of and requirements for consensual encounters, and the actions BPAs may take during lawful consensual encounters.

d.   The legal definitions of the levels of suspicion and the corresponding law enforcement actions that may be taken at each level of suspicion, including actions that may be taken only based upon reasonable suspicion or probable cause.

e.   The legal definitions of and requirements for searches and seizures, including investigative detentions of conveyances and individuals on foot, and arrests for violations of the laws that BPAs are authorized to enforce.

f.   The legal authority and immigration consequences for allowing an alien to voluntarily depart the United States under INA § 240B.

8.   Beyond the comprehensive training delivered during BPA Basic Training, BPAs receive additional on-the-job training and periodic refreshers throughout their careers related to the topics above.  Additional training may be provided locally or as a part of national training programs.

9.   BPAs are consistently taught to utilize their law enforcement authority in accordance with applicable statutes, regulations, and case law when conducting any operation, including interior enforcement operations or city patrols.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 11th day of July, 2025.

_____
EDUARDO CANTU

ER123

**El Centro Sector Muster**

**This Muster states the underlying laws and policies applicable to investigative detentions initiated by El Centro Sector Border Patrol Agents pursuant to the Fourth Amendment in the Eastern District of California, and is to be interpreted consistently with all controlling Supreme Court and Ninth Circuit case law.**

The guidance contained herein applies to all investigative detentions, also known as detentive stops, *Terry* stops, or roving patrol stops, conducted pursuant to INA § 287 [8 U.S.C. § 1357].

U.S. Border Patrol Agents ("BPAs") may briefly detain a person if the agent has reasonable suspicion, based on specific articulable facts, that the person stopped is, was, or is about to be, engaged in a violation of a law the BPA has the authority to enforce. An investigative detention is a temporary seizure of a person to investigate a specific reasonable suspicion of unlawful activity. The BPA's actions during the stop must be geared toward confirming or eliminating the BPA's reasonable suspicion of unlawful activity.

BPAs must develop reasonable suspicion before initiating an investigative stop. To develop reasonable suspicion, BPAs must identify specific, articulable facts, that when taken together with rational inferences from those facts, would lead a reasonable, objective BPA to believe that the person stopped is, was, or is about to be, engaged in a violation of a law the BPA has the authority to enforce. BPAs must evaluate the totality of the circumstances when assessing whether they have developed reasonable suspicion. BPAs may use their training and experience to provide meaning and context for the facts used to develop reasonable suspicion.

Information that may be considered when developing reasonable suspicion includes, but is not limited to:

- the location of an individual or vehicle in proximity to the border;
- the characteristics of the area in which the individual or vehicle is encountered;
- the previous travel patterns of the area, including foot or vehicle traffic;
- recent illegal border crossings in the area;
- the time of day an individual or vehicle is encountered;
- the association of the area with criminal activity;
- attempts to evade law enforcement, such as flight on foot or dangerous or erratic driving patterns;
- details revealed from records checks.

ER124

In the context of roving patrol stops, BPAs may also consider whether a certain type of vehicle is frequently used to transport contraband or illegal aliens, whether a vehicle contains components capable of smuggling aliens, and whether a vehicle appears heavily loaded with passengers. In areas where Hispanic individuals are common, an individual's apparent Hispanic race or ethnicity is not a relevant factor supporting reasonable suspicion. However, indicators that an individual is a foreign national based on mode of dress or haircut may be considered in developing reasonable suspicion, along with the presence of other, relevant factors.

An individual's refusal to answer a BPA's questions does not, without additional articulable facts, constitute a basis for reasonable suspicion to justify an investigative detention.

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
SAMUEL P. GO
Assistant Director
MARY L. LARAKERS
Senior Litigation Counsel
TIM RAMNITZ
Senior Litigation Counsel
CAROLYN D. DILLARD
Trial Attorney
OLGA Y. KUCHINS
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
771-202-1392
Olga.y.kuchins@usdoj.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FARM WORKERS, *et al.*, | No. 1:25-cv-00246-JLT-CDB |
| Plaintiffs, | **DEFENDANTS' NOTICE OF APPEAL (PRELIMINARY INJUNCTION)** |
| v. | |
| KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, *et al.*, | Hon. Jennifer L. Thurston, United States District Judge |
| Defendants. | |

ER126

Please take notice that Defendants Kristi Noem, Secretary, Department of Homeland Security; Pete R. Flores, Acting Commissioner of U.S. Border Patrol; Michael W. Banks, Chief of U.S. Border Patrol; and Gregory K. Bovino, Chief Patrol Agent for El Centro Sector of U.S. Border Patrol, in their official capacities, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Order entered on April 29, 2025, granting Plaintiffs' motion for a preliminary injunction and motion for class certification. *See* ECF No. 47. This order is an appealable interlocutory order of a district court granting an injunction. 28 U.S.C. § 1292(a)(1); *see* Ninth Cir. R. 3-3(a).

DATED: June 26, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

SAMUEL P. GO
Assistant Director

MARY L. LARAKERS
Senior Litigation Counsel

TIM RAMNITZ
Senior Litigation Counsel

CAROLYN D. DILLARD
Trial Attorney

OLGA Y. KUCHINS
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation, GLA
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel.: (771) 202-1392
Fax: (202) 305-7000
Email: Olga.Y.Kuchins@usdoj.gov
Bar No. 312901
*Attorneys for Defendants*

ER127

### **CERTIFICATE OF SERVICE**

On June 26, 2025, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of California, using the electronic case filing system of the Court. I hereby certify that I have served counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Olga Y. Kuchins*
OLGA KUCHINS
Trial Attorney

ER128

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division
SAMUEL P. GO
Assistant Director
MARY L. LARAKERS
Senior Litigation Counsel
OLGA Y. KUCHINS
Trial Attorney
CAROLYN D. DILLARD
Trial Attorney
TIM RAMNITZ
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-616-2686

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED FARM WORKERS, et al., | No. 1:25-cv-00246-JLT-CDB |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| KRISTI NOEM, SECRETARY OF HOMELAND SECURITY, et al., | <u>Scheduled Hearing</u>: April 28, 2025, at 1:30 p.m., Courtroom 4, before Hon. Jennifer L. Thurston |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................2

    I.     Procedural History .............................................................................2

    II.    Factual Background ...........................................................................2

         A.    Named Plaintiffs' Allegations...................................................2

         B.    USBP Guidance and Training....................................................4

    III.   Statutory Background.........................................................................4

STANDARD OF REVIEW............................................................................................5

ARGUMENT .................................................................................................................6

    I.     Plaintiffs Fail to Establish a Likelihood of Success on Merits.............................6

         A.    The Court Lacks Jurisdiction to Review Plaintiffs' Claims Under 8 U.S.C. 1252(a)(5) and (b)(9)................................................6

         B.    This Court Lacks Jurisdiction to Issue an Injunction to Anyone Other Than the Named Plaintiffs ..........................................9

         C.    The Plaintiffs' Claims Are Moot...............................................10

    II.    Plaintiffs Cannot Meet Their Burden to Show They Would be Irreparably Harmed Absent the Prospective Injunction They Seek....................................................12

    III.   The Balance of Equities and the Public Interest Favor the Denial of Preliminary Relief...............................................................................................................13

CONCLUSION..............................................................................................................14

# TABLE OF AUTHORITIES

## CASES

*Abel v. United States*,
  362 U.S. 217 (1960)..................................................................................... 4

*Al Otro Lado v. Exec. Office of Immigr. Rev.*,
  120 F.4th 606 (9th Cir. 2024) ................................................................... 10

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ..................................................................... 6

*Araujo v. U.S.*,
  301 F.Supp.2d 1095 (N.D. Cal. 2004) ........................................................ 9

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ....................................................................... 5

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................... 11

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ....................................................................... 5

*Garland v. Aleman Gonzalez*,
  596 U.S.542 (2022)............................................................................ 8, 9, 10

*INS v. Lopez-Mendoza*,
  468 U.S. 1032 (1984) ................................................................................. 13

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ................................................................. 7, 9

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018)........................................................................6, 7, 8, 9

*Kansas v. Nebraska*,
  574 U.S. 445 (2015)................................................................................... 13

*Leal-Burboa v. Garland*,
  2022 WL 17547799 (9th Cir. 2022) ............................................................ 7

*Loper v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ..................................................................... 5

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ....................................................................... 6

*Nava v. Department of Homeland Security*,
   435 F.Supp.3d 880 (N.D. Ill. 2020) ...................................................7, 8, 9, 11

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................ 13

*Pettibone v. Russell*,
   59 F.4th 449 (9th Cir. 2023) ...................................................................... 9

*Preiser v. Newkirk*,
   422 U.S. 395 (1975) ............................................................................ 11, 12

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ....................................................................... 7

*Recycle for Change v. City of Oakland*,
   856 F.3d 666 (9th Cir. 2017) ...................................................................... 5

*Sanchez v. Sessions*,
   904 F.3d 643 (9th Cir. 2018) .................................................................. 6, 7

*Stanley v. University of S. Cal.*,
   13 F.3d 1313 (9th Cir. 1994) ...................................................................... 6

*Tejeda-Mata v. I.N.S.*,
   626 F.2d 721 (9th Cir. 1980) ...................................................................... 4

*U.S. v. W. T. Grant Co.*,
   345 U.S. 629 (1953) ............................................................................ 12, 13

## **STATUTES**

### **Immigration and Nationality Act of 1952, as amended:**

Section 231,
   8 U.S.C. § 1221 ...................................................................................... 10

Section 232,
   8 U.S.C. § 1222 ...................................................................................... 10

Section 233,
   8 U.S.C. § 1223 ...................................................................................... 10

Section 234,
   8 U.S.C. § 1224 ...................................................................................... 10

Section 235,
   8 U.S.C. § 1225 ...................................................................................... 10

Section 236,
    8 U.S.C. § 1226 ..................................................................................... 5, 8

Section 236A,
    8 U.S.C. § 1226a ..................................................................................... 10

Section 237,
    8 U.S.C. § 1227 ...................................................................................... 10

Section 238,
    8 U.S.C. § 1228 ...................................................................................... 10

Section 239,
    8 U.S.C. § 1229 ...................................................................................... 10

Section 240,
    8 U.S.C. § 1229a ..................................................................................... 10

Section 240A,
    8 U.S.C. § 1229b ..................................................................................... 10

Section 240B,
    8 U.S.C. § 1229c ..................................................................................... 10

Section 240C,
    8 U.S.C. § 1230 ...................................................................................... 10

Section 241(a),
    8 U.S.C. § 1231 ........................................................................................ 5

Section 242,
    8 U.S.C. § 1252 ........................................................................... 6, 7, 8, 9, 10

Section 287
    8 U.S.C. § 1357 ........................................................................ 1, 2, 4, 10, 11

### **REGULATIONS**

8 C.F.R. § 287.10 .......................................................................................... 9

8 C.F.R. § 287.3(a) ........................................................................................ 5

8 C.F.R. § 287.3(b) ........................................................................................ 5

8 C.F.R. § 287.3(d) ........................................................................................ 5

## INTRODUCTION

Named Plaintiffs, Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez, in the instant putative class action, move the Court to enjoin the United States Border Patrol ("USBP") from conducting unlawful stops and arrests in the Eastern District of California. The Court should deny their motion. First and foremost, Plaintiffs cannot show a likelihood of success on the merits because the Court lacks jurisdiction to consider Plaintiffs' claims and, moreover, lacks jurisdiction to enter a class-wide injunction restraining USBP's enforcement operations. Second, the claims subject of Plaintiffs' motion for preliminary injunction have, in any event, been resolved. Plaintiffs allege that in an operation conducted between January 7, 2025, and January 9, 2025, in the Eastern District of California, USBP violated the Fourth Amendment and the statutory requirements of 8 U.S.C. § 1357(a)(2). Complaint at ¶¶ 1-3, 326-45. On April 4, 2025, USBP's El Centro Sector issued policy and guidance (termed a "Muster") and committed to providing training thereon. Exhibit A (Muster); Exhibit B (Declaration of Sergio Guzman). The Muster is materially identical to DHS's "Broadcast Statement of Policy." *See* Plaintiffs' Proposed Order (requesting the Court enjoin USBP from stops in violation of the Fourth Amendment and arrests in violation of 8 U.S.C. § 1357(a)(2) and to order USBP to comply with DHS's "Broadcast Statement of Policy"); Complaint Appendix A. Accordingly, USBP's prompt, responsive, and demonstrated commitment to forestalling similar alleged violations in the future renders an injunction inappropriate, either as a matter of mootness or lack of a cognizable continued and future irreparable injury.[1]

---

[1] Plaintiffs also allege that USBP engaged in a pattern or practice of coercing detained individuals into accepting voluntary departure, but this is not part of their motion for preliminary injunction. Complaint at ¶¶4, 272-75, 346-50 (Claim IV).

## BACKGROUND

### I.    Procedural History

On February 26, 2025, Plaintiffs filed a complaint for declaratory and injunctive relief alleging that, in an operation conducted between January 7, 2025, and January 9, 2025, USBP violated the Fourth Amendment and the statutory requirements of 8 U.S.C. § 1357(a)(2). Complaint at ¶¶ 1-3, 326-45 (Claims I, II, and III).  Specifically, Plaintiffs allege that USBP agents engaged in a pattern and practice of warrantless race-based stops, and a pattern or practice of warrantless arrests without assessing flight risk.  Complaint at ¶¶ 3, 236, 239; Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Memo") at 1-2.  Plaintiffs also claim to represent two classes under Federal Rules of Civil Procedure 23(b)(2).  Complaint at ¶¶ 17, 312-18.  On March 7, 2025, Plaintiffs filed a motion for preliminary injunction and a motion to provisionally certify a Suspicionless Stop Class and a Warrantless Arrest Class.

### II.    Factual Background[2]

#### A.    Named Plaintiffs' Allegations

On January 7, 2025, named Plaintiff Oscar Morales Cisneros left work to head home, parking outside of a liquor store to fill up empty water jugs.  Cisneros Declaration at ¶ 4.  He was about to reverse out of his parking spot when an unmarked Chevrolet Tahoe pulled up behind his truck and blocked him in.  *Id.*  Cisneros put his truck back in park and lowered his driver's side window.  *Id.*  Two men in Border Patrol uniforms approached his window and one of the men asked Cisneros if he had papers and was here legally.  *Id.* at ¶¶ 4-5.  Cisneros did not answer.  *Id.* at ¶ 5.  Cisneros provided his driver's license when asked for it and one of the officers walked back to the Tahoe with the license.  *Id.*  When the agent returned, he told Cisneros he was in the United States illegally and arrested him.  *Id.* at ¶

---

[2]  Facts in this section are as alleged by named Plaintiffs in their declarations.  Defendants do not concede these allegations.

5-6.  Cisneros was transported to a detention facility in El Centro and, on January 10, 2025, provided with a monitoring device and released.  *Id.* at ¶¶ 9, 18-19.  It is undisputed Cisneros lacks status in the United States.

On January 7, 2025, around noon, named Plaintiff Wilder Munguia Esquivel was outside a Home Depot in Bakersfield, standing with a group of other day laborers, when several unmarked vehicles pulled up and at least ten plain-clothed men, most wearing masks covering all but their eyes, exited the vehicles and aggressively "swarmed around us."  Esquivel Declaration at ¶¶ 4-5.  One of the men asked Esquivel about his status – "Do you have papers? Do you have identification? Where are you from?"  *Id.* at ¶5.  When Esquivel did not answer, the man asked again, but louder, and then asked again, louder still.  *Id.*  Esquivel turned away from the man and walked away.  *Id.*  The man followed Esquivel, continuing to ask Esquivel questions.  *Id.*  Esquivel did not respond, and the man ordered Esquivel to stop.  *Id.*  Esquivel realized the man was a federal immigration agent and stopped, telling the agent "I have the right to remain silent."  *Id.* at ¶¶ 5-6.  The agent asked Esquivel for identification and ordered Esquivel to take out his wallet.  *Id.* at ¶ 6.  Before Esquivel could comply, the agent removed the wallet from Esquivel's back pocket, looked through it, and arrested him.  *Id.* at ¶¶ 7-9.  It is undisputed that Esquivel lacks status in the United States.

On January 8, 2025, at around 4:30 pm, named Plaintiff Yolanda Aguilera Martinez was driving in a vehicle when she saw two vehicles, one with flashing police lights, pulled over to the right side of the road with three men standing near the vehicles.  Martinez Declaration at ¶¶ 4-5. The men were in plain-clothes, but with holstered firearms, and one of the men raised his hand and flagged Martinez to pull over her vehicle.  *Id.*  Once she pulled over, the man who flagged Martinez down approached her window and asked about her immigration status.  *Id.* at ¶ 6.  Martinez produced a driver's license, but the man questioned its authenticity.  *Id.* at ¶6.  The man told Martinez to exit the vehicle.  *Id.* at ¶ 7.  She exited, the man pushed her to the ground, placed handcuffs on her, then placed her in the back of his

vehicle.  *Id.*  Martinez requested an opportunity to use her phone to obtain a photograph of her permanent resident card.  *Id.* at ¶ 10.  The man agreed, she obtained her phone from her vehicle, showed the agent a photograph of her permanent resident card, and she was released from custody.  *Id.*

### B.    USBP Guidance and Training

On April 4, 2025, the El Centro Sector of Border Patrol issued a "Muster."  Exhibit ("Ex") A. The Muster contains guidance on the requirement for reasonable suspicion for traffic stops conducted throughout the Eastern District of California, guidance on assessing flight risk using factors such as "family, home, or employment" (that is, community ties), and guidance on documenting the facts and circumstances surrounding a warrantless arrest in an alien's Form I-213 as soon as practicable.  *See* Ex. A.  USBP El Centro Sector plans to conduct training sessions to ensure compliance with the Muster within 60 days for the more than 900 El Centro Sector Border Patrol Agents, supervisors, and command staff on report writing, compliance with the Fourth Amendment and 8 U.S.C. § 1357, and compliance with Supreme Court and Ninth Circuit law on conducting vehicle stops, consensual encounters, and warrantless arrests.[3]  Ex. B (Declaration of Sergio Guzman) at ¶¶ 10-16.

### III.    Statutory and Regulatory Background

Under the INA, immigration officials are authorized to perform the warrantless arrest of:

> [A]ny alien in the United States, if he has reason to believe that the alien so arrested
> is in the United States in violation of any such law or regulation and is likely to
> escape before a warrant can be obtained for his arrest, but the alien arrestee shall be taken
> without unnecessary delay . . . before an officer of the Service having authority to examine aliens
> as to their right to enter or remain in the United States.

8 U.S.C. § 1357(a)(2); *see Abel v. United States*, 362 U.S. 217, 232-37 (1960) (discussing longstanding administrative arrest procedures in deportation cases).  "Reason to believe" has been equated with the constitutional requirement of probable cause.  *Tejeda-Mata v. I.N.S.*, 626 F.2d 721, 725 (9th Cir. 1980)

---

[3]  El Centro Sector will endeavor to train all such employees within 60 days.  However, it may not be practicable to do so because of, for example, employees being on detail or extended leave.

(internal citations omitted).

The regulations implementing this statute require that "[w]ith respect to an alien arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 C.F.R. § 287.3 if the arrest is made without a warrant." 8 C.F.R. § 287.8(c)(2)(iv). That regulation provides that "an alien arrested without a warrant of arrest . . . will be examined by an officer other than the arresting officer." 8 C.F.R. § 287.3(a). "If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien." *Id.* "If the examining officer is satisfied that there is prima facie evidence that the arrested alien . . . is present in the United States in violation of the immigration laws, the officer will either refer the case to an immigration judge for further inquiry . . ., order the alien removed . . . , or take whatever other action may be appropriate or required under the laws or regulations applicable to the particular case. *Id.* at § 287.3(b). DHS ordinarily will make an initial determination within 48 hours of the apprehension whether the alien will remain in custody, be paroled, be released on bond or be released on recognizance. 8 C.F.R. § 287.3(d). In addition, DHS will decide whether to issue a notice to appear and arrest warrant. *Id.*

The general detention authority for aliens in removal proceedings is governed by 8 U.S.C. § 1226(a). Under this section, "an alien may be arrested and detained," on issuance of a warrant, "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). After a removal becomes final, 8 U.S.C. § 1231(a) authorizes detention.

## STANDARDS OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Loper v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). This is a "heavy" burden. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469

(9th Cir. 2010) (internal quotation omitted). "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation omitted). The court evaluates "these factors on a sliding scale, such that a stronger showing of one element may offset a weaker showing of another." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (internal citations omitted). When the balance of equities "tips sharply in the plaintiff's favor," the plaintiff must raise only "serious questions" on the merits - a lesser showing than likelihood of success. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Mandatory injunctions, which order a party to take action, are "particularly disfavored," *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and should be denied "unless the facts and law clearly favor the moving party," *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted).

## ARGUMENT

I. **Plaintiffs Fail to Establish a Likelihood of Success on Merits**

A. **The Court Lacks Jurisdiction to Review Plaintiffs' Claims Under 8 U.S.C. § 1252(a)(5) and (b)(9)**

Pursuant to 8 U.S.C. § 1252(b)(9), "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provision, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final [removal] order." And a petition for review filed in the appropriate court of appeals is the sole and exclusive means for judicial review of a final removal order. *See* 8 U.S.C. § 1252(a)(5). In other words, if a claim challenges a "decision to detain [an alien] in the first place or seek removal," a district court lacks jurisdiction to consider that claim and it instead must be reviewed through the administrative process. *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018).

The stops and detentions that Plaintiffs challenge were actions taken to remove them from the United States, that is, to "detain [them] in the first place and seek their removal." *Jennings*, 138 S. Ct. at 841. Plaintiffs challenge the questions of law and fact behind these actions, specifically, whether USBP had reasonable suspicion for the stops and probable cause for the arrests. Because Plaintiffs challenge questions of law and fact arising from these actions taken to remove them, 8 U.S.C. § 1252(a)(5) & (b)(9) require that they bring these claims in petitions for review in the court of appeals. Indeed, petitions for review commonly consider challenges related to whether immigration authorities had reasonable suspicion to stop, or probable cause to arrest, an alien. *Sanchez v. Sessions*, 904 F.3d 643 (9th Cir. 2018); *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1033 (9th Cir. 2016) (8 U.S.C. § 1252(a)(5) and (b)(9) bars district courts from reviewing legal questions "routinely raised in petitions for review"). And these same legal questions are commonly raised by aliens in removal proceedings asking administrative and federal courts of appeal to suppress evidence of their removability due to Fourth Amendment or regulatory violations, or terminate proceedings due to the same. *Sanchez*, 904 F.3d at 653-54 (alleged race-based stop by Coast Guard challenged in removal proceedings) (citing *Rajah v. Mukasey*, 544 F.3d 427, 446-47 (2d Cir. 2008)); *Leal-Burboa v. Garland*, No. 21-70279, 2022 WL 17547799 (9th Cir. 2022) (alleged race-based stop challenged in removal proceedings). If the legal remedy for unlawful stops and arrests is provided in removal proceedings, ipso facto these challenges are part of the decision to remove an alien. It does not matter that a class remedy "might be more efficient than requiring each applicant to file a PFR," or preferred as a method to challenge "policy and practice," as 8 U.S.C. § 1252(b)(9) plainly precludes "all district court review of any issue raised in a removal proceeding." *J.E.F.M.*, F.3d at 837 at 1034-35, 1038; *Nava*, 435 F.Supp.3d at 894 (rejecting application of 8 U.S.C. § 1252(b)(9) because removal proceedings "are not structured to provide . . . system-wide reforms").

Defendants acknowledge that in *Nava v. Department of Homeland Security*, 435 F.Supp.3d 880 (N.D. Ill. 2020), a case relied upon by Plaintiffs as similar litigation, the court rejected an argument that

8 U.S.C. § 1252(a)(9) precluded it from reviewing a class challenge to alleged unlawful stops and arrests by Immigration and Customs Enforcement ("ICE"). Complaint at ¶¶ 280-83; Memo at 16. This is a single district court case that is not remotely binding on this Court. It is also not persuasive. First, the district court incorrectly interpreted the Supreme Court's decision in *Jennings* as holding that 8 U.S.C. § 1252(a)(9) applied only to reviewing "lawful" actions taken to remove an alien from the United States. *Id.* at 890-91. The Supreme Court did nothing of the sort. Indeed, many challenges brought by aliens in a petition for review allege some variation of the claim that the decision to remove them is unlawful. This is particularly true for aliens charged with deportability under 8 U.S.C. § 1227 (describing the grounds for deportation), but even when aliens concede removability, they often allege that the denial of relief was unlawful. The district court ignored that the precise claims Plaintiffs raise here – Fourth Amendment challenges to their original arrest – may be reviewed in a petition for review. Holding that § 1252(b)(9) only applies to "lawful" actions would lead to absurd results and claim splitting wherein aliens could challenge their arrest in several Article III forums. Further, since the district court's decision in *Nava*, the Supreme Court rejected a related argument with regard to § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 552-54 (2022) (rejecting an argument that 8 U.S.C. § 1252(f)(1) applies only to the operation of "properly interpreted" statutory provisions, noting that statutes can be operated "unlawfully" or "improperly").

Second, the *Nava* court held that, in any event, the plaintiffs' factual and legal challenges to their stops and arrests of aliens were "too remote" from "the removal process," citing *Jennings*, 138 S. Ct. at 840 & 841 n.3. 435 F.Supp.3d at 891-92. First, this analysis plainly contradicts the analysis in *J.E.F.M.*, 837 F.3d at 1033, in which the Ninth Circuit held that the test for whether § 1252(b)(9) applies is whether the claims are "routinely raised in petitions for review" – a test Defendants can easily demonstrate. *See supra* at 7. Regardless, the "remote," collateral challenges described in *Jennings*, however, were challenges to injuries entirely unrelated to the decision to detain or remove an alien –

conditions of confinement, assault by a detention guard or fellow detainee, a car crash, or prolonged

detention. *Jennings*, 138 S. Ct at 840. It was too "expansive" to "cram[]" these actions into action

"arising from a decision to remove an alien." *Id.* But the stop and arrest of an alien is directly, linearly

part of the process to remove an alien – the stops occurred to investigate immigration status rendering an

alien removable, and the arrests because of probable cause of removability. The "legal questions" in this

case challenging the stops and arrests are directly part of the removal process. *Jennings*, 138 S. Ct. at

841 n.3; Complaint at ¶¶ 3, 7. Accordingly, the Court lacks jurisdiction pursuant to 8 U.S.C. §

1252(a)(5) and (b)(9). [4]

### B.    This Court Lacks Jurisdiction to Issue an Injunction to Anyone Other Than the Named Plaintiffs

That these claims must be brought in petitions for review underscores, moreover, that a class

wide injunction is inappropriate. But 8 U.S.C. § 1252(f)(1), in any event, bars the court from granting

Plaintiffs' request to preliminarily enjoin USBP's detention and removal operations. In *Aleman*

*Gonzalez*, 596 U.S. at 544, the Supreme Court held that 8 U.S.C. § 1252(f)(1) "generally prohibits lower

courts from entering injunctions that order federal officials to take or to refrain from taking actions to

enforce, implement, or otherwise carry out the specified statutory provisions." The specified statutory

provisions are 8 U.S.C. §§ 1221-1232, as amended by the Immigration and Nationality Act. *See Al Otro*

*Lado v. Exec. Office of Immigr. Rev.*, 120 F.4th 606, 627 n.16 (9th Cir. 2024). 8 U.S.C. § 1226, a

covered statute, concerns the apprehension and detention of aliens. 8 U.S.C. § 1229, another covered

statute, concerns the initiation of removal proceedings against an alien. Enjoining these provisions is

barred even if a court determines that the agency's "operation" of a covered provision is unlawful or

incorrect. *Aleman Gonzalez*, 596 U.S. at 552-54. To the extent Plaintiffs allege they are seeking to

enjoin 8 U.S.C. § 1357, the actions under this statute cannot be untangled from apprehension and

---

[4] To the extent Plaintiffs argue 8 U.S.C. § 1252(b)(9) does not apply to aliens not in removal proceedings, this is a problem with their class.

removal operations.  Consequently, Plaintiffs' request to restrain USBP's allegedly unlawful detention and removal operations necessarily seeks to enjoin operation of provisions covered by 8 U.S.C. § 1252(f)(1).  A class-wide injunction is, therefore, prohibited and any injunctive remedy must be individualized to named Plaintiffs.

### C.    The Plaintiffs' Claims Are Moot

Plaintiffs' claims are moot in light of new guidance issued by USBP providing nearly all the relief Plaintiffs seek in their motion.  Plaintiffs allege that, in an operation conducted between January 7, 2025, and January 9, 2025, USBP violated the Fourth Amendment and the statutory requirements of 8 U.S.C. § 1357(a)(2).  Complaint at ¶¶ 1-3, 326-45.  Plaintiffs seek declaratory and injunctive relief claiming Border Patrol will replicate these alleged unlawful acts because the agency lacks policy and guidance for ensuring compliance with the Fourth Amendment and 8 U.S.C. § 1357(a)(2).  Complaint at ¶¶ 249-50, 276-77, 329-30, 336, 340.  Pointing to an example of sufficient guidance issued by DHS (the "Broadcast"), Plaintiffs move the Court to enjoin USBP from conducting warrantless stops and arrests in the Eastern District of California that do not comply with the DHS Broadcast, and order USBP to develop guidance similar to the Broadcast and conduct training thereon.  PI Motion at 1-2; Memo at 16, 19, 23; Complaint at ¶¶ 278-83, Prayer for Relief ¶¶ 4-5, 8-10, Appendix A.  In the meantime, Plaintiffs continue, they will suffer "continued and future irreparable injury."  Complaint at ¶¶ 333, 339, 345.

However, on April 4, 2025, the El Centro Sector USBP issued a "Muster" to all Sector employees that is in all material respects identical to the Broadcast issued in Castanon Nava.  *Compare* El Centro Muster, Exhibit ("Ex.") A, *with* Complaint Appendix A.  The Muster contains guidance on the requirement for reasonable suspicion for traffic stops conducted throughout the Eastern District of California, guidance on assessing flight risk using factors such as "family, home, or employment" (that is, community ties), and guidance on documenting the facts and circumstances surrounding a warrantless arrest in an alien's Form I-213 as soon as practicable.  *See* Ex. A; Complaint at ¶ 278

ER143

(stating USBP should provide its officers guidance on the requirement for reasonable suspicion for traffic stops in the interior, away from the border, and guidance on assessing flight risk using factors such as "family, home, or employment," that is, community ties). El Centro Sector USBP is moreover taking steps to implement training on the Muster. Ex. B. USBP will conduct training sessions to ensure compliance with the Muster within 60 days for the more than 900 El Centro Sector Border Patrol Agents, supervisors, and command staff on report writing, compliance with the Fourth Amendment and 8 U.S.C. § 1357, and compliance with Supreme Court and Ninth Circuit law on conducting vehicle stops, consensual encounters, and warrantless arrests. Ex. B. at ¶¶ 10-16.

USBP's issuance of guidance and commitment to training thereon constitutes a change in circumstances forestalling a "substantial controversy . . . of sufficient immediacy and reality." *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (the party asserting mootness bears the burden of showing subsequent events have "made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"). This is "more than a mere voluntary cessation of allegedly illegal conduct where [USBP is]. . . free to return to [their] old ways." *Preiser*, 422 U.S. at 402. Pursuant to the Muster, Border Patrol agents "may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains alien(s) who may be illegally in the country" and, "[i]n considering 'likelihood of escape' . . .[,] must consider the totality of the circumstances known to the agent before making the arrest." Ex. A. Further, Border Patrols agents "must document the facts and circumstances surrounding the vehicle stop" and "the facts and circumstances surrounding th[e] warrantless arrest" in the narrative section of the alien's I-213 as soon as practicable. *Id.* "[W]hile there is always the possibility that [USBP] might disregard the [Muster and training thereon], such speculative contingencies afford no basis for [the court] passing on the substantive issues [Plaintiffs] would have [the court] decide." *Preiser*, 422 U.S. at 403 (internal

citations omitted).  Indeed, USBP's prompt and responsive actions in light of Plaintiffs' complaint forcefully demonstrates its commitment to forestall similar alleged violations in the future.  "[T]here is now no reasonable expectation that the [alleged] wrong will be repeated," *Preiser*, 422 U.S. at 402, and, again, this is the relief Plaintiff's requested, *see* PI Motion at 1-2; Memo at 16, 19, 23; Complaint at ¶¶ 278-83, Prayer for Relief ¶¶ 4-5, 8-10, Appendix A.  Plaintiffs, therefore, lack a continuing interest in pursuing their motion and, consequently, the Court lacks a controversy to adjudicate.  Individual allegedly aggrieved aliens can seek remedies through the administrative process described in Part I.A.

## II.     Plaintiffs Cannot Meet Their Burden to Show They Would be Irreparably Harmed Absent the Prospective Injunction They Seek

To the extent the Court has jurisdiction, and Plaintiffs claims are not moot, Plaintiffs nonetheless cannot demonstrate that they will be irreparably harmed absent a preliminary injunction in light of USBP's issuance of new guidance providing nearly all the relief Plaintiffs seek in their motion and rendering any alleged future harm unlikely.  "The purpose of an injunction is to prevent future violations" and, therefore, requires the movant establish a "cognizable danger of recurrent violation" and not just "the mere possibility" of future harm.  *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). Where the defendants proffer a "bona fide[] . . . expressed intent to comply" with plaintiffs' request and "discontinue" the alleged past violations, plaintiffs no longer possess a cognizable danger of recurrent violation.  *Id.*  By issuing the Muster and committing to training thereon, USBP has provided the remedy Plaintiffs requested for alleged past violations.  *See* Ex. A; Ex. B.  There has meanwhile been no "intransigence," or "following one adjudicated violation with others," which might serve to undermine the bona fides of USBP's expressed commitments.  *W.T. Grant Co.*, 345 U.S. at 634.  On the contrary, USBP addressed the complaint promptly, responsively, and with demonstrated commitment to forestall "similar [alleged] violations in the future."  *W.T. Grant Co*, *345 U.S. at 634; Kansas v. Nebraska*, 574 U.S. 445, 466 (2015) (defendant's "new compliance measures, so long as followed," and which were "implemented in good faith," preclude a "cognizable danger of recurrent violation") (citing *W.T. Grant*

*Co.*, 345 U.S. at 633).  Accordingly, Plaintiffs cannot establish a cognizable "continued and future irreparable injury" absent an injunction.  Complaint at ¶¶ 333, 339, 345.

## III.    The Balance of Equities and the Public Interest Favor the Denial of Preliminary Relief

When the Government is a party, the balancing of equities and public interest merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  The equities do not favor granting Plaintiffs' motion because, again, their claims have been resolved.  Indeed, the public interest should favor an agency taking prompt, responsive action in light of a complaint against it.  This is a favorable result and granting a preliminary injunction despite such actions would provide little incentive for agencies to take prompt, responsive actions in the future.   Meanwhile, it is undisputed that two of the three named plaintiffs (Cisneros and Esquivel) are illegally present in the United States.  An alien's unlawful presence in the United States is a continuing violation of the law and the government has a legitimate and significant interest in ensuring that immigration laws are enforced.  *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 (1984) (discussing that "a person whose unregistered presence in this country, without more, constitutes a crime" and while "[t]he constable's blunder may allow the criminal to go free, [] we have never suggested that it allows the criminal to continue in the commission of an ongoing crime").  And this public interest is served by allowing USBP to continue to conduct its operations without premature intervention by the Court.  Accordingly, the balance of the hardships and the public interest weigh against granting Plaintiffs' motion.

## <u>CONCLUSION</u>

The Court should, accordingly, dismiss Plaintiffs' motion for lack of jurisdiction or, alternatively, to the extent the Court finds jurisdiction, it should deny the instant motion because Plaintiffs cannot meet the standard for a preliminary injunction.

DATED:  April 7, 2025

Respectfully submitted

YAAKOV M. ROTH
Acting Assistant Attorney General Civil
Division

MICHELLE G. LATOUR
Acting Director
Office of Immigration Litigation

SAMUEL P. GO
Assistant Director
United States Department of Justice Civil
Division
Office of Immigration Litigation
P.O. Box 878
Washington, DC 20044
(202) 353-9923
Samuel.go@usdoj.gov

MARY L. LARAKERS
Senior Litigation Counsel
United States Department of Justice Civil
Division
Office of Immigration Litigation
P.O. Box 878
Washington, DC 20044
(202) 353-4419
Mary.l.larakers@usdoj.gov

/s/ Tim Ramnitz
TIM RAMNITZ
Senior Litigation Counsel
United States Department of Justice Civil
Division
Office of Immigration Litigation
P.O. Box 878
Washington, DC 20044
(202) 616-2686
Tim.ramnitz@usdoj.gov

Attorneys for Defendants

ER147

# Exhibit A

El Centro Sector Muster

**This Muster states the underlying laws and policies applicable to all arrests effected by El Centro Sector Border Patrol Agents under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) in the Eastern District of California and is to be interpreted consistent with all implementing regulations and controlling Supreme Court and Ninth Circuit case law.**

A. Warrantless Arrests

Under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), U.S. Border Patrol (USBP) Agents may conduct warrantless arrests if there is "reason to believe that the alien [] [to be] arrested is [present] in the United States in violation of any [U.S. immigration] law and is likely to escape before a warrant can be obtained for [the] arrest." The "reason to believe" standard requires USBP Agents to have probable cause that an individual is in the United States in violation of U.S. immigration laws and probable cause that the individual is likely to escape before a warrant can be obtained for the arrest.

In considering "likelihood of escape," a USBP Agent must consider the totality of circumstances known to the agent before making the arrest. While there is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained" under 8 U.S.C. § 1357(a) / INA § 287(a), factors relevant to the determination may include the USBP Agent's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from a USBP Agent, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or

ER149

against a reasonable belief that the subject is likely to abscond.  The particular circumstances before the USBP Agent are not to be viewed singly; rather, they must be considered as a whole.  However, mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be *obtained*.

When conducting enforcement actions, USBP Agents shall, at the time of arrest or as soon as it is practical and safe to do so, identify themselves as immigration officers in accordance with 8 C.F.R. § 287.8(c)(2)(iii).

After having made an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), a USBP Agent should document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable.  This documentation should include: (1) that the alien was arrested without a warrant; (2) the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area; (3) whether the alien is an employee of the business, if arrested at a place of business, or whether the alien is a resident of the residence, if arrested at a residential location; (4) the alien's ties to the community, if known at the time of arrest, including family, home, or employment (**Note**: Information learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest.); (5) the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained; and (6) a statement of how "at the time of arrest, the designated immigration officer [did], as soon as it [wa]s practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and state[d] that the person is under arrest and the reason for the arrest."

B. Vehicle Stops

The policy above applies to all warrantless arrests under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), including warrantless arrests resulting from vehicle stops.

USBP agents may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains an alien(s) who may be illegally in the country.

As soon as practicable after making an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) pursuant to a vehicle stop, in addition to the documentation requirements for warrantless arrests described above, the USBP agent also must document the facts and circumstances surrounding the vehicle stop that resulted in a warrantless arrest in the narrative section of the alien's I-213. This documentation should include the specific, articulable facts that formed the basis for the USBP Agent's reasonable suspicion that an alien in the vehicle stopped was present within the United States in violation of U.S. immigration law.

# Exhibit B

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

United Farm Workers, *et. al.,*

           Plaintiffs,

        vs.

KRISTI NOEM, Secretary of the United States Department of Homeland Security, *et al.*,

           Defendants.

Case No. 25-cv-00246-JLT-BAM

**DECLARATION OF SERGIO GUZMAN**

I, Sergio Guzman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.       I am the Acting Executive Officer (XO), El Centro Sector (ELC), U.S. Border Patrol (USBP), U.S. Customs and Border Protection (CBP), U.S. Department of Homeland Security (DHS). I have held this position since November 18, 2024.

2.       In my position as the XO, I serve directly under the Division Chief of Operations (DCO). The DCO has direct oversight of El Centro, Calexico, and Indio stations, Sector Intelligence Unit, Special Operations Detachment, and Foreign Operations Branch. I assist the DCO with both administrative and operational functions that have direct impact with the stations and other departments. I remain up to date with any critical incidents or operations occurring within the sector. I brief the Chief Patrol Agent and Deputy Chief Patrol Agent on significant matters related to the Operations Division. I also serve as a primary point of contact between USBP Headquarters (HQ) and ELC.

3.       As the XO, I was involved with the various phases (planning, execution, and after action) of Operation Return to Sender.

4.       When not serving as the XO, I am a permanent Deputy Patrol Agent in Charge at the Calexico Station (CAX). I have held that position since March 2022. I oversee and run the operational component of the station. I make all station-wide decisions in the absence of the Patrol Agent in Charge. I have three GS-14 Watch Commanders and one Special Operations Supervisor under my direct supervision. I provide guidance and mentorship to them along with

the 46 first-line supervisors assigned to CAX. I have briefed congressional visitors and uniformed/non-uniformed personnel from USBP HQ on the operational challenges at CAX. I support CAX agents with the resources, infrastructure, technology, and knowledge that could assist them to perform their job at a higher level and in a safe manner.

5.    I am submitting this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (PI).  This declaration is based on my personal knowledge, information made known to me from official records reasonably relied upon, and information conveyed to me by my staff and other knowledgeable CBP personnel in the course of my official duties.

6.    ELC is situated within the Imperial Valley of Southern California. The ELC area of responsibility (AOR) spans 70 linear miles along the U.S. and Mexico border from the Jacumba Mountains in the west to the Imperial Sand Dunes in the east.  ELC's AOR also includes inland areas of California extending all the way to the Oregon State Line, including Bakersfield, California.

7.    ELC is staffed by 975 Border Patrol Agents and 149 support personnel. Staffing is assigned to ELC HQ and the three patrol stations: El Centro, Calexico, and Indio.

8.    ELC is committed to conducting enforcement operations within the Eastern District of California in compliance with the Fourth Amendment, 8 U.S.C. § 1357, and Supreme Court and Ninth Circuit case law.

9.    In furtherance of this commitment, ELC issued a muster to all ELC employees on Friday, April 4, 2025, attached at Exhibit A.  The muster includes the underlying laws and policies applicable to all warrantless arrests effected by El Centro Sector Border Patrol under 8 U.S.C. § 1357(a)(2) in the Eastern District of California.

10.    ELC will endeavor to conduct refresher training sessions to ensure compliance with the muster within 60 Days for all ELC Border Patrol Agents (BPAs), supervisors, and Command Staff.[1]  The trainings will include instruction on report writing and compliance with the Fourth Amendment, 8 U.S.C. § 1357, and Supreme Court and Ninth Circuit case law pertaining to vehicle stops, consensual encounters, and warrantless arrests.

11.    The training sessions will cover topics such as:

---

[1] It may not be practicable to train all such ELC employees within 60 days due to, for example, employees being on detail or extended leave.

a. ELC BPAs' authority to effect warrantless arrests within the Eastern District of California pursuant to 8 U.S.C. § 1357 including factors relevant to determining "reason to believe" an alien is in the United States in violation of law or regulation and the alien's likelihood of escape before a warrant can be obtained;

b. ELC BPAs' authority to effect vehicle stops within the Eastern District of California upon establishment of reasonable suspicion of a violation of law or regulation in compliance with the Fourth Amendment, Supreme Court, and Ninth Circuit case law.

c. ELC BPAs' authority to effect consensual encounters within the Eastern District of California in compliance with the Fourth Amendment, Supreme Court, and Ninth Circuit case law;

d. Report writing requirements including documentation of the facts and circumstances pertaining to warrantless arrests in the narrative section of an alien arrestee's Record of Deportable/Inadmissible Alien ("Form I-213")[2]; and

e. Report writing requirements including documentation of the facts and circumstances pertaining to vehicle stops resulting in warrantless arrests in the narrative section of the alien arrestee's Form I-213.

12.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2025, at El Centro, California.

SERGIO GUZMAN
Digitally signed by SERGIO GUZMAN
Date: 2025.04.07 19:40:16 -07'00'

Sergio Guzman
Acting Executive Officer
El Centro Sector
U.S. Border Patrol

---

[2] A Form I-213 or DHS "Record of Deportable/Inadmissible Alien," is an official record which includes information about an alien's immigration status and the basis and key facts to support the alien's removal from the United States.

3

No. 25-4047

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED FARM WORKERS of AMERICA, et al.,

Plaintiffs-Appellees,

v.

KRISTI NOEM, et al.,

Defendants-Appellants.

On Appeal from an Interlocutory Order Issued by the U.S. District Court
for the Eastern District of California (Civil Action No. 1:25-cv-00246-JLT-
CDB)

DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD
VOLUME 3 OF 3

**BRETT A. SHUMATE**
**Assistant Attorney General**

**YAAKOV M. ROTH**
**Principal Deputy Assistant**
**Attorney General**

**DREW C. ENSIGN**
**Deputy Assistant**
**Attorney General**

**ELIANAS PEREZ**
**Assistant Director**

**TIM RAMNITZ**
**Senior Litigation Counsel**
**Office of Immigration**
**Litigation**
**Civil Division**
**U.S. Department of Justice**
**P.O. Box 878 Station**
**Ben Franklin Station**
**Washington D.C. 20044**

ER156

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>    Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  April 11, 2025<br>Time:  9:00 a.m.<br>Dept.:  Courtroom 4, 7th Floor<br>Judge:  Hon. Jennifer L. Thurston<br><br>Date Filed:  February 26, 2025<br><br>Trial Date:  None set |

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    FACTS .................................................................................................................2

       A.     Border Patrol's Immigration Sweeps Rely on Unlawful Practices..........................2

       B.     The Government Plans to Continue Suspicionless Stops and Mass Arrests. ..........6

III.   ARGUMENT .........................................................................................................7

       A.     Plaintiffs are Likely to Succeed on the Merits........................................................7

              1.     Border Patrol's Practice of Conducting Detentive Stops Without
                     Individualized Suspicion Violates the Fourth Amendment. ......................8

                     a.     Border Patrol Conducts "Immigration Stops" Without
                            Individualized Reasonable Suspicion. ...............................................9

                            i.     Moving Vehicle Stops Without Reasonable
                                   Suspicion...........................................................................10

                            ii.    Pedestrian and Parking Lot Stops Without
                                   Reasonable Suspicion. .......................................................11

                     b.     Border Patrol's Practice of Suspicionless Vehicle,
                            Pedestrian, and Parking Lot Stops Violates the Fourth
                            Amendment.............................................................................12

                     c.     Preliminary Injunctive Relief is Necessary to Protect the
                            Fourth Amendment Rights of Plaintiffs and the Putative
                            Class. .....................................................................................13

              2.     Border Patrol's Practice of Effecting Warrantless Arrests Without
                     Evaluating Flight Risk Violates 8 U.S.C. § 1357(a)(2). ..........................15

                     a.     8 U.S.C. § 1357(a)(2) Requires Agents to Evaluate and
                            Consider Flight Risk Based on Individualized Factors
                            Before Conducting a Warrantless Arrest. ......................................15

                     b.     Border Patrol Has a Practice of Effecting Warrantless
                            Arrests Without Evaluating or Considering a Person's Flight
                            Risk. ......................................................................................17

                     c.     Border Patrol's Practice of Warrantless Arrests Without
                            Assessing Flight Risk Exceeds its Statutory Authority
                            Under § 1357(a)(2). ................................................................19

       B.     Plaintiffs Will Suffer Irreparable Harm from Border Patrol's Unlawful
              Policies and Practices in the Absence of Injunctive Relief....................................20

       C.     The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an
              Injunction Is in the Public Interest. .......................................................................22

IV.    SECURITY .................................................................................................24

V.    CONCLUSION ...........................................................................................25

ER159

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ....................................................................7

*Alsaada v. City of Columbus, Ohio*,
   2021 WL 3375834 (S.D. Ohio June 25, 2021) ......................................24

*Ariz. v. U.S.*,
   567 U.S. 387 (2012).................................................................................15

*Au Yi Lau v. INS*,
   445 F.2d 217 (D.C. Cir. 1971) ...............................................................15

*Benitez-Mendez v. I.N.S.*,
   752 F.2d 1309 (9th Cir.) ...............................................................8, 11, 13

*Bravo v. City of Santa Maria*,
   665 F.3d 1076 (9th Cir. 2011) ...............................................................16

*Brendlin v. Cal.*,
   551 U.S. 249 (2007).................................................................................10

*Ill. v. Wardlow*,
   528 U.S. 119 (2000).................................................................................13

*Chalk v. U.S. Dist. Court*,
   840 F.2d 701 (9th Cir. 1988) .................................................................21

*Creedle v. Miami-Dade County*,
   349 F.Supp.3d 1276 (S.D. Fla. 2018) ...................................................19

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) .................................................................19

*Env'tl Prot. Info. Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) .................................................................22

*Fla. v. Bostick*,
   501 U.S. 429 (1991)..............................................................................9, 12

*Fla. v. Royer*,
   460 U.S. 491 (1983)...................................................................................9

*Floyd v. City of New York*,
   959 F. Supp. 2d 668 (S.D.N.Y. 2013).....................................................23

*Haw. v. Trump,*
859 F.3d 741 (9th Cir. 2017) ............................................................22

*Hernandez v. Sessions,*
872 F.3d 976 (9th Cir. 2017) ............................................................20

*Hodgers–Durgin v. de la Vina,*
199 F.3d 1037 (9th Cir. 1999) (en banc) .......................................14

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson,*
643 F. Supp. 884 (N.D. Cal. 1986) ..........................................13, 14

*Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,*
799 F.2d 547 (9th Cir. 1986) ...........................................8, 9, 14, 20

*Jorgenson v. Cassiday,*
320 F.3d 906 (9th Cir. 2003) ............................................................24

*LaDuke v. Nelson,*
762 F.2d 1318 (9th Cir. 1985) ...........................................................9

*League of Wilderness Def. v. Connaughton*
752 F.3d 755 (9th Cir. 2014) ............................................................24

*Leiva-Perez v. Holder,*
640 F.3d 962 (9th Cir. 2011) ............................................................21

*McKenzie v. Lamb,*
738 F.2d 1005 (9th Cir. 1984) ..........................................................16

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ...............................................9, 20, 24

*Melendres v. Arpaio,*
784 F.3d 1254 (9th Cir. 2015) ..........................................................23

*Morales v. Chadbourne,*
793 F.3d 208 (1st Cir. 2015) ............................................................15

*Moreno v. Napolitano,*
213 F. Supp. 3d 999 (N.D. Ill. 2016) ..............................................19

*Mountain High Knitting, Inc. v. Reno,*
51 F.3d 216 (9th Cir. 1995) ..............................................................15

*Nicacio v. U.S. I.N.S.,*
797 F.2d 700 (9th Cir. 1985) .....................................................14, 23

*Norsworthy v. Beard,*
87 F. Supp. 3d 1164 (N.D. Cal. 2015) .............................................21

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    568 F.Supp.3d 10 (D.D.C. 2021) .................................................15, 19

*Riverside All of US or None v. City of Riverside*,
    2023 WL 7751774 (C.D. Cal. Nov. 14, 2023) ..............................23

*Roy v. Cnty. of Los Angeles*,
    2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ....................................19

*Tejeda-Mata v. INS*,
    626 F.2d 721 (9th Cir. 1980) .........................................................15

*Thomas v. Dillard*,
    818 F.3d 864 (9th Cir. 2016) .......................................................9, 12

*U.S. v. Brignoni-Ponce*,
    422 U.S. 873 (1975) ....................................................2, 8, 10, 13

*U.S. v. Cantu*,
    519 F.2d 494 (7th Cir. 1975) .........................................................15

*U.S. v. Mendenhall*,
    446 U.S. 544 (1980) .......................................................................8

*U.S. v. Montero-Camargo*,
    208 F.3d 1122 (9th Cir. 2000) (en banc) ......................................13

*U.S. v. Rodriguez*,
    976 F.2d 592 (9th Cir. 1992) .....................................................8, 10

*U.S. v. Rodriguez Sanchez*,
    23 F.3d 1488 (9th Cir. 1994) ...................................................2, 8, 10

*Unnamed Parties v. Johnson*,
    2016 WL 8188563 (D. Ariz. Jan. 3, 2017) ...................................23

*Warsoldier v. Woodford*,
    418 F.3d 989 (9th Cir. 2005) .........................................................20

*Wash. v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .......................................................21

*Westover v. Reno*,
    202 F.3d 475 (1st Cir. 2000) .........................................................16

*Ybarra v. Ill.*,
    444 US 85 (1979) ...........................................................................16

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983) .........................................................24

**Federal Statutes**

8 U.S.C. § 1357(a)(2)............................................................................................. *passim*

**Regulations**

8 C.F.R. § 287.5(c)(1) .............................................................................................16

**Other Authorities**

*Castanon Nava v. DHS*, No. 1:18-cv-03757, (N.D. Ill., Feb. 7, 2022), Dkt. 155-1
    (Appendix A: Broadcast Statement of Policy).........................................................16

## I.    INTRODUCTION

In January 2025, U.S. Border Patrol agents traveled hundreds of miles inland to Kern County and launched "Operation Return to Sender." Through a nearly weeklong series of raids on the region's highways, city streets, and local businesses, Border Patrol indiscriminately detained and arrested people of color they encountered in agricultural areas and Latino neighborhoods. They made these detentions and arrests on assumptions about the person's skin color or occupation, and without the individualized assessment that the Constitution and federal law require. When people asked why they were being detained or exercised their right to remain silent, Border Patrol agents became violent—slashing tires, smashing car windows, and physically assaulting people they stopped. These practices resulted in the unlawful stops and arrests of U.S. citizens, lawful permanent residents, and undocumented immigrants alike.

This case challenges Border Patrol's recently implemented practices of stopping Latinos *en masse* without reasonable suspicion, arresting them without probable cause, and coercing them into summary expulsion from the United States. The Fourth Amendment prohibits immigration agents from conducting a detentive stop without individualized reasonable suspicion that the person stopped is unlawfully in the country. And federal law limits immigration agents' authority to conduct warrantless immigration arrests, permitting them only when there is probable cause, based on an individualized inquiry, that the person is likely to escape before a warrant can be obtained.

Despite its flagrant violations of the Constitution and federal law, Border Patrol has described "Operation Return to Sender" as a "success from day one." Declaration of Reaghan Braun ("Braun Decl."), Ex. 11. Consistent with Trump Administration Border Czar Tom Homan's plan to "arrest as many as we can," *id.*, Ex. 15, Border Patrol has made its intentions clear: its agents will soon travel inland again and replicate "Operation Return to Sender" in Bakersfield, Fresno, Sacramento, and other areas throughout this District. *See id.*, Exs. 2, 3, 10, 17. And Border Patrol has promised to arrest "even more [people] next time." *Id.*, Ex. 4.

Plaintiffs request a preliminary injunction to ensure that, when Border Patrol conducts operations in this District, it complies with its constitutional and legal duties to refrain from

(1) detentive stops without reasonable suspicion that the person stopped is in the country unlawfully, and (2) warrantless arrests without regard to probable cause that the arrestee is likely to escape before a warrant can be obtained. Such an injunction will not disturb Border Patrol's traditional function at the border or its lawful operations in this District. But Border Patrol cannot be permitted to terrorize communities hundreds of miles from the border based on nothing more than race-based assumptions about immigration status.

The Court should grant the requested preliminary injunction in its entirety.

## II.    FACTS

### A.    Border Patrol's Immigration Sweeps Rely on Unlawful Practices.

Congress designed the modern immigration system with a clear division of responsibility: Immigration and Customs Enforcement ("ICE") enforces immigration law in the interior of the United States; Customs and Border Protection ("CBP") and its Border Patrol subdivision does so *at the border*. Braun Decl., Ex. 24 ("The United States Border Patrol is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection … responsible for securing U.S. borders between ports of entry.").

Outside of the border, the Fourth Amendment prohibits Border Patrol agents from stopping a person unless they have "reasonable suspicion" based on "specific, articulable facts" that the person is a noncitizen "illegally in the country." *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). In making these stops, agents may not rely on "broad profiles which cast suspicion on entire categories of people." *U.S. v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994). Border Patrol agents are also barred from making warrantless arrests unless the agent has "reason to believe" that (a) the person being arrested "is in the United States in violation of any [immigration] law or regulation" and (b) the person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2).

Border Patrol ignored these requirements in "Operation Return to Sender." Over sixty Border Patrol agents from the U.S. Border Patrol El Centro Sector ("El Centro Border Patrol") traveled hundreds of miles north of the border where they fanned out to raid the community. *See, e.g.*, Braun Decl., Exs. 17, 18; Declaration of Elizabeth Strater ("Strater Decl.") ¶ 15. In vehicle

ER165

stops and on foot patrols, Border Patrol agents had a common practice: stop without reasonable suspicion and arrest without assessing flight risk. *See, e.g.*, Strater Decl. ¶¶ 25-29.

In the attached declarations, Plaintiffs document nearly a dozen unlawful stops from "Operation Return to Sender." Each documented encounter began with a detentive stop where there was no lawful basis for reasonable suspicion that the person stopped was unlawfully in the country. As a result, Border Patrol agents stopped people who are lawfully in the country—such as Mr. Ernesto Campos Gutierrez, a U.S. citizen, and Plaintiff Yolanda Aguilera Martinez, a lawful permanent resident—and failed to provide justification for these stops, even when asked. Declaration of Ernesto Campos Gutierrez ("Campos Gutierrez Decl.") ¶¶ 2, 5-9; Declaration of Yolanda Aguilera Martinez ("Aguilera Martinez Decl.") ¶¶ 2, 6-7, 11. Likewise, each of Border Patrol's documented arrests were performed without the legally required probable cause that the person was likely to escape before a warrant could be obtained.

In conducting vehicle stops during the raids, Border Patrol targeted Latino neighborhoods and farm roads in agricultural areas and indiscriminately pulled over cars with non-white drivers and passengers. Declaration of Maria Hernandez Espinoza ("Hernandez Espinoza Decl.") ¶¶ 4, 22; Declaration of Juan Vargas Mendez ("Vargas Mendez Decl.") ¶ 4; Strater Decl. ¶¶ 26, 37-38; Campos Gutierrez Decl. ¶¶ 2, 15. In each instance, Border Patrol agents stopped vehicles that were properly registered, driving well within the speed limit, and obeying traffic laws. Campos Gutierrez Decl. ¶ 3; Vargas Mendez Decl. ¶ 5; Hernandez Espinoza Decl. ¶ 4; Aguilera Martinez Decl. ¶ 4; Strater Decl. ¶¶ 26, 38. For example, United Farm Workers ("UFW") members "Alicia," "Benjamin," and "Carlos" were stopped on their way home along a route commonly taken by farm workers to get to and from their worksites. Strater Decl. ¶ 26. They were traveling within the speed limit and obeying traffic laws. *Id.* Border Patrol agents did not appear to know who was in the car or have any other information about the vehicle beyond its appearance and indicated no other reason for the stop than to ask for "papers." *Id.* ¶ 27.

In parking lots, Border Patrol agents targeted businesses in Latino neighborhoods and businesses that serve farm workers and day laborers. There, they approached non-white drivers in parked cars, blocked them in, and interrogated them about their immigration status. Declaration

of Oscar Morales Cisneros ("Morales Cisneros Decl.") ¶¶ 5-6. Within the parking lots, Border Patrol agents approached non-white people who appeared to be day laborers and questioned them about their immigration status. Declaration of Jesus Ramirez ("Ramirez Decl.") ¶¶ 4, 7 (stopped while standing in Home Depot parking lot); Declaration of Wilder Munguia Esquivel ("Munguia Esquivel Decl.") ¶¶ 5-8 (same); Declaration of Luis Perez Cruz ("Perez Cruz Decl.") ¶¶ 3-4 (same). Border patrol agents conducted these stops with no warrants and provided no explanation for their stops except to demand "papers" or identification. Ramirez Decl. ¶ 5 ("papers"); Munguia Esquivel Decl. ¶ 5 ("papers"); Perez Cruz Decl. ¶ 3 (identification or immigration permits); Morales Cisneros Decl. ¶ 5 (driver's license).

If people declined to answer Border Patrol's questions or demanded to know the basis for their stop, Border Patrol agents turned to violence—smashing windows, slashing tires, and ripping passengers from the cars. Messrs. Perez Cruz and Munguia Esquivel were handcuffed because they declined to answer questions. Perez Cruz Decl. ¶ 3; Munguia Esquivel Decl. ¶¶ 5-8. Mr. Vargas Mendez and Ms. Hernandez Espinoza were both arrested when they did not have their identifications on them. Vargas Mendez Decl. ¶¶ 8, 9; Hernandez Espinoza Decl. ¶¶ 7, 9. Ms. Aguilera Martinez, even after providing her ID, was forced to the ground and handcuffed when she was slow to exit her vehicle—and was only released after she was able to produce an image of her green card, which no agent had asked her about before she was handcuffed. Aguilera Martinez Decl. ¶¶ 7, 10. Border Patrol agents repeatedly smashed car windows if passengers did not roll them down. *Id.* ¶ 8 (agents threatening to smash partly open window); *see also* Strater Decl. ¶¶ 39-40 (Border Patrol agents smashed windows in car carrying UFW member); Braun Decl., Exs. 5, 6 (Border Patrol post and comments describing practice of smashing windows). After Mr. Campos Gutierrez was pulled over and provided his identification, a Border Patrol agent demanded that he also turn over his car keys—and when he refused, the agent slashed his tires. Campos Gutierrez Decl. ¶¶ 5-6.

Border Patrol has publicly celebrated these violent escalations, posting pictures on social media of vehicles with glass shattered by agents because a person had "[r]efused to open window

during an immigration inspection." *Id.*, Ex. 5. El Centro Border Patrol described the image of shattered glass as "FAFO"—meaning, "Fuck Around, Find Out"—"in full effect."[1] *Id.*, Ex. 6.

Following these unlawful stops, Border Patrol carried out warrantless arrests without performing any individualized evaluation of flight risk pursuant to § 1357(a)(2). None of the declarants conceivably posed a flight risk—each of them had families, jobs, and established residences in the community for which they were financially responsible. Nevertheless, Border Patrol failed to ask any questions to perform the requisite individualized inquiry. For example, Border Patrol arrested Plaintiff Vargas Mendez, without a warrant and without asking about his family or community ties, and kept him in custody even after he pled with the agents that he has lived in the area for 20 years and his wife and children are U.S. citizens. Vargas Mendez Decl. ¶¶ 2, 3, 10-11. Likewise, Border Patrol arrested Mr. Jesus Ramirez, who is the primary caretaker of his minor son, without any inquiry regarding his family and community ties or information to perform an assessment of Mr. Ramirez's flight risk. Ramirez Decl. ¶¶ 6-7. Border Patrol also arrested Plaintiff Wilder Munguia Esquivel without inquiring about his community ties, and even though he had already affirmatively presented himself to immigration authorities through a family-based immigration petition. Munguia Esquivel Dec. ¶ 8. These are not outliers. Border Patrol repeatedly and consistently failed to assess flight risk when it made warrantless arrests. *See also* Perez Cruz Delc. ¶ 4; Morales Cisneros Decl. ¶ 6; Campos Gutierrez Decl. ¶¶ 4, 9; Aguilera Martinez Decl. ¶¶ 6-8; Hernandez Espinoza Decl. ¶ 7; Strater Decl. ¶¶ 29, 41.

These unlawful arrests had significant consequences. Border Patrol transported individuals it arrested 300 miles south to the El Centro Border Patrol Station. At the El Centro Station, Border Patrol agents held people in windowless, cold cells without beds or warm blankets, access to showers, hygienic products, or sufficient food; deprived them of sleep, and without access to daylight or any way to tell time—all while ignoring the person's requests to make phone calls or speak to attorneys. *See, e.g.*, Vargas Mendez Decl. ¶¶ 16-19; Hernandez Espinoza Decl. ¶¶ 12-19; Strater Decl. ¶¶ 31-32, *see also* Munguia Esquivel Decl. ¶¶ 14-18;

---

[1] *Id.*, Ex. 19 (defining "FAFO" after President Trump posted an image using the term).

Morales Cisneros Decl. ¶¶ 12-15. During the same period, Border Patrol agents pressured people in their custody to sign documents without providing the documents in a language or format they could view or read. *Id.* These documents were apparently voluntary departure agreements, which waived the individuals' rights to immigration hearings and facilitated their immediate removal from the country. *Id.* Dozens of residents of Kern County and the surrounding region, including Plaintiffs Vargas Mendez and Maria Guadalupe Hernandez Espinoza, are now stranded in Mexico after Border Patrol coerced them to accept voluntary departure, leaving behind their families, communities, homes, and livelihoods. Hernandez Espinoza Decl. ¶ 21; Vargas Mendez Decl. ¶ 21.

The Plaintiffs and putative class members that remain in the United States have also suffered severe, irreparable harm. This harm has not been limited to undocumented immigrants. Indeed, because Border Patrol's practices unlawfully targeted people based on the color of their skin and their perceived occupations, U.S. Citizens and lawful permanent residents have been stopped and detained. Campos Gutierrez Decl. ¶¶ 2, 5-9; Aguilera Martinez Decl. ¶¶ 2, 6-7, 11; *see also* Strater Decl. ¶¶ 17, 22. Community members are now afraid to leave their homes and send their children to school. Strater Decl. ¶¶ 20-21; Morales Cisneros Decl. ¶ 20; Munguia Esquivel Decl. ¶ 20; Aguilera Martinez Decl. ¶ 12. They have changed jobs and commutes, avoided going to doctor's appointments, and stopped running basic daily errands. Strater Decl. ¶¶ 20–21. Border Patrol's lawless raids have left communities throughout this District in states of perpetual terror.

**B.    The Government Plans to Continue Suspicionless Stops and Mass Arrests.**

Border Patrol has made clear it plans to replicate "Operation Return to Sender" across the state, including announcing plans to continue to conduct unlawful raids of Latino, farm worker, and day laborer communities. El Centro Border Patrol's Chief Patrol Agent Gregory Bovino issued a press statement concerning "Operation Return to Sender," declaring Border Patrol "is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento." Braun Decl., Ex. 17. El Centro Border Patrol has also announced: "We are planning operations for other locals [sic] such as Fresno and especially Sacramento," as well as a return to Bakerfield.

*Id.*, Exs. 3, 10. And in public social media posts promoting "Operation Return to Sender," El Centro Border Patrol has likewise stated that there is "more to come," including ***"return to sender round 2." Id.***, Exs. 1, 12 (emphasis added).

Border Patrol has also declared an intention to increase the scope of its unlawful stops and arrests. In response to a Facebook post about "Operation Return to Sender," the El Centro Border Patrol account stated that the agency "will try and catch even more people next time." Braun Decl., Ex. 4. Chief Bovino has publicly committed to increasing the volume of arrests in Border Patrol's sweeps, agreeing that "Operation Return to Sender['s]" arrests were "rookie numbers" and that El Centro Border Patrol should "pump those numbers up." *Id.*, Ex. 14.

These comments illustrate Defendants' newly implemented practice to indiscriminately arrest people of color without adhering to constitutional and statutory requirements. Indeed, all of the above statements are consistent with Trump Administration Border Czar Tom Homan's recent promise that undocumented immigrants, regardless of individual circumstances, are "going to get arrested" "if they're in the country illegally." *Id.*, Ex. 15.

## III.    ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they can show (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Even if Plaintiffs raise only "serious questions" as to the merits of their claims, the court can grant relief if the balance of hardships tips "sharply" in Plaintiffs' favor, and the remaining equitable factors are satisfied. 632 F.3d at 1135. Here, both standards are satisfied as Plaintiffs are likely to succeed on the merits, likely to suffer irreparable harm, and the equitable factors tip sharply in their favor. This Court should grant the requested preliminary injunction.

### A.    Plaintiffs are Likely to Succeed on the Merits.

An injunction is warranted here because Border Patrol's practices violate the Fourth Amendment and federal law. *First,* Border Patrol's practice of conducting detentive stops without

reasonable suspicion that a person is in the country unlawfully violates the Fourth Amendment. *Second*, Border Patrol's practice of effecting warrantless arrests without evaluating flight risk violates the limit on warrantless arrests that Congress imposed in § 1357(a)(2).

### 1. Border Patrol's Practice of Conducting Detentive Stops Without Individualized Suspicion Violates the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." "Except at the border and its functional equivalents," immigration agents may stop private vehicles and pedestrians traveling on foot only after identifying "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that [the persons stopped are noncitizens] who may be illegally in the country." *See U.S. v. Brignoni-Ponce*, 422 U.S. 873 (1975) (vehicle stops); *Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir.), *amended*, 760 F.2d 907 (9th Cir. 1983) (pedestrians). If "a reasonable person would [believe] that he was not free to leave," even a brief stop to question a person about their immigration status constitutes an unreasonable seizure absent reasonable suspicion that the person is in the country unlawfully. *See U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980).

Reasonable suspicion is an individualized inquiry that "must be founded upon a particularized and objective basis for suspecting *the particular person* stopped." *U.S. v. Rodriguez*, 976 F.2d 592, 595 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d 1306 (9th Cir. 1993) (emphasis in original). Reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *U.S. v. Rodriguez Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994). Nor can reasonable suspicion be based on criteria "likely to sweep many ordinary citizens into a generality of suspicious appearance." *Rodriguez*, 976 F.2d 592, 595–96.

When immigration agencies have engaged in a practice of violating these strictures through suspicionless detentive stops or arrests, courts have enjoined them from continuing to do so. In *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, for example, the Ninth Circuit upheld a preliminary injunction against Border Patrol for workplace raids that involved

ER171

detaining and arresting people without the threshold suspicion or cause. 799 F.2d 547, 551 (9th Cir. 1986); *see also LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), *amended,* 796 F.2d 309 (9th Cir. 1986) (upholding permanent injunction against warrantless searches of workplace housing); *cf. Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) (upholding injunction against state detention practice for civil immigration offenses).

Plaintiffs are likely to succeed in demonstrating that Border Patrol violated the Fourth Amendment through its practice of carrying out suspicionless stops.

### a. Border Patrol Conducts "Immigration Stops" Without Individualized Reasonable Suspicion.

Border Patrol's unlawful practice of conducting detentive stops based on categorical race- and occupation-based assumptions rather than individualized reasonable suspicion in violation of the Fourth Amendment is evidenced by its conduct in "Operation Return to Sender." During the operation, Border Patrol agents stopped and detained people of color who were standing, walking, or driving through agricultural areas, Latino neighborhoods, and businesses to ask for their "papers" without reasonable suspicion that the person was violating an immigration law.

Plaintiffs document nearly a dozen stops during "Operation Return to Sender," all of which were made without reasonable suspicion. Border Patrol often stopped vehicles without knowledge about their occupants and stopped pedestrians without questioning them at all. In other instances, Board Patrol escalated stops by smashing windows, slashing tires, or arresting individuals when they exercised their right to remain silent. In both the vehicle and foot patrol context, longstanding precedent makes clear that a person's refusal to consent to questioning "does not furnish the minimal level of objective justification needed for a detention or seizure," *Fla. v. Bostick*, 501 U.S. 429, 437 (1991), and thus cannot justify even a "momentar[y]" detention, *Fla. v. Royer*, 460 U.S. 491, 498 (1983). *See also Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016).

As detailed further below, Border Patrol's "Operation Return to Sender" illustrates an unlawful practice that systematically dispenses with the Fourth Amendment's requirement of individualized suspicion and engages instead in "the wholesale seizure of miscellaneous persons."

*U.S. v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992), *opinion amended on denial of reh'g*, 997 F.2d 1306 (9th Cir. 1993).

### i.    Moving Vehicle Stops Without Reasonable Suspicion.

Any vehicle stop initiated by a law enforcement officer constitutes a seizure of the driver and all passengers. *Brendlin v. Cal.*, 551 U.S. 249, 251 (2007). The Fourth Amendment forbids "stopping vehicles at random to inquire if they are carrying [noncitizens] who are illegally in the country," *Brignoni–Ponce*, 422 U.S. at 884, and stops based on categorical assumptions rather than individualized suspicion, *Rodriguez Sanchez*, 23 F.3d at 1492.

Plaintiff and witness declarations submitted with this motion show how, during "Operation Return to Sender," Border Patrol repeatedly and consistently targeted moving vehicles driven by people of color in agricultural areas and Latino neighborhoods. *See* Hernandez Espinoza Decl. ¶¶ 4, 22 (Latino farm workers driving home from work); Campos Gutierrez Decl. ¶¶ 2, 15 (man of color hauling gardening equipment); Morales Cisneros Decl. ¶¶ 3-4, 22 (construction worker of color in Latino neighborhood); Vargas Mendez Decl. ¶ 4 (farm workers driving home from work); Strater Decl. ¶¶ 26, 37-38 (farm workers driving home from work).

The Border Patrol agents conducting these stops did not know who was in the car, and stated no reason for the stops other than to demand "papers" from vehicle occupants. *See* Hernandez Espinoza Decl. ¶ 7 (asking passengers for identification and whether they had "papers"); Aguilera Martinez Decl. ¶ 6 ("I need to see your papers"); Morales Cisneros Decl. ¶¶ 5-6 (asking if driver had "papers" and was here legally); Vargas Mendez Decl. ¶ 8 (demanding identification); Campos Gutierrez Dec. ¶ 4 (demanding identification); Strater Decl. ¶ 27 (asking for "papers"). Border Patrol agents did not appear to have any other reason for their stops. Agents stopped vehicles that were properly registered, driving well within the speed limit, obeying traffic laws, and driven by U.S. citizens and lawful permanent residents, among others. Campos Gutierrez Decl. ¶ 3; Vargas Mendez Dec. ¶ 5; Hernandez Espinoza Decl. ¶ 4; Aguilera Martinez Decl. ¶ 4; Strater Decl. ¶¶ 17, 26, 38; Campos Gutierrez Decl. ¶ 2; Aguilera Martinez Decl. ¶ 2.

Border Patrol agents also demonstrated a pattern of escalating stops needlessly and without justification. For example, when Ms. Aguilera Martinez presented a valid California

driver's license, an agent incorrectly declared that it was "fuckin' fake" and demanded that she exit her vehicle, again with no explanation. Aguilera Martinez Decl. ¶ 6. As she moved slowly out of the vehicle, the agent grabbed her, forced her to the ground, handcuffed her, and placed her in the back of an SUV—and the agent only released her significantly later after she produced an image of her green card. *Id.* ¶¶ 7, 10. Similarly, when Mr. Vargas Mendez—who had been a passenger, not a driver—was not carrying an ID he could produce, agents grabbed him, dragged him out of the vehicle, and handcuffed him. Vargas Mendez Decl. ¶¶ 8, 9. Likewise, Border Patrol agents approached the car of UFW member "Fernando," pounded on the doors and windows, and within seconds, smashed its windows with baton-like sticks. Strater Dec. ¶ 39. After Mr. Campos Gutierrez presented agents with a REAL-ID compliant driver's license, an agent demanded that he turn over his car keys, and when he refused, the agent slashed the car's tires. Campos Gutierrez Decl. ¶¶ 5-6; *see also* Strater Decl. ¶¶ 39-40 (Border Patrol agents smashing car window); Braun Decl., Ex. 5 (Border Patrol describing practice of smashing car windows). In all of these instances, Border Patrol demonstrated an unlawful practice of stopping vehicles and violently engaging with passengers despite not having any reasonable suspicion.

    **ii.**   **Pedestrian and Parking Lot Stops Without Reasonable Suspicion.**

   During "Operation Return to Sender," Border Patrol agents repeatedly performed pedestrian and parking lot stops without reasonable suspicion. *Benitez-Mendez*, 752 F.2d at 1311. These stops consistently targeted people of color in Latino neighborhoods and at businesses where farm workers and day laborers shop and eat. Morales Cisneros Decl. ¶ 4 (construction worker using water filling station at liquor store in Latino neighborhood); Ramirez Decl. ¶ 4 (day laborer at Home Depot); Munguia Esquivel Decl. ¶ 4 (same); Perez Cruz Decl. ¶ 3 (painter at Home Depot). At a Chevron gas station where farm workers often stop for breakfast on their way to pick oranges, the store manager who witnessed Border Patrol agents during "Operation Return to Sender" observed: "[I]t was only Hispanics and field workers that [Border Patrol agents] were putting aside. … It's just random people that are walking in that work in the field." Braun Decl., Ex. 16; *see also id.*, Ex. 23.

These warrantless pedestrian and parking lot stops had no individualized basis to support them. For example, before even speaking to him, Border Patrol agents blocked Mr. Morales Cisneros's parked car from behind and approached him from the drivers' side door. Morales Cisneros Decl. ¶ 4. Likewise, before speaking with him, Border Patrol agents surrounded Mr. Ramirez in the Home Depot parking lot with their vehicles, such that it was not possible for Mr. Ramirez to leave. Ramirez Decl. ¶ 4. Border Patrol agents provided no explanation for these stops except to demand people's "papers" or IDs. Ramirez Decl. ¶ 5 (demanding "papers"); Munguia Esquivel Decl. ¶ 5 (asking if he had "papers"); Perez Cruz Decl. ¶ 3 (demanding ID or immigration permits); Morales Cisneros Decl. ¶ 5 (demanding driver's license).[2]

Border Patrol agents also demonstrated a practice of unlawfully escalating stops when individuals exercised their right to remain silent in response to questioning. For example, Border Patrol agents began handcuffing Mr. Perez Cruz solely for remaining silent during voluntary questioning, telling him they would arrest him regardless of whether he provided identification. Perez Cruz Decl. ¶ 3. When Mr. Munguia Esquivel refused to consent to voluntary questioning and stated he was exercising his right to remain silent, an agent grabbed him, forcibly removed Mr. Munguia Esquivel's wallet from his pants pocket, and handcuffed him. Munguia Esquivel Decl. ¶¶ 5-8. And when Mr. Morales Cisneros—who had provided Border Patrol agents with a valid California driver's license when asked for his ID—refused to answer their question of whether he had "papers," Border Patrol agents arrested him. Morales Cisneros Decl. ¶¶ 5-6. Refusal to answer an agent's question, without more, does not create reasonable suspicion justifying an arrest. *See Bostick*, 501 U.S. at 437; *Thomas*, 818 F.3d at 884.

> **b.    Border Patrol's Practice of Suspicionless Vehicle, Pedestrian, and Parking Lot Stops Violates the Fourth Amendment.**

Common across each of these examples is the utter lack of any objective basis for individualized suspicion before conducting a stop for the purpose of investigating immigration status. This practice violates well-established Fourth Amendment law forbidding government

---

[2] In some cases, Border Patrol agents used face coverings and did not identify themselves. When Border Patrol agents surrounded Mr. Munguia Esquivel, for example, he feared the Border Patrol agents were criminals who intended to mug or kidnap him. Munguia Esquivel Decl. ¶ 5.

agents from "stopping vehicles at random to inquire if they are carrying [noncitizens] who are illegally in the country," *Brignoni–Ponce*, 422 U.S. at 884, and from performing suspicionless detentive stops outside of vehicles, *Benitez-Mendez*, 752 F.2d at 1311. Such stops—which are at best random, and at worst, motivated by the perceived race or ethnicity of the people stopped—have been adopted wholesale by Border Patrol in "Operation Return to Sender."

In its statements on social media, Border Patrol has purported to justify its indiscriminate sweeps by claiming categorically that, just as "every U.S. city [is] a border town," Braun Decl., Ex. 9, "Bakersfield is now a dyed in the wool border town," *id.*, Ex. 7. But the Ninth Circuit has warned against geographic justifications for stops that apply "to entire neighborhoods or communities in which members of minority groups regularly go about their daily business"—as Border Patrol has done here. *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc); *c.f. Ill. v. Wardlow*, 528 U.S. 119, 123–24 (2000) ("presence in an area of expected criminal activity" insufficient for reasonable suspicion).

Indeed, in a community like Kern County, where over half of the population are "Hispanic or Latino," Braun Decl, Ex. 25, "Hispanic appearance is … of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Even in cities along the U.S.-Mexico Border, the Supreme Court held that suspicionless stops violate the Fourth Amendment because it was "confident" that even in those cities, "substantially all of the traffic . . . is lawful and that relatively few . . . residents have any connection with the illegal entry and transportation of aliens." *Brignoni–Ponce*, 422 U.S. at 882. This logic applies with even greater force hundreds of miles from the land border in Kern County and other Central Valley counties where Border Patrol has announced plans to continue its "Operation Return to Sender." *See* Braun Decl., Exs. 10, 17 (stating intent to carry out further operations in Bakersfield, Fresno, and Sacramento).

           c.       **Preliminary Injunctive Relief is Necessary to Protect the Fourth Amendment Rights of Plaintiffs and the Putative Class.**

Border Patrol's unlawful violations here are systemic practices that warrant preliminary injunctive relief to protect Plaintiffs and the putative class. In *Int'l Molders' & Allied Workers'*

*Loc. Union No. 164 v. Nelson*, the Ninth Circuit upheld a preliminary injunction issued against the now-defunct Livermore Border Patrol Sector based on strikingly similar facts. 799 F.2d 547, 551 (9th Cir. 1986). *International Molders'* arose out of "Project Jobs," a weeklong series of workplace raids that Border Patrol conducted in Northern California. *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 643 F. Supp. 884, 899 (N.D. Cal. 1986). The tactics of "Project Jobs" mirror those used in "Operation Return to Sender": agents detained people before questioning them; arrested people who refused to answer questions; and detained and arrested workers—including U.S. citizens—without first developing the threshold level of suspicion. *See id.* at 899–901. The Ninth Circuit affirmed the issuance of a classwide preliminary injunction because "the record support[ed] . . . a finding of an evident systematic policy and practice of Fourth Amendment violations by [Border Patrol]" rather than "[a]n ambiguous, isolated incident [not warranting] injunctive relief." *Int'l Molders'*, 799 F.2d at 551 (internal quotation marks and citations omitted).

Similarly, in *Nicacio v. U.S. I.N.S.*, the Ninth Circuit affirmed an injunction requiring Border Patrol to document in writing the "particularized reasonable suspicion" for traffic stops of "persons of Hispanic appearance" after the court determined Border Patrol had "engaged in a pattern of unlawful stops to interrogate persons of Hispanic appearance traveling by automobile on Washington highways." 797 F.2d 700, 701, 706 (9th Cir. 1985), *overruled in part on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).

Here, just as in the above cases, Border Patrol's pattern of immigration stops without regard to the Fourth Amendment's threshold standard is not an "ambiguous, isolated incident," but rather constitutes a "systemic policy and practice of Fourth Amendment Violations." *Int'l Molders'*, 799 F.2d at 551. Just as the Border Patrol's actions in the *International Molders'* raids showed a "systemic" practice based on evidence of consistent constitutional violations, Plaintiffs here have provided declarations showing Border Patrol's practice across a dozen illegal suspicionless stops and arrests in "Operation Return to Sender." And Border Patrol's own statements attempting to justify their conduct and touting the tactics used in "Operation Return to Sender" further cement the systemic nature of these illegal practices. Braun Decl., Ex. 7

(justifying interior sweeps by calling Bakersfield a "dyed in the wool border town" despite its location hundreds of miles from the border), Exs. 4, 11 (touting the success of Operation Return to Sender as a "success from day one" and stating they "will try and catch even more people next time"). Injunctive relief is necessary to prevent Border Patrol from continuing these unlawful practices.

### 2.    Border Patrol's Practice of Effecting Warrantless Arrests Without Evaluating Flight Risk Violates 8 U.S.C. § 1357(a)(2).

Congress has codified a strong preference that immigration arrests be based on warrants in the Immigration and Nationality Act. *See Ariz. v. U.S.*, 567 U.S. 387, 407–08 (2012). Congress afforded immigration agents with limited authority to conduct warrantless arrests under 8 U.S.C. § 1357(a)(2). The statute does not authorize indiscriminate round-ups, even where an immigration agent has established probable cause that a noncitizen is unlawfully in the country. Under the statute, an immigration agent can conduct a warrantless arrest **only if** he or she has "reason to believe" that the noncitizen is "likely to escape before a warrant can be obtained for his arrest." *Id*. "Reason to believe," as used in the statute, is equated with "the constitutional requirement of probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *see also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 … must be considered the equivalent of probable cause."); *U.S. v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (same); *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971) (same). As with constitutional violations, widespread refusal to follow statutory responsibilities warrants injunctive relief. *See, e.g.*, *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F.Supp.3d 10, 35 (D.D.C. 2021) (issuing classwide permanent injunction for ICE's widespread failure to comply with statutory obligation).

### a.    8 U.S.C. § 1357(a)(2) Requires Agents to Evaluate and Consider Flight Risk Based on Individualized Factors Before Conducting a Warrantless Arrest.

Section 1357(a)(2)'s requirement that Border Patrol agents establish probable cause of flight risk before conducting a warrantless arrest "is always seriously applied." *Cantu*, 519 F.2d at 496–97; *see also Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding § 1357(a)(2) requires particularized finding of likelihood of escape before a warrantless

immigration arrest); *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000) (holding immigration agent was in "direct violation" of § 1357(a)(2) where no evidence existed that noncitizen was likely to escape before a warrant could be obtained).

"Mere suspicion, common rumor, or even strong reason to suspect are not enough" to establish probable cause. *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. U.S.*, 361 US 98, 101 (1959)). Rather, the facts an officer relies on to establish probable cause must be "particularized with respect to that person." *Ybarra v. Ill.*, 444 US 85, 91 (1979). Categorical assumptions based on a person's demographic characteristics or the conclusion that a person fits a certain "profile" are insufficient. *See Bravo v. City of Santa Maria*, 665 F.3d 1076, 1085 (9th Cir. 2011) (assumptions about gang members insufficient to establish probable cause).

Consistent with these longstanding precedents, DHS has adopted explicit requirements for agents in the field when they conduct warrantless arrests. In 2022, as part of a lawsuit settlement, DHS issued a "Broadcast Statement of Policy" setting forth requirements for evaluation and documentation of flight risk that constitute "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." Braun Decl., Ex. 26 ("Broadcast Statement of Policy"); *see also Castanon Nava v. DHS*, No. 1:18-cv-03757, Appendix A: Broadcast Statement of Policy, Dkt. 155-1, (N.D. Ill., Feb. 7, 2022). That statement concerns "all arrests effected under 8 U.S.C. § 1357(a)(2)," including those made by Border Patrol. *See* 8 C.F.R. § 287.5(c)(1) (listing Border patrol agents as subject to § 1357(a)(2)).

Under this "Broadcast Statement of Policy"—***DHS's own interpretation of § 1357(a)(2)'s warrantless arrest requirements***—immigration officers must consider the totality of the circumstances in evaluating an individual's "likelihood of escape," including an individual's community ties (such as their family, home, or employment), an individual's prior escapes or evasions of immigration authorities, and the immigration officer's ability to determine the individual's name. *See* Braun Decl., Ex. 26 (Broadcast Statement of Policy) at 1. The policy is clear that "[m]ere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*." *Id.* (emphasis in original).

The policy further requires that immigration officers who have made a warrantless arrest document the facts and circumstances surrounding the warrantless arrest "as soon as practicable." *Id.* at 2. The documentation must include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.* For warrantless arrests that occur after a vehicle stop, the immigration agent must also document the "specific, articulable facts that formed the basis for the … reasonable suspicion that an alien in the vehicle stopped was [unlawfully] present within the United States." *Id.* at 3.

> **b.    Border Patrol Has a Practice of Effecting Warrantless Arrests Without Evaluating or Considering a Person's Flight Risk.**

The circumstances surrounding the arrests of the Plaintiffs, UFW members, and members of the putative class described in the declarations accompanying this motion are the product of Border Patrol's highly coordinated practice to arrest as many undocumented immigrants as possible, regardless of their individual circumstances. As illustrated in the numerous declarations Plaintiffs have submitted, Border Patrol made no individualized assessment of flight risk when conducting warrantless arrests during "Operation Return to Sender."

For example, Plaintiff Juan Vargas Mendez was arrested following a traffic stop during which he was a passenger in a car driving under the speed limit. Vargas Mendez Decl. ¶¶ 5-12. After he did not produce his identification, agents dragged him out of the van; took his phone, wallet, and medication; handcuffed him, and called him a "Mexican bitch[]." *Id.* ¶ 10. Without questioning him on his ties to Kern County, the agents then placed him in the back of an SUV and drove him to a Border Patrol detention center. *Id.* ¶¶ 10-12. As the agents drove him away, Mr. Vargas Mendez pleaded with the agents that he had lived in the area for 20 years, had a wife and four children who are all citizens, and that he had no criminal record. *Id.* ¶ 11. An agent responded that he "did not care" and that Mr. Vargas Mendez "was going to Mexico." *Id.*

This experience was not unique to Mr. Vargas Mendez. Plaintiff Wilder Munguia Esquivel was arrested midday outside a Home Depot after he exercised his right to remain silent. Munguia Esquivel Decl. ¶¶ 5-10. After Mr. Munguia Esquivel declined to answer the agent's questions, the agent began to yell at him, forcefully grabbed him, patted him down, and

handcuffed him. *Id.* Another agent then placed him in the backseat of a vehicle. *Id.* ¶ 9. At no point did either agent ask about Mr. Munguia Esquivel's community ties, such as his family, work history, or length of residency. *Id.* ¶ 8. Had they, Mr. Munguia Esquivel would have told them that his brother is a U.S. citizen and he has a pending family-based immigration petition. *Id.*

Similarly, Mr. Ernesto Campos Gutierrez—who is a U.S. citizen—was arrested following a traffic stop in which the agent slashed his truck's tires because, after he had provided his driver's license, he refused to immediately turn over his keys as well. Campos Gutierrez Decl. ¶¶ 3-9. At no point prior to his arrest did any Border Patrol agent present a warrant or ask Mr. Campos Gutierrez about his community ties. *Id.* ¶¶ 4, 9; *see also* Perez Cruz Decl. ¶ 4 (arrested without any questioning concerning community ties); Ramirez Decl. ¶¶ 6-7 (same); Morales Cisneros Decl. ¶ 6 (same); Hernandez Espinoza Decl. ¶¶ 5, 7 (same); Strater Decl. ¶¶ 29 (Border Patrol agents asked "Alicia" if she had children only to offer to remove the children to Mexico with her and arrested "Benjamin" and "Carlos" without any questioning concerning community ties), 41 (arrested "Fernando" without any questioning about community ties).

Border Patrol's arrests without probable cause of flight risk swept up decades-long community residents with no criminal history, including parents, grandparents, and homeowners. *See* Aguilera Martinez Decl. ¶¶ 2-3 (45-year Kern County resident, mother, and grandmother with no criminal history); Munguia Esquivel Decl. ¶ 2 (12-year Kern County resident with no criminal history); Hernandez Espinoza Decl. ¶¶ 2-3 (10-year Kern County resident, mother, and grandmother, with no criminal history); Morales Cisneros Decl. ¶¶ 2-3 (Bakersfield homeowner, father, and grandfather, with no criminal history).

These indiscriminate arrest practices, executed without assessment of community ties or flight risk, are consistent with policy statements made by federal government leadership. For example, Trump Administration Border Czar Tom Homan recently declared that undocumented immigrants, regardless of individual circumstances, are "going to get arrested" "if they're in the country illegally." Braun Decl., Ex. 15. Similarly, Chief Bovino has stated that, if Border Patrol encounters "undocumented" immigrants "we will arrest." *Id.*, Ex. 13; *see also id.*, Ex. 8. And El Centro Border Patrol stated its intent to continue to effect warrantless arrests regardless of

individual circumstances, posting on Facebook: "[A]nyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." *Id.*, Ex. 1. In light of these statements, there is no doubt Border Patrol will continue its unlawful practices absent Court intervention.

### c. Border Patrol's Practice of Warrantless Arrests Without Assessing Flight Risk Exceeds its Statutory Authority Under § 1357(a)(2).

DHS has clearly stated in its "Broadcast Statement of Policy" that § 1357(a)(2) requires immigration officers executing warrantless arrests to evaluate an individual's "likelihood of escape" by considering the totality of the circumstances. Border Patrol "may not rewrite clear statutory terms"—or DHS directives—"to suit its own sense of how the statute should operate." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018), quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Courts have uniformly applied this maxim to invalidate agency practices that disregard § 1357(a)(2)'s flight risk provision. Where, as here, an immigration agency "make[s] no determination whatsoever that the subject of [an arrest] is likely to escape … before a warrant can be obtained, … [the agency] goes beyond its statutory authority to make warrantless arrests." *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008 (N.D. Ill. 2016) (granting summary judgment on plaintiffs' claim that ICE policy of issuing detainers without regard to flight risk violated § 1357(a)(2)).[3] And where, as here, there is evidence of an agency's ongoing systemic violations of a statute, an injunction is appropriate to prevent ongoing violations. *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F.Supp.3d 10, 35 (D.D.C. 2021) (issuing classwide permanent injunction forcing ICE to comply with statute requiring its officers to consider less-restrictive placement alternative before transferring detained children to adult detention centers when they turned 18). Injunctive relief is necessary to prevent Border Patrol from continuing to violate § 1357(a)(2) through its practice of conducting warrantless arrests without assessing flight risk.

---

[3] *See also Roy v. Cnty. of Los Angeles*, 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018) (same); *Creedle v. Miami-Dade County*, 349 F.Supp.3d 1276, 1295 (S.D. Fla. 2018) (same).

**B.    Plaintiffs Will Suffer Irreparable Harm from Border Patrol's Unlawful Policies and Practices in the Absence of Injunctive Relief.**

Border Patrol's illegal policies and practices are causing and will continue to cause irreparable harm to Plaintiffs and the putative class—regardless of their immigration status. "[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres*, 695 F.3d at 1002. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quotations and citation omitted). A practice of conducting detentive stops without regard to reasonable suspicion in violation of the Fourth Amendment constitutes such a constitutional violation warranting preliminary relief. *See Int'l Molders'*, 799 F.2d at 553; *see also Melendres*, 695 F.3d at 1002 (irreparable harm exists where plaintiffs face "a real possibility" that they will "again be stopped or detained and subjected to unlawful detention"); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (irreparable harm where plaintiffs were detained and highlighting the "irreparable harms imposed on anyone subject to immigration detention").

As a result of "Operation Return to Sender," Plaintiffs and members of the putative class have experienced significant harm. Following their detentions and arrests, Plaintiffs and putative class members are scared to leave their homes, go to work, accompany or send their children to school, go to the doctor, and run even the basic errands. Morales Cisneros Decl. ¶¶ 20, 22; Munguia Esquivel Decl. ¶ 20; Aguilera Martinez Decl. ¶ 12; Strater Decl. ¶¶ 35, 43; Perez Cruz Decl. ¶ 7; Campos Gutierrez Decl. ¶ 15. Although she is a lawful permanent resident, Ms. Aguilera Martinez experiences fear and anxiety when she drives near the place of her arrest and areas where Border Patrol has arrested other people, and she is terrified at the thought of being arrested again. Aguilera Martinez Decl. ¶ 12. Similarly, Mr. Morales Cisneros feels nervous leaving his home, fears showing his face, and often wears a sweater with a hood in an attempt to cover his skin color when he runs errands. Morales Cisneros Decl. ¶ 22; *see also* Munguia Esquivel Decl. ¶ 20 (terrified to go near the Home Depot where he was arrested); Strater Decl. Decl. ¶¶ 35, 42, 44 (UFW members report experiencing enormous stress and anxiety when

ER183

traveling to and from work and fear being separated from family members). Courts regularly hold that such emotional distress constitutes irreparable injury. *See, e.g.*, *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 709–10 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015).

Many members of the putative class have young children, and they are terrified of being swept up by Border Patrol and separated from their families. *See, e.g.*, *Wash. v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as irreparable harm); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011). This fear is consistent regardless of immigration status. The indiscriminate nature of Border Patrol's unlawful stop and arrest practices means that a person with lawful status or a pending immigration application—like Plaintiff Aguilera Martinez or Plaintiff Munguia Esquivel—still risks being stopped and detained with no notice to their children or family. For example, UFW members with employment authorization documents, such as H-2A agricultural visas, T-visas, or deferred action status, fear that Border Patrol will seize them for removal without regard to their authorized status. Strater Decl. ¶ 17. UFW member "Gabriela," who has legal authorization to work in the United States, has a daughter and eight grandchildren. *Id.* ¶ 42. She provides care to her grandchildren, and her daughter often relies on her to take them to appointments or pick them up from school. *Id.* She does not know who would care for her loved ones if she were detained—even for a brief period. *Id.* ¶ 44. Yet as a farm worker, she has to commute through the agricultural areas Border Patrol targets with its unlawful stop and arrest practices. *Id.*; *see also id.* ¶¶ 30, 34 (UFW member Benjamin abruptly separated from his four small children; UFW member Alicia must now raise her four children alone, living in fear that she will be subjected to Border Patrol's illegal policies and practices again); Ramirez Decl. ¶ 15 (sole living parent separated from children); Morales Cisneros Decl. ¶¶ 2, 4-6, 17-19 (separated from children for four days while detained incommunicado); Vargas Mendez Decl. Decl. ¶ 22 (separated from his four children, including his stepson who has epilepsy and for whom he is a caretaker).

Border Patrol's policies and practices also erode trust in local law enforcement. As former CBP Commissioner Chris Magnus recognized, "[t]hese roundups create widespread distrust of

law enforcement and discourage many community members from reporting crimes as victims or witnesses." Braun Decl., Ex. 20. This is true for Plaintiffs, who have developed ongoing fear of law enforcement officials, including local police officers. For example, Ms. Aguilera Martinez has experienced fear and flashbacks of her violent arrest when she has seen Bakersfield police officers drive by. Aguilera Martinez Decl. ¶ 13. Mr. Morales Cisneros no longer feels comfortable calling 911 if there is an emergency because he fears the local police will call Border Patrol to arrest him. Morales Cisneros Decl. ¶ 22.

Across party lines, elected officials have spoken out about the harm Border Patrol's practices continue to cause across the Central Valley. Fresno County supervisor Luis Chavez reported that in the wake of Border Patrol's wave of arrests in Kern County, he had "received reports of food processing facilities [with] absences of 15 to 20 [percent] locally." Braun Decl., Ex. 22. Republican Congressman David G. Valadao, representing California's 22nd Congressional District, released a statement urging Border Patrol "to avoid causing any further alarm among our farm workers" and avoid targeting "those responsible for producing our nation's food supply." *Id.*, Ex. 21.

In the face of these criticisms, Border Patrol has doubled down on its commitment to "Operation Return to Sender." Days after the raids, El Centro Border Patrol posted on social media that there is "more to come," including ***"return to sender round 2."*** *Id.*, Exs. 1, 12 (emphasis added). According to El Centro Border Patrol, the next round of "Operation Return to Sender" raids will take place in "Fresno and especially Sacramento," as well as a return to Bakerfield. *Id.*, Exs. 3, 10. Chief Bovino and El Centro Border Patrol have promised to "try and catch even more people next time" and "pump those numbers up." *Id.*, Exs. 4, 14. Plaintiffs and the putative class members will continue to suffer irreparable harm absent court intervention.

## C.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an Injunction Is in the Public Interest.

When, as here, the government is a party, courts consider the balance of equities and the public interest together. *Env'tl Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020). In doing so, courts consider the effect of granting or denying the injunction on each party. *Haw. v.*

*Trump*, 859 F.3d 741, 783 (9th Cir. 2017).

Plaintiffs' proposed injunctive relief is narrowly tailored to address the unlawful practices at issue. Plaintiffs are not asking that the Court enjoin Border Patrol from enforcing federal immigration laws. Plaintiffs merely ask the Court to order that Border Patrol take the minimal steps necessary to ensure that its stop and arrest practices comply with the Fourth Amendment and § 1357(a)(2). To that end, Plaintiffs request an injunction that requires: (i) Border Patrol in this District to: (i) refrain from detentive stops without reasonable suspicion that the person stopped is unlawfully present and warrantless arrests without probable cause that the person is likely to escape before a warrant can be obtained; (ii) timely document the reasonable suspicion that underlies detentive stops they make; (iii) comply with DHS's "Broadcast Statement of Policy" concerning § 1357(a)(2) when making warrantless arrests, including documenting the probable cause that underlies those arrests; (iv) provide that reasonable suspicion and probable cause documentation to Plaintiffs' counsel on a regular schedule; (v) develop guidance concerning how Border Patrol agents should determine whether "reasonable suspicion" exists when conducting detentive stops; and (vi) train agents on these requirements.

Such injunctive relief is standard in cases where there is a practice of widespread constitutional violations by a government agency. *See, e.g.*, *Nicacio*, 797 F.2d 700, at 706 (affirming injunction requiring Border Patrol to document the "particularized reasonable suspicion" for traffic stops of "persons of Hispanic appearance"); *Melendres v. Arpaio*, 784 F.3d 1254, 1266 (9th Cir. 2015) (affirming injunction requiring, among other things, additional training on racial profiling for local law enforcement and the development of a system that collected traffic stop data, including audio and video recordings); *Floyd v. City of New York*, 959 F. Supp. 2d 668, 682, 689 (S.D.N.Y. 2013) (ordering preliminary injunction requiring NYPD to begin documenting the bases for stops in narrative form and develop "a formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a [Trespass Affidavit Program] building on a suspicion of trespass"); *Unnamed Parties v. Johnson*, 2016 WL 8188563 (D. Ariz. Jan. 3, 2017) (granting preliminary injunction requiring quarterly production of Border Patrol data related to injunction's terms), *aff'd sub nom. Doe v. Kelly*, 878

F.3d 710 (9th Cir. 2017); *Riverside All of US or None v. City of Riverside*, No. 5:23-CV-01536-SPG-SP, 2023 WL 7751774, at *7 (C.D. Cal. Nov. 14, 2023) (granting preliminary injunction requiring the City of Riverside to refrain from any practices that are not in compliance with the city's stated policies); *Alsaada v. City of Columbus, Ohio*, No. 2:20-CV-3431, 2021 WL 3375834, at *2 (S.D. Ohio June 25, 2021) (granting preliminary injunction requiring, among other things, that the City of Columbus ensure that body and vehicle cameras are in good working order and used during every interaction with nonviolent protesters). The requested injunctive relief is both standard in cases like this one and necessary to prevent further irreparable harm to Plaintiffs.

Unlike Plaintiffs, Defendants will suffer no material harm, let alone any threat of permanent harm, should this Court grant Plaintiffs' injunction. *See League of Wilderness Def. v. Connaughton* 752 F.3d 755, 761 (9th Cir. 2014) (concluding the balance of harms tips towards plaintiffs "because the harms they face are permanent" whereas the opposing party faced only temporary delay). The requested injunctive relief does not prevent Defendants from lawfully carrying out their duties; it merely requires them to document their compliance with the law. *Cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (explaining that an agency "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations").

As "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres*, 695 F.3d at 1002, the balance of harms and the public interest support preliminary injunctive relief in this case.

## IV.    SECURITY

No security is necessary here. "Courts may dispense with the filing of a bond when … there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Such is the case here. Defendants will incur no harm from complying with Plaintiffs' proposed preliminary injunction.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and issue the requested preliminary injunction in its entirety.

Dated:  March 7, 2025                                AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION OF NORTHERN
                                                     CALIFORNIA

                                            By:   */s/ Bree Bernwanger*
                                                     BREE BERNWANGER
                                                     MICHELLE (MINJU) Y. CHO
                                                     LAUREN DAVIS
                                                     SHILPI AGARWAL

Dated:  March 7, 2025                        By:   AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION OF SOUTHERN
                                                     CALIFORNIA

                                                   */s/ Mayra Joachin* (as authorized March 7,
                                                     2025)
                                                     MAYRA JOACHIN
                                                     EVA BITRAN
                                                     OLIVER MA

Dated:  March 7, 2025                        By:   AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION OF SAN DIEGO &
                                                     IMPERIAL COUNTIES

                                                   */s/ Brisa Velazquez Oatis* (as authorized
                                                     March 7, 2025)
                                                     BRISA VELAZQUEZ OATIS

                                                   *Attorneys for Plaintiffs*

Dated:  March 7, 2025                                KEKER, VAN NEST & PETERS LLP

                                                   */s/ Ajay S. Krishnan* (as authorized March
                                            By:    7, 2025)
                                                     AJAY S. KRISHNAN
                                                     FRANCO MUZZIO
                                                     ZAINAB O. RAMAHI
                                                     JULIA GREENBERG

                                                   *Attorneys For Plaintiff Oscar Morales
                                                     Cisneros*

1  BREE BERNWANGER - # 331731
   bbernwanger@aclunc.org
2  MICHELLE (MINJU) Y. CHO - # 321939
   mcho@aclunc.org
3  LAUREN DAVIS - # 357292
   ldavis@aclunc.org
4  SHILPI AGARWAL - # 270749
   sagarwal@aclunc.org
5  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN
   CALIFORNIA
6  39 Drumm Street
   San Francisco, CA 94111
7  Telephone: (415) 621-2493

8  MAYRA JOACHIN - # 306065
   mjoachin@aclusocal.org
9  EVA BITRAN - # 302081
   ebitran@aclusocal.org
   OLIVER MA - # 354266
10 oma@aclusocal.org
   AMERICAN CIVIL LIBERTIES UNION
11 FOUNDATION OF SOUTHERN
   CALIFORNIA
12 1313 West 8th Street
   Los Angeles, CA 90017
13 Telephone: (213) 977-5000

   BRISA VELAZQUEZ OATIS - # 339132
   bvoatis@aclu-sdic.org
   AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF SAN DIEGO &
   IMPERIAL COUNTIES
   P.O. Box 87131
   San Diego, CA 92138-7131
   Telephone: (619) 398-4199

   *Attorneys for Plaintiffs*

   AJAY S. KRISHNAN - # 222476
   akrishnan@keker.com
   FRANCO MUZZIO - # 310618
   fmuzzio@keker.com
   ZAINAB O. RAMAHI - # 332139
   zramahi@keker.com
   JULIA GREENBERG - # 333864
   jgreenberg@keker.com
   KEKER, VAN NEST & PETERS LLP
   633 Battery Street
   San Francisco, CA 94111-1809
   Telephone:    415 391 5400
   Facsimile:    415 397 7188

   *Attorneys for Plaintiff Oscar Morales Cisneros*

14                    UNITED STATES DISTRICT COURT

15                   EASTERN DISTRICT OF CALIFORNIA

16                          FRESNO DIVISION

17  UNITED FARM WORKERS, et al.,          Case No. 1:25-cv-00246-JLT-BAM

18            Plaintiffs,                 **DECLARATION OF REAGHAN E.**
                                          **BRAUN IN SUPPORT OF PLAINTIFFS'**
19       v.                               **MOTION FOR PRELIMINARY**
                                          **INJUNCTION**
    KRISTI NOEM, IN HER OFFICIAL
20  CAPACITY AS SECRETARY OF THE          Date:      April 11, 2025
    DEPARTMENT OF HOMELAND               Time:      9:00 a.m.
21  SECURITY; et al.,                     Dept.:     Courtroom 4, 7th Floor
                                          Judge:     Hon. Jennifer L. Thurston
22            Defendants.
                                          Date Filed: February 26, 2025
23
                                          Trial Date:  None set
24

25

---

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883642                                                              ER189

1  I, Reaghan E. Braun, declare as follows:

2  1.  I am an attorney at law duly licensed and entitled to practice in the State of

3  California. I am an associate at Keker, Van Nest and Peters LLP, counsel of record in this action

4  for Plaintiff Oscar Morales Cisneros. I make this declaration in support of Plaintiffs' Motion for

5  Preliminary Injunction. I have personal knowledge of the following facts and, if called as a

6  witness, I could and would testify competently thereto.

7  2.  Attached to this declaration as **Exhibit 1** is a true and correct copy of a January 28,

8  2025 9:53 AM social media post by the official account of the US Border Patrol El Centro Sector

9  on the Facebook social media platform, which is also available at:

10  https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oGXFji

11  jEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl. In the post, US Border Patrol El

12  Centro Sector states, "anyone we encounter who doesn't have the legal right to be in or remain in

13  the U.S. will be arrested." In the same post, in response to a commenter inquiring about "Return

14  to sender round 2," US Border Patrol El Centro Sector states, "You bet!" with an American flag

15  emoji.

16  3.  Attached to this declaration as **Exhibit 2** is a true and correct copy of a January 29,

17  2025 3:43 AM social media post by the official account of the US Border Patrol El Centro Sector

18  on the Facebook social media platform, which is available at:

19  https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oGXFji

20  jEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl. In the same thread as Exhibit 1

21  above, US Border Patrol El Centro Sector stated, "Our agents go wherever the threats and crime

22  take us, whether that's #SanBernardino #LosAngeles #Riverside #Barstow #Bakersfield or

23  beyond."

24  4.  Attached to this declaration as **Exhibit 3** is a true and correct copy of a January 12,

25  2025 12:02 AM social media post by the official account of the US Border Patrol El Centro

26  Sector, posted on the Facebook social media platform, which is available at:

27  https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0enw1BMzPbERR9C2rxp

28

1

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

WUKrgxMzA99BYr8LgQddh3U5mQvVuMCcHAfMU2uRPhN3Bpl. A commenter posted a comment which states, "Here in Bakersfield you guys forgot to raid some people." US Border Patrol El Centro Sector posted a reply to the comment stating, "We plan on coming back!"

5.    Attached to this declaration as **Exhibit 4** is a true and correct copy of a January 10, 2025 9:18 PM social media post by the official account of the US Border Patrol El Centro Sector, posted on the Facebook social media platform, which is available at:

https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0enw1BMzPbERR9C2rxp WUKrgxMzA99BYr8LgQddh3U5mQvVuMCcHAfMU2uRPhN3Bpl. In the post, US Border Patrol El Centro Sector comments, "we will try and catch even more [people] next time" and "arrest more" in "our next operation."

6.    Attached to this declaration as **Exhibit 5** is a true and correct copy of a February 23, 2025, 5:09 PM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is also available at:,

https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0Gt3xJjwYxJhXdRB9kGy bMMruXLNjaxyu1E2QmxGjfpdevPnYUMX32kGJhsDeCq5dl. In the post, El Centro Border Patrol Sector's official Facebook account posted a photo of a vehicle's driver's seat covered with shattered glass. The text of the post stated that a noncitizen had "[r]efused to open window during an immigration inspection," "[g]ot his window shattered for an extraction," was "[a]rrested by the #PremierSector," "[w]ent to jail," and "[g]ot deported."

7.    Attached to this declaration as **Exhibit 6** is a true and correct copy of a February 23, 2025 6:47 PM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is available at:

https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0Gt3xJjwYxJhXdRB9kGy bMMruXLNjaxyu1E2QmxGjfpdevPnYUMX32kGJhsDeCq5dl. The document shows that a commenter stated "FAFO" with three laughing emojis in response on the above El Centro Border Patrol Sector post, Exhibit 5, which included a photo of a vehicle's driver's seat covered with

2

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

ER191

2883642

shattered glass. US Border Patrol El Centro Sector replied to the comment by posting: "FAFO in full effect." followed by a series of three smiling and laughing emojis.

8.     Attached to this declaration as **Exhibit 7** is a true and correct copy of a January 26, 2025 4:23 PM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is available at:

https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0n9qLZbFQb4hM9nDQkZAifPaktVP76Vn2eQBrFR7pKBnnqP7iaZEt88MKBnq9Sjvol. In the post, US Border Patrol El Centro Sector states, "What happens on the border, doesn't stay on the border. Bakersfield is now a dyed in the wool border town."

9.     Attached to this declaration as **Exhibit 8** is a true and correct copy of a January 14, 2025 7:52 PM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is available at:

https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0U5CHPhAdfYcAFLHz8xn5aS4mRvehGZnFRRYWrPE5TnMGaYHeBbL3M9Bk8PwEP6A2l. US Border Patrol El Centro Sector stated in the post, "Sanctuary jurisdictions, like all over CA, hinders [sic] local authorities from working with us to get those who are committing the worst crimes. That means we have to go out into the communities ourselves and find those people. This well and does lead to arrests of others who may not have serious crimes, but are still unlawfully present in the U.S."

10.    Attached to this declaration as **Exhibit 9** is a true and correct copy of a January 13, 2025 3:18 PM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is available at:

https://www.facebook.com/USBorderPatrolElCentroSector/posts/thank-you-citizens-of-bakersfield-the-premiersector-saw-massive-citizen-support-/908981681423101/. In the post, US Border Patrol El Centro Sector states, "every U.S. city [is] a border town."

11.    Attached to this declaration as **Exhibit 10** is a true and correct copy of a January 19, 2025 11:37 AM social media post by the official account of the US Border Patrol El Centro Sector on the Facebook social media platform, which is available at:

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

ER192

2883642

1  https://www.facebook.com/USBorderPatrolElCentroSector/posts/here-in-the-premiersector-we-

2  go-the-extra-mileor-500-of-themto-protect-our-natio/906161171705152/.  In the post, US Border

3  Patrol El Centro Sector called the sweeps "Operation Return to Sender." Stating: "We are taking

4  it to the bad people and bad things in Bakersfield," the El Centro Border Patrol said in response to

5  a comment on its Facebook page. "We are planning operations for other locals (sic) such as

6  Fresno and especially Sacramento."

7       12.     Attached to this declaration as **Exhibit 11** is a true and correct copy of a January 9,

8  2025 8:36 AM social media post by the official account of the US Border Patrol El Centro Sector,

9  posted on the Facebook social media platform, which is available at:

10  https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02W88MH4HqwiQF55d6

11  LzAURpCd9ABvnLP1godPk3qEWcS7MHoEcg1zdJwSJwSEVmWWl. In the post, US Border

12  Patrol El Centro Sector states, "Operation Return to Sender was an overwhelming success from

13  day one."

14       13.     Attached to this declaration as **Exhibit 12** is a true and correct copy of a January

15  11, 2025 6:53 AM social media post by U.S. Border Patrol Chief Patrol Agent Gregory K.

16  Bovino on the X social media platform using the handle @USBPChiefELC,which is available at:

17  https://x.com/USBPChiefELC/status/1878092797690904837. In response to a comment on his

18  post regarding "Operation Return to Sender," Chief Bovino states: "More to come on this. Much

19  more."

20       14.     Attached to this declaration as **Exhibit 13** is a true and correct copy of a January

21  12, 2025  7:58 AM social media post by U.S. Border Patrol Chief Patrol Agent Gregory K.

22  Bovino on the X social media platform using the handle @USBPChiefELC, which is available at:

23  https://x.com/USBPChiefELC/status/1878471709482737998. In response to a commenter on X

24  who asked about Border Patrol's apparent strategy of "[s]tanding outside gas station stops at

25  [H]ome [D]epots preying on any random person," Chief Bovino stated: "Undocumented means

26  just that. I recommend returning to the country of origin, obtaining proper documents, and doing

27  it the right way. If not, we will arrest."

28

4

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

15.     Attached to this declaration as **Exhibit 14** is a true and correct copy of a January 27, 2025 social media post by U.S. Border Patrol Chief Patrol Agent Gregory K. Bovino on the X social media platform using the handle @USBPChiefELC, which is available at: https://x.com/USBPChiefELC/status/1884071527630639364. In the post, Chief Bovino stated, "Can't agree more!!!" in response to a commenter who posted a meme stating that Operation Return to Sender's arrests were "rookie numbers" and that El Centro Border Patrol Sector should "pump those numbers up."

16.     Attached to this declaration as **Exhibit 15** is a true and correct copy of a transcript of a CNN Broadcast that aired on January 27, 2025 at 21:00 ET, titled *The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry*, which is accessible at: https://transcripts.cnn.com/show/skc/date/2025-01-27/segment/01. The broadcast included an interview of Tom Homan, President Trump's "Border Czar," starting at approximately 21:30:00 ET. The transcript shows that Mr. Homan told the CNN interviewer, "Well, in sanctuary cities, you're going to see a higher number of collateral arrests. . . . More agents in the neighborhood, and more collateral arrests." Later in the interview, the interviewer asked, "When you say collateral arrest, you mean someone who doesn't have a criminal record, but is here, is an undocumented immigrant. They still get deported as well, right? You're not letting them go back to their neighborhoods, or to their jobs. Is that right?" Mr. Homan stated, "Yes, if they're in the country illegally, they're going to get arrested too." Later in the interview, the interviewer asked, "Do you have a number of how many people you'd like to have deported by this time next year?" Mr. Homan stated, "As many as we -- as many as we can arrest and deport." Mr. Homan also stated, "We're going to do everything we can with what we have, and we're going to arrest as many as we can."

17.     Attached to this declaration as **Exhibit 16** is a true and correct copy of an article by Armando Garcia, dated January 9, 2025, titled *US Border Patrol arrests migrants during*

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

ER194

2883642

*latest enforcement operation*, ABC News, which is available at: https://abcnews.go.com/US/us-border-patrol-arrests-migrants-latest-enforcement-operation/story?id=117515205. The article includes quotes from a phone interview of Sarah Fuentes, a manager at a Chevron station in Bakersfield. The articles states that Ms. Fuentes "told ABC News she saw Border Patrol officers and agents in plain clothes go up to several of her customers, ask them about their immigration status, and arrest multiple people." The article further states, "Fuentes says she thought the officers were serving a warrant, but noticed 'it was only Hispanics and field workers that they were putting aside.' " Fuentes is quoted saying, "Then we seen it again, and we're like, wait a minute, this is a raid, they're picking up random people like the field workers. They don't have an order to do that," . . . "It's just random people that are walking in that work in the field."

18.    Attached to this declaration as **Exhibit 17** is a true and correct copy of an article by Jose Franco and Jenny Huh, dated January 10, 2025, titled, *US CBP issues statement on ongoing 'Operation Return to Sender' in Bakersfield*, KGET, available at: https://www.kget.com/news/local-news/us-cbp-issues-statement-on-ongoing-operation-return-to-sender-in-bakersfield-area/. The article states that, "U.S. Customs and Border Protection issued a statement Friday morning providing more details over its three-day operation in the Bakersfield area this week the agency calls 'Operation Return to Sender.' " According to the article, the "operation took place over three days and led to 78 arrests." The article includes an excerpt of the press statement issued by the El Centro Sector's Chief Patrol Agent Gregory Bovino, which states, "The U.S. Border Patrol is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento" and  that "[Border Patrol's] area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line."

19.    Attached to this declaration as **Exhibit 18** is a true and correct copy of an article by Veronica Morley, dated  January 10, 2025, titled *'RETURN TO SENDER': Border Patrol's 3-day operation in Kern, 78 arrested,* ABC Bakersfield, which is available at: https://www.turnto23.com/news/in-your-neighborhood/bakersfield/return-to-sender-border-

6

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883642

patrols-3-day-operation-in-kern-78-arrested. The article states that, according to Border Patrol, "Operation Return to Sender" "resulted in 78 people being arrested."

20.     Attached to this declaration as **Exhibit 19** is a true and correct copy of an article by Daniel Cody, dated January 27, 2025, titled *What Does FAFO Mean? Trump's Message to Colombia Goes Viral*, Newsweek, which is available at: https://www.newsweek.com/what-does-fafo-mean-trumps-message-colombia-goes-viral-2021284. The article states that ""FAFO "stands for "F*** Around, Find Out."

21.     Attached to this declaration as **Exhibit 20** is a true and correct copy of an article by Steve Eder and Miriam Jordan, dated January 17, 2025, titled '*La Migra!' A Glimpse of Trump's Promised Deportation Storm*, N.Y. Times, available at: https://www.nytimes.com/2025/01/17/us/immigration-deportation-california.html. In the article, former CBP Commissioner Chris Magnus is quoted saying, "[t]hese roundups create widespread distrust of law enforcement and discourage many community members from reporting crimes as victims or witnesses."

22.     Attached to this declaration as **Exhibit 21** is a true and correct copy of a Press Release by Congressman David G. Valadao, dated January 13, 2025, titled *Congressman Valadao Releases Statement on Customs and Border Protection Operations in Kern County*, which is available at: https://valadao.house.gov/news/documentsingle.aspx?DocumentID=1681. In the press release, Congressman David G. Valadao states: "I have been in contact with Customs and Border Protection regarding the recent immigration enforcement actions in Kern County" and that he "ha[s] received numerous calls from constituents expressing fear for their families' safety." Congressman Valado further states: "I urge [Border Patrol] to avoid causing any further alarm among our farm workers" and avoid "targeting . . . those responsible for producing our nation's food supply."

23.     Attached to this declaration as **Exhibit 22** is a true and correct copy of an article by Brisa Colón, dated January 12, 2025, titled *78 immigrants detained by Border Patrol throughout the Central Valley, officials say*, ABC 30 Action News, which is available at:

7

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883642

ER196

https://abc30.com/post/78-immigrants-detained-icecentral-valley-officials-say/15790817/. The article quotes Fresno County supervisor Luis Chavez, who stated that he had "received reports of food processing facilities [with] absences of 15 to 20 [percent] locally," representing "[o]rders that will not be able to be fulfilled."

24.     Attached to this declaration as **Exhibit 23** is a true and correct copy of an article by Sergio Olmos dated January 10, 2025, titled *A surprising immigration raid in Kern County foreshadows what awaits farm workers and businesses*, CalMatters, which is available at: https://calmatters.org/economy/2025/01/kern-county-immigration-sweep/. The article quotes Sara Fuentes, store manager of a local gas station: "It was profiling, it was purely field workers." According to the article, "Fuentes said that at 9 a.m., when the store typically gets a rush of workers on their way to pick oranges, two men in civilian clothes and unmarked Suburbans started detaining people outside the store." Quoting Fuentes, the article further states, "They didn't stop people with FedEx uniforms, they were stopping people who looked like they worked in the fields."

25.     Attached to this declaration as **Exhibit 24** is a true and correct copy of an excerpt from the U.S. Customs and Border Protection web page, which is available at: https://www.cbp.gov/border-security/along-us-borders. The web page states: "The United States Border Patrol is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection … responsible for securing U.S. borders between ports of entry."

26.     Attached to this declaration as **Exhibit 25** is a true and correct copy of a report from the U.S. Census Bureau: *QuickFacts, Kern County, California, Population Estimates: July 1, 2024,* which is available at: https://www.census.gov/quickfacts/fact/table/kerncountycalifornia/PST045224. The report estimates that 57.1% of Kern County residents are "Hispanic" or "Latino."

27.     Attached to this declaration as **Exhibit 26** is a true and correct copy of Appendix A: Broadcast Statement of Policy, which is Dkt. 155-1 in *Castanon Nava v. DHS*, No. 1:18-cv-03757, (N.D. Ill., Feb. 7, 2022).

8

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

ER197

2883642

1    I declare under penalty of perjury that the foregoing is true and correct, and that this

2  declaration was executed on March 7, 2025, in San Francisco, California.

3

4    _____

    Reaghan E. Braun

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

DECLARATION OF REAGHAN E. BRAUN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
Case No. 1:25-cv-00246-JLT-BAM

2883642

# Exhibit 1



Date/Time Posted: January 28, 2025 9:53 AM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oG
XFjijJEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl

Date Captured: March 4, 2025

# Exhibit 2



Date/Time Posted: January 29, 2025 3:43 AM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oG
XFjijJEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl

Date Captured: March 4, 2025

# Exhibit 3



Date/Time Posted: January 12, 2025 12:02 AM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0enw1BMzPbERR9C2
rxpWUKrgxMzA99BYr8LgQddh3U5mQvVuMCcHAfMU2uRPhN3Bpl

Date Captured: March 4, 2025

# Exhibit 4



Date/Time Posted: January 10, 2025 9:18 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0enw1BMzPbERR9C2
rxpWUKrgxMzA99BYr8LgQddh3U5mQvVuMCcHAfMU2uRPhN3Bpl

Date Captured: March 5, 2025

# Exhibit 5



Date/Time Posted: February 23, 2025 5:09 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0Gt3xJjwYxJhXdRB9k GybMMruXLNjaxyu1E2QmxGjfpdevPnYUMX32kGJhsDeCq5dl

Date Captured: March 4, 2025

# Exhibit 6



Date/Time Posted: February 23, 2025 6:47 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0Gt3xJjwYxJhXdRB9k
GybMMruXLNjaxyu1E2QmxGjfpdevPnYUMX32kGJhsDeCq5dl

Date Captured: March 4, 2025

# Exhibit 7



Date/Time Posted: January 26, 2025 4:23 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0n9qLZbFQb4hM9nD
QkZAifPaktVP76Vn2eQBrFR7pKBnnqP7iaZEt88MKBnq9Sjvo

Date Captured: March 4, 2025

# Exhibit 8



Date/Time Posted: January 14, 2025 7:52 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0U5CHPhAdfYcAFLHz
8xn5aS4mRvehGZnFRRYWrPE5TnMGaYHeBbL3M9Bk8PwEP6A2l

Date Captured: March 4, 2025

# Exhibit 9



Date/Time Posted: January 13, 2025 3:18 PM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/thank-you-citizens-of-bakersfield-the-premiersector-saw-massive-citizen-support-/908981681423101/

Date Captured: March 4, 2025

# Exhibit 10



Date/Time Posted: January 9, 2025 11:37 AM

Link: https://www.facebook.com/USBorderPatrolElCentroSector/posts/here-in-the-premiersector-we-go-the-extra-mileor-500-of-themto-protect-our-natio/906161171705152/

Date Captured: March 4, 2025

# Exhibit 11



Date/Time Posted: January 9, 2025 8:36 AM

Link:https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02W88MH4HqwiQF5
5d6LzAURpCd9ABvnLP1godPk3qEWcS7MHoEcg1zdJwSJwSEVmWWl

Date Captured: March 5, 2025

# Exhibit 12



Date/Time Posted: January 11, 2025 6:53 AM

https://x.com/USBPChiefELC/status/1878092797690904837

Date Captured: March 4, 2025

# Exhibit 13



Date/Time Posted: January 12, 2025 7:58 AM

Link: https://x.com/USBPChiefELC/status/1878471709482737998

Date Captured: March 4, 2025

# Exhibit 14



Date/Time Posted: January 27, 2025 6:50 PM

Link: https://x.com/USBPChiefELC/status/1884071527630639364

Date Captured: March 4, 2025

# Exhibit 15

**TRANSCRIPTS**  **Transcript Providers**

Shows By Category:

**Return to Transcripts main page**

## The Source with Kaitlan Collins

**Trump DOJ Fires Officials Who Prosecuted Him; Homan On
Mass Deportation Effort: "There's No Safe Haven"; Trump Calls
DeepSeek A.I. "Positive Development" But Also A "Wake-Up
Call" For U.S. Tech Industry. Aired 9-10p ET**

Aired January 27, 2025 - 21:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY
NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[21:00:00]

(BEGIN VIDEOTAPE)

IRENE WEISS, HOLOCAUST SURVIVOR: --keeps working, but the soul never forgets. There is a soul that
does not forget any of it. It's imprinted on the soul that keeps the memory, the pain, the grief, it's just always
there.

(END VIDEOTAPE)

ANDERSON COOPER, CNN HOST, ANDERSON COOPER 360: The soul never forgets, nor should we.
Irene Weiss, Auschwitz survivor, now 94. She's remarkable.

You can listen to the full interview on my podcast, "All There Is," wherever you get your podcasts. Or watch
the full video interview on the CNN channel on YouTube.

The news continues. "THE SOURCE WITH KAITLAN COLLINS" starts now.

KAITLAN COLLINS, CNN CHIEF WHITE HOUSE CORRESPONDENT, CNN HOST, THE SOURCE WITH KAITLAN COLLINS: Straight from THE SOURCE tonight.

Trump's new purge and the fallout tonight, as the brand-new President fires more than a dozen Justice Department officials who helped investigate him.

And an inside source on the immigration blitz underway, across the country. As Trump's promised enforcement arrives, his border czar, the man in charge of the crackdown, will join me live, in moments.

And it's hailed as the technology that will revolutionize the world, as we know it. But tonight, a shocker. Did China just eat the U.S.'s lunch in the race to conquer A.I.? Kara Swisher is here.

I'm Kaitlan Collins. And this is THE SOURCE.

They say that revenge is a dish best served cold. But if you're President Trump, it is apparently one that's delivered by the acting Attorney General, piping hot.

And tonight, he is taking aim at his perceived enemies at the Justice Department, with the acting Attorney General firing more than a dozen prosecutors, who worked with Special Counsel, Jack Smith, on the classified documents and election interference cases against Trump.

CNN obtained this letter from James McHenry, the acting Attorney General, who told these prosecutors, quote, "You are being removed from your position at the Department of Justice... effective immediately." It goes on to say, given their significant role in prosecuting the now-President, they can't be trusted to assist in implementing the President's agenda, quote, "Faithfully."

Now, this move may be shocking in its scope and, frankly, unprecedented in its nature. But no one can exactly argue that it's surprising. Trump has made clear his anger directed at those who investigated him. He even referenced it during his inaugural address.

But this mass firing could land Trump's DOJ in court, potentially facing off against some of its now-former employees. A major question that remains, this evening, is whether these career lawyers will fight back by filing lawsuits about their firings.

ER229

But what we do know, and one thing is clear, Trump's January 6 retribution tour is also getting started underway at the DOJ, as we've learned today, that the Trump administration is taking the first step, the first concrete step, to investigate the investigators.

The interim U.S. Attorney, here in Washington, D.C., has just launched a, quote, "Special project," that is really what they are calling it, into prosecutors who brought obstruction charges against some of the January 6 rioters.

My sources are here tonight.

CNN Correspondent, Katelyn Polantz, who broke this reporting.

And former federal prosecutor, Elie Honig.

Katelyn, the acting A.G., came out and said, They can't be trusted to implement Trump's agenda.

I guess, the question was, were they ever going to be able to stay at the Justice Department, these people who worked on Jack Smith's team for the last two years?

KATELYN POLANTZ, CNN CORRESPONDENT: Well, there wasn't an expectation that they would have -- wouldn't have been, because they are career employees of the Justice Department, people who even had worked in the office, back when Trump was the president before. People have been there a long time.

What they're doing with this, this is not the firing of Jack Smith, the Special Counsel, or a political appointee. These are people who are fired for doing their job at the Justice Department, that they were going back to their home offices, after finishing their work at the Special Counsel's Office.

And the way that this is being articulated by the Justice Department, you cannot underline how unusual this is, enough. I mean the way that it say -- saying, in this letter, that these people received in the middle of the afternoon, saying, They played a role in prosecuting Donald Trump, President Trump, and that they do not believe that the leadership can trust them as long-time career employees of the Department, who have worked on many cases.

A couple of them, at least one of them I know of in the U.S. Attorney's office in Washington who prosecuted the former White House Counsel of the Obama administration. So, these are not people that were signed up to do this political work. It is -- it is incredible.

COLLINS: Is it saying what they think they did wrong, beyond just simply working on Jack Smith's team?

POLANTZ: I mean, it really is that. There is an articulation in this letter, from James McHenry, that they believe that these people were part of the weaponization of the Justice Department, that they are people that were in U.S. attorney's offices.

This is the equivalent, not of a Saturday Night Massacre in the Nixon administration. It is a massacre in broad daylight, on a Monday afternoon, that the Justice Department is announcing very clearly, exactly what their motive is.

[21:05:00]

And these people, where do they go now? Maybe they go to a lawsuit, or maybe they go to what the administration says they should do, the Merit Systems Protection Board, which is not the easiest way to follow things.

COLLINS: Yes.

Well, on that Elie. I mean, just to break it down for people. These are not political appointees, which are the people that the President gets to pick. They're career prosecutors. As Katelyn noted, they've been there a long time.

The acting A.G. is claiming that Trump has constitutional authority over this, because, under Article II of the Constitution, to fire these people, rather than really arguing that they're being fired because of their performance or their conduct.

Is this legal?

ELIE HONIG, CNN SENIOR LEGAL ANALYST, FORMER ASSISTANT U.S. ATTORNEY, SOUTHERN DISTRICT OF NY: Well, so first of all, Kaitlan, this is straight-up payback, and there's no dispute about it.

They come right out and say, if you look at that letter, what the acting Attorney General says is not, You've done something wrong here. All that letter says, it's about one page, is, You were part of the team that tried to prosecute Donald Trump. We therefore don't trust you. Therefore you're out.

ER231

Now, as to what can be done. What's really remarkable here is this. It is common, ordinary and expected that any new president, new administration will fire the political appointees, the Attorney General, the U.S. attorneys, usually those people resign before that, so it doesn't even come to that.

But the people who were fired today are what we call career prosecutors, meaning what I once was, a non-political person, who's working on the line, who's doing cases and trials, and has no political affiliation. That's what makes this so unusual.

Now, can they seek recourse in the courts? It depends a bit on how senior they are. At a certain level of seniority, you have greater civil service protections than the less senior people.

But the conflict here, ultimately, is going to come down to the civil service protections on the one hand, versus just the blunt force of Article II, of the President being able to do whatever he wants in the Executive branch. So, I think we'll see this play out in courts.

COLLINS: I mean, Elie, Pam Bondi has not yet been confirmed as the Attorney General. So, this is not coming from her. It's coming from the acting Attorney General. One, what do you read into that? And two, I mean, is this going to prompt more questions, when she's back on Capitol Hill, this week?

HONIG: Well, I think, first of all, they've done a huge favor for Pam Bondi, by doing the dirty work before she arrives. Look, this is an ugly task. We knew they were going to do it. They forecasted it to you, Kaitlan, both Katelyns (ph), and others, that this was going to happen. And now it saves Pam Bondi from having to do this herself.

But when she goes back for more questioning, 100 percent she should and will be asked this. Do you approve of this type of firing? Will you continue to fire non-political career prosecutors like this?

COLLINS: Yes. Elie Honig. Katelyn Polantz.

And I should note, this is all happening, as the President has been outside of Washington. He's just landed at Joint Base Andrews. He was speaking to House Republicans in his backyard at Mar-a-Lago, at Doral earlier. We're waiting to see if he speaks to reporters, when he gets off the plane, and if he weighs in on this.

In the meantime, as we keep an eye on Air Force One, we have our White House insiders, here at the table with

me as well.

Meridith McGraw is a White House Reporter, at The Wall Street Journal, and Author of "Trump in Exile."

And Isaac Arnsdorf is a Senior White House Reporter at The Washington Post.

Isaac, what are your sources telling you about these firings, and just what this means that the DOJ is going to look like for the next four years?

ISAAC ARNSDORF, SENIOR WHITE HOUSE REPORTER, THE WASHINGTON POST: I mean, everything that we've been talking about, the difference between a political appointee and a career official, the White House just doesn't see it that way. Trump and his team just don't see it that way.

They see these as people who were going after Trump, trying to take him down. And it's only natural for them, now that he won, and he's the president, that he doesn't want them on his team. They don't trust them.

And the people who are taking over the Justice Department are his personal lawyers, who represented him in those same cases.

COLLINS: Yes, a lot of them have experience with these people, Meridith, and have been in the courtroom with them.

I think, to the point of Elie, of saying how unprecedented this is, and as Katelyn noted, calling it just a massacre in the middle of Monday, not Saturday night, like we saw with Nixon. But this was kind of inevitable, in terms of what Trump's very clear desire to reshape the DOJ looked like.

MERIDITH MCGRAW, WHITE HOUSE REPORTER, THE WALL STREET JOURNAL, AUTHOR, "TRUMP IN EXILE": Completely. It was unprecedented, unusual, but I think, wholly unsurprising.

And anybody who's been paying attention to what Donald Trump has been saying, what his allies have been saying, what he's been broadcasting from his very first 2024 campaign rally, when he was in Waco, and he had the Jan 6 choir, singing the anthem there. He's been talking about this for years now.

And him taking this swift action, I don't think should come as any surprise. And that's what people in the White House have told me today, when I was asking about it.

COLLINS: Yes, and it comes as they're also launching this so-called Special project. I mean, that's what they are referring to it. To investigate the investigators who prosecuted the January 6 rioters, and used basically a statute that admitted up to the Supreme Court, of whether or not it could be used to prosecute them.

What does that tell you about the priorities of the Justice Department here?

[21:10:00]

ARNSDORF: Well, again, the acting U.S. Attorney in D.C. was in the private sector, before this, representing defendants charged in the January 6th riot. And now, he's on the other side of the table in that prosecutorial capacity, also in an acting capacity, right?

So there is, like Elie was saying, a little bit of what, how far they can push, and what kind of stuff they can get out of the way, before the actual Senate-confirmed officials come in and face those tough questions. COLLINS: Yes, how much of the decisions, Meridith, that are being made right now, have to do with, as they're watching the confirmation schedule on Capitol Hill? Because it's Pam Bondi. Then it will be the DAG, the Deputy Attorney General.

But we are seeing other Trump officials already working. Emil Bove, for example, who was in Trump's case, when he was being prosecuted in Manhattan, has already been out there on the ground, doing the work, on the job. We're seeing these attorneys already get to work.

MCGRAW: Yes, we are. I mean, and like you were saying, the new acting U.S. Attorney, here in D.C., getting right to dismissing these January 6 cases, opening up this investigation. So many of these appointments, they are coming in waves. It's bit by bit. But they're already starting to chip away at Trump's agenda.

COLLINS: How much of this is this, not just what we're seeing with the moves of the DOJ, but overall.

You had some great reporting today about just kind of this flood-the- zone strategy that Trump is employing. I mean, we saw the executive orders, last week.

And I should note, there's Trump coming down the steps of Air Force One now. We'll see if he speaks to reporters, and bring those comments if he does.

ER234

But what this is going to look like as far as far as executive orders, and all of these executive actions that he's taking in his beginning days in office.

ARNSDORF: Yes, he just previewed that he'd be signing four more tonight.

And flood the zone was Bannon's term. And I think he's frankly, a little bit jealous of how they've done it this time around versus when Bannon was in the White House. I mean, we were talking about the I.G.s, the inspectors general, all being fired on Friday night. And now, we're talking about the DOJ massacre today.

So, it's just one thing after another. And that makes it hard for us to keep up as reporters. It makes it hard for you to keep up as viewers. And it makes it hard for the Democrats, to figure out what they want to be talking about. And lawyers, if they're going to try to challenge this.

COLLINS: Yes. And also, it seems like for Republicans, when it comes to them being questioned about it on Capitol Hill.

Meridith and Isaac, great to have you both. That's our White House insiders here.

And meanwhile, as you see Trump getting a Marine One there, we'll be watching that return to the White House. This comes as he just made a major change to the U.S. military, with these executive orders that Isaac mentioned, and his new Defense secretary, who was just confirmed on Friday now -- Friday night, is vowing to rapidly enforce them on his first official day.

Plus, tonight, we're going to speak to Trump's border czar, live, as our critical inside source on the sweeping immigration blitz underway across the country.

[21:15:00]

(COMMERCIAL BREAK)

COLLINS: President Trump has capped off his first week in office by welcoming House Republicans, to spend money at his Florida golf club. The same president who, hours before, had executed a purge of officials, at the Department of Justice, he was touting this as one of his accomplishments.

(BEGIN VIDEO CLIP)

ER235

DONALD TRUMP, PRESIDENT, UNITED STATES OF AMERICA: I also signed an order to end the weaponization of our government against the American people.

(END VIDEO CLIP)

COLLINS: Ending the weaponization. Of course, that comes after he executed that purge of those career prosecutors.

My Republican source tonight is Texas congressman, Dan Crenshaw.

And it's great to have you here, Congressman.

On what we saw happen today, do you believe that the American people elected Trump, to get revenge on federal prosecutors?

REP. DAN CRENSHAW (R-TX): I think a lot of people did. Whether this is considered revenge or not, I think, is open to interpretation. I think a lot of these federal prosecutors, one might argue, were going outside the bounds of what their prosecutorial duties might be. I mean, you go on a case-by-case basis, but.

COLLINS: But do you have any -- I mean, there is no really indication that they committed any wrongdoing or did anything improper. I mean, there's a difference, obviously, between those at the top, who are calling the shots and making the decisions, and those who are the career employees, who are -- who are just doing their jobs.

CRENSHAW: It's just hard to say, because we're not talking specifics. But if we're talking about, say, Crossfire Hurricane and Russiagate, I mean, there were some people, who very much ignored actual facts and correct intelligence, in order to go after Trump. It did happen. So, it's not that crazy to see what's -- to see him purge a lot of the ranks, right now.

COLLINS: Yes, but do you believe that it's legal?

CRENSHAW: It's his administration. I mean, it's his administration.

COLLINS: They do enjoy civil service protections.

ER236

CRENSHAW: By definition, it's his administration. They work for him, at the pleasure of the President. And if it's illegal, it should be legal. And that's, look, the firing of federal employees being so difficult as it is, that's something that we need to address as a country, just to make our government more efficient. I mean, that's a longer conversation. But it should be legal, yes.

COLLINS: But if it's not currently legal, and they do enjoy these protections because they are civil service employees, they're career prosecutors. And the point of that is, is to have people who are insulated from the politics of the political appointees, who he does have the right to put in place, there.

CRENSHAW: No, every federal worker works for the administration, which works for the President.

So, and this is -- this is a bigger problem than just these particular employees. I mean, one of the reasons a lot of our agencies don't work well is because it's so hard to fire a federal worker. Businesses couldn't operate that way, if you could just never fire anyone. It creates a highly inefficient agency, right, whatever agency we're talking about.

[21:20:00]

COLLINS: But is there the other side of that argument, where it's if every single person at the Pentagon was a political appointee, then when every four years, every eight years, every single person would be replaced, and there'd be no one who knew their way around the hallway, or where certain house -- certain decisions are made. I mean, there is a benefit to that kind of institutional knowledge, is there not?

CRENSHAW: Of course there is.

COLLINS: That's the whole point.

CRENSHAW: But not everybody is being fired either. I mean, I think -- I think we're overblowing what's actually happening.

Again, whether you're a federal employee, or a political appointee, you still work for the President, directly. That's -- that is the case. And what we -- we have a much bigger problem with the way that federal unions have become so institutionalized, that we can't actually fire people who aren't doing their jobs. It's a much bigger problem.

ER237

COLLINS: Yes, well, I mean, obviously the argument there, we'll see if they take this to court, and if there are lawsuits here. There certainly could be, from our legal experts.

But you just said that there are people who did elect Trump to do this. But there were a lot bigger campaign promises that were made by Donald Trump. And I think some people may look at this, and say, How does this further the priorities that Republicans promised to voters on the trail, whether that came to lowering grocery prices, or confronting China? I mean, is this part of that agenda?

CRENSHAW: Well, look, this is part of about a 1,000 other actions that Trump has taken, in the very short time that he's been in office. Let's talk about the ones that really do matter to people, like LNG exports. That's huge for our -- for our energy sector. Getting our border under control. I mean, he's doing a lot more than just firing a few prosecutors, let's be honest.

COLLINS: Yes, and we're going to talk to his border czar in a few moments.

I just think obviously every decision made in the first week is seen as a priority and important.

But let me ask you about some of the executive orders that Trump has been signing. Because you have said that any American, who is willing and able to serve in the military should be allowed to do so. Do you oppose Trump's ban on trans people serving in the military?

CRENSHAW: No, not at all. And I'm not sure where you got that quote. But you could find a lot of other quotes from me that would say that we should never allow anyone in the military to undergo transition surgery, which would make them medically-unqualified to deploy, and therefore reduce the readiness of the military.

So, I'm not sure what President Trump is going to do exactly on this policy. It's probably going to look a lot like his last administration, which was, you can say that you're another sex, but you can't undergo treatments to become another sex, because once you do that, you make yourself unready to deploy. It's the medical procedures themselves disqualify you.

COLLINS: But there are trans people who serve in the military, right now, who would disagree with that.

CRENSHAW: They can disagree all they want. I'm the one who's -- I know what war is like, and I know what it takes to deploy. I was not allowed to deploy for vision issues.

ER238

Now, what if you need to be on a bunch of medications, and your -- and your entire body has been -- has been changed radically into another gender? It makes it very difficult to deploy you into the places that we need to deploy you.

I had to be medically-retired for my condition. And my condition, arguably, is far less -- is far less severe than undergoing a transition to a different gender.

COLLINS: Yes, but people obviously take medical leave from the military all the time, in return.

And you said you didn't know what quote I was talking about. This is from 2021. This is -- this is the quote.

CRENSHAW: Yes, I'm sure -- I'm sure I said that. But there's--

(BEGIN VIDEO CLIP)

CRENSHAW: I think people should be able to serve openly, and tell people what their identity is. And anybody who can meet those standards should be able to serve.

(END VIDEO CLIP)

CRENSHAW: And then I probably--

COLLINS: Do you still?

CRENSHAW: And then I -- and then I -- and then I probably went on to say -- if the conversation was about transgenderism in the military, I probably, in that interview, went on to say exactly what I just said. Because I've never changed my mind on this.

COLLINS: So, when you say, I think people should be able to serve openly and tell people what their identity is, anyone who can meet those standards. I mean, aren't you arguing that those people that if someone who is trans is in the military, and they can meet the standards, that they should be able to serve? I don't -- I don't know that--

CRENSHAW: What I'm saying is by--

COLLINS: Why would you be making that decision, and not a medical professional, or someone who makes those decisions about vision, or whatever issues they evaluate, before deploying somebody?

CRENSHAW: I'm saying, by definition, if you -- if you have transitioned into a different gender, you are not meeting our medical standards. There's -- you're creating--

COLLINS: Right. But that's your opinion.

CRENSHAW: No, it's not an opinion. That is -- that is a pretty easy -- that's an easy-to-prove fact. It makes it much harder on our units to deploy. Period. Like, full stop. And again, there's a--

COLLINS: But then how are there trans people serving in the military, right now, Sir?

CRENSHAW: There's a difference between identifying -- like, again, look, you could -- you could -- Kaitlan, you could show up to your job, the next day, and say that your name is now, Ken. That's different. You can identify that way. And that was Trump's old policy, by the way. They would allow you to serve that way.

But there's a very big difference between doing that, and actually undergoing medical procedures that take you -- that take you out of service. And there's -- and, yes, you call it medical leave. But that's some pretty severe medical leave. So, why would we allow that? And then you -- and to say that you're deployable to austere environments? No way. That's just not true.

COLLINS: OK. But Congressman, I-- CRENSHAW: And so, I've never -- I've never changed my mind on that.

COLLINS: The executive order is banning all trans people. Period. It's not making a caveat that you're making there.

CRENSHAW: I don't think we've seen the text of the -- of the order, have we? I don't have the text.

[21:25:00]

COLLINS: Are you -- this is what was -- how it's been described to us by our sources. Are you telling us that--

CRENSHAW: Yes, but we don't -- but we don't have the--

ER240

COLLINS: --it makes that distinction?

CRENSHAW: I don't -- I don't have the text. If you're making any guess on what the text is, I have a feeling it'll look a lot like the last administration. We don't know yet.

COLLINS: OK. So, you're in favor of this, though, regardless?

CRENSHAW: Yes. Yes, my position on this has always been very clear, so.

COLLINS: Congressman Dan Crenshaw, thank you for your time.

CRENSHAW: Thanks.

COLLINS: Meanwhile, Trump's sweeping immigration crackdown that he pledged to carry out on the campaign trail is here. More than a 1,000 people were arrested in one day.

Border czar, Tom Homan, is here, live, for the first time since taking on his new job, here with us on THE SOURCE.

(BEGIN VIDEO CLIP)

TRUMP: Today in Tijuana, you probably saw the -- I got a call from Tom Homan, and some of the people. They said, Sir, it's unbelievable.

We're deporting 100 percent of all new trespassers apprehended at the border.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

[21:30:00]

COLLINS: The Trump administration's promised immigration blitz is now well underway, across the U.S., and just getting started, as multiple federal agencies are now swarming cities, across the country.

As the President today compared his deportation flights to a 1990s Nicolas Cage movie.

(BEGIN VIDEO CLIP)

TRUMP: You got 300 people sitting in a plane. Every one of them either a murderer, a drug lord, a kingpin of some kind, a head of the mob, or a gang member. And you're flying that plane, it's not going to end well. You ever see the movie Con Air?

(LAUGHTER)

TRUMP: That's what -- yes. Except here's the difference. The people in Con Air were actors. They weren't nearly as tough as these guys.

(END VIDEO CLIP)

COLLINS: My source tonight is President Trump's border czar, Tom Homan.

Don't worry, Tom Homan, I'm not going to ask you about Nicolas Cage, or any movies.

But on the numbers and what we're seeing, you guys actually put into practice. Just today, ICE says it has made 1,179 arrests. How many of those people had been convicted of crimes in the U.S.?

TOM HOMAN, PRESIDENT TRUMP'S BORDER CZAR: Look, I don't have exact numbers with me. But for -- I'll give you an example. I was in Chicago, yesterday, for that operation. And everybody but I think four were collateral -- with four collateral arrest, everybody else was a criminal.

And when I walked out at the end of my shift, we already had, I think, nine Tren de Aragua. Two of them were actually being charged with crimes, because there was -- here's an illegal alien -- illegal alien gang member in the United States, selling illegal guns in the neighborhood. And they even sold the switches, which turned the gun into fully automatic machine guns.

We arrested, I think, we had a total of seven sexual predators, crimes -- sexual crimes against children. We had two illegal aliens, convicted of murder that were released by the state prison back to the streets.

ER242

So everybody we arrested in Chicago, yesterday, was -- it was a significant public safety threat. There were several collateral arrests that happened to be there, when we arrested the bad guy. So, this operation, right now, is concentrated on public safety threats and national security threats throughout the country.

COLLINS: So the majority of those yesterday were -- did have criminal records. And do you believe the majority of today's numbers have criminal records?

HOMAN: I won't see those numbers till midnight tonight. But, again, we're focused on -- we're focused on criminals. But I think you and I discussed before. Well, in sanctuary cities, you're going to see a higher number of collateral arrests. I mean, we're going to have more criminals, but there's going to be a big number, what we call, collateral.

Because when we're forced into the neighborhood, to find the bad guy, he's probably going to be with others. And we're not going to instruct the ICE agents to ignore their oaths, ignore the law. If they're here illegally, they're going to go -- they're going to go to jail too.

And that's why I just -- I'm imploring the sanctuary cities, let us into jail, to arrest the bad guy in the jail, where the community's safe, the officer's safe, the alien's safe. If you're forcing into community, you're going to get exactly what you don't want.

COLLINS: And when you say--

HOMAN: More agents in the neighborhood, and more collateral arrests.

COLLINS: When you say collateral arrest, you mean someone who doesn't have a criminal record, but is here, is an undocumented immigrant. They still get deported as well, right? You're not letting them go back to their neighborhoods, or to their jobs. Is that right?

HOMAN: Yes, if they're in the country illegally, they're going to get arrested too.

COLLINS: Now that you're officially in your position, you've been here about a week on the job. We spoke to you last, before you would actually come in formally to the role. Do you have a better target number for how many people you want to deport overall?

HOMAN: As many as we can. My goal is -- I think success is removing every criminal gang member out of

this country, every public safety threat, illegal alien, out of this country, every child trafficker, illegal alien, out of this country. Then that aperture opens, right?

We got 1.4 million illegal aliens in this country, who had due process at great taxpayer expense. They were ordered to remove by a federal judge, and didn't leave. They became a fugitive. They're next. So, we're going to keep opening that aperture, and enforcing immigration law. And all for those in the country illegally--

COLLINS: And how long--

HOMAN: --those who don't have a final order, those who have not been ordered by an immigration judge, if you're in the country illegally, you should leave.

Because if we have to formally deport you, you can face the -- anywhere it's from a five- to 20-year bar from ever coming back, either as a student, a visitor visa, a tourist visa, or be petitioned by a U.S. citizen child. If you're in the country illegally, you have been ordered to be deported? Leave and come back the right way--

COLLINS: Yes. HOMAN: --because there will be other opportunities.

COLLINS: You're talking about going after public safety threats, national security threats first. But you just said that aperture is going to widen, meaning, the scope of the people you're going to go after. How long do you anticipate, before you're in that next phase where the aperture has gotten wider?

[21:35:00]

HOMAN: Very soon. I mean, sanctuary cities are making it very difficult to arrest the criminals. For instance, Chicago, very well- educated. They've been educated how to defy ICE, how to -- how to hide from ICE.

And I've seen many pamphlets from many NGOs, Here's how you escape ICE from arresting you, Here's what you need to do. They call it, Know your rights. I call it, How to escape arrest. There's a warrant for your arrest, and they tell you how to hide from ICE. No -- don't open your door. Don't answer questions.

OK, they can call it Know your rights, all you want. But if there's an order for the removal, they've been ordered to remove by a federal judge after due process, at great taxpayer expense? They need to go. But if we got to play that cat and mouse game, that's what we're going to do, till every one of them gone.

COLLINS: In terms of how you're messaging this, obviously you've been speaking publicly. We know that officials were told to be ready, to be in front of the cameras. Agents were, that they could be around when these arrests were happening. We saw Dr. Phil was along and embedded with one of your teams.

How much thought are you putting into, to making this kind of a made- for-TV moment, in order to publicly message? Or, whatever your strategic goal is here?

HOMAN: Well, look, we got Kristi Noem who's just -- she got her vote this weekend. You're going to see a lot more from Secretary of DHS, should be out here, talking much more. We've -- the new CBP Commissioner, who's being nominated, Rodney Scott, he will empower the Chief Patrol Agents to talk. So, we want all the frontline managers to talk throughout the country.

But the message that I'm sending is that we're going to force it -- we're going to force immigration laws in this country. And if people don't like -- they like it, then they need to change the law.

Because ICE isn't making this up. We're enforcing laws enacted by Congress and signed by a president. But we're doing it in a smart way. The Trump administration, in the beginning, says, we're going to concentrate on public safety threats and national security -- national security threats around the country (ph). The worst, first, and that's what we're doing.

But as, like I say, as we go on, we're not going to say it's OK for 1.4 million illegal aliens to ignore a judge's order to deport. So, they're going to be next. And we're going to keep opening that aperture up.

So, we're sending a message. It's not OK to be in this country illegally. It is not OK to enter this country illegally. It is a crime. And there's going to be consequences.

COLLINS: Do you have a number of how many people you'd like to have deported by this time next year?

HOMAN: I don't have a number. As many as we -- as many as we can arrest and deport. We're going to enforce the law.

COLLINS: OK. But no firm number?

HOMAN: If you're here in the country illegally -- if they're in the country illegally, they got a problem, and they're not off the table.

COLLINS: Yes, but on numbers, you have been clear that your success here, in this effort, will depend on how much money you can get from Congress.

Now that you're in this role, do you know how much money, what kind of budget you would need to deport the people that you say are public safety threats, national security threats? And also, the 1.2 million that you just referenced there, who have gotten orders from a judge?

HOMAN: 1.4 million. And yes, like we needed -- we needed more than the 100,000 beds. Right now, we got about 34,000 beds. We'll fill them up in a week. So we need -- we need at least a 100,000 beds. We need more international air flights. We need more grounds transportation. We need more money to hire more officers and Border Patrol agents.

And that's why we're bringing, right now, the whole of government is coming in, right? In the Chicago operation, in every operation throughout the country, now, we got DEA, we got FBI, we got U.S. Marshals, we got ATF, we got HSI, we got ERO. So right now, we're bringing the whole of government into this, so we can create more teams and arrest more people.

So, this dynamic is constantly changing. And depending on the city.

COLLINS: Yes, and if you--

HOMAN: Is it a sanctuary city, not a sanctuary city?

COLLINS: Yes, you're using them as like a force multiplier.

But when it goes to the real money that you'll need from Congress, to get more beds, and to hire more agents, if Congress is not reliable, as I'm sure you are well-aware, in terms of what they can get passed? I know they believe this is a big part of Trump's agenda. But if you don't get what you need from Congress, can you achieve what you're trying to achieve here?

HOMAN: We're going to do everything we can with what we have, and we're going to arrest as many as we can.

However, you're right. We can be more successful if we have more money, if we can buy more beds. Because

ER246

every time we arrest an illegal alien, we just don't deport them that day. We have to detain them for a few days, or a few weeks, to get travel documents, get landing rights in their home country. So, the more money we have, the more we can do.

COLLINS: Mr. Homan, I've got a few more questions for you, if you'll stick around, for a few minutes, with us.

We're going to take a quick break, and then we'll be back with Mr. Tom Homan, Trump's border czar, after a short commercial break.

[21:40:00]

(COMMERCIAL BREAK)

COLLINS: And we're back with President Trump's border czar, Tom Homan, whose name came up at the confirmation hearing, for the newly- confirmed Secretary of Homeland Security, Kristi Noem.

(BEGIN VIDEO CLIP)

SEN. ANDY KIM (D-NJ): I guess I'm uncertain about roles and responsibilities regarding your position, and Tom Homan's.

How are you going to work with Mr. Homan? What is the division there? I'm trying to get a better sense of who's in charge.

KRISTI NOEM, UNITED STATES SECRETARY OF HOMELAND SECURITY: Yes, Tom -- Tom Homan is an incredible human being, who has over 30 years of experience.

KIM: Incredible experience, I get that.

NOEM: Yes, at the border, and the inside--

KIM: I'm just trying to think through decision-making process--

NOEM: Yes.

ER247

KIM: --when it comes to your work. For instance, will he be giving orders directly to CBP, ICE, USCIS?

NOEM: Tom Homan has a direct line to the President. He is an adviser to the President, the border czar.

I obviously will be, if nominated and confirmed, and put into the position of being the Department of Homeland Security Secretary, and responsible for the authorities that we have, and the actions that we take.

(END VIDEO CLIP)

[21:45:00] COLLINS: And Mr. Homan is back with me.

And who is the person, who will be issuing those orders, to the Senator's question there, to ICE agents, to Border Patrol? Is that your purview here? Or is that Secretary Noem's purview?

HOMAN: Secretary Noem has the authority of Border Patrol and ICE. That's in statute.

But as the Senior Adviser to the President, I'm writing strategic vision, and operational plans, and coming up with a strategy to secure the border, and to run this deportation operation, to find over 300,000 missing children. And me and Secretary Noem will work very close on those plans, and to implement them, and do what the President wants us to do.

So, me and Kristi Noem will be shoulder to shoulder every day. We talk every day. So, we'll be working together, to achieve the President's goals.

COLLINS: How often are you talking to the President himself about this?

HOMAN: Several times a week.

COLLINS: And on one of the things that we've been seeing, as you're publicly talking about this first week. I saw the numbers that ICE put out tonight, that we started asking you about.

We also saw this video, last week, of something you told me was going to happen, using military flights. This is a C-17. It's flying about 80 people back to Guatemala. The flight costs from El Paso, for that is about $252,000 numbers, based on an estimate we got from the government today. Do you think that's a better use of

taxpayer money than a charter flight, which would cost closer to, I believe, a $9,000?

HOMAN: Well, it's a force multiplier. We got a lot of planes flying every day across mostly to Central America and South America. So, they're adding, they're adding a resource to us. So, again, the cost of this operation is expensive. It's expensive to enforce the laws, and protect our national security. But I don't put a price tag on securing that border.

Once we secure the border, and we show consequences -- the numbers are already down. We had like 500 crossings in one day. Compare that to 10,000 to 12,000 a day under Biden.

COLLINS: Right. But why is it better to use a military plane?

HOMAN: 500 a day? I mean, that's one of the lowest I've seen in my 34- year career.

COLLINS: But why is it better to use a military plane that costs so much more than just a charter plane, which is what was happening before? HOMAN: Charter planes are still running at full capacity. This is just an added thing. And they can put a lot more people on the plane, rather than -- that can make a long distance, such as going to Columbia. We'll use them for European removal. So, it makes sense to fill that plane up, a lot of people, and get them moving.

Again, it's an added asset, because our air contracts now are full, 100 percent capacity. So, as we add more flights, I'm sure we'll add more charter flights. But right now, DOD is working with us on the border, building infrastructure, appearance denial (ph). They're down there, building, putting razor wire up, and they're flying planes.

COLLINS: OK.

HOMAN: They'll also probably do some ground transportation. We're going to use DOD.

COLLINS: And I should note that, we are told that the Department of Homeland Security will not be reimbursing the Pentagon for these flights. That sometimes is the case. But we were told today, that that's not the case.

On what you said earlier about your big priority, right now, is deporting public safety threats and national security threats. How does changing the ICE policy that allows agents to conduct arrests and enforcement at

ER249

churches and schools help with that?

HOMAN: There's no safe haven for public safety threats and national security threats.

People will say, Well, will you really go into a high school?

Well, people need to look at the MS-13 members and Tren de Aragua members, who enter this country, a majority in between the ages of 15 and 17, many are attending our schools. And they're -- and they're selling drugs in the schools. And they're -- and they're doing strong- armed robberies of other students.

So, we do not go into schools or hospitals, as a matter of practice. But if it's a -- if there's a significant public safety threat, or a significant homeland security threat, there's no safe haven. We'll go where we need to go, to take them off the street.

COLLINS: But you obviously are someone -- you've been working on the border for years, Sir. I mean, you got an award from President Obama, for people who don't know watching. And you also have worked through these administrations. This was the policy that's been in place, I believe, since 2011, and it wasn't changed before.

I mean, do you have any reason to believe that elementary schools or churches are harboring these violent immigrants, who are here illegally?

HOMAN: Like I said, and when the circumstances arise, we got national security threat, or a significant public safety threat? We're going to go where we got to go, whether it's a school, a church or hospital. The national security is important.

And look, name another law enforcement agency. Does the FBI have those requirements? No. Does DEA have those requirements? No. So, ICE shouldn't have those requirements either.

We have a national security responsibility. And we're going to take those people off the street. If it's out of school, then that's what we're going to do. Again, it takes a lot to get approval to go into school or church. But if there's a national security threat, we're going.

[21:50:00]

COLLINS: What does it take -- what is the standard, I guess, to go into an elementary school? Because what we had heard from immigration advocates, is that this is going to provide a chilling effect to parents in the school drop-off line, or something of that matter.

HOMAN: It shouldn't be a chilling effect, unless your child is a terrorist, or a public safety threat. If they're a public safety threat, a national security threat, they should be chilled, they should be afraid, because we're looking for them.

COLLINS: Well, if their parent is here, and they're an undocumented immigrant, I think was, was more of the argument that they were making.

HOMAN: They're not off the table either. I mean, if they're in the country illegally, they got a problem. I mean, it's not OK -- look, it's not OK to enter this country illegally. It's a crime. And that's what it's supposed to be. I wouldn't feel comfortable if I'm in Switzerland illegally. So, we're going to enforce laws in this country.

So, the schools and the churches, and sensitive location was a policy only for ICE, only for immigration, right? But national security threats and public safety threats have no safe haven in this country, and we'll go where we got to go.

COLLINS: Have you gone into any schools or churches yet that you know of personally?

HOMAN: Not yet -- not yet, of this operation.

COLLINS: Mr. Tom Homan, thank you for coming and taking our questions tonight. We hope to have you back here on THE SOURCE soon. And we do appreciate your time.

HOMAN: Thanks for having me.

COLLINS: Up next. We're going to check in with some deep panic that is underway in Silicon Valley. That new A.I. startup, DeepSeek, and what it means, as a cheaper A.I. alternative from China has emerged, and it sent U.S. tech stocks plunging today.

[21:55:00] (COMMERCIAL BREAK)

COLLINS: Just days after we saw President Trump unveil a $500 billion investment in artificial intelligence, a

Chinese A.I. company today stunned the entire industry, and also sent U.S. stocks plunging. That's because this Chinese startup, known as DeepSeek, revealed a new chatbot called R1 that matches the capabilities that OpenAI's ChatGPT, and Google's Gemini has, but at a fraction of the cost.

Now, we all know, U.S. companies have spent hundreds of millions of dollars, if not billions, to develop these A.I. models that we've been tracking so closely in recent years. DeepSeek, which launched a year ago, I should note, says it spent just over $5 million.

Here's how President Trump responded to this news today,

(BEGIN VIDEO CLIP)

TRUMP: The release of DeepSeek A.I. from a Chinese company, should be a wake-up call for our industries that we need to be laser-focused on competing to win, because we have the greatest scientists in the world.

This is very unusual. When you hear a DeepSeek, when you hear somebody come up with something. We always have the ideas. We're always first. So, I would say that's a positive, that could be very much a positive development. So instead of spending billions and billions, you'll spend less, and you'll come up with, hopefully the same solution.

(END VIDEO CLIP)

COLLINS: My source tonight is the veteran tech journalist, Kara Swisher.

And Kara, some people were calling this A.I.'s Sputnik moment. I mean, it's obviously put so many questions in front of major companies like Meta, and Nvidia. What are your takeaways--

KARA SWISHER, PODCAST HOST, "ON WITH KARA SWISHER" & "PIVOT," CNN CONTRIBUTOR: Yes.

COLLINS: --from what we've seen today?

SWISHER: I think everyone should calm down. I mean, the stock market didn't, because it shows -- it puts into question all the spending that's been going on with all these companies.

And I think that's the worry they have. Is that Mark Zuckerberg just announced, I think $50 billion, $60 billion, they're spending on different A.I. things. They've talked about building all kinds of datacenters, et cetera, which they should continue to do, moving forward.

I think what's interesting about what DeepSeek is, it's riding on our rails. It's riding on our open-source models. And so, the question is, is this going to be an open-source-developed industry, where everything, the prices go very low, just like the original internet was? Or is it going to be captured by only the big players?

And so, I think they were showing that it's going to be very easy for -- you know, there's an expression, the plains are covered with the bodies of pioneers. Pioneers, sometimes, they cost too much and the price is too much, and then others follow in their wake. And China is a very fast follower. And that's what's happening here.

COLLINS: Yes. What does that say about the competitiveness of U.S. companies in this space, given what we saw?

SWISHER: Well, like I said, they're riding on our rails. They're riding on our open-source models, specifically Llama from Meta, and things like that, because there's a whole -- there is a whole struggle between open source and closed companies like OpenAI that tradition (ph).

The question is, with everybody spending all this money on closed systems, only one or two are going to win, right, in that model. And so, if you open it up, and you allow more people to innovate, at lesser cost? It's good news, say, for companies, any company, who doesn't have to pay too much for A.I., when it's almost free, essentially.

At the same time, you'll have worries about lack of any safety. Because you didn't hear DeepSeek talk about possible safety problems, which U.S. companies tend to adhere to.

COLLINS: Yes.

SWISHER: And so, it's sort of this Wild West situation. And then you'll hear U.S. companies saying, No more regulations, because China is going to beat us.

China is beating us, because they're taking advantage of our innovation. And the question is, how can we make it so it's inexpensive for innovation to happen everywhere.

ER253

And so there'll be an initial panic, because of all the money spent, say Nvidia is perfect. These chips are very expensive. They've been bought up by all the big rich companies. Do you need those chips particularly? Are there better ways to do it?

[22:00:00]

And so, the question is, how can our country innovate on at all levels of this?

COLLINS: Yes.

SWISHER: Because we are the -- we are the first in line here. So, it definitely is a wake-up call for everyone to see where this is headed, which will be good for some, and not so good for others.

COLLINS: Yes. DeepSeek using just a fraction of the chips that others have.

Kara Swisher, we'll be watching it all, hopefully with you here to help us. So, thank you for your time tonight.

SWISHER: Thank you.

COLLINS: Thank you all for joining us.

"CNN NEWSNIGHT WITH ABBY PHILLIP" is up next.

# Exhibit 16

# US Border Patrol arrests migrants during latest enforcement operation

*ABC News*

Immigrant communities in Kern County, California, are on edge as the U.S. Border Patrol has been seen conducting enforcement operations throughout the region this week.

Videos and images that surfaced online appear to show Border Patrol agents apprehending people at various locations throughout the region. United States Customs and Border Protection has confirmed the operations, which officials describe as "targeted."

"The USBP conducts targeted enforcement arrests of individuals involved in smuggling throughout our areas of operations as part of our efforts to dismantle transnational criminal organizations," a CBP spokesperson said in a statement.

However, Sarah Fuentes, a manager at a Chevron station in Bakersfield, told ABC News she saw Border Patrol officers and agents in plain clothes go up to several of her customers, ask them about their immigration status, and arrest multiple people.

Fuentes says she thought the officers were serving a warrant, but noticed "it was only Hispanics and field workers that they were putting aside."

Recent Stories from ABC News



0:00 / 0:00

0:00 / 0:00                    0:00 / 0:00

ER256

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 260 of 435



Visit Advertiser website GO TO PAGE

"Then we seen it again, and we're like, wait a minute, this is a raid, they're picking up random people like the field workers. They don't have an order to do that," she said in a phone interview. "It's just random people that are walking in that work in the field."

Fuentes shared photos and videos she took of the incident, including one she says shows a woman who locked herself in her car as a person in plain clothes allegedly urged her to open her door. "10-15 minutes after she refused, they got a Border Patrol truck to park behind her vehicle so she wouldn't be able to leave," she said. When press arrived, the agents allegedly let the woman go, according to Fuentes.

United Farm Workers members were detained throughout Kern County as part of the operation , the union said in a post on X.

ER257

"UFW union members are among those detained while traveling home from work yesterday in Kern County, CA. We are providing them and their families with support. Random actions like this are not meant to keep anyone safe, they are intended to terrorize hardworking people," the post said.

UFW says an initial and rough estimate shows as many as 192 people may have been detained in Kern County this week.

Antonio De Loera-Brust, Communications Director for UFW, said he's never seen this kind of operation in the region before.

"They're very far from the border and despite their public claims that they're conducting targeted operations, everything we're hearing and seeing indicates random detention, stopping people in public areas, at gas stations, basically at random."

Karen Goh, the mayor of Bakersfield, confirmed to ABC News that the police department is aware of the operations but is not assisting federal agencies.

"The Bakersfield Police Department is aware the U.S. Border Patrol is conducting operations in the City of Bakersfield. State law requires that no local or state resources are used to assist in federal immigration enforcement. The Bakersfield Police Department remains strictly focused on local public safety responsibilities. If a resident is a victim and is in need of police services, irrespective of his/her immigration status, the resident is welcome to call the Bakersfield Police Department," she said in a statement shared with ABC News.

Oliver Ma, an attorney for the ACLU of Southern California, says the organization has received multiple reports of Border Patrol officers showing up at farm-working communities and other locations throughout the county.

"We heard, for example, from one person who was fueling up for gas and she said the border patrol came behind her car, started asking who she was, and put down tire spikes behind her car so she couldn't leave," he told ABC News. "They tried to figure out what her name was and then she saw them also approach seven people who were just having lunch nearby and began talking to them and then all seven people were arrested and taken away."

ER258

# Exhibit 17

## US CBP issues statement on 'Operation Return to Sender' in Bakersfield area

*Jose Franco, Jenny Huh*

BAKERSFIELD, Calif. (KGET) — U.S. Customs and Border Protection issued a statement Friday morning providing more details over its three-day operation in the Bakersfield area this week the agency calls "Operation Return to Sender."

Throughout the week, 17 News requested interviews with the agency over its operation in the Bakersfield area but was provided a statement stating its operation took place over three days and led to 78 arrests. U.S. CBP said it would not provide further statements.

The agency said it arrested people unlawfully in the U.S. from Central, South America and China.

According to the statement, Border Patrol had 60 agents in the area focusing on alleged drug and human traffickers. Agents were on patrol in marked and unmarked vehicles, officials said.

CBP highlighted agents arrested people previously convicted of crimes including sex offenses, drug possession, child abuse, spousal abuse and DUI. Agents seized marijuana and methamphetamine during the operation, the statement said.

Border Patrol officials said it is "no stranger" to operating in the Central Valley and its work may send agents all the way to the California-Oregon state line.

Read the full U.S. Customs and Border Protection statement below:

> Border Patrol Agents with the El Centro Sector Border Patrol conducted an operation in and around the Bakersfield area in Kern County. Our operation focused on interdicting those who have broken U.S. federal law, trafficking of dangerous substances, non-citizen criminals, and disrupting the transportation routes used by Transnational Criminal Organizations. The U.S. Border Patrol is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento, as the now closed Livermore Border Patrol Sector regularly conducted enforcement operations over this area up to the mid 2000s. "The El Centro Sector takes all border threats seriously," said Chief Patrol Agent Gregory Bovino. "Our area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line."



- 

> During this three day operation we had over 60 agents on the ground, using both marked and unmarked vehicles. The results of our operation, named "Return to Sender" are as follows:

> 78 arrests (all subjects unlawfully present in the U.S.) The nationality/citizenship of those arrested were from Peru, Guatemala, El Salvador, Honduras, Ecuador, Mexico, and China.

> One subject arrested was a convicted sex offender convicted of raping an 8 year old girl.

> Another subject had an active warrant from the Visalia Sheriff's Department for a sex offense against a child.

> One subject had a warrant for being a felon in possession of a weapon out of Tulare County. He was turned over to the Kern County Sheriff's Department for extradition to Tulare County. A detainer was placed on this subject so we can take him back into custody on pending federal charges.

> Three separate Marijuana seizures: 33.01 lbs., 3.1 lbs., and 30.7 grams of personal use.

> Four separate methamphetamine seizures totaling 7.1 grams.

> Multiple DUI convictions among those arrested, including some that included hit and run and injury enhancements.

> Other criminal histories of those arrested included: failure to appear, tampering with a vehicle, petty theft, felony drug possession, vandalism, burglary, inflicting injury on spouse, and child abuse convictions amongst others.

> *David Kim, Assistant Chief Patrol Agent, El Centro Sector*

# Exhibit 18

# 'RETURN TO SENDER': Border Patrol's 3-day operation in Kern, 78 arrested

*Veronica Morley*

Latest Kern County, California and US and world news from 23ABC in Bakersfield, Calif.



[Veronica Morley](#)

Senior Reporter Covering Bakersfield

KERN COUNTY, Calif. (KERO) — The U.S. Border Patrol has released more details on what has been coined operation "Return to Sender" by the agency. It resulted in 78 people being arrested who were "unlawfully present in the U.S.", according to Border Patrol.

The El Centro Sector Border Patrol agents were in Kern for three days chasing down individuals who have, in Border Patrol's words: "Broken U.S. federal law, trafficking of dangerous substances, non-citizen criminals, and disrupting the transportation routes used by Transnational Criminal Organizations."

The agency said they had over 60 agents throughout Kern County in marked and unmarked vehicles.

"The El Centro Sector takes all border threats seriously," said Chief Patrol Agent Gregory Bovino. "Our area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line."

Of the 78 arrested, one was convicted of raping an 8-year-old girl, while another had a warrant for a sex offense against a child out of Visalia.

There were multiple arrests for large amounts of marijuana and possession of methamphetamine and DUI convictions, according to Border Patrol.

Border Patrol went on to mention that other subjects arrested had criminal histories that including charges such as: failure to appear, tampering with a vehicle, petty theft, felony drug possession, vandalism, burglary, inflicting injury on a spouse, and child abuse convictions.

All subjects arrested were from Peru, Guatemala, El Salvador, Honduras, Ecuador, Mexico, and China, according to Border Patrol.

---

Stay in Touch with Us **Anytime, Anywhere**:

- Download Our Free App for **Apple** and **Android**
- Sign Up for Our Daily **E-mail Newsletter**
- Like Us on **Facebook**
- Follow Us on **Instagram**
- Subscribe to Us on **YouTube**

Copyright 2025 Scripps Media, Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

**Sign up for the Headlines Newsletter and receive up to date information.**

# Exhibit 19

# What Does FAFO Mean? Trump's Message to Colombia Goes Viral

*Daniel Cody*



⚪         0:00 / 0:00     ⚪

Video Player is loading.

Current TimeÂ 0:01

DurationÂ 0:15

Remaining TimeÂ 0:14

Â

What It's Like With Double Name As Man's Parents Call Him Matthew Mathews

By

Digital Media Reporter

Donald Trump garnered attention on Sunday with a Truth Social post that appeared to be a message to Colombia featuring the acronym "FAFO".

The post, which also featured an image of Trump wearing a fedora, was made after [Colombia's initial refusal to allow](#) [U.S. military](#) planes carrying deported migrants to land on its territory.

The President's use of "FAFO"—which stands for "F*** Around, Find Out"—quickly went viral, underscoring his no-nonsense approach to foreign policy disputes.

Elon Musk amplified the viral nature of Trump's post by [posting](#) it on X, formerly [Twitter](#), and commenting: "This is awesome."

*Newsweek* approached the White House for comment via email on Monday.

ER264

"FAFO" is an acronym meaning "F*** Around, Find Out," commonly used as a warning that actions will lead to consequences. The phrase has gained popularity in online spaces such as TikTok and Twitter, and is often employed in memes and social media captions.

While the phrase is not new, its use by Trump in the context of international diplomacy has brought it into the political spotlight. "FAFO" serves as a succinct, if controversial, encapsulation of Trump's hard-line stance on the ongoing dispute with Colombia. The phrase, often compared to "If you mess with the bull, you get the horns," highlights the potential repercussions of perceived defiance.



ER265

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 269 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 78 of 113

President Donald Trump speaks to reporters aboard Air Force One as he travels from Las Vegas to Miami on Saturday, January 25, 2025. Mark Schiefelbein/AP Photo

## Where Did FAFO Originate?

ER266



ER267

- 

  **The 1600 Newsletter: Zelensky Screwed Up**

- **Stephen King's Reaction to Trump's Clash With Zelensky Takes Off Online**

- **Trump Celebrates Return of Classified Documents: 'Justice Finally Won Out'**

- **Internet Reacts To Marco Rubio's Body Language At Trump-Zelensky Meeting**

"FAFO" has long been part of internet culture, particularly used as a way to express consequences for actions. Its resurgence in popularity has been linked to viral moments on social media, where brevity and catchphrases carry significant influence.

ER268

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 272 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 81 of 113

Trump's adoption of "FAFO" reflects his ability to blend popular internet trends with political messaging. This tactic has proven effective in gaining widespread attention, even among younger demographics. His use of the phrase in a high-stakes geopolitical context, however, marks a significant departure from its typical use in casual or humorous settings.

## What Is Happening Between Colombia and the U.S.?

The diplomatic dispute began when Colombia refused to allow two U.S. military planes carrying deported migrants to land on its soil. These planes were part of a U.S. deportation process, and their rejection by Colombia was confirmed by both the U.S. Department of Defense and the Department of Homeland Security.

Colombian President Gustavo Petro stated that his government would not permit the return of Colombian migrants under the U.S. policy.

Trump initially responded with proposed economic measures, including a 25% tariff on all Colombian imports, set to escalate to 50% if the dispute was not resolved within a week.

Trump also announced visa bans for Colombian officials and stricter customs inspections. However, these proposed tariffs and visa bans were withdrawn after Colombia agreed to Trump's terms, including accepting the deportees.

"Today's events make clear to the world that America is respected again," White House press secretary Karoline Leavitt said in a statement late Sunday. "President Trump will continue to fiercely protect our nation's sovereignty, and he expects all other nations of the world to fully cooperate in accepting the deportation of their citizens illegally present in the United States."

The disagreement between the two world leaders highlights broader tensions surrounding immigration and sovereignty. Colombia's initial refusal to accept deported migrants reflects a growing pushback against U.S. immigration policies by nations seeking to assert their autonomy.



## fairness meter

## fairness meter

Newsweek is committed to journalism that's factual and fair.

Hold us accountable and submit your rating of this article on the meter.

Newsweek is committed to journalism that's factual and fair.

Hold us accountable and submit your rating of this article on the meter.

ER269



**Unfair** Left leaning

**Mostly Fair**
Left leaning

**Fair**

**Mostly Fair**
**Right leaning**

**Unfair** Right leaning

Click On Meter To Rate This Article

# Top stories

## About the writer

Daniel Cody

Dan Cody is a journalist based in London. His focus is increasing the search visibility of Newsweek's reporting across all ... Read more

ER270

# Exhibit 20

3/4/25, 1:47 PM

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 275 of 435

'La Migra!' A Glimpse of Trump's Promised Deportation Storm - The New York Times

Case 1:25-cv-00246-JLT-BAM     Document 15-2     Filed 03/07/25     Page 84 of 113

# 'La Migra!' A Glimpse of Trump's Promised Deportation Storm

Sweeps by Border Patrol agents in California have stoked fears among undocumented migrant workers on the eve of Donald J. Trump's presidential inauguration.

 ▶ **Listen to this article · 7:30 min**  Learn more

 

**By Steve Eder and Miriam Jordan**

Jan. 17, 2025

When President-elect Donald J. Trump takes office on Monday, the U.S. Border Patrol is poised to play a central role in his promised immigration crackdown. On Thursday, Californians got a preview of the tensions likely to play out as undocumented migrants get rounded up in places that rely on their labor.

On one side, a Border Patrol chief posted a video on social media showcasing sweeps last week in California's Central Valley. Named Operation Return to Sender, the effort involved dozens of arrests. "They think I'm hiding in the shadows, but I am the shadows," a voice whispered during the video, echoing a popular Batman movie.

On the other side, United Farm Workers officials held a news briefing, describing the fears the operation had caused in immigrant communities. They suggested the arrests signaled that "rogue" law enforcement agents, inspired by Mr. Trump's plans, could take matters into their own hands.

"This is part of a new political climate of people in some of these agencies feeling emboldened," said Antonio De Loera-Brust, a spokesman for the organization, a labor union.

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 276 of 435

3/4/25, 1:47 PM 'La Migra!' A Glimpse of Trump's Promised Deportation Storm - The New York Times

Case 1:25-cv-00246-JLT-BAM Document 15-2 Filed 03/07/25 Page 85 of 113

The Biden administration and the Trump transition team did not reply to messages seeking comment. U.S. Customs and Border Protection would not answer questions about the effort, saying broadly that agents conducted "targeted enforcement arrests of individuals involved in smuggling throughout our areas of operation as part of our efforts to dismantle transnational criminal organizations."

Details about the sweeps have primarily come from the social media channels of Gregory K. Bovino, a Border Patrol chief in Southern California. In a series of posts, he called the three-day operation an "overwhelming success" that resulted in the arrests of 78 people, all of whom were in the country illegally and some with "serious criminal histories."



A social media post on X by Gregory K. Bovino, a Border Patrol chief in Southern California.

The United Farm Workers and some farmers in the area suggested the sweeps were much wider.

"Agents were asking people in parking lots for their documents, and if they were in the country legally," said Manuel Cunha Jr., president of the Nisei Farmers League, which represents more than 500 growers and packers in the state. "They were then just taking them away in vans."

What's clear is that about 60 agents in marked and unmarked cars drove hundreds of miles from their headquarters near the border in Imperial, Calif., converging in and around Bakersfield, a vast agricultural area that relies on immigrant labor. The agents staked out a Home Depot, gas stations and other locations frequented by undocumented people.

The posts by Mr. Bovino, a near 30-year veteran of the agency who serves in a nonpolitical role in its El Centro sector, said the effort had yielded "two child sex predators" and other "aggravated felons," including a Chinese citizen suspected of defrauding a U.S. dementia patient "to the tune of $70K."

He called the sweeps a "targeted operation," saying agents "go where the threat is." In addition to the arrests, he said, agents seized marijuana and methamphetamine.

When a social media commenter noted on Jan. 10 that Mr. Bovino would be "extremely busy" in 10 days — the number of days until Mr. Trump's inauguration — Mr. Bovino replied: "The El Centro Sector stands ready to take it to them."

In other posts, he said that unauthorized immigrants should simply get papers: "Undocumented means just that. I recommend returning to the country of origin, obtaining proper documents, and doing it the right way. If not, we will arrest."

ER274

3/4/25, 1:47 PM          'La Migra!' A Glimpse of Trump's Promised Deportation Storm - The New York Times



A farm near Bakersfield, a rich agricultural area that relies on immigrant labor. Workers have avoided showing up out of fear.  Mario Tama/Getty Images

Mr. Trump has vowed to conduct mass deportations. Since his election, he has continued to use social media to share his views on the border, writing in late November that "thousands of people are pouring through Mexico and Canada, bringing Crime and Drugs at levels never seen before."

Unlawful crossings have plunged in recent months, following new asylum restrictions introduced by the Biden administration and stepped-up enforcement by Mexico and other countries on the migrant route. Some 46,000 people crossed the border illegally in November, the lowest number during the Biden administration and lower than when Mr. Trump ended his term in 2020.

**Got a confidential news tip?** The New York Times would like to hear from readers who want to share messages and materials with our journalists.

ER275

See how to send a secure message at nytimes.com/tips

Thomas D. Homan, a former senior official with Immigration and Customs Enforcement, who has been appointed "border czar" by Mr. Trump, has said enforcement under the new administration would target immigrants with outstanding deportation orders and criminal records, but has left open the possibility that others would be arrested during roundups.

Bakersfield straddles State Route 99, a heavily trafficked highway for trucks transporting the bounty harvested in the Central Valley, California's agricultural heartland. But it is also a key corridor for smuggling illicit substances.

Shootouts have become a feature of life there, as gangs battle for control over lucrative drug sales. Working-class neighborhoods are accustomed to law enforcement conducting operations to track down and arrest those involved in the drug trade.

Chris Magnus, who served as Customs and Border Protection commissioner for the first part of the Biden administration, said unauthorized immigrants who had committed serious crimes should be apprehended.

"However, mass roundups of day laborers and field workers through profiling do not improve public safety and waste law enforcement resources," Mr. Magnus said. "These roundups create widespread distrust of law enforcement and discourage many community members from reporting crimes as victims or witnesses."

ER276

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 280 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 89 of 113



Thomas D. Homan, a former senior official with Immigration and Customs Enforcement, has been appointed "border czar" by Mr. Trump.   Maddie McGarvey for The New York Times

Indeed, arrests of random people who had been interrogated about their immigration status generated panic in Bakersfield and surrounding Kern County.

Between 30 and 40 percent of the labor force failed to report to the fields on the days after the raids, Mr. Cunha of the Nisei Farmers League said.

Near Bakersfield, Pete Belluomini, a citrus farmer, said that about two-thirds of his harvesting crew did not show up for two or three days. "This wasn't the first time stuff like this has happened, but in this political climate, it was a bigger splash," he said.

It is an open secret that most people who harvest America's food are unauthorized immigrants, mainly from Mexico and Central America, many of them decades-long residents of the United States. Often the parents of American-born children, they have lived for years with the cloud of deportation hanging over them.

3/4/25, 1:47 PM 'La Migra!' A Glimpse of Trump's Promised Deportation Storm - The New York Times

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 281 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 90 of 113

Alejandra and her partner, Pedro, undocumented immigrants from Mexico, had just started picking lemons on the first morning of the sweeps, Jan. 7, when their supervisor warned them that "*la migra*" — slang for the Border Patrol — was in the area.

They soon learned that one of their co-workers had been arrested, and most people decided to remain in the field until after dark, she said. The couple returned to Bakersfield before sundown to pick up their 5-year-old son at day care.

"Our biggest fear as parents is, what will be of our children if we are deported?" said Alejandra, 38, who did not share her or her partner's surname out of concern for their safety. With workers feeling anxious during the week of the sweeps, she said, "the fields were almost empty."

To feel more empowered, Alejandra said, she attended three information sessions held by community advocates to learn about her rights.

"I am nervous, I am afraid," she said. "We don't know what Trump has in store for us."

**Steve Eder** has been an investigative reporter for The Times for more than a decade. More about Steve Eder

**Miriam Jordan** reports from a grass roots perspective on immigrants and their impact on the demographics, society and economy of the United States. More about Miriam Jordan

---

A version of this article appears in print on , Section A, Page 19 of the New York edition with the headline: California Gets Preview of Vowed Deportations

ER278

# Exhibit 21

# Congressman Valadao Releases Statement on Customs and Border Protection Operations in Kern County



Today, Congressman David Valadao released a statement addressing last week's Customs and Border Protection (CBP) operations in Kern County.

**WASHINGTON –** Today, Congressman David Valadao released a statement addressing last week's Customs and Border Protection (CBP) operations in Kern County.

*"I have been in contact with Customs and Border Protection regarding the recent immigration enforcement actions in Kern County, and I was informed these operations were focused on apprehending known criminals or those with ties to criminal organizations in our community,"* **said Congressman Valadao.** *"I have received numerous calls from constituents expressing fear for their families' safety, and I do not support inciting concern. I think we can all agree known criminals should be expelled from the United States, but it is crucial that future operations are communicated clearly to avoid causing any further alarm among our farmworkers. I urge the Biden Administration—and future administrations—to ensure CBP prioritizes targeting criminals rather than those responsible for producing our nation's food supply. We urgently need common sense immigration reform that creates a pathway to earned legal status for hardworking individuals contributing to our economy while ensuring the removal of those who threaten the safety of our communities, and I am looking forward to working on new legislation to combat these issues in Congress."*

###

ER280

# Exhibit 22

# 78 immigrants detained by Border Patrol throughout the Central Valley, officials say

FRESNO, Calif. (KFSN) -- This week, U.S. Customs and Border Protection (CBP) Agents conducted unannounced raids of undocumented immigrants in the Central Valley.

*EDITORS NOTE: A previous headline incorrectly attributed the wrong agency behind the detainments. We regret this error and have made the appropriate correction.*

In a press conference Saturday, local and federal leaders announced 78 people were detained from both Fresno and Kern Counties.

"Jurisdiction for custom and border protections is delineated in federal law within 100 miles of the border clearly current county and anything north of Kern County is far from 100 miles of the border," Rep. Jim Costa said.

Costa said that the CBP commissioner told him that the mission was targeted at criminals of drug and human trafficking and that all 78 of those detained had previous criminal records.

"I asked whether or not that was the extent of it. He told me that they had concluded their effort as a result of their arrest as of a day or two ago and that they would reassess where they would go from there," he said.

State leaders though contradicting claims that only criminals were detained.

"What we know is farmworkers have been taken into custody, loaded onto Vans at gas stations stores and also at random traffic stops," State Sen. Anna Caballero said "And we verified because people have it called our office and we've been able to verify a lot of this information."

In a statement on X, the UFW confirmed that some union members were detained while traveling home from work.

These raids are stoking fear amongst uncertain immigrant communities and are already taking a toll on the Valley's agriculture industry.

"I have received reports of food processing facilities. I have absences of 15 to 20% here locally. Orders that will not be able to be fulfilled," Fresno County supervisor Luis Chavez said.

Fresno Unified is also anticipating an increase in absenteeism, as students prepare to return to school from winter break.

Service providers have been hit hard and inundated with calls.

ER282

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 286 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 95 of 113

"We are a very busy organization on a normal day. This is just threefold, fivefold what we do," Margarita with Central La Familia said.

Leaders clarified that local law enforcement resources were not used to assist in these raids, which took many by surprise.

"So this whole issue with immigration, quite frankly, was shocking and was not expected this early," Caballero said.

Action News reached out to the CBP for comment and has not heard back.

*For news and weather updates, follow Brisa Colón on* [Facebook](Facebook), [Twitter](Twitter) *and* [Instagram](Instagram).

Copyright © 2025 KFSN-TV. All Rights Reserved.

ER283

# Exhibit 23



ECONOMY

# A surprising immigration raid in Kern County foreshadows what awaits farmworkers and businesses

 **BY SERGIO OLMOS**
**JANUARY 10, 2025    UPDATED JANUARY 22, 2025**

| Republish |
| --- |



Farmworkers work on a field outside of Bakersfield in Kern County on July 25 2023. Photo by Larry Valenzuela, CalMatters/CatchLight Local

**IN SUMMARY**

ER285

"If this is the new normal, this is absolute economic devastation," says one local economist

*Lea esta historia en **Español***

Acres of orange groves sat unpicked in Kern County this week as word of Border Patrol raids circulated through Messenger chats and images of federal agents detaining laborers spread on local Facebook groups.

The Border Patrol conducted unannounced raids throughout Bakersfield on Tuesday, descending on businesses where day laborers and field workers gather. Agents in unmarked SUVs rounded up people in vans outside a Home Depot and gas station that serves a breakfast popular with field workers.

This appears to be the first large-scale Border Patrol raid in California since the election of Donald Trump, coming just a day after Congress certified the election on January 6, in the final days of Joe Biden's presidency. The panic and confusion, for both immigrants and local businesses that rely on their labor, foreshadow what awaits communities across California if Trump follows through on his promise to conduct mass deportations.

"It was profiling, it was purely field workers," said Sara Fuentes, store manager of the local gas station. Fuentes said that at 9 a.m., when the store typically gets a rush of workers on their way to pick oranges, two men in civilian clothes and unmarked Suburbans started detaining people outside the store. "They didn't stop people with FedEx uniforms, they were stopping people who looked like they worked in the fields." Fuentes says one customer pulled in just to pump gas and agents approached him and detained him.

Fuentes has lived in Bakersfield all her life and says she's never seen anything like it. In one instance, she said a man and woman drove up to the store together, and the man went inside. Border Patrol detained the man as he walked out, Fuentes said, and then demanded the woman get out of the vehicle. When she refused, another agency parked his vehicle behind the woman, blocking her car. Fuentes said it wasn't until the local Univision station showed up that Border Patrol agents backed up their car and allowed the woman to leave.

Fuentes says none of the regular farm workers showed up to buy breakfast on Wednesday morning. "No field workers at all," she said.

Growers and agricultural leaders in California and across the nation have warned that Trump's promised mass deportations will disrupt the nation's food supply, leading to shortages and higher prices. In Kern County this week, just the word of the deportations inspired workers to stay away from the fields.



Video courtesy of Sara Fuentes

"People are freaked out, people are worried, people are planning on

ER286

staying home the next couple of days," said Antonio De Loera-Brust, director of communication for the United Farm Workers. De Loera-Brust said the Border Patrol detained at least one UFW member in Kern County as they "traveled between home and work."

Videos shared in local Facebook groups and Instagram pages show Border Patrol agents pulling over vehicles along the 99 Highway on Tuesday and Wednesday in Bakersfield.

"They were stopping cars at random, asking people for papers. They were going to gas stations and Home Depot where day laborers gather," said Antonio De Loera-Brust. "It's provoking intense anxiety and a lot of fear in the community."

U.S. Customs and Border Protection did not respond to a request for comment. On social media, Gregory K. Bovino, the Border Patrol chief in El Centro, called the sweeps "Operation Return to Sender."

"We are taking it to the bad people and bad things in Bakersfield," the El Centro Border Patrol said in response to a comment on its Facebook page. "We are planning operations for other locals (sic) such as Fresno and especially Sacramento."



A U.S. Customs and Border Protection patch on the uniform of an agent in the Jacumba mountains in Imperial County on Oct. 6, 2022. Photo by Allison

ER287

It's unclear how many people have been detained by Border Patrol or how long the operation would last.

"We're in the middle of our citrus harvesting. This sent shockwaves through the entire community," said Casey Creamer, president of the industry group California Citrus Mutual, on Thursday. "People aren't going to go to work and kids aren't going to school. Yesterday about 25% of the workforce, today 75% didn't show up."

He pushed back on the Border Patrol's claims they're targeting bad people. He said they appeared to be general sweeps of workers.

"If this is the new normal, this is absolute economic devastation," said Richard S. Gearhart, an associate professor of economics at Cal State-Bakersfield.

In the short term, he predicted farms and dairies could make up the losses, but that homebuilders, restaurants and small businesses would be most hurt financially.

But he's worried about the long-term.

"You are talking about a recession-level event if this is the new long-term norm," he said.

Agriculture comprises about 10 percent of Kern County's gross domestic product and undocumented workers may comprise half of the workforce, he said. And the Central Valley provides about a quarter of the United States' food.

"So, you WILL see, in the long run, food inflation and food shortages," he wrote in a text message.

He predicted immigrants, even ones with documents, would stop shopping, going to school and seeking health care.

"So, this could have some serious deleterious long run impacts beyond lost farm productivity. Losses in education and health would be catastrophic," he said. "Basically, you know how Kern County complains about oil? This event would be analogous to shutting down oil production. Economic catastrophe."

*For the record: The first paragraph of this story has been updated to reflect that orange groves went unpicked. The original version referred to grape fields. However, this time of year, grape fields are being pruned, not picked.*

**READ MORE IMMIGRATION COVERAGE**

ER288



### Trump allies warn California leaders they could go to prison over sanctuary city laws

DECEMBER 27, 2024



### 'What's going to happen to my kids': California prepares to resist Trump deportations

NOVEMBER 25, 2024

---

## THE LATEST



**Gavin Newsom shocks LGBTQ allies with criticism of transgender athletes**



**College athletes can now make millions off sponsorship deals. Here's the first look at California's numbers**



**California is spending billions on mental health housing. Will it reach those most in need?**



**Bay Area city backs down after proposing ban on 'aiding and abetting' homeless encampments**



**Have federal agents served warrants at California's Capitol? The Legislature doesn't want you to know**

© 2025 CalMatters

ER289

# Exhibit 24

# Along U.S. Borders

*The United States Border Patrol is the mobile, uniformed law enforcement arm of U.S. Customs and Border Protection within the Department of Homeland Security responsible for securing U.S. borders between ports of entry. The Border Patrol was officially established on May 28, 1924 by an act of Congress passed in response to increasing illegal immigration. As mandated by this Act, the small border guard in what was then the Bureau of Immigration was reorganized into the Border Patrol. The initial force of 450 officers was given the responsibility of combating illegal entries and the growing business of human smuggling.*

## Mission

Since the terrorist attacks of September 11, 2001, the focus of the Border Patrol has changed to detection, apprehension and/or deterrence of terrorists and terrorist weapons. Although the Border Patrol has changed dramatically since its inception in 1924, its overall mission remains unchanged: to detect and prevent the illegal entry of individuals into the United States. Together with other law enforcement officers, the Border Patrol helps maintain borders that work, facilitating the flow of legal immigration and goods while preventing the illegal trafficking of people and contraband.



ER291

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 295 of 435

Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 104 of 113

*Border Patrol Agent on Horseback.*

The Border Patrol is specifically responsible for patrolling the 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico. Agents work around the clock on assignments, in all types of terrain and weather conditions. Agents also work in many isolated communities throughout the United States.

## Daily Duties

One of the most important activities of a Border Patrol agent is line watch. This involves the detection, prevention and apprehension of terrorists, undocumented aliens and human smugglers at or near the land border by maintaining surveillance from a covert position, following up leads, responding to electronic sensor television systems, aircraft sightings, and interpreting and following tracks, marks and other physical evidence. Some of the major activities are traffic check, traffic observation, city patrol, transportation check, administrative, intelligence, and anti-smuggling activities.

## Training



ER292



*Border Patrol Agent stands next to border patrol vehicle at checkpoint.*

As one of the most rigorous and demanding law enforcement training programs in the country, U.S. Border Patrol training has become the envy of the federal law enforcement community. All newly hired Border Patrol Agent Trainees are required to complete a 117-day basic training program which includes instruction in Law, Operations, Spanish, Driver Training, Physical Techniques, and Firearms. Scenario-Based Training plays a significant role in the trainees' development as it allows them to apply the theoretical information in life like situations. The U.S. Border Patrol Academy is located in Artesia, NM. While in training, all trainees receive full pay and benefits.

Federal Law Enforcement Center (FLETC) courses are: Communications, Ethics and Conduct, Report Writing, Introduction to Computers, Fingerprinting, and Constitutional Law. The U.S. Border Patrol Academy is located in Artesia, NM.

## History

The U.S. Border Patrol has a long and rich history of helping to secure and protect the American way of life.



ER293

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 297 of 435

Case 1:25-cv-00246-JLT-BAM     Document 15-2     Filed 03/07/25     Page 106 of 113



*Black and white image of border patrol agents in the 1920s.*

# Exhibit 25



An official website of the United States government   Here's how you know ⌄

**Census**

**QuickFacts**
**Kern County, California**

What's New & FAQs ❯

QuickFacts provides statistics for all states and counties. Also for cities and towns with a *population of 5,000 or more.*

| 🔍 Enter state, county, city, town, or zip code | -- Select a fact -- ▾ | | CLEAR | TABLE | MAP | CHART | MORE |

| All Topics ▾ | | 🔍 | Kern County, California |
|---|---|---|---|
| ⓘ Hispanic or Latino, percent **(b)**   **(b)** | | | ⚠ 57.1% |

| 👤 **PEOPLE** |
|---|

**Population**

| | Kern County, California |
|---|---|
| ⓘ Population estimates, July 1, 2024, (V2024) | ⚠ NA |
| ⓘ Population estimates, July 1, 2023, (V2023) | ⚠ 913,820 |
| ⓘ Population estimates base, April 1, 2020, (V2024) | ⚠ NA |
| ⓘ Population estimates base, April 1, 2020, (V2023) | 909,229 |
| ⓘ Population, percent change - April 1, 2020 (estimates base) to July 1, 2024, (V2024) | ⚠ NA |
| ⓘ Population, percent change - April 1, 2020 (estimates base) to July 1, 2023, (V2023) | ⚠ 0.5% |
| ⓘ Population, Census, April 1, 2020 | 909,235 |
| ⓘ Population, Census, April 1, 2010 | 839,631 |

**Age and Sex**

| ⓘ Persons under 5 years, percent | ⚠ 6.9% |
| ⓘ Persons under 18 years, percent | ⚠ 28.4% |
| ⓘ Persons 65 years and over, percent | ⚠ 12.2% |
| ⓘ Female persons, percent | ⚠ 49.3% |

**Race and Hispanic Origin**

| ⓘ White alone, percent (a) | ⚠ 81.4% |
| ⓘ Black alone, percent (a)   (a) | ⚠ 6.2% |
| ⓘ American Indian and Alaska Native alone, percent (a)   (a) | ⚠ 2.8% |
| ⓘ Asian alone, percent (a)   (a) | ⚠ 5.9% |
| ⓘ Native Hawaiian and Other Pacific Islander alone, percent (a)   (a) | ⚠ 0.3% |
| ⓘ Two or More Races, percent | ⚠ 3.5% |
| ⓘ Hispanic or Latino, percent **(b)**   **(b)** | ⚠ 57.1% |
| ⓘ White alone, not Hispanic or Latino, percent | ⚠ 30.0% |

**Population Characteristics**

| ⓘ Veterans, 2019-2023 | 32,696 |
| ⓘ Foreign-born persons, percent, 2019-2023 | 19.7% |

**Housing**

| ⓘ Housing Units, July 1, 2023, (V2023) | 309,653 |
| ⓘ Owner-occupied housing unit rate, 2019-2023 | 59.8% |
| ⓘ Median value of owner-occupied housing units, 2019-2023 | $310,600 |
| ⓘ Median selected monthly owner costs -with a mortgage, 2019-2023 | $1,901 |
| ⓘ Median selected monthly owner costs -without a mortgage, 2019-2023 | $599 |
| ⓘ Median gross rent, 2019-2023 | $1,220 |
| ⓘ Building Permits, 2023 | 2,451 |

**Families & Living Arrangements**

| ⓘ Households, 2019-2023 | 281,416 |
| ⓘ Persons per household, 2019-2023 | 3.15 |
| ⓘ Living in the same house 1 year ago, percent of persons age 1 year+, 2019-2023 | 90.4% |
| ⓘ Language other than English spoken at home, percent of persons age 5 years+, 2019-2023 | 45.2% |

**Computer and Internet Use**

| ⓘ Households with a computer, percent, 2019-2023 | 94.1% |
| ⓘ Households with a broadband Internet subscription, percent, 2019-2023 | 89.8% |

**Education**

| ⓘ High school graduate or higher, percent of persons age 25 years+, 2019-2023 | 77.1% |
| ⓘ Bachelor's degree or higher, percent of persons age 25 years+, 2019-2023 | 18.6% |

**Health**

| ⓘ With a disability, under age 65 years, percent, 2019-2023 | 8.5% |
| ⓘ Persons without health insurance, under age 65 years, percent | ⚠ 7.7% |

**Economy**

| ⓘ In civilian labor force, total, percent of population age 16 years+, 2019-2023 | 58.4% |
| ⓘ In civilian labor force, female, percent of population age 16 years+, 2019-2023 | 53.3% |
| ⓘ Total accommodation and food services sales, 2022 ($1,000)   (c) | 2,111,941 |

ER296

| | |
|---|---|
| ⓘ Total health care and social assistance receipts/revenue, 2022 ($1,000)  (c) | 5,727,357 |
| ⓘ Total transportation and warehousing receipts/revenue, 2022 ($1,000)  (c) | 2,689,976 |
| ⓘ Total retail sales, 2022 ($1,000)  (c) | 13,442,643 |
| ⓘ Total retail sales per capita, 2022  (c) | $14,663 |

**Transportation**

| | |
|---|---|
| ⓘ Mean travel time to work (minutes), workers age 16 years+, 2019-2023 | 24.4 |

**Income & Poverty**

| | |
|---|---|
| ⓘ Median households income (in 2023 dollars), 2019-2023 | $67,660 |
| ⓘ Per capita income in past 12 months (in 2023 dollars), 2019-2023 | $29,238 |
| ⓘ Persons in poverty, percent | ⚠ 19.0% |

### 🏢 BUSINESSES

**Businesses**

| | |
|---|---|
| ⓘ Total employer establishments, 2022 | 14,233 |
| ⓘ Total employment, 2022 | 206,892 |
| ⓘ Total annual payroll, 2022 ($1,000) | 11,061,785 |
| ⓘ Total employment, percent change, 2021-2022 | 6.8% |
| ⓘ Total nonemployer establishments, 2022 | 55,844 |
| ⓘ All employer firms, Reference year 2022 | 10,551 |
| ⓘ Men-owned employer firms, Reference year 2022 | 6,495 |
| ⓘ Women-owned employer firms, Reference year 2022 | S |
| ⓘ Minority-owned employer firms, Reference year 2022 | 3,881 |
| ⓘ Nonminority-owned employer firms, Reference year 2022 | 5,397 |
| ⓘ Veteran-owned employer firms, Reference year 2022 | S |
| ⓘ Nonveteran-owned employer firms, Reference year 2022 | 8,839 |

### 🌐 GEOGRAPHY

**Geography**

| | |
|---|---|
| ⓘ Population per square mile, 2020 | 111.8 |
| ⓘ Population per square mile, 2010 | 103.3 |
| ⓘ Land area in square miles, 2020 | 8,134.65 |
| ⓘ Land area in square miles, 2010 | 8,131.92 |
| ⓘ FIPS Code | 06029 |

About datasets used in this table

**Value Notes**

⚠ Methodology differences may exist between data sources, and so estimates from different sources are not comparable.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Quick Info ⓘ icon to the left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2024) refers to the final year of the series (2020 thru 2024). Different vintage years of estimates are not comparable.

Users should exercise caution when comparing 2019-2023 ACS 5-year estimates to other ACS estimates. For more information, please visit the 2023 5-year ACS Comparison Guidance page.

**Fact Notes**

| | |
|---|---|
| (a) | Includes persons reporting only one race |
| (b) | Hispanics may be of any race, so also are included in applicable race categories |
| (c) | Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data |

**Value Flags**

| | |
|---|---|
| D | Suppressed to avoid disclosure of confidential information |
| F | Fewer than 25 firms |
| FN | Footnote on this item in place of data |
| NA | Not available |
| S | Suppressed; does not meet publication standards |
| X | Not applicable |
| Z | Value greater than zero but less than half unit of measure shown |
| - | Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest or upper interval of an open ended distribution. |
| N | Data for this geographic area cannot be displayed because the number of sample cases is too small. |

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Small Area Income and Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**CONNECT WITH US**   f  𝕏  in  ▶  ⊙

Information Quality | Data Linkage Infrastructure | Data Protection and Privacy Policy | Accessibility | FOIA | Inspector General | No FEAR Act | U.S. Department of Commerce | USA.gov

**Measuring America's People, Places, and Economy**

ER297

# Exhibit 26

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 302 of 435
Case: 1:18-cv-03757 Document #: 155-1 Filed: 02/07/22 Page 18 of 28 PageID #:1563
Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 111 of 113
FINAL DRAFT (11/23/21)

## APPENDIX A

Broadcast Statement of Policy

**This Broadcast states the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations, as well as any DHS or ICE policies or memoranda governing immigration enforcement priorities and any additional requirements such policies or memoranda may impose upon the taking of any action to enforce the immigration laws of the United States.**

A. Warrantless Arrests

Under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), Immigration & Customs Enforcement ("ICE") Officers may conduct warrantless arrests if there is "reason to believe that the alien [] [to be] arrested is [present] in the United States in violation of any [U.S. immigration] law and is likely to escape before a warrant can be obtained for [the] arrest." The "reason to believe" standard requires ICE Officers to have probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest.

In considering "likelihood of escape," an ICE Officer must consider the totality of circumstances known to the officer before making the arrest. While there is no exhaustive list of factors that should be considered in determining whether an individual is "likely to escape before a warrant can be obtained" under 8 U.S.C. § 1357(a) / INA § 287(a), factors relevant to the determination may include the ICE Officer's ability to determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances that weigh in favor or against a reasonable belief that the subject is likely to abscond.  The particular circumstances before the ICE Officer are not to be viewed singly; rather, they must be considered as a whole. However, mere presence within the

*Castañon Nava, et al. v. Department of Homeland Security, et al.*
1: 18-cv-03757 (NDIL)
Settlement Agreement Page **17** of **19**

ER299

**FINAL DRAFT (11/23/21)**

United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be *obtained*.

When conducting enforcement actions, ICE Officers shall, at the time of arrest or as soon as it is practical and safe to do so, identify themselves as immigration officers in accordance with 8 C.F.R. § 287.8(c)(2)(iii).

After having made an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2), an ICE Officer must document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable. This documentation must include: (1) that the alien was arrested without a warrant; (2) the location of the arrest and whether this location was a place of business, residence, vehicle, or a public area; (3) whether the alien is an employee of the business, if arrested at a place of business, or whether the alien is a resident of the residence, if arrested at a residential location; (4) the alien's ties to the community, if known at the time of arrest, including family, home, or employment (**Note**: Information learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest.); (5) the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained; and (6) a statement of how "at the time of arrest, the designated immigration officer [did], as soon as it [wa]s practical and safe to do so, identify himself or herself as an immigration officer who is authorized to execute an arrest; and state[d] that the person is under arrest and the reason for the arrest."

## B. Vehicle Stops

The policy above applies to all warrantless arrests under 8 U.S.C. § 1357 (a) (2) / INA § 287(a)(2), including warrantless arrests resulting from vehicle stops.

As federal law enforcement officers, ICE Officers lack federal statutory authority to enforce state or local vehicle or traffic laws. *See* 8 U.S.C. §§ 1357 (a)(4), (a)(5) / INA §§ 287(a)(4), (a)(5). Accordingly, when making vehicle stops, ICE Officers shall not state to the driver or occupant(s) of a vehicle that the purpose for a stop is related to any vehicle or traffic laws and regulations.

*Castañon Nava, et al. v. Department of Homeland Security, et al.*
1: 18-cv-03757 (NDIL)
Settlement Agreement Page **18** of 19

ER300

Case: 25-4047, 09/26/2025, DktEntry: 13.1, Page 304 of 435
Case: 1:18-cv-03757 Document #: 155-1 Filed: 02/07/22 Page 20 of 28 PageID #:1565
Case 1:25-cv-00246-JLT-BAM    Document 15-2    Filed 03/07/25    Page 113 of 113

**FINAL DRAFT (11/23/21)**

ICE Officers may stop a vehicle to enforce civil immigration laws only if they are aware of specific, articulable facts that reasonably warrant suspicion that the vehicle contains an alien(s) who may be illegally in the country.

As soon as practicable after making an arrest under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) pursuant to a vehicle stop, in addition to the documentation requirements for warrantless arrests described above, the ICE Officer also must document the facts and circumstances surrounding the vehicle stop that resulted in a warrantless arrest in the narrative section of the alien's I-213. This documentation shall include the specific, articulable facts that formed the basis for the ICE Officer's reasonable suspicion that an alien in the vehicle stopped was present within the United States in violation of U.S. immigration law.

*Castañon Nava, et al. v. Department of Homeland Security, et al.*
1: 18-cv-03757 (NDIL)
Settlement Agreement Page **19** of **19**

ER301

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF ELIZABETH STRATER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        April 11, 2025<br>Time:        9:00 a.m.<br>Dept.:        Courtroom 4, 7th Floor<br>Judge:        Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date:  None set |

I, Elizabeth Strater, declare:

1.    I serve as Director of Strategic Campaigns and National Vice President of the United Farm Workers of America ("UFW"). I have worked for UFW since 2017 and have been National Vice President since I was elected by a Convention of farm worker union members in September 2024. As a member of the elected Union Executive Board, I help direct the union's work in organizing, negotiating, public campaigns, rulemaking, legislative campaigns and wide-reaching advocacy on behalf of farm workers.

2.    As Director of Strategic Campaigns, I direct campaigns on behalf of farm workers to empower them to improve their safety, wages, working conditions and to underscore their basic human dignity. An important part of my role is to humanize the essential contributions of farm workers and to protect the rights of UFW's membership, the majority of whom are immigrants. I have detailed knowledge about UFW's membership demographics, membership criteria, member needs and priorities, and how members direct UFW's mission and advocacy. As part of my role as Director of Strategic Campaigns and National Vice President, I regularly hear from UFW members about their safety, wages, working conditions, immigration issues, and other concerns members face in their communities. I also hear these concerns communicated through UFW organizers who speak directly with members and report to the Board. In recent weeks, I have heard from numerous members about the impact of Operation Return to Sender.

3.    I make this statement based upon personal knowledge, files, and documents of UFW that I have reviewed, as well as information supplied to me by employees of UFW whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting UFW's business. If called as a witness, I could testify truthfully to these facts.

**Background on UFW**

4.    UFW is the first and largest farm worker union in the country. It represents thousands of migrant and seasonal farm workers in various agricultural occupations throughout the United States. It is headquartered in Kern County in Keene, California.

5.    As of February 2025, UFW has approximately 7,000 members.

6.      UFW members reside throughout the country. California is home to more UFW members than any other state. In California, UFW members reside across the entire state: as far south as San Diego County and as far north as Sonoma County, with the highest density in the Central Valley region. UFW members also live in counties across the Eastern District of California, including Fresno County, Kern County, Madera County, Merced County, San Joaquin County, Solano County, Stanislaus County, and Tulare County.

7.      UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement. In addition to these categories, UFW recognizes other forms of membership, including full-time employees who have been employed for at least two years, individuals recognized as martyred members due to their sacrifice in the struggle for social justice, honorary members who are family members of martyred members, and retired members who contribute voluntarily after leaving active employment.

8.      Generally, individuals seeking to become contributing or associate members of UFW complete an official application, which is reviewed and processed by UFW staff for approval. Dues-paying members become members through the procedures set forth in the California Agricultural Labor Relations Act or other applicable laws, their collective bargaining agreements, and union rules.

9.      UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests. For example, in 2008, in response to requests from our members, we created educational scholarships for students who are working toward an undergraduate degree and are either eligible UFW members or their dependents in California, Oregon, and Washington state.

10.     UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Through an established negotiating committee comprised of workers, UFW members negotiate benefits such as medical insurance, pension, wages, paid time off, working conditions, seniority, right to recall, equipment provisions and other terms of employment. Contributing or associate members (also called "direct" members) receive accidental life insurance of $4000, access to UFW discounts with private businesses, and other benefits. In addition, for services that prioritize agricultural workers, UFW direct membership establishes eligibility.

11.     Founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders, UFW was created from the merger of workers' rights organizations to form one union. Our mission is to improve the lives, wages, and working conditions of agricultural workers and their families.

12.     To fulfill our mission, UFW engages in collective bargaining, worker education, advocacy, state and federal legislation, and public campaigns. Our stated values are integrity, "Sí se puede" attitude, dignity, and innovation. We promote total nonviolence as a core tenet. As a result of UFW's work, thousands of agricultural workers are protected under UFW contracts. UFW has also sponsored and advocated for legal reforms to protect all farm workers at the state and federal level, including related to overtime pay, heat safety, pesticides safety, COVID-19 protections, and other policies to protect farmworkers and advance their rights.

13.     As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights. For example, in 2022, UFW's President Teresa Romero participated in the House Education and Labor Subcommittee on Workforce Protections hearing titled "Second Class Workers: Assessing H2 Visa Program Impact on Workers." The H2-A visa applies to seasonal farm workers. At this hearing, President Romero advocated for legislation that would provide such farm workers with a path to citizenship and called on the federal government and Congress to establish heat standards to protect farm workers from preventable heat deaths. We have also spearheaded national public campaigns and congressional lobbying efforts to raise

public awareness of the critical role migrant farm workers play in our communities and economy and advocate for immigration reform, including a path to citizenship for farm workers.

14.    UFW members reach out to us to seek assistance, advocacy, advice, and information. My team is in constant contact with its membership through in-person meetings, emails, phone calls, text messages, and social media, among other platforms. Members guide the organization at Conventions and quarterly consejo de base (advisory) meetings and will reach out to union staff, including me and my direct reports, on a daily basis via text message, phone, social media, email or at a UFW office.

**UFW Members Were Harmed by "Operation Return to Sender" and Fear Harm from Future Border Patrol Operations**

15.    Based on my reports from members about their experiences with "Operation Return to Sender," I understand that during the week of January 6, 2025, Border Patrol agents based in El Centro, Imperial County, fanned across Kern County and the surrounding region and arrested dozens of individuals as part an operation they dubbed "Return to Sender." They appeared to target certain populations for federal immigration enforcement, including farm workers commuting to and from work on highways and roads near agricultural operations. As described below, at least two UFW members were pulled over, arrested, detained, forced to accept "voluntary" departure, and expelled to Mexico within days, leaving behind, between them, seven young children in the U.S.

16.    Based on my reports from members and their families, I understand that Border Patrol's operation has caused widespread panic among UFW members across California, and even in Oregon and Washington. On the days of the raids, many UFW members were already at work and heard about Border Patrol's activities through word-of-mouth. Fearing they could be targeted, many of them remained in the fields until late at night, afraid to drive home on highways where Border Patrol might indiscriminately pull them over, arrest and detain them, and seek to expel them from the country.

17.    I also understand that the panic and fear described above were, and are, felt by UFW members of diverse immigration statuses because, based on UFW's institutional and direct

understanding with such raids, Border Patrol's practices target non-white and/or Spanish-speaking farm workers broadly, with little regard to whether particular farm workers have lawful presence or deep ties to the local community. For instance, UFW members who are long-time lawful permanent residents nevertheless feel anxious about being swept up in future raids because of reports that Border Patrol's operation indiscriminately arrested people even if they had U.S. citizenship or lawful permanent residence. UFW members with employment authorization documents, such as those with H-2A temporary agricultural visas, T-visas, Temporary Protected Status, Deferred Action for Labor Enforcement, or Deferred Action for Childhood Arrivals, similarly express fear to me and my team that Border Patrol will seize, arrest, and/or detain them for removal without regard to their authorization to be in the U.S.

18.    In response to "Operation Return to Sender" and the harms it inflicted on UFW members, we mobilized quickly to support our members. We connected members with immigration attorneys and helped them identify where their loved ones were being detained. We aided farm workers by helping to arrange travel between their homes and Border Patrol's detention centers, often hundreds of miles away. When breadwinners were detained or summarily expelled from the country, we assisted affected families in locating emergency food, diapers, and infant formula supplies needed for survival.

19.    In the aftermath of "Operation Return to Sender," many UFW members read news reports that leaders in the El Centro Border Patrol Sector expressed their plans to execute future operations in the interior of the country, including as far north as the California-Oregon state border line.

20.    I also understand based on my reports from members and their families that the fear of future immigration enforcement operations similar to "Operation Return to Sender" has deeply affected UFW members and has prompted many of them to change how they arrange their lives. For example, many UFW members no longer commute to and from work in the same vehicle as their spouses, and whenever possible, no longer run daily errands together. Some members used to work at the same worksite as their spouses; after the raids, either the member or

their spouse changed jobs to reduce the likelihood of both spouses being arrested simultaneously during a workplace raid or Border Patrol roving patrol along their commute.

21.    Many UFW members have young children. They are terrified of being swept up in a raid and separated from their children, who may have no one to take care of them. In the days after the raids, many members kept their children home from school or daycare and avoided going to doctor's appointments, church, or the store, paralyzed by the fear of being arrested with no notice. Members with young children have arranged for a trusted community member to pick their children up from school or daycare to minimize the risk of being detained, arrested, or taken away by Border Patrol in front of their children. Members who are parents of school aged children are reluctant to attend school meetings in case of an indiscriminate raid, hindering them from being an active participant in their child's education. These members leave for work each day scared they will not come home to their children because of another enforcement action by Border Patrol or other immigration authorities.

22.    As a result of Border Patrol's January operation, and Border Patrol's statements that they will replicate their operations elsewhere in California, many UFW members, regardless of the stability or permanence of their immigration status, fear that future operations will again target farm workers, especially those who appear non-white. They are terrified that Border Patrol will—again—arrest people without warrants and without regard to how long someone has been living in the community or the family members they have waiting for them, including young children; that Border Patrol will—again—detain people, regardless of immigration status, in a detention facility without the ability to contact their family members or an attorney; and that Border Patrol will pressure or deceive individuals to agree to voluntary departure unknowingly and involuntarily, separating them from their family members, homes, and all they have worked for without even a chance to say goodbye or arrange their affairs.

23.    I also understand based on my reports from members and their families, of Border Patrol's tactics during "Operation Return to Sender" quickly circulated among the UFW community. These reports and videos left many UFW members feeling deeply fearful, regardless of the stability or permanence of their immigration status. Our members have expressed their

alarm that, like during "Operation Return to Sender," Border Patrol agents conducting any future operation will run roughshod over their constitutional rights if they attempt to assert them during a stop, seizure, arrest, and/or detention.

24.    Because of "Operation Return to Sender" and the deep harms it inflicted on farm worker families and communities, UFW members feel chilled from exercising their right to speak up about workplace abuses or wage theft. They are scared that speaking up will attract negative attention to themselves, and that a vengeful employer could call immigration enforcement to report them. They feel the risks of being separated from their families and expelled from their homes are too great.

**Stories of UFW Members Harmed By "Operation Return to Sender" and Who Fear Harm From Future Operations**

_Alicia, Benjamin, and Carlos_

25.    Through my role as National Vice President in the ordinary course of UFW's business, I received reports of UFW members impacted by "Operation Return to Sender," including "Alicia,"[1] who is a farmworker and UFW member who lives in Kern County, California with her four school-age children, her husband, UFW member "Benjamin," and her brother-in-law, UFW member "Carlos." Alicia had lived with "Benjamin," until Border Patrol agents coerced him into "voluntary" departure and expelled him to Mexico as part of "Operation Return to Sender." Alicia and Benjamin have lived and worked in Kern County for the past 10 years working in berry, table grape, almond, and citrus agriculture.

26.    On January 7, 2025 at about 2:00 p.m., Alicia was in a car with Benjamin and "Carlos," on their way home from the citrus orchards where they all worked together. They were on Highway 99, a common route for farm workers to get to rural roads where their worksites are located. They were traveling within the speed limit and obeying traffic laws.

27.    Alicia, Benjamin, and Carlos all noticed one marked and two unmarked vehicles were parked on the shoulder with police-style lights on the grill. When Alicia, Benjamin, and

---

[1] To protect the privacy and security of our members, I am using fictitious names to identify them.

Carlos's car passed these vehicles, the vehicles left the shoulder, pulled up behind them, and signaled with their lights for them to pull over. They complied. Several men approached the car and asked Alicia, Benjamin, and Carlos if they had "papers." Upon information and belief, these were Border Patrol agents. The agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for "papers." In light of the police-style lights that the agents used, Alicia, Benjamin, and Carlos did not feel like they were free to leave.

28.    After asking for "papers," the Border Patrol agents arrested Alicia, Benjamin, and Carlos. They did not present a warrant for arrest. They did not ask any further questions.

29.    After they had handcuffed her, the agents asked Alicia if she had family. When she told them she had children, an agent "offered" to go pick up the children so they could all be taken to Mexico together. The men did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk.

30.    The men transported Alicia, Benjamin, and Carlos to a large tent on the outskirts of Bakersfield, which appeared to have been set up as a mobile processing center. The Border Patrol agents said they would be detained for many months. Alicia begged the agents to release her, explaining that she had four young children that needed to be picked up from daycare and no one else to care for them. An agent called the daycare to speak to a teacher and confirm Alicia was telling the truth. After confirming it, the agent released her, hours after she had been arrested.

31.    Border Patrol agents transported Benjamin and Carlos to the El Centro Border Patrol Station, where they were detained in cold, windowless cells. Border Patrol agents did not provide Benjamin or Carlos with any hygiene items and gave them only a thin aluminum sheet for warmth. It was impossible for Benjamin or Carlos to sleep because the lights in the cell were on day and night and there was nothing to lie down on except hard, cold concrete.

32.    Border Patrol agents forced Benjamin and Carlos into accepting voluntary departure. When Benjamin and Carlos indicated they did not want to agree to voluntary departure, Border Patrol agents deliberately displayed their weapons as a show of intimidation. Scared, Benjamin and Carlos signed where they were told. Border Patrol agents never informed

Benjamin or Carlos that taking "voluntary" departure involved waiving their right to a hearing in immigration court, nor did they inform them of the consequences of voluntary departure, including that it could result in a 3-year or 10-year period of inadmissibility. Instead, Border Patrol agents also lied to Benjamin and Carlos before they signed, and claimed that "voluntary" departure would make it easier for them to return to the U.S. Benjamin and Carlos signed their names on a small screen that had space only for their signature. Border Patrol did not show them the documents they were signing nor provide them any documents in English or Spanish.

33.    Neither Benjamin nor Carlos understood what voluntary departure was. No one explained to them that voluntary departure meant they could be barred from returning to the U.S. for years. No one explained the rights they would have had in an immigration court hearing. If they had understood their rights, and the consequences of voluntary departure, neither Benjamin nor Carlos would have signed the documents. They would have insisted on an opportunity to see a judge.

34.    Border Patrol's actions tore Alicia's, Benjamin's, and Carlos's lives apart. Benjamin is stranded in Mexico, forcing Alicia to raise their four children alone. While she grieves her separation from her husband, she also must manage their household alone and care for her children without her husband's presence or support. Alicia does not know how she will provide for her children on a single income. Alicia and Benjamin still feel shocked by what happened to them. Both are experiencing profound sadness over their family's separation.

35.    Alicia continues to work as a farm worker in the Kern County area. She cannot avoid the locations Border Patrol targets in its immigration sweeps. She must travel through agricultural areas to get to and from work. She cannot avoid getting gas or running errands at stores in Bakersfield, including in locations where other farm workers shop and gather. She feels enormous stress and anxiety that because she cannot avoid these locations, Border Patrol agents will seize her again, regardless of whether they have the requisite reasonable suspicion to do so, and will arrest her again regardless of whether she poses a flight risk. She fears Border Patrol agents will force her into voluntary departure, like they forced her husband and brother-in-law. If she is expelled from the country, her children will be left without a parent in the United States.

Alicia cannot bear the thought of being separated from her children the way she has been separated from her husband.

36.    Benjamin is worried for his children, two of whom are still in diapers. He is devastated that he is separated from and unable to support his wife and his children, as he knows they are struggling without him.

*Fernando*

37.    Through my role as National Vice President in the ordinary course of UFW's business, I also received a report of how "Operation Return to Sender" impacted "Fernando," a farm worker and UFW member who has lived in Kern County for around 20 years. Fernando has raised a family with his wife, supporting his family by working in the fields.

38.    On January 9, 2025, Fernando was in a car driving home after work on a public road between Bakersfield and Mettler, California. They were traveling within the speed limit and obeying traffic laws. On the highway, traveling on a route commonly taken by agricultural workers when traveling between orchard worksites and farm worker communities, a truck turned on flashing lights and signaled for their car to pull over.

39.    When Fernando's car came a stop, several men jumped out of their vehicles and approached the car, yelling in an intimidating manner. Upon information and belief, these were Border Patrol agents. They grabbed the handles of the locked car doors and pounded on the closed windows. They warned Fernando and his companions that if they did not open the windows, they would smash the glass. The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from "five." When they reached "one," they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants. The time from approaching the vehicle to smashing the windows was approximately 15 seconds.

40.    The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway. The agents arrested Fernando. The vehicle was impounded.

41.     The agents did not identify themselves, did not appear to know Fernando was, and did not appear to have any reason for pulling the car over, other than to target its passengers for federal immigration enforcement. The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk.

*Gabriela*

42.     Through my role as National Vice President in the ordinary course of UFW's business, I also understand how "Operation Return to Sender" impacted "Gabriela" is a farm worker and UFW member who has lived in Fresno for 22 years. Gabriela has a daughter and eight grandchildren. Gabriela helps her daughter with childcare when her daughter had doctor's appointments or needs assistance picking up the children from school. Gabriela has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years. Gabriela has legal authorization to work in the United States. Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring "Operation Return to Sender" to her community in Fresno. Gabriela is an active member of her community and has heard other farm workers express the same fears.

43.     Gabriela cannot avoid traveling through and visiting the types of locations that Border Patrol targeted in "Operation Return to Sender." Gabriela must drive in and around the Fresno region, including on highways and in agricultural areas, to commute to and from work. She fills up her car with gas, purchases food, and runs errands at businesses frequented by other farm workers. Gabriela fears that Border Patrol agents will seize her without reasonable suspicion to do so, simply because of where she is, her skin color, or her apparent occupation as a farm worker. Although she has a child and grandchildren who live in the community and deep community ties, she fears that Border Patrol will arrest her without a warrant without regard to whether she is actually a flight risk. After arresting her, Gabriela fears that Border Patrol will coerce her into voluntary departure.

44.    Gabriela is fearful and anxious at the thought of being detained and separated from her child and grandchildren. She does not know who would care for the loved ones who depend on her, even if she were detained for a brief period. She cannot imagine the grief and pain of being expelled from the country and separated forever from her loved ones.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 7, 2025

_____
Elizabeth Strater

ER314

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF ERNESTO CAMPOS GUTIERREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:       April 11, 2025 <br> Time:      9:00 a.m. <br> Dept.:      Courtroom 4, 7th Floor <br> Judge:     Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

I, Ernesto Campos Gutierrez, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Ernesto Campos Gutierrez. I am 44 years old. I have lived in Bakersfield, CA, for over 20 years. I am a U.S. citizen. I own my home, where I live with my partner and children. I own my own gardening and landscaping business. I am also a member of my local church and involved with church activities.

3.      On January 8, 2025 at around 9:40 a.m., I was driving in Bakersfield on my way to a gardening job. I had a passenger in the front passenger seat. My truck is registered under my name, had current license plates and registration, and had no stickers or decals. I was hauling a mini trailer containing gardening equipment. I was driving within the speed limit.

4.      An unmarked, white Chevrolet Tahoe followed me for a couple minutes. Then, it turned on flashing lights and signaled for me to pull over. I complied. The Tahoe stopped behind me. A Black male agent got out of the Tahoe, walked over to my truck, and tried to pull open the driver's side door, but the door was locked. He was wearing a vest that said the words "POLICE" in large letters. Through the closed car window, he asked for our IDs. He called to another person and said he "had two bodies." He did not identify himself, show me a warrant, or explain why he had pulled me over.

5.      I lowered my window, asked the agent why he had pulled us over, and handed him my REAL ID driver's license. The agent glanced at the license and told me to hand him the keys to my truck. I told him I was not going to give him my keys because he had not told me who he was or why he had pulled me over. The agent said he needed my keys because I was going to drive away. I said my truck was turned off and I was not going to drive away. I had just handed the agent my driver's license, and as such, had no intention of driving away and leaving my driver's license behind.

6.      The agent pulled out a knife and proceeded to slash both tires on the driver's side of my truck. I was shocked. When the agent pulled out a knife, I suddenly felt afraid he might

attack us or pull out a gun. I could not believe the agent had slashed my tires. I asked again who he was and why he had pulled us over. He refused to answer my questions.

7.      Another truck arrived and blocked me in by parking right in front of my vehicle. A white male agent got out of the truck and stood next to my vehicle while the first agent returned to his vehicle to check my license.

8.      The Black agent came back to the passenger side of my vehicle and ordered my passenger to lower his window and open the door. My passenger lowered the window a few inches. The agent pulled out a handheld tool and threatened to break the window. He ordered my passenger to open the window and open the door. My passenger complied. The agent forcibly grabbed my passenger out of the truck and handcuffed him. The agent never asked my passenger any questions about his community ties. I told the agent he should not have slashed my tires. The agent said, "I'm not going to argue with you, bro. You did what you did, I did what I did."

9.      A Hispanic agent arrived. He said I was under arrest for "alien smuggling." I tried to explain to the agent that my passenger had an open immigration case. He did not respond. He handcuffed me and took away my phone and wallet. He never asked me any questions about my community ties. None of the agents ever identified themselves, presented a warrant, nor explained why they had pulled me over.

10.     I videorecorded part of these interactions using my cell phone.

11.     The agents placed me and my passenger in the back of a truck that said "Immigration." They left my truck on the side of the road and drove us to a facility about 20 minutes away. During the drive, I asked the agents why they had arrested me when I am a United States citizen. They said it was because I had been transporting someone without documents.

12.     I was detained at the facility in handcuffs for about four hours. I asked for a phone call to call my partner. The Hispanic agent said I did not have the right to make a call. At one point, the Black agent told the Hispanic agent that he had slashed my tires because I had become aggressive and "flipped" him off. I told the Hispanic agent that was a lie, and if he wanted to find out the truth he should review the body camera footage. The Hispanic agent listened to me but did not reply.

13.     After detaining me for about four hours, the agents placed me in a truck, drove me to my home and dropped me off.

14.     I had to spend approximately $500 to replace the two slashed tires on my truck. My partner spent about $350 on the two tow trucks that towed my truck and mini trailer home. Additionally, I lost wages because the Border Patrol detained me for so many hours which forced me to cancel all the clients I had scheduled for that day.

15.     I'm scared and in disbelief of how I was treated during this incident. I believe the Border Patrol stopped me solely because of the color of my skin and my appearance. I travel in and around Bakersfield frequently for work and my daily life.

16.     This declaration was read to me in full in Spanish on February 24, 2025 by Mayra Joachin. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 24, 2025 at Bakersfield, California.

_____
Ernesto Campos Gutierrez


**CERTIFICATE OF INTERPRETATION**

I, Mayra Joachin, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Ernesto Campos Gutierrez in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.


Date: February 24, 2025                  _/s/ Mayra Joachin_____
                                         Mayra Joachin


ER318

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF JESUS RAMIREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:      April 11, 2025 <br> Time:     9:00 a.m. <br> Dept.:    Courtroom 4, 7th Floor <br> Judge:    Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date: None set |

I, Jesus Ramirez, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Jesus Ramirez. I am 64 years old, and I live in Bakersfield, California, where I rent my home. I am the primary caretaker for my minor son, and the only living parent to both my daughter and son. I moved to Bakersfield recently, only about one month before my arrest. Before then, I lived in San Mateo.

3.      I have worked in Bakersfield and San Mateo as a day laborer, fixing roofs and sprinklers and mowing grass.

4.       On or around January 7, 2025, I was detained by Border Patrol agents at the Home Depot at 4001 Ming Avenue in Bakersfield. At around 11 a.m., I was standing with some other day laborers in the Home Depot parking lot when we were surrounded by Border Patrol agents. I knew they were Border Patrol agents because they had badges on their vests. I was not doing anything unlawful when they surrounded us. The agents arrived in multiple vehicles, some of which had sirens on when they surrounded us. We could not go anywhere because there were many agents all around us.

5.      Border Patrol agents repeatedly demanded we show our "papers." I reached for my wallet to locate my ID and as I pulled it from my pocket, an agent snatched the wallet from me and removed my ID. He looked at it but did not ask me any questions about it. He returned my wallet but kept my ID.

6.      The Border Patrol agent did not ask me any questions about my family or ties to the community. If he had asked, I would have told him I have family in Bakersfield and elsewhere in California. I would have told him my children live in California, and my son is still a minor. I would have told him I am the only remaining living parent to my children.

7.      It was clear to me the agents did not know who I was. They did not show me any document or have a warrant for me.

8.      I was loaded into a vehicle in the parking lot of Home Depot and transported behind the store, where I was loaded into a bigger vehicle. The vehicle was full of other people. A

ER320

Border Patrol agent said I was going to be taken "home," and I believed he meant that I was going to be taken to my own home in Bakersfield.

9.      It was not until Border Patrol drove us to a makeshift processing station that I learned to my shock that immigration was formally arresting me.

10.      At the makeshift processing station, Border Patrol told me to remove my shoelaces and put them in a bag with other belongings. I was detained there for about 7 or 8 hours with about twelve other individuals. We were offered only some small crackers and one small bottle of water. At the end of our long wait, we were ordered to board a bus, which filled with people. Another person asked a Border Patrol agent where they were taking us, and I heard the agent say Calexico.

11.      The bus stopped at a gas station. We remained on the bus. After about an hour, the bus continued to El Centro, a Border Patrol detention center in Imperial County.

12.      At El Centro, Border Patrol agents took my fingerprints. An agent ordered me to sign a document and said it was required for a judge to review my case. The document was in English, a language I do not read. The document was not translated or explained to me. I requested an opportunity to make a phone call to a family member but was denied.

13.      In the afternoon of January 9, I was moved from El Centro to Imperial Regional Detention Facility, an ICE detention center, along with about eight other men.

14.      I have been in immigration detention since early January. I have had one court date with an immigration judge who only told me that crossing the border is illegal and did not ask me any questions or tell me anything else. I have another immigration court date scheduled for February 20.

15.      I feel devastated about what has happened. I worry every day about how my children are doing. Their mother tragically died years ago, and I am their only living parent. I am heartbroken thinking about what they must be going through without me. They are the most important people in the world to me. I long to be released from detention so I can be reunited with my children and take care of them, support them, and guide them in their lives.

16.      This declaration was read to me in full English and Spanish on February 13, 2025

by Maricela Sanchez. I completely understand the content of this declaration.

     I declare under penalty of perjury that the foregoing is true and correct.

     Executed on February 13, 2025 at Calexico, California.

Jesus Ramirez

## CERTIFICATE OF INTERPRETATION

     I, Maricela Sanchez, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Jesus Ramirez in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 13, 2025

/s/

Maricela Sanchez

ER322

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF JUAN VARGAS MENDEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:      April 11, 2025 <br> Time:      9:00 a.m. <br> Dept.:     Courtroom 4, 7th Floor <br> Judge:     Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

I, Juan Vargas Mendez, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Juan Vargas Mendez. I am 37 years old. I am currently living in Mexico because Border Patrol expelled me from the U.S. by "voluntary departure" without my knowing and voluntary consent. Until I was arrested by Border Patrol, I lived in Bakersfield, California with my U.S.-citizen wife and our family. We have been married since 2013 and have three U.S.-citizen children together: a seven-year-old boy, a four-year-old boy, and a three-year-old girl. My wife's eight-year-old son, also a U.S. citizen, is also part of our family. I am proud to be his stepfather and I consider him my son. He has been diagnosed with epilepsy and suffers from seizures, and he depends on me as a caregiver. I have no criminal history.

3.      I lived in Kern County for about 20 years. I worked as a farmworker at the same ranch for more than 10 years, picking oranges. I also sometimes worked as a gardener with my friends.

4.      On January 8, 2025 at around 5:00 p.m., five of my coworkers and I were driving home in a van after working in the fields. The van had large windows. We were traveling on Maricopa Highway, which is a central highway for farmworkers in southwest Kern County, especially to get to many orange and almond fields. I often got off work and went home via Maricopa highway around this time.

5.      As we approached the David Road exit, we heard loud sirens. I looked at the speedometer and saw we were driving under 40 miles an hour, well within the speed limit. A gray SUV with lights flashing on its roof pulled in front of us on the road and stopped, forcing our car to quickly stop on the road. Through the window, I saw a second SUV, also with flashing lights and sirens, come to a stop immediately behind us. Both cars surrounded us very quickly and aggressively, blocking us in so it was impossible to drive away. I could not see any identifiable logos or markings on the vehicles.

6.      I watched four people exit from the SUVs, two from each car. They were all wearing regular clothing, not uniforms. I did not know who they were, but thought they might be

the police because their vehicles had sirens and flashing lights.

7.      One of the men approached our van, and our driver rolled down his window. The man demanded the driver and front passenger show their license and proof of residency. The driver and front passenger showed him their IDs. The man sounded so angry and aggressive that I felt afraid he might hurt us. He did not explain why we had been stopped.

8.      As the agent was reviewing the IDs, two other agents flung open the door on the right side of the van. The agents did not ask for consent to open the van door or search the van, and no one in the car had provided such consent. Of the two agents who opened the van doors, one appeared to be Latino while the other appeared white. The Latino agent shouted in Spanish that we needed to show him our IDs, and warned us that we had better "tell the truth." I saw both agents had guns on their waists. They kept yelling at us, "Hurry up and tell me the truth," over and over again.

9.      I felt very intimidated by the agents and was afraid they would hurt me. I did not produce an ID because I was not carrying one with me. Two agents grabbed me and dragged me out of the van. They grabbed one of my coworkers and dragged him out, too. They demanded we hand over our personal belongings. I gave them my phone, wallet, and a medical spray I use to help me breathe. I did not feel I had any choice and I did not feel free to leave.

10.     The agents put my hands behind my back and handcuffed me. They did not identify themselves or explain why my coworker and I were being arrested. They did not show us any warrants. They never asked about my community ties to Kern County, such as how long I had lived there, my family, or my employment. The agents mocked us, calling us "Mexican bitches." They searched me and put me and my coworker in the backseat of an SUV.

11.     They took off our handcuffs and drove us away. The agents continued mocking us and calling us names. I was really afraid, but after a little while I tried talking to one of the agents. At this point, I suspected they were immigration agents. I asked him, "Why are you trying to take me?" I told him I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record. He responded he did not care and that I was "going to Mexico."

ER325

12.     After about a half hour, we arrived at a large white warehouse with barbed wire. There were about eight other arrested people gathered there, and about 15 armed agents. They told us they were Border Patrol. They took our temperatures, our fingerprints, and photos.

13.     They forced us onto a bus. After driving for about another half hour, they ordered us off the bus and into the back of a truck. It was very tight and uncomfortable. There were no seats or seatbelts, so we all sat or squatted on the floor and tried to keep our balance. The back of the truck was completely covered, with no windows. The truck drove for a very long time. It felt like about four or five hours. We did not stop even once for people to use the bathroom.

14.     When we finally stopped, they squeezed us into a larger van, which drove for a few more hours. Finally, we arrived at a detention facility at around 1:00 a.m. No one told us where we were.

15.     Agents spoke to us individually. An agent told me I had been arrested because I am "illegal" here, and said I would be deported. I told the agent I had been in the area for 20 years, I have a family, I am a hardworking man, and I have no criminal record. The agent told me he didn't care; that I would be deported anyway. Then he directed me to a holding room.

16.     As soon as I stepped into the holding room, I started to shiver because it was freezing cold. An agent told me to take off my work boots and gave me thin slippers which did not keep out the cold. There were about 20 to 25 of us detained in the room. Some people who were already detained here told us we were at El Centro. For warmth, we received only a thin aluminum sheet, which helped very little against the cold. There were two concrete benches in the room, but no beds. I did not receive a toothbrush, toothpaste, soap, or other hygiene products. They gave us each juice, a stale hot dog, and an apple. I did not eat the hot dog because someone else said it had made them sick.

17.     I have a medical problem with my nose that makes it difficult for me to breathe. I need to use a nasal spray to help me breathe. My spray had been confiscated by the agents when they arrested me and they had not returned it to me. I asked for my spray repeatedly, but no one helped me. I had trouble breathing during the whole time I was detained because I was not allowed to access my medicine.

ER326

18.    On January 9, at around noon, an agent took me to a room. He showed me a 7- or 8-page packet and said I needed to sign the documents. The papers were in English, a language I do not read. The agent did not explain to me what the documents said. He only said if I didn't sign, I would go to prison for months or years. I did not want to sign anything I could not understand. I asked the agent three or four times to please allow me to call my wife. Each time, the agent said no.

19.    Finally, after about fifteen minutes of this standoff, my resolve crumbled. I was freezing cold, I had trouble breathing without my medicine, and I was terrified of the prospect of going to prison for a long time. I was scared my family would never know where I was if I refused to sign and was taken to prison. The agents had a small digital pad ready. I signed my name on it. The digital pad was about the size of a cell phone, had a space for my signature and nothing else, and did not display the documents I was apparently signing. I suspected the documents might be about my deportation, but I was not certain. No one helped me understand what I was signing, gave me any copies of the documents in English or Spanish, or explained what voluntary departure was. No one explained that voluntary departure meant I could be barred from returning to the U.S. for years. No one explained I had the option to go before an immigration judge, or the rights I would have in an immigration court hearing. If I had understood my rights, and the consequences of voluntary departure, I would never have agreed to sign those documents. I would have insisted on an opportunity to speak to a judge, no matter how much pressure they put on me.

20.    Only about two hours later, at about 2 pm on January 9, Border Patrol agents placed me onto a bus and told me they were taking me to Mexico. They drove me to the border across from Mexicali, Mexico and dropped me off. When we arrived, a Border Patrol agent gave me a copy of the documents they claim I signed and a list of pro bono legal services. After my wife translated one of the documents for me, I realized that my signature was on an English-language document apparently agreeing to voluntary departure. I also learned that the document says, "Notice read to subject by Esteban Echeverria, in the Spanish language." This is false. If someone had read the document to me in Spanish, I would not have signed it because I did not

want to agree to be deported. Border Patrol agents returned my wallet, phone, shoelaces, nasal spray, and work boots. I had nothing else besides the clothes on my back.

21.      Being away from my wife and children has been the most devastating experience of my life. After my expulsion, my wife and children came to Mexico to visit me for two days, but I have not seen them since. I am depressed and often cry while on the phone with my wife. I never wanted to be deported from the U.S. My family means everything to me. I am so worried my kids will think I abandoned them. They are too young to understand why I haven't come home. I am in disbelief that I have no idea when I will be able to live with them again.

22.      My eight-year-old stepson, who has epilepsy, depends on me at nights when my wife is at work. We do not have other relatives nearby to help. I used to administer his medicine and help him cope with his seizures. My wife tells me that since my expulsion, his seizures have become worse. She says all the children have become quiet and scared. They are not eating well and are losing weight. I feel my heart is breaking when I think about how they are suffering because of what happened to me.

23.      I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorney to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24.      This declaration was read to me in full in Spanish on February 18, 2025 by Angelina Alas. I completely understand the content of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2025.

_Juan Carlos Vargas Mendez_

Juan Vargas Mendez

**CERTIFICATE OF INTERPRETATION**

I, Angelina Alas, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Juan Vargas Mendez in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 18, 2025                    */s/ Angelina Alas*
                                           Angelina Alas

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF LUIS PEREZ CRUZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:    April 11, 2025 <br> Time:    9:00 a.m. <br> Dept.:    Courtroom 4, 7th Floor <br> Judge:    Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

I, Luis Perez Cruz, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Luis Perez Cruz. I am 28 years old and I have lived in Bakersfield, California with my mother for over two years. I have other family ties in Bakersfield, including cousins. I work as a painter.

3.      On January 7, 2025, I stopped by Home Depot on my way to work. I ran into two of my cousins in the parking lot and was chatting with them. Two men wearing civilian clothes walked up to us. They said they were from Border Patrol and told us to show them IDs saying that we were in the United States legally or had permits to be here. They also asked us if we had open immigration cases. I remained silent. One of the Border Patrol agents then grabbed me and began to handcuff me. I did not feel that I was free to leave. The agent said that whether or not we showed ID, they would arrest us. I felt that I had no choice, so I showed the agent my ID.

4.      None of the agents asked me anything about my family, community ties, work, or life in Bakersfield. The agents did not present me with a warrant of any kind and did not appear to have any idea who I was before they demanded my ID.

5.      The agents picked me up, along with other people they were arresting, in a truck and drove us behind the Home Depot. There, they loaded us into a van and transported us to a station they had set up on 7th Standard Road. They took my fingerprints, name, and my wife and children's names at the station. Then they loaded me into a large bus that looked like a Greyhound bus and drove me to a holding center in El Centro, California.

6.      There, the agents tried to make me sign documents. They refused to show me the documents they wanted me to sign and only showed me the screen where I needed to sign, but suggested signing would lead to me being deported. I refused to sign anything until I saw a judge. After nearly four days, the agents eventually fitted me with a wrist monitor, gave me papers about going to immigration court, and released me to a shelter in Calexico.

7.      This incident still gives me a lot of fear. The agents were very aggressive, and now that I have an immigration case, I am afraid they will pick me up again and treat me even worse.

8.      This declaration was read to me in full Spanish on February 24, 2025 by Mayra

Joachin. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025 at Bakersfield, California.

Luis Perez Cruz

**CERTIFICATE OF INTERPRETATION**

I, Mayra Joachin, certify that I am fluent in Spanish and English and that I am competent

to interpret between these languages. I further certify that I have read the foregoing to Luis Perez

Cruz in Spanish. I further declare that I am competent to render this interpretation and that I

would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 24, 2025                    _/s/ Mayra Joachin_____
                                            Mayra Joachin

ER332

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF MARIA GUADALUPE HERNANDEZ ESPINOZA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       April 11, 2025<br>Time:       9:00 a.m.<br>Dept.:      Courtroom 4, 7th Floor<br>Judge:      Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date:  None set |

I, Maria Guadalupe Hernandez Espinoza, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Maria Guadalupe Hernandez Espinoza, and I am 46 years old. I am currently living in Mexico because Border Patrol expelled me from the U.S. by "voluntary departure" without my knowing and voluntary consent. Until I was arrested by Border Patrol, I lived in Bakersfield for about 10 years. My partner and I have rented the same apartment in Bakersfield for the past three years. I have no criminal history.

3.      I have worked in the agricultural sector for close to 20 years. I picked and packed a variety of different fruits and vegetables, including broccoli, onions, cabbage, lettuce, apples, and tomatoes. I raised my three daughters with my ex-husband. I am very proud of my daughters because they're hardworking like me. My two eldest daughters are married, and I have a grandson. My youngest daughter is attending university. Everything I worked for is in Bakersfield.

4.      On January 7, 2025, around 5:30 p.m., my partner, a coworker, and I were driving on CA-58, heading home to Bakersfield after working at a tomato greenhouse plant in Tehachapi. My partner was driving us in his black Nissan Sentra, which is registered under his name. His car has no stickers or decals, and the license plate and registration were current. My partner was not breaking any traffic laws. He was getting ready to exit when we were approached from behind by an unmarked white Ford pickup truck. The truck followed us and flashed its lights at us, and I heard something that sounded like a police siren. My partner pulled over.

5.      A man in a white shirt came to the driver's side door and asked my partner to turn off the car. My partner complied. This caused the car doors to unlock, and the man pulled open the driver's side door and ordered my partner to step out of the car. The man did not identify himself, show a warrant, or ask us any questions. The man took my partner toward his truck while my coworker and I stayed in the car. I was very nervous, and my coworker began to cry. I noticed six or so white Chevrolet Malibus pull up behind us. They were all unmarked. Each car had three to four men inside, most of whom wore white shirts and civilian clothing. I did not see any of

ER334

them with a badge, but I could see they had guns on their waists.

6.      Two more agents approached our car and asked me and my coworker to get out, which we did. They wore green pants and white shirts. They did not have badges or other identifying information on their clothing. They walked us over to the white Ford truck where my partner and the first agent were.

7.      The agents asked us for our IDs, if we had papers, and if we were here legally. I did not answer their questions, and I did not produce an ID because I was not carrying one with me. The agents did not explain why they had pulled us over. The agents never asked me questions about my community ties, such as the many years I lived here, my work history, or my children and grandson.

8.      The agents began searching my partner's car. They never asked if they could search the car and my partner never consented to a search. They took my partner's wallet from the car and pulled out his ID.

9.      The agents said we were under arrest and took all three of us into the backseat of the white Ford truck. I was not handcuffed, but since they said we were arrested, I did not feel free to go. The agents did not explain why they had arrested us. I was still unsure who the agents worked for, but I could tell from their vehicles, sirens, handguns, and matching clothing that they worked for some type of law enforcement agency. I had no inkling they were affiliated with immigration.

10.      The agents left my partner's car on the side of the road and transported us to a makeshift processing area on 7th Standard Road in Bakersfield. When we arrived at the makeshift processing area, I saw a white truck with a green stripe on it and recognized it as a Border Patrol truck. That was the moment I realized we were in Border Patrol custody. They had brought many people to this makeshift processing station, dozens of men and just one other woman besides me and my coworker. The Border Patrol agents took away my personal belongings including my inhaler, reading glasses, and 80 dollars cash. I asked an agent if I could make a phone call to my family, but they said no. We remained at the makeshift processing center for about an hour before we were loaded onto a bus.

11.     The bus left Bakersfield in the late evening and drove on CA-58 through Mojave. About three hours into the drive, the bus stopped to switch drivers. One of the drivers looked at us, laughed, and said, "Vamos por mas mojados," which means "Let's go for more wetbacks." I was so nervous that I suffered from several anxiety attacks while on the bus.

12.     The bus continued driving and arrived at El Centro Border Patrol station in the early morning hours of January 8. I was exhausted, scared, and hungry. The agents ordered us off the bus and searched us. To my horror, they searched me in front of dozens of men, lifting my shirt and exposing my bra. I felt humiliated; it was so indecent. They took away my sweater and scarf. The agents then took my photograph and fingerprints.

13.     The agents locked me in a frigid room where I met two other women and their children. They said they were asylum seekers and had been in the room for days.

14.     The agents began calling in people for an initial interview. A Latina agent said I could either agree to voluntary departure or see a judge. She said, "If you choose to see a judge, it will take around two to three years to see a judge and either way, you'll likely end up deported." Feeling extremely anxious, sleep deprived, and terrified at the thought of being detained for years, I impulsively said I would agree to voluntary departure. The agent did not have us sign anything. After this quick conversation, I was sent back to the room where I thought about my decision. I realized I wanted to see a judge and have an opportunity to return to Bakersfield. I knew I had to quickly tell an agent I had changed my mind.

15.     When a different agent came by to drop off diapers for one of the children, I told her I had changed my mind about voluntary departure and that I wanted to see a judge. I reiterated I wanted to see a judge and that I would not sign anything agreeing to my deportation. She told me I was not allowed to see a judge.

16.     I was overcome with anxiety; I felt so stressed and did not know what to do. When I tried to sleep, I kept waking up and crying. I still had not been able to contact my family. I could not tell what time it was since we were kept indoors and not exposed to any windows or sunlight. I had to repeatedly ask the agents for the time to keep track of the time. There was no bed and nowhere to sleep or rest except the floor or a metal bench. At one point, a man came to the room

and I thought he was another agent. I told him I wanted to see a judge, but he told me he was a janitor. I made sure to tell every agent who passed by our room that I wanted to see a judge, but no one listened or cared.

17.     Eventually, I was brought to a large room where a female agent I had not met before was sitting in front of a computer. I told her I wanted to see a judge. She told me I could not. I said why not, if I haven't signed any documents? She said, "That doesn't matter, your signature doesn't matter, all of you are going to be deported." She told me I needed to sign some documents. I was skeptical and asked what I was signing. I tried to look at the documents on her computer screen, but she did not let me.

18.     The agent claimed the documents were related to my fingerprints and would prove my identity. She directed me to write my initials on a small digital device. The screen on the device showed an "X" and a line for my signature and nothing else. Based on the agent's words, I believed I had no choice but to sign. I never got to see the documents I was signing, despite asking. After signing, I asked one more time, "Is there any way I can see a judge?" She said no, and said I did not have the right to see a judge.

19.     The agent never explained I was signing documents related to voluntary departure. If I had known they were documents accepting voluntary departure, I never would have signed them. No one ever told me I could be barred from reentering the U.S. if I accepted voluntary departure, and no one gave me a document explaining that. No one ever told me anything about what rights I would have had before an immigration judge, only that I had no right to see one. I was never given an opportunity to speak to a lawyer or call a family member.

20.     The next day, January 9, 2025, at around 1:00 p.m., the agents called me from my room. The agents gave me the belongings they had taken away from me when I arrived at El Centro station and said they were sending me to Mexico. All my hopes and dreams of returning to Bakersfield were shattered. I felt horrified. I couldn't believe what was happening. It is incredibly difficult for me to remember this moment and relive the emotions I felt. I was loaded onto a truck with a group of other people and taken to Mexicali, Mexico.

21.     When we arrived in Mexicali, I had no money and no cell phone. A Border Patrol

agent gave me a copy of the document I signed and a list of pro bono legal services providers in southern California. This was the first time I was able to see that my signature was on a document purporting to agree to voluntary departure. Most of the document is in Spanish, but at the bottom, it says in English, "Notice read to subject by Elisabeth Cota, in the Spanish language." A friend in Mexicali read this and translated it for me. I was in shock. This statement is false. If anyone had read the form to me in Spanish, I would not have signed it because I did not want to accept voluntary departure. My whole life was left in Bakersfield.

22.     I feel like my life has been turned upside down. I feel traumatized. I have trouble sleeping. I wake up in the middle of the night and cry. The life I built in the United States is gone; everything I worked for is gone. I believe Border Patrol stopped us because we were Latinos, and we looked like farmworkers who had just gotten off from work. I have a lot of trouble processing the injustice of what happened to me and others like me.

23.     I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24.     This declaration was read to me in full English and Spanish on February 13, 2025 by Maricela Sanchez. I completely understand the content of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 13, 2025.

Ma. Guadalupe H.

Maria Guadalupe Hernandez Espinoza

**CERTIFICATE OF INTERPRETATION**

I, Maricela Sanchez, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Maria Guadalupe Hernandez Espinoza in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: February 13, 2025

/s/ *[signature]*

Maricela Sanchez

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF OSCAR MORALES CISNEROS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:    April 11, 2025 <br> Time:    9:00 a.m. <br> Dept.:    Courtroom 4, 7th Floor <br> Judge:    Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

I, Oscar Morales Cisneros, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Oscar Morales Cisneros, and I am 51 years old. I currently reside in Bakersfield, where I own my home. I have lived in Bakersfield since 2021. Before moving to Kern County, I worked and lived in Los Angeles County for about 15 years. I have been married to my wife for around 30 years now and we have two daughters together. I also have two grandsons and one granddaughter.

3.      I am a maintenance worker and a construction worker. I am a practicing Catholic and attend mass every Sunday in Bakersfield. I also support our local church by donating money to local causes organized by the church and church members. I do not have any criminal history.

4.      On January 7, 2025, after leaving work to head home, I stopped at a water refill station outside a liquor store to fill up my empty water jugs. The liquor store is located in a predominantly Latino-populated neighborhood. After refilling my jugs with water, I got in my truck. My truck is registered to me, my license plates and registration are up-to-date, and it does not have any stickers or decals. I shifted my truck into reverse and was about to back out when a grey Chevrolet Tahoe pulled up behind me and blocked me in the parking lot. It was unmarked and looked like a regular civilian vehicle. I put the truck back in park and lowered my driver's side window. I saw two agents standing outside my truck. One was a white man, and the other was a Latino man. They both wore green uniforms with "Border Patrol" written on them.

5.      In Spanish, the Latino agent asked me if I had papers and was here legally. I exercised my right to remain silent and did not answer his questions. The white agent asked me for my driver's license, which I provided. The agents did not explain why they had blocked my truck in, nor why they needed my license. The agents took my license and walked back to the Chevy Tahoe. I called my daughter on my cell phone to tell her what was going on. The Latino agent returned and asked who I was calling, and I said I was calling my daughter. When my daughter answered, I told her Border Patrol had stopped me. The Latino agent asked me to put my phone on speakerphone and asked to speak with my daughter. I heard him identify himself to her

as Officer Sanchez.

6.      Officer Sanchez told my daughter in Spanish I was being detained by Border Patrol for being here illegally without documents, and that I would be able to call her in two hours. My daughter asked, "But what did he do?" Officer Sanchez told my daughter I was here illegally and that he had to end the call. He asked me to step out of my vehicle. I complied. He handcuffed me and placed me in the back of the Chevy Tahoe. I asked Officer Sanchez if I could call someone to pick up my truck, and he said no. The agents never presented me with a warrant or, aside from what Officer Sanchez said to my daughter, explained why they arrested me. They did not ask about my ties to the community, such as my family members, my work history, or how long I have lived in the neighborhood.

7.      We drove around Bakersfield. I was in handcuffs the entire time. I did not know where they were taking me, and I was not sure exactly where we were because they made many turns. At one point, the agents stopped at a gas station and pulled up behind a vehicle to block it in, like they had done to me. The agents got out and spoke to a person in the vehicle, and I overheard one of the agents say in English, "We're doing our job." Eventually, they were let go and the agents returned to the Chevy Tahoe.

8.      After about two hours of driving around like this, the agents took me to a station where Border Patrol was holding other people and a bus was waiting. I was not sure where we were. The agents took my personal belongings and put them in a bag. I was fingerprinted and my photo was taken. I asked the agent who took my fingerprints if I could call my daughter since Officer Sanchez had said I could do so after two hours. He allowed me to call her, and I told my daughter I was going to be taken away. The agent then took my phone, turned it off, and placed it in the bag with my other belongings. He placed the bag under the bus in the storage compartment.

9.      I felt very anxious and asked for water. I was given a bottle of water and waited on the bus until it filled up with other detained people. When it was full, there were about 40 people on the bus. We left the station late in the evening, I believe around 10 or 11 p.m., and drove for about three hours. I did not know where we were going, and the agents did not tell us. The bus stopped at a gas station to switch drivers. By this point, everyone on the bus was saying they were

hungry. I was also hungry because I had not eaten since lunch. The agents passed around some granola bars and some small water bottles. We continued driving until we arrived at a detention center in El Centro in the early morning hours.

10.     At the detention center, the agents made everyone remove their clothing. It was very cold. They made me remove my undergarments as well as my vest and thermal pants, which I wore to keep warm. They made us take off our shoes and gave us each a pair of sandals. I experience joint pain whenever I am cold, so I was in pain the entire time I was detained.

11.     When they finished processing me, I was taken to see an agent. The agent said I had two options: I could agree to voluntary departure, or I could wait to see a judge. He said voluntary departure would make it easier for me in the future if I decided to "fix" my papers, but if I wanted to see a judge, I would have to wait for two to six months. I told him I wanted to speak to a judge, and I wanted to speak to my attorney or make a phone call. He told me I did not have the right to an attorney or a phone call. I repeated that I needed to speak with my attorney or make a phone call. The agent said no.

12.     After this conversation, I was placed in a very cold cell for the night. The cell had about 10 to 12 other people. The only places to lie down were the floor or a steel bench. I was given only a silver foil blanket to keep warm. I tried to sleep, but it was very difficult because it was so cold and uncomfortable, and I would wake up every time an agent shouted for someone else to leave the cell.

13.     Later that day, on January 8, I was called to the office area again. An agent presented me with the same two options as the day before. This time, I was told if I agreed to voluntary departure, I would be released the next day, and it "wouldn't affect me in the future" if I wanted to submit a new immigration application. The agent said if I wanted to wait to speak to a judge, I would have to wait many months. Again, I asked to speak to my attorney and to make a phone call. Again, I was told I did not have a right to an attorney or a phone call. I was sent back to the freezing cell.

14.     That night, I was called to the counter office area again for more questioning. Again, I asked for a phone call and to speak to my attorney, and again I was denied. The agent

seemed angry because I refused to agree to voluntary departure. None of the agents I spoke to during my detention ever told me that taking voluntary departure included consequences, like being barred from reentering the U.S. for years. None of them explained that if I chose to speak to a judge, I would have certain legal rights. The agent ordered me back to my cell.

15.     The cell was still freezing cold. I noticed that every time I came back to the cell, the temperature felt colder than before. My silver foil blanket shook from the force of the cold air blowing in the room. Again, I had a very hard time sleeping because it was so cold and uncomfortable. I also noticed the days began to blur into one another. It was hard for me to keep track of time since there was no natural sunlight and the lights were kept on all day and night.

16.     On January 9, the agents loaded me onto a bus with around 18 other people and took us to Imperial Regional Detention Center, about 10 or 15 minutes' drive away. No one explained why we were being moved. At Imperial, they took my temperature and put me in a holding cell. Agents called people out of the holding cell a few at a time, but I was not one of them. An hour later, five people from the group, including me, were loaded back on a bus and taken back to El Centro. I do not know why this happened.

17.     On January 10, I was taken out of my cell again, to speak with another agent. The agent gave me the same two options: I could agree to voluntary departure or see a judge. I said I wanted to see a judge and I wanted to speak to an attorney.

18.     To my surprise, the agent told me to sign my name on a small electronic pad to be released. I was scared to sign because I thought he was tricking me into agreeing to voluntary departure. I asked the agent why I needed to sign. He said I had to sign to see a judge and be put on a monitoring device. I repeated I did not want to sign anything agreeing to voluntary departure. The agent said that was not what I was signing. The agent did not allow me to see or read the documents, and he did not explain anything else about what the documents said. Since I wanted to see a judge, and I worried I would not be allowed to unless I signed my name, I signed, even though I felt scared to sign documents without an opportunity to read them. The small electronic screen where I signed my name only had space for my signature. It did not display any of the documents I was signing. I was fitted with a monitoring device on my wrist.

19.     I was released from El Centro that evening. Border Patrol dropped a group of us off at a shelter nearby and told us to figure out our transportation home. I was able to get a ride back to Bakersfield with a person I had met while detained.

20.     Since my ordeal with Border Patrol, I have felt stress, desperation, and a lot of uncertainty. I feel scared whenever I leave my house, because I'm nervous I will encounter Border Patrol and be arrested and detained again. I try to limit how much I have to go out, though that is not always possible. I have a hard time sleeping now. I wake up in the middle of night, my heart racing, thinking about the possibility Border Patrol will arrest and detain me again. Sometimes, I look out my window to see if Border Patrol is there. I feel traumatized and scared.

21.     The way I was treated was frustrating and frightening. I tried to exercise my right to remain silent, and my right to a phone call and attorney, but no one respected my rights. This incident made me feel like I do not have rights at all, even though I know I do. I worry that something like this could happen to my family members.

22.     Since my arrest and detention, I feel too scared to go to the store where I was arrested. I also feel nervous just walking around in my neighborhood. I try to keep a low profile because I fear my neighbors might call Border Patrol or ICE on me. I never felt this way before Border Patrol arrested me. Now, when I go out to run errands, I wear a thick sweater with a hood. I cover my head with the hood to hide the color of my skin as much as possible. I believe I was arrested by Border Patrol because of the color of my skin, so if I can hide the color of my skin, maybe it will reduce the chances Border Patrol will arrest me again. I no longer feel comfortable calling 911 if there is an emergency because I am afraid the local police will call Border Patrol to arrest me.

23.     I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

24.    This declaration was read to me in full English and Spanish on February 20, 2025 by Maricela Sanchez. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 20, 2025 at Bakersfield, California.

_____

Oscar Morales Cisneros


**CERTIFICATE OF INTERPRETATION**

I, Maricela Sanchez, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Oscar Morales Cisneros in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.


Date: February 20, 2025

/s/ _____

Maricela Sanchez

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al.,<br><br>Defendants. | Case No. 1:25-cv-00246-JLT-BAM<br><br>**DECLARATION OF WILDER MUNGUIA ESQUIVEL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        April 11, 2025<br>Time:        9:00 a.m.<br>Dept.:       Courtroom 4, 7th Floor<br>Judge:      Hon. Jennifer L. Thurston<br><br>Date Filed: February 26, 2025<br><br>Trial Date:  None set |

I, Wilder Munguia Esquivel, declare:

1.    I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.    My name is Wilder Munguia Esquivel, and I am 38 years old. I live in Bakersfield, California, with my brother, my sister-in-law, and their daughter, all of whom are U.S. citizens. I have lived in Kern County with them for about 12 years. My brother owns our home. Before living in Bakersfield, I lived in Los Angeles, California.

3.    I have worked as a day laborer for about 12 years. I am also a licensed handyman. I am a Christian and I attend services about twice a week at Iglesia Casa de Fe in Bakersfield, where I have been a church member for over ten years. I have no criminal history.

4.    On January 7, 2025, at around 12 p.m., I was outside Home Depot at 4001 Ming Avenue in Bakersfield. I was standing in a group with other day laborers when several unmarked vehicles pulled up. At least ten men got out of the vehicles and aggressively swarmed around us.

5.    They immediately demanded our "papers". One of them asked me directly in Spanish, "Do you have papers? Do you have identification? Where are you from?" I did not respond. I had no idea who he or any of the other men were. They wore civilian clothing and I did not see any badges. Most of them were wearing masks covering their faces, with holes only for their eyes. Some of them wore large sunglasses. My first thought was they might be terrorists mugging or kidnapping us. I even wondered if my friends and I could be murdered. The man questioning me was not only wearing a mask covering his entire face, he was also wearing a hat and thick sunglasses. I felt terrified. The man kept yelling at me, louder and louder, asking me again and again if I had papers and where I was from. I began to slowly walk away. The man followed, continuing to yell questions at me. I stayed silent. In Spanish, he ordered me to "turn around" and said, "I'm going to put you in handcuffs." It was around this time that I realized the men were federal immigration agents.

6.    I tried to exercise my rights and said, "I have the right to remain silent." The agent ignored me and asked again if I had documents and identification. He ordered me to take out my wallet.

7.      Before I could comply, the agent suddenly and forcefully yanked my left arm toward him and removed my wallet from my back pants pocket. He yanked my arm with so much force that I instantly felt excruciating pain and to this day continue to experience pain in my arm and shoulder. He opened the wallet and looked through it. He spread my legs in a wider stance and conducted a pat-down search. He told me to call a family member to come pick up my truck, which was parked at Home Depot. He said if they did not come within 20 minutes, my truck would be towed.

8.      The agent never identified himself or explained why he was arresting me. Nor did he ask me about my community ties, such as my family, work history, or how long I have been living here. Had he asked me, I would have told him that my brother is a U.S. citizen and I have a pending family petition. I would have told him I have a strong community here in my family, friends, and church, and Bakersfield is my home.

9.      After the agent handcuffed me, he and another agent put me in the backseat of a silver vehicle with metal bars between the front seats and the back seats. My sister-in-law and niece came to Home Depot to collect my truck. They spoke to the agents detaining me and told them I was in the process of regularizing my immigration status. The agents did not care and said they were taking me anyway.

10.     The agents drove me to the back lot of Home Depot where I saw several vehicles and over ten people who had been detained, including some who were elderly. I believe we were targeted at Home Depot because many day laborers gather to get work there. The immigration agents did not seem to be targeting specific individuals. The agent who arrested me did not seem to know who I am.

11.     After a 15- or 20-minute wait, the agents drove us to a makeshift facility on 7th Standard Road. One bus was already full of people who had been detained. A second bus arrived.

12.     The agents ordered me to place my belongings in a bag, including a gold chain with a gold cross I was wearing around my neck. They took my fingerprints and photos. I asked for food and only received a small granola bar. I had not yet eaten lunch when the agents detained me at Home Depot. I was very hungry and it was difficult to go so long without eating.

13.     In the evening, around 7 or 8 p.m., I was placed on a bus that took us to Imperial County. We drove for many hours. We arrived at a detention facility in Imperial County in the early morning hours. When we got off the bus, the agents made us sit on a cold, concrete floor. I was very cold because the agents had taken my jacket. The agents kicked the bags containing our belongings with their feet.

14.     The agents detained me in an extremely cold cell with about 20 other men, including some who were elderly. I was only given a thin, silver blanket, which did not keep me warm. There were no beds. The only place to sit or lie down was the cold, hard concrete floor. Having to sit or lie down on this floor for three days caused severe pain in my knee, where I'd recently had surgery after having been hit and injured by a large truck. The lights were kept on all day and night, and there was no natural light, so I lost track of the time. It was extremely difficult to sleep because the lights were so bright and people were constantly moving into and out of the cell. I was given only a little food: a small juice, fruit, a granola bar, and a piece of tortilla or bread with a little protein on it. After eating it I was still hungry. I was not provided a toothbrush, toothpaste, or other personal hygiene products. There was nowhere to shower.

15.     On January 8, I was brought to an office where an agent asked me several questions in Spanish. She asked me to sign a small device which had a space for a signature but displayed nothing else. She did not tell me why she needed me to sign my name, nor offer copies of the documents she was asking me to sign. She had a computer screen in front of her, but I could not see the screen. I told the agent my brother had petitioned for me, and that I would not sign anything because I had a pending application. She said I needed to sign if I wanted to see a judge and go to court. I told the agent I could not see the document she was asking me to sign. She said, "You can't, but I can." I did not know what to do. I was scared to sign something I was not allowed to read; I was just as scared of what could happen if I refused to sign. Another person in my cell had just shared that he had refused to sign something and the agents had treated him terribly, yelling at him and slamming the door. I feared agents would be similarly aggressive and possibly violent with me if I refused to sign. Feeling I had no choice, I signed my name on the small device. I returned to my cell, feeling terrified I had unwittingly made a terrible mistake. To

this day I am not certain what I signed.

16.    On January 9, I was again brought into an office to speak to a different agent. He told me to sign my name on a small screen, which again had space for a signature but displayed nothing else. He did not provide me a copy of the document or tell me what it said. I asked the agent why he needed my signature, and all he said was that it was for my "fingerprints" and "record." I felt nervous about signing my name to a document I could not see. But I did not feel comfortable asking further questions and felt I had no choice. I chose to believe the agent when he said it was for my "fingerprints" and "record," and I signed. To this day I am not certain what I signed.

17.    On January 10, I was brought out of my cell. An agent said in Spanish, "You can leave today but you will have conditions. If you agree, you can leave today. If not, it's up to you." By then, I had been detained for three days. I was hungry because I had been given so little food, and the cold was unbearable. I had not had an opportunity to shower, brush my teeth, or wash my face. I had not been able to contact any family members and I wondered if they knew where I was. I felt defeated and unsafe. I did not want to remain in custody and agreed to be released that day.

18.    The agent gave me a physical document to sign. It was written in English. I was not provided a copy in Spanish. The agent did not explain what the document said or the conditions Border Patrol was imposing on me. Despite not knowing what it said, I signed the document because I was suffering from the conditions of my confinement. I decided to trust that the agent was being honest and would release me. I believe Border Patrol kept me, and other people like me, uncomfortable and hungry to pressure us to give up on our immigration cases. Even though I have a family petition application pending, it was very difficult to endure those circumstances and not give in to their demands.

19.    Upon my release, I received a bag containing most of my belongings. However, the gold chain with a gold cross I had been wearing the day I was arrested was gone. It had been a birthday gift from a girlfriend and had religious and personal significance to me. I wore it every day because it was so special to me. It is still missing.

20.     My experience with Border Patrol was deeply traumatizing. When I have to go near the Home Depot where I was arrested, I feel terrified. I get nervous and my heart starts pounding. Though it has been over a month since my arrest, I continue to have pain in my left arm and shoulder from when the Border Patrol agent yanked me hard by the arm. Every time I leave my house to run errands or go to appointments, I ask myself if it is really necessary. I fear that immigration agents will stop, arrest, and detain me again. I am scared of being detained in those inhumane conditions again. I fear they will try again to pressure me to agree to deportation. I have trouble concentrating on anything because I experience persistent flashbacks of my experience being arrested and detained.

21.     I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

22.     This declaration was read to me in full English and Spanish on February 21, 2025 by Brisa Velazquez Oatis. I completely understand the content of this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025 at Bakersfield, California.

_____
Wilder Munguia Esquivel

**CERTIFICATE OF INTERPRETATION**

I, Brisa Velazquez Oatis, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Wilder Munguia Esquivel in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Date: Feb. 24, 2025

_____
Brisa Velazquez Oatis

ER353

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **DECLARATION OF YOLANDA AGUILERA MARTINEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:    April 11, 2025 <br> Time:    9:00 a.m. <br> Dept.:    Courtroom 4, 7th Floor <br> Judge:    Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

I, Yolanda Aguilera Martinez, declare:

1.      I have personal knowledge of the facts stated in this declaration and, if called as a witness, could testify truthfully to those facts.

2.      My name is Yolanda Aguilera Martinez. I am 56 years old and I live in Bakersfield, where I rent my home. I am a lawful permanent resident. I immigrated to the United States with my parents and siblings when I was around six years old and became a lawful permanent resident at around 20 years old. I have no criminal history.

3.      I have lived in Kern County for close to 45 years. Most of my family also lives in Kern County, including my children and grandchildren. I started working in the fields when I was about 16 years old and continued working as a farmworker most of my adult life. I mostly work in the vineyards picking grapes. I recently stopped working due to the off-season, and plan to take additional time off from work for medical reasons. I attend mass every Sunday at Our Lady Guadalupe Catholic Church in Bakersfield.

4.      On January 8, 2025, at around 4:30 pm, I was driving to a doctor's appointment in Bakersfield. I saw two vehicles pulled over to the right side of the road and three men standing near the vehicles. One man raised his hand to flag me down and signaled for me to pull over, so I did. I was driving my own vehicle, and I was the only one in my car. My car is registered under my name and my car registration, my license plate, and my driver's license are all current. I was not speeding.

5.      I parked in front of one of the vehicles, which was a beige or off-white SUV with flashing police lights located on the grill. Both vehicles were unmarked. All three men were in regular street clothing and had guns on their waist. I thought they might be police officers.

6.      The man who flagged me down walked over to my driver-side door. He did not identify himself, and did not seem to know who I was. He said, "I need to see your papers," so I took out my valid, current, California driver's license and handed it to him. He looked at my license and said, "This shit is fuckin fake," and threw it down at my lap.

7.      In a strong and aggressive voice, the agent ordered me to get out of the car. I felt scared and confused because I still did not know who these men were. However, I complied

because I felt I had no choice. I recently had hip replacement surgery, which has affected my mobility, so I was moving slowly as I tried to get out of my car. I opened my car door and, before I knew it, the agent had grabbed my arm, pushed me down to the ground, and handcuffed me. He never told me why he had stopped me, and he did not explain why he was now handcuffing me. I was speechless with terror and shock. He took me to the back of the off-white SUV and made me sit in the back seat.

8.      The agent never asked me about my community ties to Kern County, like how long I have lived and worked here and all the family members I have who live here.

9.      From the backseat of the SUV, I could see the three men standing behind the SUV talking to each other, but I couldn't hear what they were saying. I could not believe I had been arrested. I hunched over in fear. I am not sure how long I was left there, but it felt like an eternity.

10.     When the agent who handcuffed me came back, I asked him if I could call someone to send me a photo of my green card to show him. He agreed. He walked me back to my car and removed the handcuffs. I called a friend and urgently asked her to take a photo of my green card and text it to me. When I received the photo, I showed it to the agent. He quickly scanned it and said, "Get the fuck out of here." I got in my car and drove away.

11.     I drove aimlessly around Bakersfield, not knowing what to do. I was very stressed and in shock. I felt violated. I still did not know why I had been stopped, nor who those men were. In the days after my arrest, I saw multiple videos and photos on social media of Border Patrol agents arresting people in Bakersfield, including at Home Depot and along Highway 99. I realized the men who had stopped me, and their vehicles, looked just like some of the Border Patrol agents and vehicles I saw on social media. I realized I had been stopped and handcuffed by Border Patrol, just like many other people who live in and around Kern County had experienced that week.

12.     I feel extremely worried and nervous this could happen to me again. Just running my daily errands makes me feel stressed out. I cannot avoid driving in and around Bakersfield because I have to run errands, go to doctor's appointments, and attend church. I try to avoid going to areas where other people were arrested by Border Patrol, like Home Depot on Ming Avenue,

but that is not always possible. When I have to drive on roads near where my arrest took place, I feel my heart beat faster and I start to feel queasy. I am terrified at the thought of experiencing an arrest ever again.

13.    My experience with Border Patrol has made me afraid of police officers. Soon after this incident, I went to the store to run errands. While I was there, a Bakersfield police officer drove by. Seeing the officer really scared me, and I experienced a flashback to being stopped and violently arrested. On another occasion, I was a passenger in a car with my sisters. Three Bakersfield police officers drove next to our car. I felt a spike of fear. I immediately asked my sisters to move our car away from them and to not look at them. I covered my face with my hand because I did not want them to see me.

14.    For days after my encounter with Border Patrol, I had bruises on my wrists from the tight handcuffs, and more bruises on my legs from when the agent shoved me to the ground.

15.    I understand that, as a class representative, I represent the interests of everyone in the class, and not just myself. I understand I need to stay informed about what is happening with my case and stay in touch with my attorneys to give them information they need. I am committed to being a class representative because I do not want other people in the community to be harmed by Border Patrol's unlawful practices the way I was. I have never served as a class representative in any prior action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2025 at Bakersfield, California.

_Yolanda Aguilera Martinez_

Yolanda Aguilera Martinez

ER357

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA GREENBERG - # 333864
jgreenberg@keker.com
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

*Attorneys For Plaintiff Oscar Morales Cisneros*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; et al., <br><br> Defendants. | Case No. 1:25-cv-00246-JLT-BAM <br><br> **[PROPOSED] ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date:        April 11, 2025 <br> Time:        9:00 a.m. <br> Dept.:       Courtroom 4, 7th Floor <br> Judge:       Hon. Jennifer L. Thurston <br><br> Date Filed: February 26, 2025 <br><br> Trial Date:  None set |

### [PROPOSED] ORDER

Plaintiffs Motion for Preliminary Injunction came before this Court on April 11, 2025. Having considered Plaintiffs' Motion and supporting papers, Defendants' Opposition and supporting papers, and the arguments of counsel, the Court finds that Plaintiffs have demonstrated a strong likelihood of success on the merits; that, absent an injunction, they face immediate, irreparable injury from Defendants' actions: and that the balance of the equities and the public interest favor immediate injunctive relief.

Therefore, the Court hereby **GRANTS** the motion and orders the following:

- Border Patrol is enjoined from conducting detentive stops in this district unless there is reasonable suspicion that the person stopped is a noncitizen present within the United States in violation of U.S. immigration law, as required by the Fourth Amendment of the United States Constitution.

- Border Patrol is enjoined from effecting warrantless arrests in this district unless there is probable cause that the noncitizen being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2).

- Any Border Patrol agent who conducts a detentive stop in this District must, as soon as practicable, document the facts and circumstances surrounding the stop in narrative form. This documentation shall include the specific, particularized facts that supported the agent's reasonable suspicion that: (i) for vehicle stops, the vehicle contained a noncitizen present within the United States in violation of U.S. immigration law; and (ii) for stops on foot, the person stopped was a noncitizen within the United States in violation of U.S. immigration law. The documentation shall also include the date and time that the agent completed it.

- Any Border Patrol agent who conducts a warrantless arrest in this District must comply with all requirements set forth in DHS's "Broadcast Statement of Policy" on compliance with 8 U.S.C. § 1357(a)(2), including but not limited to the requirement that as soon as practicable after an arrest, agents document in writing "the facts and circumstances surrounding the warrantless arrest" and the "specific, particularized

ER359

facts supporting the conclusion that the [individual] was likely to escape before a warrant could be obtained."

- Every 60 days until this litigation is terminated or the Court rules otherwise, Border Patrol shall release to Plaintiffs' counsel the above-described documentation describing Border Patrol's detentive stops and warrantless arrests within this District, or if requested by Plaintiffs' counsel concerning specific individual detentive stops or warrantless arrests, no later than seven days after the request.

- Within 60 days of this order, Defendants will submit to the Court and Plaintiffs' counsel a directive setting forth guidance to Border Patrol agents concerning how they should determine whether "reasonable suspicion" exists when conducting detentive stops, including vehicle stops, in this District. This guidance will include, among other things, that refusal to answer questions does not, without more, constitute a basis for reasonable suspicion to justify a detentive stop.

- Within 90 days of this order, Defendants will submit to the Court and Plaintiffs' counsel documentation showing that they have trained Border Patrol agents who have performed or will perform Border Patrol operations in this District on the requirements articulated in the bullets above.

**IT IS SO ORDERED.**

Dated: _____          _____
                              HON. JUDGE JENNIFER L. THURSTON

BREE BERNWANGER - # 331731
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO - # 321939
mcho@aclunc.org
LAUREN DAVIS - # 357292
ldavis@aclunc.org
SHILPI AGARWAL - # 270749
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MAYRA JOACHIN - # 306065
mjoachin@aclusocal.org
EVA BITRAN - # 302081
ebitran@aclusocal.org
OLIVER MA - # 354266
oma@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

BRISA VELAZQUEZ OATIS - # 339132
bvoatis@aclu-sdic.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO & IMPERIAL
COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4199

*Attorneys for Plaintiffs*

AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
FRANCO MUZZIO - # 310618
fmuzzio@keker.com
ZAINAB O. RAMAHI - # 332139
zramahi@keker.com
JULIA L. GREENBERG - # 333864
jgreenberg@keker.com
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

*Attorneys for Plaintiff Oscar Morales Cisneros*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| UNITED FARM WORKERS; OSCAR MORALES CISNEROS; WILDER MUNGUIA ESQUIVEL; YOLANDA AGUILERA MARTINEZ; JUAN VARGAS MENDEZ; and MARIA GUADALUPE HERNANDEZ ESPINOSA,<br><br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; PETE R. FLORES, in his official capacity as Acting Commissioner of U.S. Border Patrol; MICHAEL W. BANKS, in his official capacity as Chief of U.S. Border Patrol; and GREGORY K. BOVINO, in his official capacity as Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol,<br><br>　　　　　　　Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.    In January 2025, Border Patrol agents based at the United States-Mexico border traveled over 300 miles north to Bakersfield to launch "Operation Return to Sender"—a nearly weeklong sweep through predominantly Latino areas of Kern County and the surrounding region to stop, detain, and arrest people of color who appeared to be farm workers or day laborers, regardless of their actual immigration status or individual circumstances. With no explanation of where they were being taken or why and no notice to their family members, Border Patrol agents bussed the people they arrested to the El Centro Border Patrol station ("El Centro Station"), detained them incommunicado, and coerced and deceived them into waiving their right to see an immigration judge and submitting to summary expulsion.

2.    "Operation Return to Sender" tore families apart and terrorized the community. It also violated the law. The Fourth Amendment prohibits Border Patrol agents from detaining a person, whether in a private vehicle or on foot, without reasonable suspicion that the person is in the country unlawfully. The person's perceived race, ethnic background, or occupation cannot justify a detentive stop. Nor can a person's refusal to answer voluntary questions. And Congress has prohibited immigration officers, including Border Patrol agents, from making indiscriminate arrests without a warrant. Prior to making a warrantless arrest, 8 U.S.C. § 1357(a)(2) requires agents to make a particularized finding that a person (1) is violating immigration law *and* (2) is a flight risk—a finding the Border Patrol does not train or instruct its agents to make. Moreover, the Fifth Amendment prohibits Border Patrol agents from subjecting people in their custody to "voluntary departure"—a form of summary expulsion—unless they knowingly and voluntarily waive their right to an immigration court hearing. The stakes are high: voluntary departure can result in a yearslong bar on reentry to the United States.

3.    "Operation Return to Sender" disregarded these legal mandates by design. Apparently expecting that people who appeared to be Latino or who work as farm workers or day laborers would lack immigration status, Border Patrol agents went on a fishing expedition, dispensing with reasonable suspicion and stopping people based on assumptions about their race or occupation instead. Border Patrol agents made warrantless arrests indiscriminately, without

evaluating or considering flight risk. At the El Centro Station, agents pressured people in their custody to accept voluntary departure without providing any information about the serious consequences it carries.

4.     Border Patrol planned and executed these tactics at a large scale. Local reports suggest that Border Patrol swept close to 200 people into the operation's unlawful dragnet. Border Patrol said in a media statement that its agents made 78 arrests during the sweeps. On information and belief, at least 40 of the people Border Patrol arrested—the majority of whom had lived in the United States for years—were expelled to Mexico after being coerced to accept voluntary departure, leaving behind families, communities, homes, and livelihoods. Across the operation's entire scope, Border Patrol agents followed a clear pattern: stop regardless of reasonable suspicion, arrest regardless of flight risk, and expel without explanation.

5.     **Step One: Stop Regardless of Reasonable Suspicion.** To carry out "Operation Return to Sender," Border Patrol relied on a practice of conducting detentive stops regardless of reasonable suspicion that a person was in the country unlawfully. For example, on the morning of January 7, 2025, Border Patrol agents approached Plaintiff Wilder Munguia Esquivel while he was standing outside a Home Depot with a group of day laborers. The Border Patrol agents did not identify themselves. When Mr. Munguia Esquivel tried to walk away, an agent followed him and ordered him to turn around so he could be handcuffed. When Mr. Munguia Esquivel affirmatively exercised his right to remain silent, the agent grabbed him by the arm, searched him, and arrested him. Later that day, in a parking lot in a Latino neighborhood, Border Patrol agents surrounded and blocked in Plaintiff Oscar Morales Cisneros' car. When Mr. Morales Cisneros declined to answer the agents' questions about his immigration status, they arrested him.

6.     On the morning of January 8, 2025, a Border Patrol agent pulled over Ernesto Campos Gutierrez, a U.S. citizen who works as a gardener and was hauling a trailer full of gardening equipment. When Mr. Campos Gutierrez declined to surrender his truck keys to the agent who had pulled him over, the agent slashed his tires. When his passenger did not immediately open the passenger-side door, the agent threatened to break the window. When the

passenger lowered the window, the agent dragged his passenger from the vehicle. Border Patrol
agents arrested both men.

7.      That same afternoon, Border Patrol agents pulled over Plaintiff Yolanda Aguilera
Martinez, a lawful permanent resident, for no discernable reason. When Ms. Aguilera Martinez
showed Border Patrol agents her valid California driver's license, they ordered her out of her car,
threw her to the ground, and arrested her. On information and belief, in each of these stops—and
across "Operation Return to Sender"—Border Patrol agents possessed no information about the
person they seized, only an assumption that they fit a profile of an undocumented person based on
their presumed race, ethnicity, or occupation.

8.      **Step Two: Arrest Regardless of Flight Risk.** Border Patrol agents also relied on a
practice of escalating stops to warrantless arrests without evaluating whether the arrestee posed a
flight risk. Border Patrol agents did not attempt to evaluate whether Plaintiff Munguia Esquivel
Plaintiff Morales Cisneros, Mr. Campos Gutierrez, or Plaintiff Aguilera Martinez were likely to
escape before a warrant could be obtained. If they had, they would have learned that each had lived
in Bakersfield for years, had deep family and community ties, had histories of local employment,
and presented no likelihood of escape—let alone probable cause. And when an arrestee
affirmatively informed Border Patrol agents of facts showing they were *not* a flight risk, Border
Patrol agents ignored them. For example, Border Patrol agents pulled over the van in which
Plaintiff Juan Vargas Mendez was a passenger after a day of working in the fields. After Mr.
Vargas Mendez and another passenger told agents they were not carrying IDs, agents arrested and
taunted them, calling them "Mexican bitches." Plaintiff Vargas Mendez pleaded that he had lived
in Kern County for 20 years and was married with four young children. The agent responded that
he did not care and Mr. Vargas Mendez would be "going to Mexico" anyway.

9.      **Step Three: Expel Without Explanation.** Once Border Patrol agents transported
the people they arrested to the El Centro Station—a Border Patrol station just north of the U.S.-
Mexico border—the ultimate goal of "Operation Return to Sender" became clear: extract voluntary
departure agreements from as many people as possible without explaining the consequences. Once
at the El Centro Station, agents commenced a campaign of coercion that relied on consistent

tactics: detain people in frigid holding cells without access to sleeping quarters, showers, hygiene products, or sufficient food; deny requests to call attorneys or family members; fail to inform or misinform people in custody about the consequences of voluntary departure and the process of exercising their right to an immigration court hearing; and refuse to provide written information about voluntary departure to people in custody in any readable format.

10.    For example, Plaintiff Morales Cisneros, Plaintiff Vargas Mendez, and Plaintiff Maria Guadalupe Hernandez Espinoza were detained in cold, windowless cells lit 24 hours a day, with no bed, mattress, or blankets besides an aluminum sheet. Border Patrol agents denied their repeated requests to call a lawyer or their family. At no point did Border Patrol agents provide written information about voluntary departure in a language or format they could read.

11.    Instead, Border Patrol agents provided a slew of misinformation about voluntary departure. At different points, agents told Mr. Morales Cisneros that voluntary departure would allow him to "fix his status" or would not affect him in the future. Neither statement is true. Agents misleadingly told Plaintiffs they would be imprisoned for months or years if they chose to exercise their right to an immigration court hearing. After Ms. Hernandez Espinoza verbally suggested openness to voluntary departure, she changed her mind and for two days, insisted that she be permitted to see an immigration judge. Border Patrol agents incorrectly told her that she had no right to a hearing. Eventually, Border Patrol agents told Ms. Hernandez Espinoza they needed her signature on a digital pad. The agents refused to show her what she was signing and told her that her signature was needed to confirm her identity. The next day, Border Patrol agents dropped Ms. Hernandez Espinoza off in Mexicali, handing her a printout of a document she had never seen. To her shock, it was a voluntary departure form bearing her signature.

12.    Mr. Vargas Mendez and Ms. Hernandez Espinoza are now stranded in Mexico, far from their homes, communities, and livelihoods. They do not know when they will see their families again. Border Patrol's tactics appear to have been built to culminate in this swift expulsion, ripping families and communities apart in its wake.

13.    The tactics in the above-referenced examples and, on information and belief, in countless other stops, arrests, and expulsions, reflect Border Patrol's policies and practices, which

blatantly flout the Constitution, the restrictions on warrantless arrests Congress imposed on immigration agents in 8 U.S.C. § 1357(a)(2), and federal regulations.

14.    The consequences of Border Patrol's unlawful practices have shaken the Central Valley to its core. Media outlets reported that in the immediate aftermath of Border Patrol's raids, agricultural fields were deserted and school attendance dipped, as farm workers and their families feared being profiled by Border Patrol agents. Yet despite its unlawful tactics and devastating impact on the community, Border Patrol flaunts "Operation Return to Sender" as a success. Border Patrol has stated publicly that it plans to return to Bakersfield and replicate the operation in Fresno, Sacramento, and throughout California.

15.    Individual Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinosa ("Individual Plaintiffs") are—or were, until Border Patrol's unlawful operation—Kern County residents with deep ties to the community. Border Patrol agents subjected each of them to at least one of the three unlawful practices that drove "Operation Return to Sender," and which Defendants maintain today: (1) conducting detentive stops without regard to reasonable suspicion that a person is in the country unlawfully, (2) effecting warrantless arrests without regard to probable cause that a person is likely to escape, and (3) extracting expulsion through voluntary departure without a knowing, voluntary, and intelligent waiver of rights.

16.    Organizational Plaintiff United Farm Workers ("UFW") is headquartered in Kern County and counts among its members thousands of migrant and seasonal farm workers throughout the country, with its greatest concentration of membership living and working in California's Central Valley, including Kern County. During "Operation Return to Sender," Border Patrol subjected at least some UFW members to the unlawful practices described above. UFW's members across the state fear that they will be subjected to Defendants' unlawful practices in the future.

17.    On their own and as representatives of three classes of similarly situated individuals, Individual Plaintiffs, along with Plaintiff UFW on behalf of its members (collectively, "Plaintiffs") seek injunctive and declaratory relief to compel Border Patrol and its parent agencies,

Customs and Border Protection ("CBP") and the Department of Homeland Security ("DHS"), to design and conduct its operations in compliance with the Constitution and federal law. Unless this Court intervenes to stop Defendants from continuing their unlawful practices, Plaintiffs, UFW's members, and countless other Central Valley residents—regardless of their immigration status—will continue to be subjected to Border Patrol's lawless sweeps, indiscriminate arrests, and coercive expulsions.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

19.    Defendants do not have immunity. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 526 (9th Cir. 1989).

20.    Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

21.    **Plaintiff United Farm Workers ("UFW")**, founded in 1962 by Cesar Chavez, Dolores Huerta, Larry Itliong and other leaders, is the first and largest farm worker union in the country. UFW's mission is to improve the lives, wages, and working conditions of agricultural workers and their families. UFW is dedicated to the cause of eliminating discrimination against farm workers, immigrants, people of color, and any other groups that have been the target of unfair or unlawful treatment. As part of this work, UFW is a national leader in the movement for immigration reform and immigrants' rights.

22.    UFW has approximately 7,000 members. California is home to more UFW members than any other state, with the highest density in the Central Valley region. UFW membership is voluntary and consists of various categories of members. Among these, contributing or associate members are individuals who make a monthly or annual contribution of a

designated amount to UFW. Dues-paying members are those who benefit from a UFW collective bargaining agreement. Generally, individuals seeking to become contributing or associate members of UFW complete an official application, which is reviewed and processed by UFW staff for approval. Dues-paying members become members through the procedures set forth in the California Agricultural Labor Relations Act or other applicable laws, their collective bargaining agreements, and union rules.

23.     UFW members play an important role in deciding what activities UFW engages in as an organization. At the UFW's quadrennial Constitutional Convention, members introduce and vote on motions to govern and guide the union's work, and to elect the Union Executive Board. On an ongoing basis, UFW members respond to surveys, provide feedback, and participate in advisory meetings (known as "consejo de base" in Spanish) to actively participate in the Union's decisions. UFW has created various programs in response to members' feedback and requests.

24.     UFW membership comes with a variety of benefits. Dues-paying members receive protections from collective bargaining in which UFW engages on their behalf. Through an established negotiating committee comprised of workers, UFW members negotiate benefits such as medical insurance, pension, wages, paid time off, working conditions, seniority, right to recall, equipment provisions, and other terms of employment. Contributing or associate members (also called "direct" members) receive UFW photographic identification, accidental life insurance of $4,000, access to UFW discounts with private businesses, and other benefits. The UFW membership photo ID card can be used as identification when interacting with school systems, financial institutions, Covered California (state health insurance marketplace), towing and impound services, and other institutions or agencies requiring secondary ID. For services that prioritize agricultural workers, UFW direct membership establishes eligibility.

25.     UFW brings this action on behalf of its members. UFW's members have been harmed by Border Patrol's unlawful stop, arrest, and expulsion practices and fear being subjected to those practices in the future. At least four UFW members—"Alicia," "Benjamin," "Carlos," and "Fernando" have been subjected to Border Patrol's practice of conducting stops without regard to reasonable suspicion and effecting arrests without regard to probable cause of flight risk.

"Benjamin" and "Carlos" also were coerced into accepting expulsion via voluntary departure. They remain in Mexico, leaving behind, between them, seven children in the United States.

26.    Many UFW members, regardless of the stability or permanence of their immigration status, fear Border Patrol will continue to target farm workers with its unlawful practices, especially those who appear non-white. They are terrified that Border Patrol will—again—arrest people without warrants and without regard to how long someone has been living in the community or the family members they have waiting for them, including young children; that Border Patrol will—again—detain people for days in a detention facility without the ability to contact their family members or an attorney; and that Border Patrol will—again—summarily banish individuals from the U.S. against their will and without their consent, separating them from their family members, homes, and all they have worked for without even a chance to say goodbye or arrange their affairs. These members face irreparable harm from Border Patrol's unlawful stop, arrest, and expulsion practices.

27.    **Plaintiff Oscar Morales Cisneros** is a 51-year-old homeowner who has lived in Bakersfield since 2021 and works in maintenance and construction. Before moving to Kern County, he lived in Los Angeles County for about 15 years. On January 7, 2025, Border Patrol agents stopped him while he was in his parked vehicle without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station, where they pressured him to accept voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of his rights.

28.    **Plaintiff Wilder Munguia Esquivel** is a 38-year-old resident of Bakersfield, California. He has lived there for about 12 years with his brother, sister-in-law, and niece, all of whom are U.S. citizens, in a home owned by his brother. He is a licensed handyman and a day laborer. On January 7, 2025, Border Patrol agents stopped and detained him without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station.

29.    **Plaintiff Yolanda Aguilera Martinez** is a 56-year-old a lawful permanent resident and resident of Bakersfield, California. She has been a lawful permanent resident since she was about 20 years old and has resided in Kern County for nearly 45 years. Her family, including her children and grandchildren, also reside in Kern County. She has worked as a farm worker in the Central Valley for most of her adult life. On January 8, 2025, Border Patrol agents stopped her in a vehicle stop without reasonable suspicion that she was in the country unlawfully and arrested her without a warrant and without evaluating her likelihood of escape before a warrant could be obtained.

30.    **Plaintiff Juan Vargas Mendez** is a 37-year-old husband to a U.S. citizen, father to three U.S.-citizen children, and caregiver and stepfather to a U.S.-citizen stepson who is diagnosed with epilepsy. Until Border Patrol expelled him from the United States pursuant to its unlawful voluntary departure practices, Plaintiff Vargas Mendez resided in Bakersfield, California. Prior to his expulsion, he had lived in Kern County for about 20 years. He had worked consistently as a farm worker picking oranges at the same local ranch for over 10 years. On January 8, 2025, Border Patrol agents stopped him in a vehicle stop without reasonable suspicion that he was in the country unlawfully, arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained, and transported him to the El Centro Station, where they deceived and coerced him into accepting voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of his rights.

31.    **Plaintiff Maria Guadalupe Hernandez Espinoza** is a 46-year-old mother and grandmother who lived in Bakersfield, California for about 10 years. Until Border Patrol expelled her from the United States pursuant to its unlawful voluntary departure practices, Plaintiff Hernandez Espinoza had rented the same apartment in Bakersfield with her partner for about three years. She had consistently worked in the agricultural sector as a farm worker for nearly 20 years. Border Patrol agents stopped her in a vehicle stop without reasonable suspicion that she was in the country unlawfully, arrested her without a warrant and without evaluating her likelihood of escape before a warrant could be obtained, and transported her to the El Centro Station, where they

deceived and coerced her into voluntary departure without explaining its consequences or obtaining a knowing and voluntary waiver of her rights.

32.    **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security, which oversees the component agencies responsible for enforcing U.S. immigration law, including CBP. Defendant Noem is sued in her official capacity.

33.    **Defendant Pete R. Flores** is the Acting Commissioner of CBP, the agency within DHS that is responsible for enforcing immigration laws at the U.S. border. In that capacity, Defendant Flores has direct authority over all CBP policies, procedures, and practices related to stops, arrest, and detention. Defendant Flores is sued in his official capacity.

34.    **Defendant Michael W. Banks** is Chief of U.S. Border Patrol. In that capacity, Defendant Banks has direct authority over all Border Patrol policies, procedures, and practices related to stops, arrest, and detention. Defendant Banks is sued in his official capacity.

35.    **Defendant Gregory K. Bovino** is the Chief Patrol Agent for El Centro Sector of the U.S. Border Patrol. In that capacity, Defendant Bovino has direct authority over all El Centro Sector policies, procedures, and practices related to stops, arrest, and detention. Defendant Bovino is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. Background on the Border Patrol's History of Unlawful Interior Raids and "Operation Return to Sender"

36.    When Congress dismantled the legacy Immigration and Naturalization Service ("INS") and replaced it with DHS, it divided immigration enforcement responsibilities between two sub-agencies: Immigration and Customs Enforcement ("ICE") and CBP. ICE inherited "the investigative and interior enforcement elements" of the INS,[1] while CBP became "the nation's first comprehensive border security agency with a focus on maintaining the integrity of the nation's boundaries and ports of entry."[2]

---

[1] *Who We Are*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice (last visited Feb. 18, 2025).
[2] *CBP History Through the Years*, U.S. Customs and Border Protection, https://www.cbp.gov/about/history (last modified Dec. 05, 2024).

37.    This division of responsibility remains. ICE's Enforcement and Removal Operations division operates out of 25 nationwide field offices that cover the whole of the United States and its territories and handles enforcement in the interior of the United States, "manag[ing] all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of [noncitizens] who are subject to removal or are unlawfully present in the U.S."[3] ICE oversees all adult civil immigration detention operations in the United States.

38.    In contrast, CBP focuses on immigration enforcement at the border. The Border Patrol is its "uniformed, law enforcement arm[,] . . . responsible for securing U.S. borders between ports of entry."[4] Border Patrol operates out of approximately 20 sectors. Border Patrol does not operate detention centers designed or intended for long-term detention. Instead, Border Patrol operates only short-term holding facilities. Border Patrol policy requires that agents make "[e]very effort . . . to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation," and regardless of the circumstances, instructs that detention should not exceed 72 hours.[5] Border Patrol does not operate any stations or holding facilities in Kern County, which at its southernmost point is over 150 miles from a land border.

39.    Despite its unique border-focused mission and design, Border Patrol has a history of making incursions deep in the interior of the United States, typically to conduct indiscriminate roving-patrol operations. When conducting such operations, Border Patrol is bound by the same statutory and constitutional restrictions on detentive stops and arrests that constrain all immigration officers. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.5(c); *United States v. Brignoni-Ponce*, 422 U.S. 873, 882–83 (1975) (holding the Fourth Amendment prohibits Border Patrol from stopping private vehicles near the border absent reasonable suspicion that someone in the vehicle is unlawfully in the United States); *see also Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019) (regulations

---

[3] *Enforcement and Removal Operations*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice/ero (last visited Feb. 18, 2025).
[4] *Along U.S. Borders*, U.S. Customs and Border Protection, https://www.cbp.gov/border-security/along-us-borders (last modified Feb. 12, 2025).
[5] U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search § 4.1 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [hereinafter TEDS].

governing seizures by ICE and CBP are "at least as stringent as those imposed by the Fourth Amendment").

40.    Nevertheless, Border Patrol's interior sweeps demonstrate a pattern of noncompliance with the statutory and constitutional limits on its authority, including unlawfully relying on perceived race or ethnicity to justify stops,[6] stopping persons and vehicles without establishing reasonable suspicion of an immigration violation,[7] threatening property damage or physical abuse if a person refuses to consent to a search or voluntary questioning,[8] and detaining or arresting people who decline to consent to voluntary questioning.[9]

41.    On at least three occasions, the Ninth Circuit has upheld injunctions to remedy Border Patrol's pattern and practice of Fourth Amendment and statutory violations in its interior enforcement operations. *First*, in *LaDuke v. Nelson*, residents of farm worker housing in interior Washington, Montana, and Idaho challenged Border Patrol's practice of raiding their communities, seizing residents without reasonable suspicion, and searching their homes without probable cause.

---

[6] New York Civil Liberties Union, et al., *Justice Derailed: What Raids on New York's Trains and Buses Reveal About Border Patrol's Interior Enforcement Practices* (2011), https://assets.nyclu.org/publications/NYCLU_justicederailedweb_0.pdf (report describing pattern of disproportionate stops of people of color by Border Patrol in New York State); Letter from ACLU Border Litigation Project to U.S. Customs and Border Protection (Nov. 20, 2014), https://www.acluaz.org/sites/default/files/documents/100%20Mile%20Zone%20Updated%2011.20.2014.pdf (letter to Border Patrol describing concerns about racial profiling in New York State).

[7] Press Release, ACLU Washington, Settlement Reins in Border Patrol Stops on the Olympic Peninsula (Sept. 24, 2013), https://www.aclu-wa.org/news/settlement-reins-border-patrol-stops-olympic-peninsula (Washington lawsuit alleging Border Patrol conducted racially motivated stops without reasonable suspicion); Complaint to U.S. Dep't of Homeland Security Office for Civil Rights and Civil Liberties and Office of Inspector General from ACLU of Arizona and ACLU Border Litigation Project (Oct. 9, 2013), https://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf [hereinafter ACLU AZ Complaint re CBP Roving Patrols].

[8] *See* ACLU AZ Complaint re CBP Roving Patrols, *supra* note 7 (describing threats to tase a woman and cut her out of her seatbelt with a retractable knife if she did not exit vehicle and consent to search; forcibly dragging U.S. citizens from their vehicles after vehicle stop, with no explanation and no basis for suspicion of unlawful activity).

[9] Press Release, Northwest Immigrant Rights Project & ACLU of Washington, U.S. Border Patrol Agrees to Two $35,000 Settlements in Racial Profiling, Unlawful Detention Cases (Apr. 29, 2021), https://www.nwirp.org/news-events/press-releases/posts/border-patro-agrees-to-two-35k-settlements/.

762 F.2d 1318, 1321 (9th Cir. 1985), *as amended*, 796 F.2d 309 (9th Cir. 1986). The Ninth Circuit upheld the district court's holding that Border Patrol engaged in a "standard pattern" of searches and seizures that likely violated farm workers' Fourth Amendment rights and upheld a classwide permanent injunction prohibiting its unlawful practices. *Id.*

42.     *Second*, in *International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, a district court granted a preliminary injunction barring the now-defunct Livermore Border Patrol Sector from replicating the unlawful practices it had used in "Operation Jobs," a weeklong series of about 50 workplace raids across Northern California. 643 F. Supp. 884, 887–89 (N.D. Cal. 1986). The tactics Border Patrol employed in *International Molders'* are strikingly similar to the practices Plaintiffs challenge here: agents detained people before questioning them, arrested people who refused to answer questions, and detained and arrested workers regardless of their immigration status and likelihood of flight risk—including U.S. citizens. *See* 643 F. Supp. at 899–901. The Ninth Circuit affirmed the issuance of a classwide preliminary injunction because "the record support[ed] . . . [a] finding of an evident systematic policy and practice of [F]ourth [A]mendment violations by [Border Patrol]." *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 551 (9th Cir. 1986) (internal quotation marks omitted).

43.     *Third*, the Ninth Circuit upheld a permanent injunction enjoining Border Patrol from engaging in a pattern of vehicle stops based on the occupants' race and perceived occupation, rather than objective, particularized reasonable suspicion of unlawful presence in the United States. *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 701, 705 (9th Cir. 1985), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).[10]

_____

[10] Border Patrol and its parent agency CBP also have has settled numerous other lawsuits nationwide challenging similar unlawful practices during Border Patrol's interior incursions. *See, e.g.*, Settlement Agreement, *Elshieky v. United States*, No. 2:20-CV-00064-SAB (E.D. Wash. Apr. 23, 2021), https://www.aclu-wa.org/docs/elshieky-settlement-agreement (alleging Washington Border Patrol agents racially profiled plaintiff and arrested him despite his documentation of lawful status); Settlement Agreement, *Sosa Segura v. United States*, No. 2:19-CV-00219-SAB (E.D. Wash. Apr. 27, 2021), https://www.aclu-wa.org/docs/sosa-settlement-agreement (alleging Washington Border Patrol agents racially profiled plaintiff and conducted warrantless arrest when plaintiff refused to consent to voluntary questioning); Press Release, ACLU of New Hampshire, ACLU Settles Lawsuit Challenging Border Patrol Checkpoints (May

44.    Border Patrol also has a history of subjecting people it arrests to deceptive, coercive, and threatening tactics to pressure them to accept voluntary departure. In this context, too, courts have repeatedly intervened to stop unlawful Border Patrol practices.

45.    In *Orantes-Hernandez v. Thornburgh*, the Ninth Circuit upheld a permanent injunction based on a finding that Border Patrol "engage[d] in a pattern and practice of pressuring or intimidating Salvadorans . . . to recant their requests for a hearing and to return voluntarily to El Salvador." 919 F.2d 549, 556 (9th Cir. 1990). The court highlighted practices that Border Patrol continues to use today: telling people to sign a form without allowing them to read it or providing it only in a language they did not understand, telling people they had no choice but to accept voluntary departure, and telling them they would be imprisoned if they did not accept voluntary departure. *Id.* at 561–62.

46.    Nearly two decades later, a group of Mexican nationals challenged similar unlawful practices by Border Patrol agents in California, ultimately settling with Border Patrol to secure the return of nearly 100 people who Border Patrol had unlawfully expelled. *See Lopez-Venegas v. Beers*, No. LA CV13-03972-JAK (PLAx), 2013 WL 12474081, *14–15 (C.D. Cal. Dec. 27, 2013) (denying motion to dismiss claims that Border Patrol's coercive voluntary departure tactics violated the Fifth Amendment); *Lopez-Venegas v. Johnson*, No. LA CV13-03972-JAK (PLAx) Settlement Agreement, Dkt. 90-4 (C.D. Cal. Aug. 18, 2014).

**B.    Border Patrol Relies on Practices of Conducting Suspicionless Stops, Effecting Warrantless Arrests, and Coercing Voluntary Departure in its Interior Enforcement Operations**

47.    The unlawful practices Border Patrol consistently used in "Operation Return to

18, 2023), https://www.aclu-nh.org/en/press-releases/aclu-settles-lawsuit-challenging-border-patrol-checkpoints (alleging Border Patrol's practice of stopping vehicles in New Hampshire without reasonable suspicion of unlawful presence violated the Fourth Amendment and federal law); Press Release, ACLU, Customs and Border Protection Settles Federal Lawsuit with American Citizens Racially Profiled and Unlawfully Detained for Speaking Spanish Settlement Agreement (Nov. , *Suda v. U.S. Customs & Border Protection*, No. 4:19-cv-0010-BMM (D. Mont. Nov. 24, 2020), https://www.aclu.org/press-releases/customs-and-border-protection-settles-federal-lawsuit-american-citizens-racially (alleging a Montana CBP agent unlawfully detained plaintiffs for speaking Spanish); Settlement Agreement, *Sanchez v. U.S. Border Patrol*, No. 3:12-cv-05378-BHS (W.D. Wash. Sept. 24, 2013), https://www.aclu-wa.org/docs/settlement-agreement-sanchez-v-homeland-security.

Sender" bear the hallmarks of Border Patrol's historically abusive enforcement operations and illustrate the agency's unlawful stop, arrest, and expulsion policies and practices. The following paragraphs describe examples of these policies and practices.

*Stop, Arrest, and Attempted Expulsion of Plaintiff Oscar Morales Cisneros*

48.     Plaintiff Oscar Morales Cisneros is a 51-year-old resident of Bakersfield, California, where he owns his home. He has lived in Bakersfield since 2021; before then, he lived in Los Angeles County for about 15 years. He has been married for about 30 years. He has two daughters and three grandchildren. He is a maintenance worker and construction worker. He is a practicing Catholic and an active member of his church. He has no criminal record.

49.     On January 7, 2025, on his way home from work, Mr. Morales Cisneros stopped to fill empty water containers at a water filling station outside a liquor store. The water filling station was located in a predominantly Latino-populated neighborhood. He returned to his truck, which is registered under his name and has current license plates, and shifted into reverse to back out of the parking spot.

50.     Before Mr. Morales Cisneros could back out, an unmarked, grey Chevrolet Tahoe pulled up behind him and blocked him in. Mr. Morales Cisneros put his truck back in park and lowered his window. He saw two agents standing outside his truck. Both wore green uniforms with "Border Patrol" written on them.

51.     A Spanish-speaking agent asked Mr. Morales Cisneros if he had papers and was lawfully present. Mr. Morales Cisneros exercised his right to remain silent and did not answer his questions. The agents asked Mr. Morales Cisneros for his driver's license, which he provided. The agents did not explain why they had blocked in his truck nor why they needed his license. The agents took his license and walked back to their vehicle.

52.     Mr. Morales Cisneros called his daughter to tell her that Border Patrol had stopped him. The Spanish-speaking agent returned and asked him to put the phone on speakerphone so he could speak with Mr. Morales Cisneros' daughter. He identified himself to Mr. Morales Cisneros' daughter as "Officer Sanchez."

53.     Officer Sanchez told Mr. Morales Cisneros' daughter he was being detained by Border Patrol for being unlawfully present. Officer Sanchez ended the call and asked Mr. Morales Cisneros to step out of his truck. Mr. Morales Cisneros complied. Officer Sanchez handcuffed Mr. Morales Cisneros and placed him in the back of the Border Patrol agents' vehicle. The agents did not allow Mr. Morales Cisneros to call someone to pick up his truck.

54.     At no point did the agents produce a warrant, explain to Mr. Morales Cisneros why they had stopped him, or—aside from what Officer Sanchez told his daughter—explain why they arrested him. At no point did they ask Mr. Morales Cisneros about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

55.     The Border Patrol agents drove Mr. Morales Cisneros around Bakersfield for about two hours. At one point, the Border Patrol agents stopped behind a vehicle at another gas station and got out to speak to the vehicle's occupants. Mr. Morales Cisneros overheard an agent saying, "We're doing our job."

56.     The agents took Mr. Morales Cisneros to a station where he saw other people were being detained and a bus was waiting. Border Patrol agents removed Mr. Morales Cisneros' personal belongings and placed them in a bag. They took his fingerprints and photographs.

57.     Mr. Morales Cisneros boarded the bus, which eventually filled with about 40 people. The bus departed in the late evening. Mr. Morales Cisneros had not eaten since lunch and was hungry. Border Patrol agents provided nothing to eat except some granola bars and some small water bottles.

58.     The bus arrived at El Centro Station in Imperial County in the pre-dawn hours of January 8, 2025. After being processed in, Mr. Morales Cisneros was taken to see an agent. The agent told Mr. Morales Cisneros he had two options: he could agree to voluntary departure, which the agent falsely claimed would make it easier to "fix" his papers in the future; or he could wait anywhere from two to six months to see a judge. Mr. Morales Cisneros replied he wanted to speak to a judge and repeatedly requested to speak to his attorney or make a phone call. The agent said he did not have a right to speak to an attorney or make a phone call and denied his requests.

59.     Mr. Morales Cisneros was detained in a very cold holding cell with about 10 to 12 other people. There was nowhere to lie down except the floor or a steel bench. To keep warm, Border Patrol agents provided him only a silver foil blanket, thin clothes, and a pair of sandals. He attempted to sleep but it was very difficult because the conditions were so cold and uncomfortable. Mr. Morales Cisneros, who experiences joint pain when he is cold, was in constant pain during his detention. There was no access to natural light and the electric lights were kept on all day and night, making it difficult to keep track of time.

60.     Later on January 8, 2025, Mr. Morales Cisneros was again taken to speak to a Border Patrol agent. The agent presented him with the same two options: if he accepted voluntary departure, he could be released the next day and it "wouldn't affect [him] in the future" if he submitted a new immigration application, or he could wait several months to speak to a judge. Mr. Morales Cisneros requested to speak to his attorney or make a phone call. The agent denied his requests.

61.     That night, Mr. Morales Cisneros was again taken to speak to a Border Patrol agent. Mr. Morales Cisneros again requested to speak to an attorney or make a phone call, and again he was denied. Mr. Morales Cisneros refused to agree to voluntary departure.

62.     None of the Border Patrol agents who interviewed Mr. Morales Cisneros ever explained the consequences and waivers of legal rights that would result from accepting voluntary departure, nor that he would have certain rights if he appeared before an immigration judge.

63.     On January 10, 2025, Mr. Morales Cisneros was taken out of his cell yet again to speak to another Border Patrol agent. The agent presented him with the same two options: voluntary departure or immigration court. Mr. Morales Cisneros repeated that he wanted to speak to a judge and speak to an attorney.

64.     To his surprise, the Border Patrol agent told him to sign his name on a small electronic pad to be released. Mr. Morales Cisneros feared the Border Patrol agent might be tricking him into agreeing to voluntary departure. The agent did not allow him to see or read the documents he was asking Mr. Morales Cisneros to sign, nor did the agent explain anything else about what the documents said. The agent only insisted Mr. Morales Cisneros had to sign the

documents to see a judge and be placed on a monitoring device.

65.    Mr. Morales Cisneros signed his name as directed. The small electronic screen where he signed his name had only a space for his signature. It did not display any of the documents he was signing.

66.    That evening, Mr. Morales Cisneros was released from the El Centro Station. Border Patrol agents dropped Mr. Morales Cisneros and several others at a shelter nearby and told them to figure out their transportation home.

67.    In the aftermath of this incident, Mr. Morales Cisneros feels scared whenever he leaves his home because he fears he will encounter Border Patrol and be arrested and detained again. He does his best to limit how much he leaves his home. He has a hard time sleeping.

68.    Since his arrest and detention, Mr. Morales Cisneros feels scared to return to the water filling station where he was arrested. When he has to run errands, he wears a sweater with a hood to cover his head to hide the color of his skin as much as possible, as he believes Border Patrol targeted him for arrest because of the color of his skin. Mr. Morales Cisneros feels afraid to call 911 if there is an emergency because he fears the local police will call Border Patrol.

69.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Morales Cisneros did not have reasonable suspicion that he was unlawfully present in the United States.

70.    Upon information and belief, the Border Patrol agents who arrested Mr. Morales Cisneros did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### _Stop and Arrest of Plaintiff Wilder Munguia Esquivel_

71.    Plaintiff Wilder Munguia Esquivel is a 38-year-old resident of Bakersfield, CA, where he has lived for about 12 years. His brother, sister-in-law, and niece, with whom he lives, are all U.S. citizens. He works as a day laborer and handyman. He has been a member of his church in Bakersfield for over ten years. He has no criminal record.

72.    On January 7, 2025, at approximately 12 p.m., Mr. Munguia Esquivel was outside the Home Depot at 4001 Ming Avenue in Bakersfield. He was standing in a group with other day laborers.

73.    Several unmarked vehicles pulled up and at least ten men got out of the vehicles and aggressively swarmed around the group Mr. Munguia Esquivel was standing with. The men were wearing masks covering their faces, with holes only for their eyes. Mr. Munguia Esquivel's first thought was they might be terrorists out to mug, kidnap, or even murder Mr. Munguia Esquivel and his friends. Upon information and belief, the men were Border Patrol agents. They started loudly demanding papers and asking individuals where they were from.

74.    Mr. Munguia Esquivel did not respond to the agents' questions. He began to slowly walk away. One of the agents followed him, yelling questions at him. Mr. Munguia Esquivel stayed silent. The agent ordered Mr. Munguia Esquivel to turn around so he could put Mr. Munguia Esquivel in handcuffs.

75.    The Border Patrol agent ordered Mr. Munguia Esquivel to take out his wallet. Before he could comply, the agent suddenly and forcefully yanked Mr. Munguia Esquivel's left arm and removed his wallet from his back pants pocket. The agent opened the wallet and looked through it. He searched Mr. Munguia Esquivel by patting him down and told Mr. Munguia Esquivel to call a family member to pick up his truck.

76.     At no point did the Border Patrol agent identify himself, explain to Mr. Munguia Esquivel why he had stopped him, explain why he had arrested him, or produce a warrant. At no point did he ask Mr. Munguia Esquivel about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight. When he was arrested, Mr. Munguia Esquivel had a pending family-based immigration petition.

77.    The agent handcuffed Mr. Munguia Esquivel and forced him into a vehicle. The agent drove Mr. Munguia Esquivel behind Home Depot, where he saw many more Border Patrol vehicles and about 10 to 15 detained individuals, including some who were elderly.

78.     When Mr. Munguia Esquivel's family came to pick up his truck, they told Border Patrol agents that he was in the process of regularizing his immigration status. The agents responded that they were taking him anyway.

79.     Border Patrol agents transported Mr. Munguia Esquivel to a makeshift facility on 7th Standard Road in Bakersfield. Agents ordered him to place his belongings in a bag, including a gold chain with a gold cross he had been wearing around his neck. Border Patrol agents fingerprinted him and took his photograph. He remained at the processing station from midday until evening. He was not provided any food during this time except a small granola bar.

80.     Border Patrol agents placed Mr. Munguia Esquivel on a bus, which arrived at the El Centro Station in the pre-dawn hours. The facility was extremely cold. Mr. Munguia Esquivel was placed in a cell with about 20 other individuals, including some who were elderly. The agents provided Mr. Munguia Esquivel only a silver foil blanket, which was not sufficient to keep him warm. There was no natural light. The electric lights were kept on all day and night, so it was difficult to keep track of time. It was difficult to sleep because there was nowhere to lie down except the hard, concrete floor, which exacerbated pain in Mr. Munguia Esquivel's knee from a recent surgery. Mr. Munguia Esquivel received only a little food. He did not receive a toothbrush, toothpaste, or other personal hygiene products. He was not given an opportunity to shower.

81.     During Mr. Munguia Esquivel's time in the cell, another person detained there shared that Border Patrol agents had asked him to sign something, and when he refused, the agents got aggressive, yelling at him and slamming a door.

82.     On January 8, 2025, Mr. Munguia Esquivel was brought to an office where a Border Patrol agent sitting at a computer asked him questions. The agent asked him to sign a small device that had space for a signature but displayed nothing else. The agent did not tell Mr. Munguia Esquivel what he was signing, offer copies of any documents, or explain what she was asking him to sign. Mr. Munguia Esquivel stated he was not going to sign anything because he had a pending family-based immigration petition. The agent told Mr. Munguia Esquivel that he needed to provide his signature to see a judge. Mr. Munguia Esquivel told the agent that he could not see the document he was being asked to sign. The agent responded, "You can't, but I can." Feeling

afraid and that he had no choice, Mr. Munguia Esquivel provided his signature on the device. He still does not know what he signed.

83.    On January 9, 2025, a different Border Patrol agent summoned Mr. Munguia Esquivel and told him to again sign his name on a small screen that had space for a signature but displayed nothing else. Mr. Munguia Esquivel asked what his signature was for. The Border Patrol agent said that it was for his "fingerprints" and "record." The agent did not provide a copy of the document he was signing or explain what it said. Mr. Munguia Esquivel felt nervous about signing a document he had not been permitted to see or read. Again feeling he had no choice, he provided his signature on the device. He still does not know what he signed.

84.    On January 10, 2025, Mr. Munguia Esquivel was again brought out of his cell. A Border Patrol agent informed him that he would be permitted to leave that day, but only if he agreed to conditions. By then, Mr. Munguia Esquivel had been detained for three days. Border Patrol agents had not allowed him to call his family. He had no idea if his family knew where he was. Feeling hungry, cold, exhausted, defeated, and unsafe, Mr. Munguia Esquivel agreed to be released on conditions.

85.    The Border Patrol agent gave Mr. Munguia Esquivel an English-language document to sign. He was not provided a copy of the document in Spanish. The agent never explained what the document said, nor the conditions Border Patrol was imposing on him. Hoping it would lead to his release, Mr. Munguia Esquivel signed the document.

86.    Border Patrol agents released Mr. Munguia Esquivel. His bag of belongings was returned to him, but the gold chain and gold cross he had been wearing the day he had been arrested was gone. It had been a birthday gift from a girlfriend and had religious and personal significance to Mr. Munguia Esquivel. It is still missing.

87.    Mr. Munguia Esquivel feels traumatized by his experience with Border Patrol. He believes Border Patrol agents targeted people at Home Depot, like him, because day laborers gather there. He feels terrified and his heart starts pounding when he has to go near the Home Depot where he was arrested. When he has to leave his home to run errands or go to appointments, he fears immigration agents will stop and arrest him again.

88.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Munguia Esquivel did not have reasonable suspicion that he was unlawfully present in the United States.

89.    Upon information and belief, the Border Patrol agents who arrested Mr. Munguia Esquivel did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### _Stop and Arrest of Plaintiff Yolanda Aguilera Martinez_

90.    Plaintiff Yolanda Aguilera Martinez is a 56-year-old mother and grandmother who lives in Bakersfield. She has been a lawful permanent resident for approximately 36 years. She has resided in Kern County for nearly 45 years, and most of her children and grandchildren also reside in Kern County. She has been a farm worker since she was about 16 years old. She has no criminal record.

91.    On January 8, 2025, at approximately 4:30 p.m., Ms. Aguilera Martinez was driving alone to a doctor's appointment in Bakersfield. She was driving her own car, which is lawfully registered in her name, and was driving within the speed limit. Ms. Aguilera Martinez saw two unmarked vehicles with flashing police lights and three men in plainclothes with guns on their waist motioning for her to pull over. Thinking the men might be police officers, Ms. Aguilera Martinez pulled over. Upon information and belief, the men were Border Patrol agents.

92.    One of the Border Patrol agents approached Ms. Aguilera Martinez's door. He did not identify himself or seem to know who she was. The agent told Ms. Aguilera Martinez that he needed to see her "papers." She presented her current, valid driver's license. The agent looked at the license, said, "This shit is fuckin' fake," and threw it back into her lap.

93.    In an aggressive voice, the Border Patrol agent told Ms. Aguilera Martinez to get out of her car. Ms. Aguilera Martinez did not feel free to leave. Feeling she had no choice, she complied. After Ms. Aguilera Martinez opened her door to get out, the Border Patrol agent grabbed her arm, pushed her to the ground, and handcuffed her. He took her to the back of one of the SUVs, made her sit in the back seat, and left her there. Ms. Aguilera Martinez was speechless with shock and fear.

94.     At no point did any of the agents identify themselves, explain to Ms. Aguilera Martinez why they had stopped the van, explain why they had arrested her, or produce a warrant. At no point did they ask Ms. Aguilera Martinez about her family, employment, or community ties, or undertake any other evaluation of whether she posed a risk of flight.

95.     From the backseat of the unmarked vehicle, Ms. Aguilera Martinez could see the three men standing and talking to each other, but she could not hear what they were saying.

96.     When the agent who had handcuffed her returned, Ms. Aguilera Martinez asked if she could call someone to send her a photo of her green card. He agreed. Ms. Aguilera Martinez obtained a photo of her green card and showed it to the agent. The agent quickly scanned it and said "get the fuck out of here." Ms. Aguilera Martinez returned to her car and drove away.

97.     Ms. Aguilera Martinez felt violated, stressed, and in shock. She did not attend her doctor's appointment. Ms. Aguilera Martinez suffered bruises on her wrists from the tight handcuffs, and bruises on her legs from when the Border Patrol agent pushed her to the ground.

98.     In the following days, Ms. Aguilera Martinez saw photos and videos of Border Patrol agents arresting people in Bakersfield. She then realized that the men who stopped and handcuffed her had been Border Patrol agents.

99.     Ms. Aguilera Martinez feels worried and anxious that Border Patrol will pull her over and handcuff her again. She cannot avoid driving in Bakersfield to run errands, go to doctor's appointments, and attend church. Although she tries to avoid the areas that she learned Border Patrol agents targeted during "Operation Return to Sender," it is not always possible to do so. She is terrified of being arrested again.

100.    Ms. Aguilera Martinez is now afraid of police officers. Seeing police officers has caused her to experience flashbacks of being stopped and violently handcuffed by Border Patrol agents.

101.    Upon information and belief, the Border Patrol agents who stopped and detained Ms. Aguilera Martinez did not have reasonable suspicion that she was unlawfully present in the United States.

102.    Upon information and belief, the Border Patrol agents who arrested Ms. Aguilera Martinez did not have probable cause to believe she was likely to escape before a warrant could be obtained for her arrest.

*Stop, Arrest, and Expulsion of Plaintiff Juan Vargas Mendez*

103.    Plaintiff Juan Vargas Mendez is a 37-year-old husband and father who lived in Bakersfield with his family before Border Patrol expelled him to Mexico. Mr. Vargas Mendez is married to a U.S. citizen with whom he has four U.S. citizen children: a seven-year-old boy; a four-year-old boy; a three-year-old girl; and his wife's eight-year-old son, who has epilepsy, and whom Mr. Vargas Mendez raises as his own son.

104.    Mr. Vargas Mendez had been a Kern County resident for approximately 20 years before his expulsion. When Border Patrol arrested him, he had been working as a farm worker picking oranges at the same ranch for over 10 years. Mr. Vargas Mendez has no criminal history. Mr. Vargas Mendez has a medical problem with his nose that makes it difficult to breathe, and relies on a nasal spray to aid his breathing.

105.    On January 8, 2025, at about 5:00 p.m., Mr. Vargas Mendez was a passenger in a van driving home from working in the fields with several co-workers. They were driving on the Maricopa Highway in southwest Kern County, a common commuting route for many farm workers, especially those working on orange and almond fields. The van was driving well within the speed limit.

106.    Suddenly, Mr. Vargas Mendez heard loud sirens. One SUV with flashing lights and sirens pulled in front of the van and stopped, forcing the van to stop, while another SUV with flashing lights and sirens pulled up behind, blocking it in. The SUVs did not have identifiable markings.

107.    About four people in plain clothes exited the SUVs. Upon information and belief, the men were Border Patrol agents.

108.    One Border Patrol agent approached the driver's side window and demanded the driver and passenger in the front seat provide their licenses and proof of residency. They complied.

109.    While that agent was reviewing the IDs, two other Border Patrol agents, with guns on their waists, flung open the door on the right side of the van. The agents had not sought consent to enter or search the van, and no one in the van had provided such consent. One of the agents shouted in Spanish that the passengers of the van needed to show their IDs and "tell the truth."

110.    Mr. Vargas Mendez was not carrying an ID. Two Border Patrol agents grabbed him and one of his coworkers and dragged them both out of the van. The Border Patrol agents told Mr. Vargas Mendez to surrender his belongings. He gave them his phone, wallet, and his nasal spray. Mr. Vargas Mendez did not feel he was free to leave at any point during this encounter.

111.    The Border Patrol agents handcuffed Mr. Vargas Mendez, searched him, and put him and his coworker in the backseat of one of the SUVs. As he was being handcuffed, the Border Patrol agents mocked him and his co-passenger, calling them "Mexican bitches."

112.    At no point did the agents identify themselves, explain to Mr. Vargas Mendez why they had stopped the van, explain why they had arrested him, or produce a warrant. At no point did they ask Mr. Vargas Mendez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

113.    In the van, Mr. Vargas Mendez informed the Border Patrol agents that he had lived in the area for 20 years and had a family and four children. The agent responded that he did not care, and that Mr. Vargas Mendez was "going to Mexico."

114.    The Border Patrol agents transported Mr. Vargas Mendez to a warehouse that functioned as a makeshift processing center. There, agents photographed and fingerprinted him. Then, Border Patrol agents transported Mr. Vargas Mendez, along with several other people, to a detention center several hours away. Upon information and belief, the agents transported Mr. Vargas Mendez to the El Centro Station, where they arrived at around 1:00 a.m. on January 9, 2025.

115.    At the El Centro Station, an agent told Mr. Vargas Mendez that he was "illegal" and was going to be deported. Again, Mr. Vargas Mendez told the agent that he had been in the

area for 20 years, had a family in the United States, and had no criminal record. The agent told Mr. Vargas Mendez that he did not care, and Mr. Vargas Mendez would be deported anyway.

116.    Mr. Vargas Mendez was confined in a very cold holding cell. He was forced to remove his boots and received only an aluminum sheet for warmth. The only places to sit or lie down in the holding cell were two concrete benches. Mr. Vargas Mendez was given very little to eat and no hygiene products. Mr. Vargas Mendez had difficulty breathing and repeatedly requested his nasal spray, but Border Patrol agents ignored his requests.

117.    Around noon on January 9, 2025, a Border Patrol agent showed Mr. Vargas Mendez a packet of documents, in English, and told Mr. Vargas Mendez he needed to sign the paperwork. The agent told Mr. Vargas Mendez if he did not sign the documents, he would go to prison for a long time. Mr. Vargas does not speak English and could not read the documents. He asked repeatedly to call his wife, but the Border Patrol agent refused his requests.

118.    The agent presented Mr. Vargas Mendez with a small digital pad where they directed him to sign his name. The pad was about the size of a cell phone and did not display the documents they asked him to sign. Cold, in need of his breathing aid, and afraid of going to prison, Mr. Vargas Mendez signed the digital pad.

119.    Upon information and belief, the Border Patrol agent actually had Mr. Vargas Mendez sign Form I-826, a voluntary departure consent form. About two hours later, Border Patrol agents loaded Mr. Vargas Mendez onto a bus, drove him across the border, and dropped him off in Mexicali.

120.    After arriving in Mexico, a Border Patrol agent gave Mr. Vargas Mendez a copy of the documents he is purported to have signed. The document included another section signed by a person named "Esteban Echeverria," stating that Mr. Echeverria had read the document to Mr. Vargas Mendez in Spanish.

121.    No one read Form I-826 to Mr. Vargas Mendez in Spanish. Border Patrol did not provide any information, whether verbal or written, about the consequences of accepting voluntary departure or the legal rights Mr. Vargas Mendez would waive by accepting voluntary departure.

122.     At no point did Mr. Vargas Mendez understand the consequences of accepting voluntary departure, including that he would be subject to a period of inadmissibility, or the rights he was waiving.

123.     At no point did Mr. Vargas Mendez understand that the documents he was signing constituted an acceptance of voluntary departure or a waiver of his right to an immigration court hearing.

124.     If Border Patrol had permitted Mr. Vargas Mendez to exercise his right to an immigration hearing, he would have refused to sign the documents presented to him and would have insisted on his right to contest his removability and/or pursue relief from removal. Because he has no criminal history, he also would have been eligible for a bond hearing to seek release from immigration detention.

125.     As a result of Mr. Vargas Mendez's expulsion to Mexico, he is separated from his wife and children, who remain in Bakersfield. His wife has reported to Mr. Vargas Mendez that the children have become quiet and scared; they are not eating well and have lost weight. Mr. Vargas Mendez used to care for his stepson by administering medicine and helping him cope with seizures when Mr. Vargas Mendez's wife was working night shifts. Without Mr. Vargas Mendez at home to take care of his stepson, his stepson's seizures have worsened. Mr. Vargas Mendez is devastated to think his young children may not understand why he has not come home and may feel he has abandoned them. Mr. Vargas Mendez feels depressed and often cries while speaking on the phone with his wife.

126.     Upon information and belief, the Border Patrol agents who stopped and detained Mr. Vargas Mendez did not have reasonable suspicion that he or anyone else in the vehicle was unlawfully present in the United States.

127.     Upon information and belief, the Border Patrol agents who arrested Mr. Vargas Mendez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

_Stop, Arrest, and Expulsion of Plaintiff Maria Guadalupe Hernandez Espinoza_

128.    Plaintiff Maria Guadalupe Hernandez Espinoza is a 46-year-old mother and grandmother who lived in Bakersfield for about 10 years. Before Border Patrol expelled her to Mexico, she and her partner had been renting the same apartment for the past three years. Ms. Hernandez Espinoza worked as a farm worker in the agricultural sector for close to 20 years, including in and around Bakersfield for approximately the past 10 years.

129.    On January 7, 2025, Ms. Hernandez Espinoza, her partner, and a coworker were in a vehicle driven by her partner, driving home to Bakersfield on California Highway 58 after working in a tomato greenhouse plant in Tehachapi. The car had a current, valid registration in her partner's name, a current license plate, and no stickers or decals. Ms. Hernandez Espinoza's partner was not violating any traffic laws. As he prepared to exit the highway, an unmarked white Ford pickup truck pulled up behind the car, flashed its lights, and activated a siren. Ms. Hernandez Espinoza's partner pulled over.

130.    A man in a white shirt approached the driver and instructed him to turn off the car. When he complied, the doors automatically unlocked, and the man opened the driver's side door and instructed Ms. Hernandez Espinoza's partner to exit the car.

131.    The man did not identify himself, show a warrant, or ask any questions. The man escorted Ms. Hernandez Espinoza's partner to the Ford truck.

132.    About six white Chevrolet Malibus then pulled up behind the car Ms. Hernandez Espinoza was in. All were unmarked and each carried three to four men with guns at their waists. Upon information and belief, the men in the Chevy Malibus and Ford truck were all Border Patrol agents.

133.    Two agents approached the car and instructed Ms. Hernandez Espinoza and her coworker to exit the car. They complied. The agents walked Ms. Hernandez Espinoza and her coworker to the white Ford truck, where her partner was waiting with the first Border Patrol agent. The agents asked Ms. Hernandez Espinoza, her partner, and her coworker for their identification and whether they were lawfully present. Ms. Hernandez Espinoza did not answer their questions, and did not produce an ID because she was not carrying one with her.

134.    Without a warrant, and without obtaining consent from Ms. Hernandez Espinoza, her partner, or her coworker, the Border Patrol agents began searching their vehicle. They removed Ms. Hernandez Espinoza's partner's wallet from the car and removed his ID.

135.    The Border Patrol agents told Ms. Hernandez Espinoza, her partner, and her coworker that they were under arrest. Ms. Hernandez Espinoza still did not know who the agents were because they had not identified themselves. From their vehicles, sirens, handguns, and matching clothing, she believed they worked for a law enforcement agency, but she did not know they were affiliated with immigration. During this encounter, Ms. Hernandez Espinoza did not feel free to leave.

136.    At no point did the agents identify themselves, explain to Ms. Hernandez Espinoza why they had stopped the vehicle, explain why they had arrested her, or produce a warrant. At no point did they ask Ms. Hernandez Espinoza about her family, employment, or community ties, or undertake any other evaluation of whether she posed a risk of flight.

137.    The Border Patrol agents left Ms. Hernandez Espinoza's partner's car on the side of the highway and transported Ms. Hernandez Espinoza, her partner, and her coworker to a makeshift processing center on 7th Standard Road in Bakersfield. There, Ms. Hernandez Espinoza recognized a Border Patrol truck and realized that she had been arrested by Border Patrol agents.

138.    Ms. Hernandez Espinoza saw dozens of men and a few women at the makeshift processing center. Border Patrol agents took away her personal belongings. Ms. Hernandez Espinoza asked to make a phone call to a family member. Border Patrol agents denied her request.

139.    After about an hour wait, Border Patrol agents loaded Ms. Hernandez Espinoza and others into a bus, which left Bakersfield in the late evening and drove down California Highway 58 through Mojave. A few hours into the drive, one of the agents looked at the group of detained individuals, laughed, and said in Spanish, "Let's go for more wetbacks."

140.    Ms. Hernandez Espinoza did not know where she was being taken and experienced anxiety attacks on the bus.

ER390

141.    In the pre-dawn hours of January 8, 2025, the bus arrived at the El Centro Station. Ms. Hernandez Espinoza was exhausted, scared, and hungry.

142.    At the El Centro Station, Border Patrol agents searched Ms. Hernandez Espinoza in front of dozens of men by lifting her shirt and exposing her bra. She felt humiliated. Agents then took her photograph and fingerprints.

143.    Ms. Hernandez Espinoza was ordered into a freezing cold room where she met two other women and their children. They told Ms. Hernandez Espinoza they were asylum seekers and had been in the room for days.

144.    The room contained no bed. There was nowhere to sit or lie down except the floor or a metal bench. The room had no windows or exposure to sunlight. Ms. Hernandez Espinoza did not know what time it was unless she asked a Border Patrol agent.

145.    Ms. Hernandez Espinoza was brought to speak to a Border Patrol agent for an initial interview. A female agent told Ms. Hernandez Espinoza she could agree to voluntary departure or wait two to three years to see a judge. She told Ms. Hernandez Espinoza that either way, she would "likely end up deported."

146.    Ms. Hernandez Espinoza felt anxious, sleep deprived, and terrified at the prospect of being detained for years. In a knee-jerk reaction, she verbally said she would accept voluntary departure. She was not given any paperwork explaining voluntary departure or anything to sign.

147.    When the agent returned Ms. Hernandez Espinoza to her cell, Ms. Hernandez Espinoza thought more about the choice she had been offered. She realized she wanted to speak to a judge and have an opportunity to return to Bakersfield.

148.    When a different agent came to the cell to drop off diapers for one of the detained children, Ms. Hernandez Espinoza informed the agent that she had changed her mind and wanted to see a judge. Ms. Hernandez Espinoza said she would not sign anything agreeing to voluntary return. The agent told Ms. Hernandez Espinoza that she was not allowed to see a judge.

149.    Ms. Hernandez Espinoza felt extremely anxious. She had trouble sleeping because she kept waking up and crying. When a man entered the cell, Ms. Hernandez Espinoza told him she wanted to see a judge. The man told Ms. Hernandez Espinoza that he was a janitor and could

not help her. Ms. Hernandez Espinoza told every agent who passed by that she wanted to see a judge, but no one assisted her.

150.    Later, Ms. Hernandez Espinoza was pulled out of her cell and brought to a room where a different female agent was sitting before a computer. Ms. Hernandez Espinoza told the agent she wanted to see a judge. The Border Patrol agent said she could not see a judge. Ms. Hernandez Espinoza asked why, and reiterated that she had not signed any paperwork accepting voluntary departure. The agent told Ms. Hernandez Espinoza: "That doesn't matter, your signature doesn't matter, all of you are going to be deported."

151.    The Border Patrol agent told Ms. Hernandez Espinoza that she needed to sign documents related to her fingerprints and identification. Ms. Hernandez Espinoza tried to look at the documents on the agent's computer screen, but the agent did not allow her to see them.

152.    The Border Patrol agent directed Ms. Hernandez Espinoza to sign her initials on a small digital device which showed a line for her signature only. The device did not display the documents Ms. Hernandez Espinoza was being asked to sign. Based on the Border Patrol agent's representation that the documents were related to her fingerprints and identification, Ms. Hernandez Espinoza believed she had no choice, and she signed where told.

153.    Upon information and belief, the Border Patrol agent actually had Ms. Hernandez Espinoza sign Form I-826, a voluntary departure consent form.

154.    After signing her name, Ms. Hernandez Espinoza asked the Border Patrol agent if she could see a judge. The agent told her no, and that she had no right to see a judge.

155.    On January 9, 2025, Border Patrol returned Ms. Hernandez Espinoza's belongings to her and said she was being expelled to Mexico. Ms. Hernandez Espinoza felt horrified and shocked. Border Patrol transported her in a truck to Mexicali, Mexico, with a group of other individuals.

156.    When Border Patrol left Ms. Hernandez Espinoza in Mexicali, an agent gave her a copy of the document she had signed the day before. It was the first time Ms. Hernandez Espinoza saw that her signature was on a document purporting to agree to voluntary departure. She was in disbelief.

157.    The document included another section signed by a person named "Elisabeth Cota," stating that Ms. Cota had read the document to Ms. Hernandez Espinoza in Spanish.

158.    No one read Form I-826 to Ms. Hernandez Espinoza in the Spanish language. Border Patrol did not provide any information, whether verbal or written, about the consequences of accepting voluntary departure or the rights she would waive by accepting voluntary departure.

159.    At no point did Ms. Hernandez Espinoza understand the consequences of accepting voluntary departure, including that she would be subject to a period of inadmissibility, or the rights she was waiving.

160.    At no point did Ms. Hernandez Espinoza understand that the documents she was signing constituted an acceptance of voluntary departure or a waiver of her right to an immigration court hearing.

161.    If Border Patrol had permitted Ms. Hernandez Espinoza to exercise her right to an immigration hearing, she would have refused to sign the documents presented to her and would have insisted on her right to contest her removability and/or pursue relief from removal. Because she has no criminal history, she also would have been eligible for a bond hearing to seek release from immigration detention.

162.    Ms. Hernandez Espinoza is now stranded in Mexico, separated from her home, her job, her daughters and grandson, and her community. She feels traumatized and has trouble sleeping because she wakes up in the middle of the night to cry. She feels everything she has worked for in her life is gone.

163.    Upon information and belief, the Border Patrol agents who stopped and detained Ms. Hernandez Espinoza did not have reasonable suspicion that she or anyone else in the vehicle was unlawfully present in the United States.

164.    Upon information and belief, the Border Patrol agents who arrested Ms. Hernandez Espinoza did not have probable cause to believe she was likely to escape before a warrant could be obtained for her arrest.

*Stop, Arrest, and Expulsion of UFW Members*

165.     "Alicia" and her husband "Benjamin" are farm workers, UFW members, and parents to four young children. Before Border Patrol expelled Benjamin to Mexico, Alicia and Benjamin had lived in Kern County for about 10 years and worked in berry, table grape, almond, and citrus agriculture.

166.     On January 7, 2025, at approximately 2:00 p.m., Alicia, Benjamin, and Alicia's brother-in-law "Carlos," who is also a UFW member, were traveling in Carlos's car home from the citrus orchards where they all worked together. As they drove down Highway 99, a common route for farm workers to access rural roads where their worksites are located, they saw vehicles parked on the shoulder with police-style lights on the grill. Carlos was driving within the speed limit and obeying traffic laws. Several vehicles pulled up behind Carlos's car and signaled with their lights for him to pull over.

167.     After Carlos pulled over, several men approached the car. The men asked Alicia, Benjamin, and Carlos if they had "papers." Upon information and belief, the men were Border Patrol agents.

168.     The Border Patrol agents did not appear to know who was in the car or have any other information about the vehicle beyond its appearance. They indicated no other reason for the stop than to ask for "papers." After asking for "papers," the Border Patrol agents arrested Alicia, Benjamin, and Carlos. They did not present a warrant for arrest.

169.     After handcuffing her, the Border Patrol agents asked Alicia if she had family. When she told them she had children, an agent said he could go pick up the children so they could all be taken to Mexico together. The Border Patrol agents did not ask Benjamin or Carlos about their family, employment, or community ties, or undertake any other evaluation of whether either of them posed a risk of flight.

170.     The Border Patrol agents transported Alicia, Benjamin, and Carlos to a large tent on the outskirts of Bakersfield, which appeared to be a mobile processing center. Agents told Alicia, Benjamin, and Carlos they would be detained for many months.

171.    Alicia begged the Border Patrol agents to release her, explaining that she had four young children who needed to be picked up from daycare. She told the agents the children had no one else to care for them. A Border Patrol agent called the daycare provider to confirm Alicia was telling the truth. After confirming it, the agent released her, hours after she had been arrested.

172.    Border Patrol agents transported Benjamin and Carlos to the El Centro Station, where they were detained in cold, windowless cells. Border Patrol agents did not provide Benjamin or Carlos with any hygiene items and gave them only a thin aluminum sheet for warmth. It was impossible for Benjamin or Carlos to sleep because the lights in the cell were on day and night and there was nothing to lie down on except hard, cold concrete.

173.    At the El Centro Station, Border Patrol agents used coercive tactics to extract signatures on voluntary departure forms from Benjamin and Carlos.

174.    Border Patrol agents did not inform Benjamin or Carlos that voluntary departure involved waiving their rights to an immigration court hearing. Nor did Border Patrol agents inform Benjamin or Carlos of the consequences of voluntary departure, including that it could subject them to a period of inadmissibility. Instead, Border Patrol agents told Benjamin and Carlos that accepting voluntary departure would make it easier for them to return to the United States.

175.    When Benjamin and Carlos indicated that they did not want to agree to voluntary departure, Border Patrol agents displayed their weapons as a show of intimidation. In fear, Benjamin and Carlos signed where they were told.

176.    Border Patrol agents presented Benjamin and Carlos with a small digital screen that had space only for their signature, which they entered. Border Patrol agents did not show Benjamin or Carlos the documents they were purportedly signing, read any documents to Benjamin or Carlos, or provide copies of any documents to Benjamin or Carlos.

177.    Border Patrol agents transported Benjamin and Carlos to Mexico.

178.    At no point did Benjamin or Carlos understand the consequences of accepting voluntary departure, including that they would be subject to a period of inadmissibility, or the rights they were waiving.

179.    At no point did Benjamin or Carlos understand that the documents they were signing constituted a waiver of their right to an immigration court hearing.

180.    If Border Patrol agents had provided Benjamin and Carlos information about their right to an immigration hearing and the consequences of voluntary departure, both Benjamin and Carlos would have refused to sign anything and would have insisted on their right to contest their removability and/or pursue relief from removal.

181.    Benjamin is stranded in Mexico, forcing Alicia to raise their four children alone. While she grieves her separation from her husband, she also must manage their household alone and care for her children without her husband's presence or support. Alicia does not know how she will provide for her children on a single income. Alicia and Benjamin still feel shocked by what happened to them. Both are experiencing profound sadness over their family's separation.

182.    Benjamin is worried for his children, two of whom are still in diapers. He is devastated that he is separated from and unable to support his wife and his children, as he knows they are struggling without him.

183.    Alicia continues to work as a farm worker in the Kern County area. She cannot avoid the locations Border Patrol targets in its immigration sweeps. She must travel through agricultural areas to get to and from work. She cannot avoid getting gas or running errands at stores in Bakersfield, including in locations where other farm workers shop and gather.

184.    Alicia feels stress and anxiety that because she cannot avoid these locations, Border Patrol agents will stop her again, regardless of whether they have the requisite reasonable suspicion to do so. Alicia fears Border Patrol agents will arrest her again regardless of whether she poses a flight risk. She fears Border Patrol agents will force her into voluntary departure, like they forced her husband and brother-in-law. If she is expelled from the country, her children will be left without a parent in the United States. Alicia cannot bear the thought of being separated from her children the way she has been separated from her husband.

185.    Upon information and belief, the Border Patrol agents who stopped and detained Alicia, Benjamin, and Carlos did not have reasonable suspicion that anyone in the vehicle was unlawfully present in the United States.

186.    Upon information and belief, the Border Patrol agents who arrested Alicia, Benjamin, and Carlos did not have probable cause to believe any of them was likely to escape before a warrant could be obtained for their arrest.

### Stop and Arrest of UFW Member "Fernando"

187.    "Fernando" is a farm worker and UFW member who has lived in Kern County for approximately 20 years. Fernando has raised a family with his wife, supporting his family by working in the fields.

188.    On January 9, 2025, Fernando was in a car driving home after work on a public road between Bakersfield and Mettler, California. They were traveling within the speed limit and obeying traffic laws. On the highway, traveling on a route commonly taken by agricultural workers when traveling between orchard worksites and farm worker communities, a truck turned on flashing lights and signaled for their car to pull over.

189.    When Fernando's car came a stop, several men jumped out of their vehicles and approached the car, yelling in an intimidating manner. Upon information and belief, the men were Border Patrol agents. They grabbed the handles of the locked car doors and pounded on the closed windows. They warned Fernando and his companions that if they did not open the windows, they would smash the glass.

190.    The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from "five." When they reached "one," they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants. The time from approaching the vehicle to smashing the windows was approximately 15 seconds.

191.    The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway. The agents arrested Fernando. The vehicle was impounded.

192.    The agents did not identify themselves, did not appear to know who Fernando was, and did not appear to have any reason for pulling the car over, other than to target its passengers for federal immigration enforcement. The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk.

193.    Upon information and belief, the Border Patrol agents who stopped and detained Fernando did not have reasonable suspicion that anyone in the vehicle was unlawfully present in the United States.

194.    Upon information and belief, the Border Patrol agents who arrested Fernando did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### *Stop and Arrest of Jesus Ramirez*

195.    Jesus Ramirez is a 64-year-old Bakersfield resident and father to two children. Mr. Ramirez is the only living parent to both of his children and is the primary caregiver for his son. Mr. Ramirez works as a day laborer.

196.    On January 7, 2025, at approximately 11:00 a.m., Mr. Ramirez was standing with other day laborers in the parking lot of Home Depot at 4001 Ming Avenue in Bakersfield when Border Patrol agents surrounded them. The Border Patrol agents arrived in multiple vehicles, some with sirens on. The agents surrounded Mr. Ramirez such that he could not walk away.

197.    The Border Patrol agents demanded that the men, including Mr. Ramirez, show their "papers." Mr. Ramirez reached for his wallet to locate his ID. As Mr. Ramirez pulled his wallet from his pocket, an agent snatched the wallet out of his pocket and removed his ID. He looked at the ID but did not ask Mr. Ramirez any questions about it. The agent returned Mr. Ramirez's wallet but kept his ID.

198.    The agents loaded Mr. Ramirez into one of their vehicles and transported him behind the store, where they loaded him into a larger vehicle. The agents told Mr. Ramirez he would be going "home," which he believed meant he would be returned to his home in Bakersfield. But the agents did not drive Mr. Ramirez home; they took him to a makeshift

processing station, where they detained him for several hours before loading him onto a bus and transporting him to the El Centro Station.

199.    At no point did the Border Patrol agents explain to Mr. Ramirez why they had arrested him or produce a warrant. At no point did they ask Mr. Ramirez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

200.    At the El Centro Station, Border Patrol agents took Mr. Ramirez's fingerprints. An agent presented Mr. Ramirez with a document in English, a language Mr. Ramirez does not read, and told Mr. Ramirez to sign it. The agent said that the document was required for a judge to review Mr. Ramirez's case, but did not translate or explain the document to Mr. Ramirez. Mr. Ramirez asked the agents to allow him to call a family member, but they refused.

201.    On January 9, 2025, Mr. Ramirez was moved from the El Centro Station to Imperial Regional Detention Facility, an ICE detention center, where he is still detained. Mr. Ramirez feels devastated and heartbroken over his separation from his children.

202.    Upon information and belief, the Border Patrol agents who stopped and detained Mr. Ramirez did not have reasonable suspicion that he was unlawfully present in the United States.

203.    Upon information and belief, the Border Patrol agents who arrested Mr. Ramirez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### *Stop and Arrest of Ernesto Campos Gutierrez*

204.    Ernesto Campos Gutierrez is a 44-year-old homeowner and resident of Bakersfield, where he has lived for over 20 years. He owns his home, where he lives with his partner and children. He is a U.S. citizen. He owns a gardening business in Bakersfield and is an active member of his church.

205.    On January 8, 2025, at around 9:40 a.m., Mr. Campos Gutierrez was driving in Bakersfield on his way to a gardening job, with a passenger sitting in the front passenger seat. His truck is registered under his name, has current license plates and registration, and has no stickers or

decals. The truck was hauling a mini trailer containing gardening equipment. Mr. Campos Gutierrez was driving within the speed limit.

206.    An unmarked, white Chevrolet Tahoe turned on flashing lights and signaled for Mr. Campos Gutierrez to pull over, which he did. On information and belief, this was a Border Patrol vehicle containing Border Patrol agents.

207.    A Black male Border Patrol agent wearing a vest with the words "POLICE" in large letters approached Mr. Campos Gutierrez's vehicle. He tried to pull open the driver's side door, which was locked. Through the closed car window, the agent asked for Mr. Campos Gutierrez's and his passenger's IDs. The agent did not identify himself, show a warrant, or explained why he had pulled Mr. Campos Gutierrez over.

208.    Mr. Campos Gutierrez lowered his window, asked the Border Patrol agent why he had been pulled over, and handed the agent his REAL ID driver's license. The agent did not respond to Mr. Campos Gutierrez's question. The agent instructed Mr. Campos Gutierrez to hand over the keys to his truck. Mr. Campos Gutierrez declined because the agent had not identified himself or explained why he had pulled Mr. Campos Gutierrez over. The Border Patrol agent stated he needed the keys because Mr. Campos Gutierrez would drive away otherwise. Mr. Campos Gutierrez stated he would not drive away. The agent still had Mr. Campos Gutierrez's driver's license in his possession.

209.    The Border Patrol agent took out a knife and slashed two of the tires on Mr. Campos Gutierrez's truck. Mr. Campos Gutierrez was in shock.

210.    A second Border Patrol truck arrived and blocked Mr. Campos Gutierrez's truck in by parking directly in front of it. A white male agent got out of the second vehicle and stood by Mr. Campos Gutierrez's truck while the Black agent returned to his vehicle to run Mr. Campos Gutierrez's license.

211.    The Black Border Patrol agent returned to Mr. Campos Gutierrez's vehicle and approached the passenger side. He ordered Mr. Campos Gutierrez's passenger to lower his window and open the door. When Mr. Campos Gutierrez's passenger lowered the window a few inches, the Border Patrol agent pulled out a handheld tool and threatened to break the window. Mr. Campos

Gutierrez's passenger lowered his window further and opened the door.

212.    The Black Border Patrol agent forcibly grabbed Mr. Campos Gutierrez's passenger out of the truck and handcuffed him. The agent never asked Mr. Campos Gutierrez's passenger about his community ties or otherwise undertake any other evaluation of whether he posed a risk of flight. Mr. Campos Gutierrez told the agent he should not have slashed the tires. The agent responded, "I'm not going to argue with you, bro. You did what you did, I did what I did."

213.    A third agent arrived and told Mr. Campos Gutierrez he was under arrest for "alien smuggling." The agent handcuffed Mr. Campos Gutierrez and took away his phone and wallet.

214.    At no point did the agents identify themselves, explain to Mr. Campos Gutierrez why they had stopped his vehicle, explain why they had arrested him, or produce a warrant. At no point did they ask Mr. Campos Gutierrez about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight.

215.    Border Patrol agents placed Mr. Campos Gutierrez and his passenger in the back of a truck and began driving them away, leaving Mr. Campos Gutierrez's truck on the side of the road. Mr. Campos Gutierrez informed the agents he is a U.S. citizen, but they continued to detain him.

216.    Border Patrol agents transported Mr. Campos Gutierrez and his passenger to a facility about 20 minutes' drive away. Mr. Campos Gutierrez was detained there in handcuffs for about four hours. Mr. Campos Gutierrez requested a phone call to his partner. The agent who had handcuffed Mr. Campos Gutierrez said he did not have the right to a call.

217.    After about four hours, Border Patrol agents placed Mr. Campos Gutierrez in a truck and drove him home.

218.    During this ordeal, Mr. Campos Gutierrez felt scared for his life. When the Border Patrol agent pulled out a knife just before slashing his tires, Mr. Campos Gutierrez feared he would be attacked or that the agent might pull out a gun next. Mr. Campos Gutierrez has to travel often for work on the roads and highways in and around Bakersfield. When he thinks about how he was treated by Border Patrol during this encounter, he feels scared and in disbelief.

219.     Upon information and belief, the Border Patrol agent who stopped and detained Mr. Campos Gutierrez did not have reasonable suspicion that he, or anyone else in his vehicle, was unlawfully present in the United States.

220.     Upon information and belief, the Border Patrol agents who arrested Mr. Campos Gutierrez did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### Stop and Arrest of Luis Perez Cruz

221.     Luis Perez Cruz is a 28-year-old resident of Bakersfield, where he has lived with his mother for over two years. Mr. Perez Cruz has other family members who live in Bakersfield. He works as a painter.

222.     On January 7, 2025, Mr. Perez Cruz stopped at Home Depot on his way to work. He ran into two of his cousins in the parking lot. While he chatted with them, two men in civilian clothes approached them and told them they were Border Patrol agents.

223.     The Border Patrol agents told Mr. Perez Cruz and his cousins to show them IDs demonstrating that they were in the United States lawfully. The agents also asked if Mr. Perez Cruz and his cousins if they had open immigration cases.

224.     Mr. Perez Cruz exercised his right to remain silent. One of the Border Patrol agents grabbed him and began to handcuff him. Mr. Perez Cruz did not feel free to leave.

225.     The agent told Mr. Perez Cruz that whether he and his cousins showed ID or not, the agents would arrest them. Feeling he had no choice, Mr. Perez Cruz showed the agent his ID.

226.     Agents loaded Mr. Perez Cruz into a truck with a group of other people they were arresting. The agents drove the truck behind the Home Depot. There, they loaded Mr. Perez Cruz and the others into a van. The agents drove the van to a processing station on 7th Standard Road.

227.     Before arresting Mr. Perez Cruz, Border Patrol agents did not ask him about his family, employment, or community ties, or undertake any other evaluation of whether he posed a risk of flight. The agents did not produce a warrant of any kind and did not appear to have any idea who Mr. Perez Cruz was before demanding his ID.

228.    At the station on 7th Standard Road, Border Patrol agents took Mr. Perez Cruz's fingerprints and the names of some family members. The agents loaded him into a bus and transported him to a holding center in El Centro, California. On information and belief, the Border Patrol agents brought Mr. Perez Cruz to the El Centro Station.

229.    At the El Centro Station, agents tried to make Mr. Perez Cruz sign documents. The agents refused to show Mr. Perez Cruz the documents they told him to sign. Instead, agents presented Mr. Perez Cruz with a screen with space for his signature and directed him to sign it. Mr. Perez Cruz refused to sign anything and insisted on seeing a judge.

230.    After nearly four days, Border Patrol agents fitted Mr. Perez Cruz with an electronic monitor and released him to a shelter in Calexico.

231.    Mr. Perez Cruz still lives in Bakersfield and fears Border Patrol agents will stop and arrest him again.

232.    Upon information and belief, the Border Patrol agent who stopped and detained Mr. Perez Cruz did not have reasonable suspicion that he was unlawfully present in the United States.

233.    Upon information and belief, the Border Patrol agents who arrested Mr. Perez Cruz did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest.

### *Border Patrol's Pattern of Seizing, Arresting, and Coercing Voluntary Departure of Similarly Situated Individuals*

234.    The experiences of the Plaintiffs and community members in the preceding paragraphs are not unique. To the contrary, they reflect three unlawful policies and practices that Border Patrol relies on in its interior operations: (1) conducting detentive stops without regard to reasonable suspicion that a person is in the country unlawfully, (2) effecting warrantless arrests without regard to probable cause that a person is likely to escape, and (3) extracting expulsion through voluntary departure without a knowing and voluntary waiver of rights.

235.    Border Patrol agents consistently adhered to these policies and practices throughout "Operation Return to Sender." In vehicle patrols and on foot, Border Patrol agents conducted detentive stops without regard to whether there was reasonable suspicion that a person was

unlawfully in the United States. In vehicle patrols, Border Patrol agents roved Highway 99, the central artery of the agricultural heart of the San Joaquin Valley, and other roads in predominantly Latino neighborhoods and agricultural areas. Border Patrol agents tailed cars, flashing their lights, or pulled cars over from the shoulder; targeted people of color, people who appeared to be farm workers, and people who appeared to be day laborers for stops; and did so without any basis to believe that anyone in the car was violating an immigration law.

236.    In vehicles and on foot patrol, Border Patrol agents went to businesses in predominantly Latino neighborhoods and areas where farm workers and day laborers gather. There, Border Patrol agents roved parking lots and blocked parked cars from behind with their own vehicles to stop and detain people inside the cars. Border Patrol agents targeted people of color parked in their cars without any basis to believe that anyone in the car was violating an immigration law. Border Patrol agents also approached people of color and people who appeared to be farm workers or day laborers to question them about their immigration status.

237.    Upon information and belief, if a person approached by Border Patrol on foot verbally exercised their right to remain silent, walked away, or otherwise declined to consent to questioning, Border Patrol agents escalated the interaction to a detentive stop or arrest, conducted warrantless searches without consent, and did so without any basis to believe the person was violating an immigration law.

238.    Upon information and belief, when a person in a vehicle declined to answer Border Patrol agents' questions or consent to the encounter, the agents similarly escalated the encounter by blocking the car in, smashing the car's windows, slashing the car's tires, and/or ordering or physically pulling people out of vehicles and handcuffing them.

239.    Border Patrol agents effected warrantless arrests regardless of whether the agents had probable cause to believe that the person posed a risk of escape. Border Patrol agents did not undertake an assessment of a person's flight risk or attempt to obtain a warrant before making an arrest. Instead, Border Patrol agents indiscriminately arrested people swept up in "Operation Return to Sender," including people with pending immigration applications, no criminal history,

established residences in the community, steady employment, family in the United States, or other community ties mitigating any purported flight risk.

240.    Border Patrol appears to have designed "Operation Return to Sender" to accommodate a high volume of warrantless arrests and detentions. Border Patrol set up at least one makeshift processing center, on 7th Standard Road in Bakersfield, to conduct mobile processing for people arrested in the raids, and coordinated transportation to that station from its points of arrests throughout the community.

241.    In these temporary processing centers, Border Patrol generally photographed and fingerprinted the people agents arrested before bussing them to the El Centro Station. Border Patrol had no process or procedure for informing family members where their loved ones were or why they had been taken. Individuals held at this makeshift facility were not provided phone calls, access to attorneys, or meals. Border Patrol then transported these individuals over 300 miles south to the El Centro Station in a coordinated effort involving buses, vans, and trucks.

242.    In the El Centro Station, for up to three days, Border Patrol agents detained incommunicado the people they had arrested; held them in windowless, cold cells without beds or warm blankets, access to showers, hygienic products, or sufficient food; deprived them of sleep, without access to daylight or any way to tell time; and pressured them to waive their right to an immigration hearing and accept voluntary departure, no matter how many times the people detained asked to speak to an attorney or make a phone call.

243.    Border Patrol did not inform people in their custody of the penalties that voluntary departure carries, including a three- or ten-year period of "inadmissibility" for reentry to the United States, either verbally or in writing. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I)–(II). Instead, Border Patrol agents merely directed people to sign their names on small electronic screens only large enough to display a person's signature, refusing to allow people to read or review the documents they were signing. Only after people had signed away their rights and were expelled to Mexico did Border Patrol agents give them a copy of the form they had signed, containing language explaining the stark consequences of accepting voluntary departure.

244.    To coerce people in their custody into purportedly agreeing to their summary expulsion, Border Patrol agents denied them phone calls to attorneys or loved ones and deliberately misinformed them about their options. Among other things, Border Patrol agents claimed people could be imprisoned for going before an immigration judge; that accepting voluntary departure would make it easier to secure immigration status in the future; and/or that people in custody had *no choice* but to accept voluntary departure.

245.    As a result of Border Patrol's coercive tactics, on information and belief, dozens of residents of Kern County and the surrounding region, many of whom had deep ties to the community, accepted voluntary departure without understanding its consequences and are now stranded in Mexico, far from their homes, families, jobs, and communities.

### C. Border Patrol Will Continue to Rely on Its Unlawful Practices Throughout the Region

246.    Despite the patently unlawful practices it relied on, Border Patrol has claimed that "Operation Return to Sender was an overwhelming success from day one."[11]

247.    Border Patrol plans to replicate "Operation Return to Sender" across the state. Border Patrol has stated publicly that it is planning operations in Fresno and Sacramento,[12] as well as a return to Bakersfield.[13]

248.    After "Operation Return to Sender," the El Centro Sector's Chief Patrol Agent Gregory Bovino issued a press statement declaring that "[the El Centro Sector's] area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line" and that Border Patrol "is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento."[14]

---

[11] US Border Patrol El Centro Sector, Facebook (Jan. 9, 2025, 8:21 AM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02WAdqbqXraaLavfpjM uh8kGtAE96Jqms9bWPQdXnikRJUakc9Xp2Z3uUcGKrHB3bql.

[12] Sergio Olmos, *A surprising immigration raid in Kern County foreshadows what awaits farm workers and businesses*, CalMatters, Jan. 10, 2025, https://calmatters.org/economy/2025/01/kern-county-immigration-sweep/.

[13] US Border Patrol El Centro Sector, Facebook (Jan. 12, 2025, 12:02 AM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0eqSVW9EQE5Q3GiNU BaipVp8wtzsSbG3VycZBfsnVtEDqLwqSFez8AdnNNUp64dcal.

[14] Jose Franco & Jenny Huh, *US CBP issues statement on ongoing 'Operation Return to Sender'*

249.    The unlawful practices Border Patrol relied on in "Operation Return to Sender," and continues to employ, are consistent with agency-wide policy. In particular, Border Patrol's policy and practice of conducting warrantless arrests without regard to flight risk conforms to a DHS-wide commitment to relying on broad sweeps to conduct immigration arrests in jurisdictions with laws intended to protect immigrants, often called "sanctuary" jurisdictions.

250.    Tom Homan, a former ICE director who now serves as President Trump's "Border Czar," has repeatedly explained the Trump administration's intent to rely on indiscriminate warrantless arrests in sanctuary jurisdictions.

251.    On January 21, 2025, Mr. Homan told Fox News: "There's not only public safety threats that will be arrested, because in sanctuary cities, we're not allowed to get that public safety threat in the jail, which means we got to go to the neighborhood and find him . . . . And when we find him, he may be with others. And unlike the last administration, we're not going to tell ICE officers not to arrest an illegal alien. *So if they find others, they'll be arrested.*"[15]

252.    On January 27, 2025, Mr. Homan told CNN: "Well, in sanctuary cities, you're going to see a higher number of collateral arrests. . . . More agents in the neighborhood, and more collateral arrests."[16]

253.    Later in the interview, the interviewer asked Mr. Homan to confirm that by "collateral arrests," he referred to people without criminal records who agents had not planned to encounter or arrest. Mr. Homan confirmed: "Yes, if they're in the country illegally, they're going to get arrested too."[17]

---

*in Bakersfield*, KGET, Jan. 10, 2025, https://www.kget.com/news/local-news/us-cbp-issues-statement-on-ongoing-operation-return-to-sender-in-bakersfield-area/.

[15] Adam Shaw, *Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats'*, Fox News, Jan. 21, 2025, https://www.foxnews.com/politics/trump-border-czar-tom-homan-reveals-ice-teams-already-arresting-public-safety-threats (emphasis added).

[16] *The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry* (CNN broadcast Jan. 27, 2025), https://transcripts.cnn.com/show/skc/date/2025-01-27/segment/01.

[17] *Id.*

254.    In public statements, Border Patrol offered the same explanations when discussing its practices during "Operation Return to Sender." In a comment on its official Facebook account, the El Centro Border Patrol Sector stated: "Sanctuary jurisdictions, like all over CA, hinders [*sic*] local authorities from working with us to get those who are committing the worst crimes. That means we have to go out into the communities ourselves and find those people. This well and does lead to arrests of others who may not have serious crimes, but are still unlawfully present in the U.S."[18]

255.    In a post referencing "Operation Return to Sender" on the social media site X, Border Patrol Chief Patrol Agent Gregory Bovino, who oversees the El Centro Sector, stated: "Sanctuary policies hinder common sense approaches w/getting serious criminals off our streets; we have to go looking for them in the communities, leading to unintended arrests."[19]

256.    In response to a commenter on X who asked about Border Patrol's apparent strategy of "[s]tanding outside gas station stops at [H]ome [D]epots preying on any random person," Chief Bovino stated: "Undocumented means just that. I recommend returning to the country of origin, obtaining proper documents, and doing it the right way. If not, *we will arrest*."[20]

257.    In a similar comment on Facebook, the El Centro Border Patrol Sector stated its intent to continue to effect warrantless arrests regardless of individual circumstances, posting: "*anyone we encounter* who doesn't have the legal right to be in or remain in the U.S. will be arrested."[21]

258.    Border Patrol has also issued social media posts celebrating its practice of escalating a stop or retaliating when a person does not comply with their demands. On February

---

[18] US Border Patrol El Centro Sector, Facebook (Jan. 14, 2025, 7:52 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0U5CHPhAdfYcAFLHz8xn5aS4mRvehGZnFRRYWrPE5TnMGaYHeBbL3M9Bk8PwEP6A2l.
[19] @USBPChiefELC, X (Jan. 13, 2025, 5:53 PM), https://x.com/USBPChiefELC/status/1878983633073307860.
[20] @USBPChiefELC, X (Jan. 12, 2025, 7:58 AM) (emphasis added), https://x.com/USBPChiefELC/status/1878471709482737998 (emphasis added).
[21] US Border Patrol El Centro Sector, Facebook (Jan. 28, 2025, 9:53 AM) (emphasis added), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02oBnaCzDoxG72oGXFjijJEJEtPWWixAqgZhkYbPtEqLnsLr1M8mcd7D3bi5koxWVvl.

23, 2025, the El Centro Border Patrol Sector's official Facebook account posted a photo of a vehicle's driver's seat covered with shattered glass. The accompanying post stated that a noncitizen had "[r]efused to open window during an immigration inspection," "[g]ot his window shattered for an extraction," was "[a]rrested by the #PremierSector," "[w]ent to jail," and "[g]ot deported" within the span of a week.[22]

259.    In response to a comment on the photo of the shattered window, the El Centro Border Patrol Sector posted: "FAFO in full effect."[23] On information and belief, "FAFO" means "fuck around and find out," and refers to Border Patrol's justification for its agents' decision to shatter a vehicle's window after the driver did not roll it down.

### D. Border Patrol's Policy and Practice of Conducting Detentive Stops without Reasonable Suspicion of an Immigration Violation Violates the Fourth Amendment

260.    Border Patrol does not have authority to indiscriminately stop and detain residents of the Central Valley to determine their immigration status, whether in vehicles or on foot. Such conduct violates the Fourth Amendment. *See Brignoni-Ponce*, 422 U.S. at 873 (vehicle stops); *Benitez-Mendez v. I.N.S.*, 752 F.2d 1309, 1311 (9th Cir. 1983), amended, 760 F.2d 907 (9th Cir. 1983) (all detentive stops).

261.    A vehicle stop by a law enforcement officer constitutes a seizure of the driver and all passengers. *Brendlin v. California*, 551 U.S. 249, 251 (2007). "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain [noncitizens] who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. A driver or passenger's perceived ethnicity or national origin, based on their physical characteristics, cannot justify a vehicle stop. *Id.* at 885–86. Nor may a

---

[22] US Border Patrol El Centro Sector, Facebook (Feb. 23, 2025, 5:09 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid02Lbr9X3qedBrmHoZyT Di2K5zTNnwWtpZKP6kfoYiJ5NuTRULxhon7oRjCaqQMNGV8. Upon information and belief, "extraction" refers to the forcible physical removal of the occupant from the vehicle, and "Premier Sector" refers to the El Centro Border Patrol Sector.
[23] US Border Patrol El Centro Sector, Facebook (Feb. 23, 2025, 7:44 PM), https://www.facebook.com/USBorderPatrolElCentroSector/posts/pfbid0GaFS3Ee5x652GbbTW UsLPDhkxLToiaMui8nYbEZ6XYFTfoufzgAvSfos7gEH6Xsvl.

person's occupation, without more, give rise to reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) ("to establish reasonable suspicion, an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the lawabiding population")*.*

262.    On foot, a stop becomes detentive and constitutes a seizure when "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Fourth Amendment prohibits Border Patrol from conducting a detentive stop without reasonable suspicion that a person is in the country unlawfully. *Benitez-Mendez*, 752 F.2d at 1311; *accord LaDuke*, 796 F.2d at 309.

263.    Refusal to answer questions does not establish reasonable suspicion and does not justify even a "momentar[y]" detention. *Florida v. Royer*, 460 U.S. 491, 498 (1983). Similarly, refusing to consent to a search cannot independently establish sufficient cause for a search. *Thomas v. Dillard*, 818 F.3d 864, 884 (9th Cir. 2016). If that were the case, "the Fourth Amendment would have no effect." *Id*.

264.    The patterns and practices of "Operation Return to Sender" stand in stark contrast to these longstanding Fourth Amendment protections. Instead of relying on "specific, articulable facts" to justify a seizure, Border Patrol agents stopped people of color who they perceived to be farm workers or day laborers to demand their "papers" and unlawfully treated a subject's refusal to consent as grounds for escalation.

**E. Border Patrol's Policy and Practice of Effecting Warrantless Arrests Without Making Individualized Determinations of Flight Risk Violates Federal Law**

265.    In the Immigration and Nationality Act ("INA"), Congress enacted a strong preference that immigration arrests be based on warrants. 8 U.S.C. § 1357(a)(2) sets forth Border Patrol agents' limited authority to conduct warrantless arrests, prescribing two conditions that must be met before the arrest: the agent must have "reason to believe" both that (1) the individual "is in

the United States in violation of any [immigration] law or regulation," *and* (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *Id.*[24]

266.    "Reason to believe," as used in the statute, is equated with "the constitutional requirement of probable cause." *Tejeda-Mata v. INS*, 626 F.2d 721, 725 (9th Cir. 1980); *see also Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971) (interpreting 1357(a)(2)); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975) (in a statute, the words "'reason to believe' are properly taken to signify probable cause"); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 'must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause.'").

267.    Probable cause requires an individualized inquiry particular to the person at issue. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

268.    Accordingly, Border Patrol agents may not execute warrantless arrests unless they have made an individualized determination that a person is likely to escape before a warrant can be obtained.

269.    Categorical assumptions about an individual's circumstances or behavior are insufficient to establish probable cause. *See, e.g.*, *United States v. $49,576.00 U.S. Currency*, 116 F.3d 425, 427–28 (9th Cir. 1997) (fitting a "drug courier profile . . . cannot establish probable cause").

270.    Border Patrol agents thus may not make categorical assumptions about likelihood of escape based on a person's apparent race and assumed immigration status. Instead, § 1357 requires Border Patrol agents to make an individualized determination of flight risk before they can lawfully conduct a warrantless arrest. *See Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (immigration arrest was unauthorized by statute where agents did not make determination whether arrestee was "particularly likely to escape").

---

[24] Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. 8 C.F.R. § 287.8(c)(2)(ii). The regulations further require immigration officers to identify themselves and state the reason for the arrest. 8 C.F.R. § 287.8(c)(2)(ii)–(iii).

271.    The statutory prohibition on warrantless immigration arrests absent probable cause that a noncitizen is likely to escape before a warrant can be obtained "is always seriously applied." *Cantu*, 519 F.2d at 496–97. Courts routinely enjoin laws, policies, and practices that fail to adhere to the statute's strict limitations. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 408, 410 (2012) (emphasizing that federal immigration officers' warrantless arrest authority is limited to situations where there is a likelihood of flight before a warrant can be obtained); *Roy v. Cnty. of Los Angeles*, No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018) (enjoining ICE policy of issuing detainers without evaluating whether there is a likelihood of flight before a warrant can be obtained); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008 (N.D. Ill. 2016) (same).

## F.  Border Patrol's Policy and Practice of Extracting Voluntary Departure Agreements Without a Knowing and Voluntary Waiver of Rights Violates the Fifth Amendment

272.    It is well settled that noncitizens present in the United States are entitled to due process, including "all opportunity to be heard upon the questions involving [their] right to be and remain in the United States" before they can be removed from the country. *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903). Due Process affords noncitizens the right to apply for immigration relief for which they may be eligible. *United States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir. 2012). The INA contemplates they will apply for such relief at a removal hearing before an immigration judge. *See generally* 8 U.S.C. § 1229a(c)(3)–(4).

273.    Voluntary departure is contingent on a waiver of those rights. 8 U.S.C. § 1229c(a)(1). The Due Process Clause requires such a waiver to be knowing and voluntary. *See, e.g.*, *United States v. Ramos*, 623 F.3d 672, 682–83 (9th Cir. 2010) (because waiver of right to a removal hearing must be "knowing and voluntary," "stipulated removal" process that failed to provide rigorous waiver procedures violated due process); *Gete v. INS*, 121 F.3d 1285, 1293 (9th Cir. 1997) (knowing and voluntary requirement "appl[ies] equally to criminal and civil cases," including in immigration context).

274.    In addition to waiving the fundamental right to a hearing and its attendant opportunities to secure relief from removal, voluntary departure carries severe penalties. People

who have been unlawfully present in the United States for 180 days or more are subject to a three- or ten-year period of "inadmissibility" to the United States after accepting voluntary departure, regardless of any immigration relief for which they were otherwise eligible. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(II). A waiver of the fundamental right to a removal hearing cannot be knowing and voluntary unless a person understands consequences and agrees without coercion. *See, e.g.*, *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 620 (9th Cir. 2006).

275.    Border Patrol agents cannot lawfully rely on omission, deception, or coercion to secure voluntary departure agreements, as they have done here. Border Patrol's policy and practice of failing to explain to those in their custody their right to an immigration hearing and/or the consequences of voluntary departure, in coercive conditions of confinement, with no access to counsel, violates the Fifth Amendment.

### G. Defendants Fail to Ensure that Border Patrol Agents Comply with Their Obligations under the Fourth Amendment and § 1357(a)(2)

276.    CBP promulgates little to no guidance informing its agents of their obligations under the Fourth Amendment when conducting enforcement actions outside of the agency's traditional border context. On information and belief, any guidance CBP provides generally confines its application to CBP's unique border authority, which is not applicable in the interior of the United States. CBP has issued a handbook on "conducting searches of a person at the border by CBP officers using border search authority," but it "does not address personal searches undertaken away from the border."[25] CBP has issued policies governing transport and short-term detention in Border Patrol holding cells, but they have no application to field arrests.[26] And CBP's directive imposing requirements on vehicle stops explains that "Authorized Officers/Agents may only conduct vehicle stops when there is reasonable suspicion to believe a violation of law has occurred that the Authorized Officer/Agent has the authority to enforce"—but includes no guidance on what constitutes "a reasonable suspicion."[27]

---

[25] U.S. Customs and Border Protection Office of Field Operations, Personal Search Handbook CIS HB 3300-04C, 15, 17 (April 2021) (on file with authors).
[26] TEDS, *supra* note 5. TEDS "govern CBP's interaction with detained individuals." *Id.* at 3.
[27] U.S. Customs and Border Protection Directive No. 4510-026A, U.S. Customs and Border

277.    The same is true of 8 U.S.C. § 1357(a)(2): on information and belief, CBP does not provide guidance to its agents on how to make an individualized determination of likelihood of escape before a warrant can be obtained. In this vacuum, CBP allows its agents to make warrantless arrests *carte blanche*, in violation of the statute. As a result, Border Patrol has a policy and practice, in excess of its actual legal authority, of making warrantless arrests without assessing or considering a person's flight risk. This guarantees that Border Patrol agents ultimately will arrest people who are not flight risks, as they repeatedly did during "Operation Return to Sender."

**H.  CBP's Predecessor Agency and Sister Agency Promulgated Detailed Guidance on the Limits to Warrantless Immigration Enforcement Action**

278.    This vacuum was not always the case. The legacy INS, which covered the border and interior immigration enforcement functions now divided between CBP and ICE, respectively, historically promulgated a field manual containing detailed guidance explaining the constraints the Fourth Amendment and 8 U.S.C. § 1357(a)(2) impose on its agents and instructing them how to comply with their standards. For example, the manual provided a detailed explanation of the Fourth Amendment's requirement to establish reasonable suspicion for vehicle stops outside of the border and its functional equivalents.[28] And in its discussion of § 1357(a)(2), the manual recognized that "[t]he law strongly favors the use of an arrest warrant, even for a non-criminal arrest."[29] The manual offered guidance to agents evaluating likelihood of escape under § 1357(a)(2) before making a warrantless arrest, explaining that ties to the community such as family, home, or employment were probative factors weighing against probable cause for such arrests.[30]

279.    For decades after Congress disbanded the INS and created the current federal immigration system, ICE, like CBP, did not have any policy or guidance in place to ensure that the

---

Protection Emergency Driving and Vehicular Pursuits (June 1, 2023), https://www.cbp.gov/sites/default/files/assets/documents/2023-Jun/cbp-pursuits-dir-4510-026A-redacted-june-2023.pdf.

[28] U.S. Department of Justice Immigration and Naturalization Service, The Law of Arrest, Search, and Seizure for Immigration Officers at II-2 (Jan. 1993), https://www.scribd.com/document/21968268/ICE-M-69-Law-of-Arrest-January-1993.

[29] *Id.* at II-4.

[30] *Id.*

agency's personnel would comply with the statutory and regulatory restrictions on warrantless arrests.

280.    Around May 2018, ICE conducted sweeps in the greater Chicago area similar to "Operation Return to Sender," zeroing-in on day laborers and predominantly Latino neighborhoods for suspicionless vehicle stops and warrantless arrests without regard to flight risk. A class of individuals unlawfully arrested in the raids, along with immigrants' rights organizations, sued. After the plaintiffs' claims survived dismissal, the lawsuit settled.

281.    As part of the settlement agreement, defendants DHS and ICE developed and promulgated a nationwide policy—which remains in effect today—requiring ICE officers to (1) evaluate a person's likelihood of escape before making a warrantless arrest and (2) document the facts and circumstances surrounding the warrantless arrest in the person's immigration file as soon as practicable. To evaluate "likelihood of escape," officers must consider the totality of the circumstances, including community and family ties, as part of the flight risk evaluation: "Mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape before a warrant for arrest can be *obtained*." Appendix A: Broadcast Statement of Policy, *Castanon Nava v. DHS*, No. 1:18-cv-03757 (N.D. Ill., Feb. 7, 2022), ECF No. 155-1 (emphasis in original). To document the arrest, officers must include, among other things, the "specific, particularized facts supporting the conclusion that the [noncitizen] was likely to escape before a warrant could be obtained." *Id.*

282.    While the *Castanon Nava* "Broadcast Statement of Policy" was directed toward ICE, the agency that conducted for the Chicago enforcement operation, DHS was a party to the case and settlement. Moreover, the Broadcast states that it is not merely a policy, but rather a restatement of "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2) / INA § 287(a)(2) and is to be interpreted consistent with all implementing regulations."

283.    Although Border Patrol agents are equally bound by § 1357(a)(2)'s restrictions, on information and belief, neither Border Patrol nor its parent agency, CBP, has promulgated any similar policy or guidance requiring compliance with the statute. Nor does Border Patrol follow the statement of policy issued by DHS and ICE following the *Castanon Nava* litigation. Instead,

Border Patrol has a policy and practice of conducting warrantless arrests without assessing flight risk, in violation of its statutory obligations.

I. **Border Patrol's Illegal Practices Have Terrorized the Community, Sowed Distrust in Police, and Chilled Plaintiffs' Protected Speech**

284.     Because of Border Patrol's policy and practice of conducting suspicionless stops and warrantless arrests, Plaintiffs and community members feel scared to leave their homes, afraid that movement in the community could result in another Border Patrol encounter.

285.     Plaintiff Morales Cisneros feels nervous leaving his home. He feels scared to return to the store where he used to go regularly to refill his water jugs. He fears showing his face to his neighbors and tries to keep a low profile to avoid attracting attention. When he runs errands, he often wears a sweater with a hood to cover his head in an attempt to cover his skin color, as he believes Border Patrol targeted him due to the color of his skin.

286.     Similarly, Plaintiff Aguilera Martinez feels stressed running her daily errands. She feels scared when going near areas where Border Patrol arrested people, like Home Depot on Ming Avenue in Bakersfield.

287.     Plaintiffs and community members have developed a fear of law enforcement officials, including local police officers. Ms. Aguilera Martinez feels fear when she sees Bakersfield police officers drive by. On one occasion after Border Patrol arrested her, when she saw a police car was driving in the lane next to hers, she asked her sister to navigate away from the police car and covered her face with her hand so the officers could not see her. Mr. Morales Cisneros is not comfortable calling 911 because he fears the local police will call Border Patrol to arrest him.

288.     Plaintiffs and community members experienced physical injuries, pain, and/or hunger due to Border Patrol's unlawful arrests and/or the ensuing events. Ms. Aguilera Martinez developed bruises on her wrists and legs from the violent manner in which the Border Patrol agent effectuated her arrest. Mr. Morales Cisneros suffered from joint pain during his three-day detention at the El Centro Station because CBP kept his cell extremely cold and did not provide him with adequately warm clothes. Mr. Munguia Esquivel experienced ongoing pain in his left arm and

shoulder from where a Border Patrol agent yanked him at Home Depot as he attempted to exercise his right to remain silent.

289.    All Plaintiffs, and all those similarly situated, experienced emotional and dignitary harms because Border Patrol targeted them for enforcement based on their appearance, including their apparent race or ethnicity. Border Patrol discriminated against them, disparaged them, and made them feel they do not belong in their communities.

290.    Border Patrol's actions have also stoked intense anxiety and fear of future harm among UFW members. UFW members Benjamin and Carlos were coerced into accepting voluntary departure due to Border Patrol's illegal operation, abruptly separating those members from their small children without notice. UFW member Alicia must now raise the children she shares with Benjamin alone, while living in fear that she will be subjected to Border Patrol's illegal practices again.

291.    UFW member "Gabriela" is a farm worker who has lived in Fresno for 22 years. Gabriela has a daughter and eight grandchildren. Gabriela helps her daughter with childcare when her daughter has doctor's appointments or needs assistance picking up the children from school. Gabriela has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years. Gabriela has legal authorization to work in the United States.

292.    Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring "Operation Return to Sender" to her community in Fresno. Gabriela is an active member of her community and has heard other farm workers express the same fears.

293.    Gabriela cannot avoid traveling through and visiting the types of locations that Border Patrol targets. Gabriela must drive in and around the Fresno region, including on highways and in agricultural areas, to commute to and from work. She fills up her car with gas, purchases food, and runs errands at businesses frequented by other farm workers.

294.    Gabriela fears that Border Patrol agents will stop and detain her without reasonable suspicion to do so, simply because of where she is, her skin color, or her apparent occupation as a farm worker.

295.    Although Gabriela has a child and grandchildren who live in the community and has deep community ties, she fears that Border Patrol will arrest her without a warrant without regard to whether she is actually a flight risk. After arresting her, Gabriela fears that Border Patrol will coerce her into voluntary departure.

296.    Gabriela is fearful and anxious at the thought of being detained and separated from her child and grandchildren. She does not know who would care for the loved ones who depend on her, even if she were detained for a brief period. She cannot imagine the grief and pain of being expelled from the country and separated forever from her loved ones.

297.    Gabriela's panic and fear are shared across UFW's membership and felt by UFW members of diverse immigration statuses because Border Patrol's practices target non-white and/or Spanish-speaking farm workers broadly, with little regard to whether particular farm workers have lawful presence or deep ties to the local community. For instance, UFW members who are long-time lawful permanent residents are nevertheless anxious about being swept up in future raids because of confirmed reports that Border Patrol's operation indiscriminately arrested people even if they had U.S. citizenship or lawful permanent residence. UFW members with employment authorization documents, such as those with H-2A temporary agricultural visas, T-visas, Temporary Protected Status, Deferred Action for Labor Enforcement, or Deferred Action for Childhood Arrivals, similarly express fear that Border Patrol will seize, arrest, and/or detain them for removal without regard to their authorization to be in the U.S.

298.    Many UFW members no longer commute to and from work in the same vehicle as their spouse, and whenever possible, member spouses no longer run daily errands together. Some members used to work at the same worksite as their spouses; after the raids, either the member or their spouse changed jobs to reduce the likelihood of both spouses being arrested simultaneously during a workplace raid or Border Patrol roving patrol along their commute.

299.    Many UFW members with young children are terrified of being swept up in a raid and separated from their children, who may have no one else to take care of them. In the days after "Operation Return to Sender," many members kept their children home from school or daycare and avoided going to doctor's appointments, church, or the store, paralyzed by the fear of being arrested with no warning.

300.    UFW members with young children have arranged for a trusted community member to pick their children up from school or daycare to minimize the risk of being detained, arrested, or taken away by Border Patrol in front of their children. Members who are parents of school-aged children have expressed reluctance to attend school meetings in case of immigration enforcement activity, hindering them from being active participants in their children's education. These members leave for work each day scared they will not come home to their children because of another enforcement action by Border Patrol or other immigration authorities.

301.    Because of Border Patrol's unlawful actions, UFW members also feel chilled from exercising their right to speak up about workplace abuses or wage theft. They fear that speaking up will attract negative attention to themselves, and that a vengeful employer could report them for immigration enforcement. They feel the risks of being separated from their families and expelled from their homes are too great.

302.    Elected leaders have sounded the alarm about the widespread harmful effects of Border Patrol's practices. Republican Congressman David G. Valadao, representing California's 22nd congressional district, released a statement urging Border Patrol "to avoid causing any further alarm among our farm workers" and further avoid targeting "those responsible for producing our nation's food supply."[31]

303.    California State Senator Melissa Hurtado, representing District 16, stated Border Patrol's arrests had "broader impacts on our district's economy and workforce. These actions are

---

[31] Press Release, Congressman David Valadao, Congressman Valadao Releases Statement on Customs and Border Protection Operations in Kern County (Jan. 13, 2025), https://valadao.house.gov/news/documentsingle.aspx?DocumentID=1681.

not just affecting individuals—they're rippling through our entire community."[32]

304.    California State Senator Anna Caballero, representing District 14, described CBP's operation as "shocking."[33]

305.    California State Assemblymember Joaquin Arambula, representing District 31, expressed, "I am extremely concerned that these arrests may have taken place at random, or based on racial profiling. Everyone in our state and nation deserves to be treated with dignity and respect—everyone is entitled to due process and constitutional rights."[34]

306.    And Fresno County supervisor Luis Chavez reported that in the wake of Border Patrol's wave of arrests in Kern County, he had "received reports of food processing facilities [with] absences of 15 to 20 [percent] locally," representing "[o]rders that will not be able to be fulfilled."[35]

307.    Other government officials have also criticized Border Patrol's operation. For example, former CBP Commissioner Chris Magnus stated, "[M]ass roundups of day laborers and field workers through profiling do not improve public safety and waste law enforcement resources." He emphasized, "These roundups create widespread distrust of law enforcement and discourage many community members from reporting crimes as victims or witnesses."[36]

308.    While Border Patrol's unlawful arrests during "Operation Return to Sender" were largely concentrated in Kern County, they sent shockwaves of terror across the Central Valley. By one estimate, approximately half of California's agricultural workforce consists of immigrants

---

[32] Joshua Yeager, et al., *Border patrol agents make arrests in California's Central Valley as Trump's 'mass deportations' loom*, KVPR, Jan. 9, 2025, https://www.kvpr.org/community/2025-01-09/border-patrol-agents-make-arrests-in-californias-central-valley-as-trumps-mass-deportations-loom.

[33] Brisa Colón, *78 immigrants detained by Border Patrol throughout the Central Valley, officials say*, ABC 30 Action News, Jan. 12, 2025, https://abc30.com/post/78-immigrants-detained-ice-central-valley-officials-say/15790817/.

[34] Rachel Uranga & Andrea Castillo, *'They just got my uncle': Immigration arrests spark fear among farm workers in Central Valley*, L.A. Times, Jan. 11, 2025, https://www.latimes.com/politics/story/2025-01-11/they-just-got-my-uncle-mass-immigration-arrests-spark-fear-among-farmworkers-in-central-valley.

[35] Colón, *supra* note 33.

[36] Steve Eder & Miriam Jordan, 'La Migra!' A Glimpse of Trump's Promised Deportation Storm, N.Y. Times, Jan. 17, 2025, https://www.nytimes.com/2025/01/17/us/immigration-deportation-california.html.

with a precarious immigration status.[37] One farm worker described agricultural fields as "almost solitary" after the raids, when ordinarily, at this time of year, "the orchards are usually full of people."[38] Indeed, farms in Bakersfield "reported big dips in employee attendance, with droves of fearful workers choosing to stay home."[39] Undocumented immigrants also comprise significant proportions of California's manufacturing and construction workforce.[40]

309.    Immigration attorneys searched for their detained clients' whereabouts, not knowing where their clients were being held, or by whom, for up to three days.[41]

310.    In the wake of the raids, teachers and community members reported widespread anxiety among immigrant families about sending their children to school, some of whom opted to keep their children at home in the immediate aftermath of the sweeps.[42]

311.    Associate Economics Professor Richard S. Gearhart of Cal State-Bakersfield predicted that if Border Patrol continues its practice of indiscriminately sweeping up farm workers, it would cause "a recession-level event" from the effects of food shortages that would result. He warned such harms would be compounded by immigrants being afraid to leave their homes to go shopping, go to school, and seek health care, resulting in potentially "catastrophic" losses in education and health.[43]

## CLASS ACTION ALLEGATIONS

312.    Individual Plaintiffs seek to represent three classes of individuals who have been or will be subjected to the three unlawful practices this lawsuit challenges: detentive stops regardless

---

[37] Yeager, et al., *supra* note 32.

[38] Brian Osgood, 'Fields were solitary': Migration raids send chill across rural California, Al Jazeera, Jan. 17, 2025, https://www.aljazeera.com/news/2025/1/17/fields-were-solitary-migration-raids-send-chill-across-rural-california.

[39] Yeager, et al., *supra* note 32; *see also* Eder & Jordan, *supra* note 36 (President of the Nisei Farmers League stated that 30 to 40 percent of the agricultural labor force did not report to fields on the days after the raids; a citrus farmer stated that about two-thirds of his harvesting crew did not show up for work on the days after the raids).

[40] Yeager, et al., *supra* note 32.

[41] Uranga & Castillo, *supra* note 34.

[42] Emma Gallegos, 'Students are scared': Border Patrol raids fuel fear in schools, EdSource, Jan. 14, 2025, https://edsource.org/2025/students-are-scared-border-patrol-raids-fuel-fear-in-schools/725105.

[43] Olmos, *supra* note 12.

of reasonable suspicion of unlawful presence, arrests regardless of probable cause of flight risk, and voluntary departure without a knowing and voluntary waiver of rights.

**A. The Suspicionless Stop Class**

313.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez seek to represent a class under Federal Rules of Civil Procedure 23(b)(2) consisting of:

> All persons who, since January 6, 2025, have been or will be subjected to a detentive stop by Border Patrol in this district pursuant to a practice of conducting stops without warrants and without an individualized assessment of reasonable suspicion whether the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States.

314.    The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding suspicionless, detentive stops, as well as the absence of policies relating to the Fourth Amendment's limitations on detentive stops outside of the border and the border's functional equivalent. There are questions of law and fact common to the class, including:

> a.    Whether Border Patrol has a policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States; and
>
> b.    Whether Border Patrol's policy, pattern, or practice of conducting stops without regard to whether reasonable suspicion exists that the person (1) is engaged in an offense against the United States or (2) is a noncitizen unlawfully in the United States violates the Fourth Amendment.

315.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez and the class have been directly injured by Defendants' constitutional, statutory, and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under the Fourth Amendment.

**B. The Warrantless Arrest Class**

316.    Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez also seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

All persons whom Border Patrol, since January 6, 2025, has arrested or will arrest without a warrant in this district.

317. The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding warrantless arrests, as well as the absence of policies relating to how an agent should make a probable cause determination of flight risk. There are questions of law and fact common to the class, including:

    a.    Whether Border Patrol has a policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest;

    b.    Whether Border Patrol's policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2); and

    c.    Whether Border Patrol's policy, pattern, or practice of conducting warrantless arrests without probable cause that an individual is likely to escape before a warrant can be obtained for the arrest violates 8 C.F.R. § 287.8(C)(2)(II).

318. Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez and the class have been directly injured by Defendants' statutory and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under the 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(C)(2)(II).

## C. The Voluntary Departure Class

319. Plaintiffs Maria Guadalupe Hernandez Espinoza and Juan Vargas Mendez also seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

All persons, who, since January 6, 2025, have been physically present outside of the United States under color of administrative voluntary departure that occurred following an arrest by Border Patrol in this district, and who would have had a plausible basis to contest their removal from the United States under the immigration laws and programs of the Department of Homeland Security had they not been expelled under administrative voluntary departure.

320. The proposed class meets the commonality requirements of Rule 23(a)(2) because all members of the class are subject to Border Patrol's policies and practices regarding voluntary departure. There are questions of law and fact common to the class, including:

      a.       Whether Border Patrol has a policy, pattern, or practice of denying Class Members sufficient and accurate information so that they can make a knowing and voluntary election of voluntary departure;

      b.       Whether Border Patrol has a policy, pattern, or practice of providing Class Members with deceptive information, or making misstatements or omissions, about the immigration consequences of voluntary departure, and the rights Class Members waive by agreeing to it; and

      c.       Whether Border Patrol's policy, pattern, or practice related to voluntary departure violates the Fifth Amendment's Due Process Clause.

321.    Plaintiffs Maria Guadalupe Hernandez Espinoza and Juan Vargas Mendez and the class have been directly injured by Defendants, and their injuries are ongoing as a result of Defendants' acts and omissions in failing to adhere to their obligations under the Fifth Amendment.

**D. Allegations Common to All Classes**

322.    The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are sufficiently numerous so as to make joinder impracticable. Border Patrol issued public statements that between January 7 and 10, 2025, its agents arrested at least 78 people within Kern County and the surrounding region as part of "Operation Return to Sender." Upon information and belief, Border Patrol agents subjected many additional community members to unlawful suspicionless stops that did not conclude in arrest. Indeed, local counts place the number of people impacted by "Operation Return to Sender" closer to 200. Upon information and belief, at least 40 people arrested during the raid accepted voluntary departure to Mexico. Border Patrol has publicly stated that it intends to replicate "Operation Return to Sender" in Fresno, Sacramento, and elsewhere in the state, and that it intends to continue making warrantless arrests regardless of an individual's circumstances.

323.    The proposed classes meet the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Individual Plaintiffs' legal claims are typical to all members of the proposed classes. Individual Plaintiffs have no interests separate from those of the classes they seek to represent, and seek no relief other than the relief sought on behalf of each class. Defendants have acted and intend to act in a manner adverse to the rights of the members of the Suspicionless Stop

Class, the Warrantless Arrest Class, and the Voluntary Departure Class, making final injunctive and declaratory relief appropriate with regard to each class as a whole.

324.    The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the Suspicionless Search Class, the Warrantless Arrest Class, and the Voluntary Departure Class.

325.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of Plaintiffs and the proposed classes. Plaintiffs' counsel will fairly and adequately represent the interests of each class.

### FIRST CLAIM FOR RELIEF
#### Violation of 8 U.S.C. § 1357(a)(2):
#### Warrantless Arrests Without Probable Cause of Flight Risk
#### Warrantless Arrest Class and United Farm Workers

326.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

327.    Defendants arrested Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinoza, as well as U.F.W. members "Alicia," "Benjamin," and "Carlos" without warrants. Before each arrest, Defendants failed to make an individualized finding of flight risk.

328.    Defendants made these arrests without a warrant and without "reason to believe" that they were "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 U.S.C. § 1357(a)(2). These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latino descent, farm workers, and day laborers live, work, drive, and gather.

329.    Defendants do not have a policy or practice for ensuring compliance with the statutory limits of CBP's warrantless arrest authority and do not provide guidance to CBP personnel, including Border Patrol agents, on how to make an individualized determination of

likelihood of escape before a warrant can be obtained. Defendants permit Border Patrol agents to make warrantless arrests *carte blanche* in violation of law.

330.    Based on Border Patrol's public statements that it intends to replicate "Operation Return to Sender" elsewhere in California and make "unintended arrests" in sanctuary jurisdictions, along with statements from Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants will continue to arrest individuals without regard to whether there is a reason to believe that they are likely to escape before a warrant can be obtained for the arrests, in violation of 8 U.S.C. § 1357(a)(2).

331.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

332.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is *ultra vires* and in excess of statutory authority.

333.    Individual Plaintiffs, the Warrantless Arrest Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### SECOND CLAIM FOR RELIEF
**Violation of 8 C.F.R. § 287.8(c)(2)(ii):**
**Warrantless Arrests Without Probable Cause of Flight Risk**
**Warrantless Arrest Class and United Farm Workers**

334.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

335.    Defendants arrested Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadalupe Hernandez Espinoza, as well as U.F.W. members "Alicia," "Benjamin," and "Carlos" without a warrant and without "reason to believe" that they were "likely to escape before a warrant can be obtained" in violation of 8 C.F.R. § 287.8(c)(2)(ii). These arrests were part of Defendants' policy, pattern, and/or practice

of making warrantless arrests during sweeps of areas where people of Latino descent, farm workers, and day laborers live, work, drive, and gather.

336.    Defendants do not have a policy or practice for mandating compliance with the regulatory limits of their warrantless arrest authority and do not provide guidance on how to make an individualized determination of likelihood of escape before a warrant can be obtained. Defendants permit Border Patrol agents to make warrantless arrests *carte blanche* in violation of law.

337.    Based on Border Patrol's public statements that it intends to replicate "Operation Return to Sender" elsewhere in California and make "unintended arrests" in sanctuary jurisdictions, along with statements from Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants' will continue to arrest individuals without reason to believe that they are likely to escape before a warrant can be obtained for the arrests, in violation of 8 C.F.R. § 287.8(c)(2)(ii).

338.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized flight risk analysis is "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

339.    Individual Plaintiffs, the Warrantless Arrest Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### THIRD CLAIM FOR RELIEF
**Fourth Amendment Violation: Stops Without Reasonable Suspicion**

**Suspicionless Stop Class and United Farm Workers**

340.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

341.    Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from conducting a detentive stop to investigate a person's immigration status without reasonable suspicion that a person is a noncitizen unlawfully in the United States.

342.    Defendants stopped Plaintiffs Oscar Morales Cisneros, Wilder Munguia Esquivel, and Yolanda Aguilera Martinez, Juan Vargas Mendez, and Maria Guadelupe Hernandez Espinoza, as well as U.F.W. members "Alicia," "Benjamin," and "Carlos" in Kern County without reasonable suspicion that any of them was a noncitizen unlawfully in the United States.

343.    Defendants have a policy, pattern, and/or practice of traveling outside the border and its functional equivalents and stopping individuals without regard to reasonable suspicion that they are unlawfully in the United States.

344.    Defendants' policy, pattern, and/or practice of traveling outside the border and its functional equivalents and stopping individuals without regard to reasonable suspicion that the individuals are unlawfully in the United States violates the Fourth Amendment to the United States Constitution.

345.    Individual Plaintiffs, the Suspicionless Stop Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

### FOURTH CLAIM FOR RELIEF
**Fifth Amendment Violation:**
**Voluntary Departure Without a Knowing and Voluntary Waiver of Rights**
**Voluntary Departure Class and United Farm Workers**

346.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

347.    Between January 7 and January 10, 2025, Defendants' agents expelled Plaintiffs Juan Vargas Mendez and Maria Guadalupe Hernandez Espinoza, as well as U.F.W. members "Benjamin" and "Carlos" to Mexico via voluntary departure without securing a knowing and voluntary waiver of their rights.

348.    Defendants have a policy, pattern, and/or practice of administering voluntary departure without securing a knowing and voluntary waiver of a person's rights before expelling the person via voluntary departure.

349.    Defendants' policy, pattern, and/or practice violates the Fifth Amendment, which requires that an individual's waiver of rights in connection with his or her expulsion from the United States be knowing and voluntary.

350.    Individual Plaintiffs, the Voluntary Departure Class, and Plaintiff United Farm Workers have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to redress their ongoing injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

3.    Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

4.    Declare that Defendants' actions violate the rights of Plaintiffs and the Suspicionless Stop Class under the Fourth Amendment of the United States Constitution;

5.    Declare that Defendants' actions violate the rights of Plaintiffs and the Warrantless Arrest Class under 8 U.S.C. § 1357(a)(2) and the APA;

6.    Declare that Defendants' actions violate the rights of Plaintiffs and the Voluntary Departure Class under the Fifth Amendment of the United States Constitution;

7.    Declare that Defendants' actions will continue to violate the Fifth Amendment rights of Plaintiff United Farm Workers unless Defendants end their policy and practice of administering voluntary departure without securing a knowing and voluntary waiver of rights;

8.    Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Suspicionless Stop Class's rights under the Fourth Amendment of the United States Constitution;

9.    Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Warrantless Arrest Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

10.    Vacate Defendants' unlawful policies and practices that violate 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

11.    Order that Defendants return Plaintiffs Juan Vargas Mendez and Maria Hernandez Espinoza to the United States in a manner that restores them to the legal position that they held prior to their respective voluntary departures;

12.    Issue a permanent injunction redressing the ongoing violations of Plaintiff Juan Vargas Mendez's and Maria Hernandez Espinoza's rights under the Fifth Amendment of the United States Constitution;

13.    Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

14.    Order any and all such other relief as the Court deems just, equitable, and proper.


Date: February 26, 2025                    Respectfully Submitted,

                                           /s/Bree Bernwanger
                                           Bree Bernwanger (SBN 331731)
                                           Michelle (Minju) Y. Cho (SBN 321939)
                                           Lauren Davis (SBN 357292)
                                           Shilpi Agarwal (SBN 270749)
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF NORTHERN CALIFORNIA

                                           /s/Mayra Joachin (as authorized Feb. 26, 2025)
                                           Mayra Joachin (SBN 306065)
                                           Eva Bitran (SBN 302081)
                                           Oliver Ma (SBN 354266)
                                           AMERICAN CIVIL LIBERTIES UNION
                                           FOUNDATION OF SOUTHERN CALIFORNIA

_/s/Brisa Velazquez Oatis_ (as authorized Feb. 26, 2025)
Brisa Velazquez Oatis (SBN 339132)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SAN DIEGO & IMPERIAL
COUNTIES

_Attorneys for Plaintiffs_

_/s/Ajay S. Krishnan_ (as authorized Feb. 26, 2025)
Ajay S. Krishnan (SBN 222476)
Franco Muzzio (SBN 310618)
Zainab O. Ramahi (SBN 332139)
Julia L. Greenberg (SBN 333864)
KEKER, VAN NEST & PETERS LLP

_Attorneys for Plaintiff Oscar Morales Cisneros_

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 26, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Tim Ramnitz
TIM RAMNITZ
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division,
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
T: (202) 616-2686
tim.ramnitz@usdoj.gov