No. 25-4047

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED FARM WORKERS OF AMERICA, et al.,

*Plaintiffs-Appellees,*

v.

KRISTI NOEM, et al.,

*Defendants-Appellants.*

---

On Appeal from an Interlocutory Order Issued by the U.S. District Court for the Eastern District of California (Civil Action No. 1:25-cv-00246-JLT-CDB)

---

**PLAINTIFFS-APPELLEES' NOTICE REGARDING LIMITED REMAND RULING BY DISTRICT COURT**

---

KEKER, VAN NEST & PETERS LLP
CHRISTINA LEE
clee@keker.com
JASON GEORGE
jgeorge@keker.com
JULIA L. GREENBERG
jgreenberg@keker.com
NATALIE HEIM
nheim@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

BREE BERNWANGER
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO
mcho@aclunc.org
EMILY CHENGXI ZHU
ezhu@aclunc.org
SHILPI AGARWAL
sagarwal@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

MARIO MARTINEZ
mmartinez@farmworkerlaw.com
EDGAR IVÁN AGUILASOCHO
eaguilasocho@farmworkerlaw.com
MARTINEZ AGUILASOCHO LAW, INC.
900 Truxtun Avenue, Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174
Facsimile: (661) 840-6154

MAYRA JOACHIN
mjoachin@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

Attorneys for Plaintiffs-Appellees
UNITED FARM WORKERS OF AMERICA, ET AL.

Pursuant to this Court's August 24, 2026, Order, ECF No. 69, Plaintiffs-Appellees, by and through the undersigned counsel, hereby notify the Court that the district court has issued its order addressing this Court's limited remand. *See United Farm Workers, et al. v. Mullin, et al.*, Case No. 1:25-cv-00246-JLT-CDB (E.D. Cal. Nov. 6, 2026), ECF No. 251. The order is attached hereto as **Exhibit A**.

This Court "retain[ed] jurisdiction over this appeal" while lifting the preliminary injunction because it did not have "assurance of standing" based on the district court record. ECF No. 69 at 3. Given the district court has now found that "the named individual Plaintiffs have standing to seek prospective relief," Ex. A at 42, Plaintiffs-Appellees respectfully request that the Court immediately vacate the stay of further proceedings in this Court and reenter the preliminary injunction, *see* ECF No. 69 at 3–4.

This Court also ordered the parties to "clearly identify the materials considered by the district court" "[i]f, on remand, the district court considers the muster or any other additional evidence." *Id.* at 3. A chart indexing the additional evidence considered by the district court is attached hereto as **Exhibit B**.

Dated: November 10, 2026 Respectfully submitted,

By: */s/ Julia L. Greenberg*

KEKER, VAN NEST & PETERS LLP
CHRISTINA LEE
clee@keker.com
JASON GEORGE
jgeorge@keker.com
JULIA L. GREENBERG
jgreenberg@keker.com
NATALIE HEIM
nheim@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
BREE BERNWANGER
bbernwanger@aclunc.org
MICHELLE (MINJU) Y. CHO
mcho@aclunc.org
EMILY CHENGXI ZHU
ezhu@aclunc.org
SHILPI AGARWAL
sagarwal@aclunc.org
39 Drumm Street
SAN Francisco, CA 94111
Telephone: (415) 621-2493

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA
MAYRA JOACHIN
mjoachin@aclusocal.org
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5000

MARTINEZ AGUILASOCHO LAW, INC.
MARIO MARTINEZ
mmartinez@farmworkerlaw.com
EDGAR IVÁN AGUILASOCHO
eaguilasocho@farmworkerlaw.com
900 Truxtun Avenue, Suite 300
Bakersfield, CA 93301
Telephone: (661) 859-1174
Facsimile: (661) 840-6154

Attorneys for Plaintiffs-Appellees
UNITED FARM WORKERS OF AMERICA,
ET AL.

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2026, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 10, 2026 Respectfully submitted,

By: */s/ Julia L. Greenberg*

KEKER, VAN NEST & PETERS LLP
CHRISTINA LEE
clee@keker.com
JASON GEORGE
jgeorge@keker.com
JULIA L. GREENBERG
jgreenberg@keker.com
NATALIE HEIM
nheim@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Plaintiffs-Appellees
UNITED FARM WORKERS OF AMERICA, ET AL.

# EXHIBIT A

**FILED**
Nov 06, 2026
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

UNITED FARM WORKERS, et al.,

Plaintiffs,

v.

MARKWAYNE MULLIN, et al.,

Defendants.

Case No. 1:25-cv-00246 JLT CDB

TEMPORARILY UNDER SEAL

ORDER ADDRESSING LIMITED REMAND RE PLAINTIFFS' STANDING TO PURSUE PROSPECTIVE RELIEF

(Doc. 204)

## I. INTRODUCTION

In early January 2025, U.S. Border Patrol launched "Operation Return to Sender" which targeted areas within and near Kern County, California, in efforts to stop, detain, and arrest people suspected of being in the country unlawfully. (Doc. 1 at 2; Doc. 15-2 at 72.) Plaintiffs alleged these actions involved a pattern of unlawful conduct by Border Patrol Agents and requested provisional class certification and preliminary injunctive relief. (*See id.*; *see also* Docs. 14, 15.) The undisputed evidence presented by Plaintiffs showed that Agents stopped noncitizens[1] and citizens for little more than having a certain skin color while conversing with others, working as a gardener, driving home from work, or stopping for gas. (*See generally* Doc. 47 ("PI Order") at 2–18.) Agents detained these people, demanded to see their "papers," and questioned them

[1] Consistent with other decisions addressing this area of law, the Court uses the term "noncitizen" interchangeably with the statutory term "alien."

about their immigration status, all without any legal basis for doing so. (*See id*. at 5, 7, 9, 12, 13, 17.)

If a person could not produce proof of their legal status in this country, Agents then arrested them without considering or complying with the applicable federal statute that requires Agents to evaluate whether, when making warrantless arrests, the noncitizen poses a flight risk or a danger to community if released. (*See* PI Order at 5, 7, 10, 13–15, 17–18.) Rather than abide by Congress' mandate, Agents arrested everyone who could not establish citizenship. The government did not contest or counter <u>any</u> of the Plaintiffs' evidence demonstrating the unlawfulness of these actions.

On this undisputed factual basis, the Court granted Plaintiffs' request for provisional class certification and preliminary injunctive relief. (PI Order at 86–88.) The Court enjoined Border Patrol Agents from conducting detentive stops in this District absent reasonable suspicion that the person stopped is a noncitizen who violated immigration laws. The Court further enjoined Agents from conducting warrantless arrests without first establishing probable cause of flight risk, as required by 8 U.S.C. § 1357(a)(2). The Court required Defendants to provide additional guidance and training related to the requirements of the PI to the Agents responsible for making detentive stops and arrests. The Court also ordered Agents to submit documentation for every warrantless stop or arrest of a noncitizen made in this District. The PI Order required this documentation to contain particularized, narrative facts supporting the arresting Agent's conclusion that reasonable suspicion existed the detention and that probable cause existed to support the arrest.

Months after the Court issued the PI Order, on July 17, 2025, Border Patrol engaged in an immigration enforcement action in the parking lot of a Home Depot in Sacramento, California. (*See generally* Doc. 176.) Following that incident, Plaintiffs filed a motion to enforce the terms of the PI Order, which the Court granted in part, requiring additional documentation related to detentive stops. (*Id.*)

Meanwhile, Defendants appealed the Court's PI Order, arguing, among other things, that the Court had failed to evaluate whether the individual, representative and organizational Plaintiffs had standing to seek prospective injunctive relief. (Doc. 59.) Acknowledging that no

party raised the issue but that the Court nevertheless had a *sua sponte* duty to examine standing, the Ninth Circuit vacated the PI Order and remanded the case for the limited purpose of determining whether Plaintiffs have the requisite standing to sue. (Doc. 204, No. 25-4047.) The Ninth Circuit explained that the Court "considered only Plaintiffs' allegations of past harm" and that "[a]lthough past harm may support standing to seek damages, it does not, on its own, establish standing to seek prospective injunctive relief." (*Id.* at 2–3 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (explaining that evidence of past wrongs "in itself" is insufficient to establish standing for prospective relief but may bear on whether there is a real and immediate threat of repeated injury).)

After considering the Parties' supplemental briefs[2] and evidence, the Court finds that the individual Plaintiffs have standing to pursue prospective injunctive relief in this case and thus finds it unnecessary to separately evaluate the organizational Plaintiff's standing.

## II. FACTUAL BACKGROUND

### A. Previous Findings of Fact

In its PI Order, this Court made detailed findings of fact based upon the then-existing record. Because the factual findings of that order form the foundation of this one, the Court repeats them in their entirety here:

> **<u>II. Experiences of Named Plaintiffs</u>**
>
> The named plaintiffs contend they were each targeted as part of "Operation Return to Sender." Plaintiffs allege that "Border Patrol targeted them"— and similarly situated individuals— "based on their appearance, including their apparent race or ethnicity." (Doc. 1 at 57, ¶ 289.) Plaintiffs allege that the Border Patrol agents lacked

---

[2] Pursuant to the Court's scheduling order (Doc. 208), Plaintiffs filed the opening supplemental brief on September 17, 2026 (Doc. 210, refiled without redactions at Doc. 225); Defendants filed their supplemental brief on October 1 (Doc. 215, refiled with redacted exhibits at Doc. 248); and Plaintiffs replied on October 15 (Doc. 222, refiled without redactions at Doc. 234). The Court's order also indicated that "[i]f necessary, Federal Defendants may respond to any evidentiary objections." (Doc. 208 at 4.) However, even though Plaintiffs did not technically "object" to any of the evidence Federal Defendants submitted, Federal Defendants filed a sur-reply that argues (1) Plaintiffs did not meaningfully respond to Defendants' evidence; and (2) Plaintiffs waived certain arguments made in response to the Defense evidence. (Doc. 232 at 4–11.) In an abundance of caution, the Court has considered the sur-reply to the extent it replies to Plaintiffs' responses to Defendants' newly presented evidence. The Court has not considered Defendants' separate, repetitive sur-reply arguments about UFW's standing, (Doc. 232 at 11), as there is no plausible justification for including that issue in the sur-reply.

reasonable suspicion for the executed stops (*id.* ¶¶ 69, 88, 101, 126, 163) and that the agents lacked probable cause to believe the plaintiffs were likely to escape before warrants could be obtained. (*Id.*, ¶¶ 70, 89, 102, 127, 164.)

**A. Oscar Morales Cisneros**

Oscar Morales Cisneros is 51 years old and works in maintenance and construction. (Doc. 15-9 at 2, Decl. ¶¶ 2-3.) He lived in Los Angeles County for approximately 15 years before moving to Bakersfield in 2021. (*Id.*, ¶ 2.) He has no criminal history. (*Id.*)

Morales Cisneros asserts "Border Patrol agents stopped him" on January 7, 2025. (Doc. 1 at 9, ¶ 27.) He states that "after leaving work to head home," he stopped at a water filling station outside a liquor store "located in a predominantly Latino-populated neighborhood." (Doc. 15-9 at 2, ¶ 4; *see also* Doc. 1 at 16, ¶ 49.) While in the cab of his truck—which was registered under his name, had current registration, and no stickers or decals—an unmarked Chevy Tahoe pulled in behind his truck and "blocked him in the parking spot." (*Id.*) He "put the truck back in park and lowered [the] driver's side window." (*Id.*) Two agents wearing green "Border Patrol" uniforms stood outside his truck. (*Id.*)

According to Morales Cisneros, a Spanish-speaking agent, later identified as "Officer Sanchez," asked if he "had papers and was here legally." (Doc 15-9 at 2, ¶ 5.) Morales Cisneros "exercised [his] right to remain silent and did not answer [the] questions." (*Id.*) However, he provided his driver's license upon the agents' request, which the agents took to their vehicle. (*Id.*) Morales Cisneros states that he called his daughter to tell her that Border Patrol agents stopped him. (*Id.*) Officer Sanchez asked for the call to be put on speaker, identified himself to Morales Cisneros' daughter, and informed her that Morales Cisneros "was being detained by Border Patrol for being here illegally without documents." (*Id.* at 2-3, ¶¶ 5-6; *see also* Doc. 1 at 16-17, ¶¶ 52-53.) Officer Sanchez then ended the call and asked Morales Cisneros to step out of the truck. (*Id.* at 3, ¶ 6.) Officer Sanchez handcuffed him and placed him in the Border Patrol vehicle. (*Id.*) The agents did not produce a warrant or explain why they stopped him, other than while on the phone with his daughter. (*Id.*) The agents did not ask about his "ties to the community," including his family members, work history, or how long he "lived in the neighborhood." (*Id.*) Thus, Plaintiffs contend the Border Patrol agents did not "undertake any other evaluation of whether [Morales Cisneros] posed a risk of flight." (Doc. 1 at 17, ¶ 54.)

The Border Patrol agents drove around Bakersfield, with him handcuffed, for about two hours. (Doc. 15-9 at 3, ¶ 6.) "At one point, the agents stopped at a gas station and pulled up behind a vehicle to block it in, like they had done to [him]." (*Id.*, ¶ 7.) Morales Cisneros "overheard one of the agents say in English, 'We're doing our job.'" (*Id.*) The people "were let go and the agents returned to the Chevy Tahoe." (*Id.*)

Morales Cisneros asserts the agents took him "to a station where he

saw other people were being detained and a bus was waiting." (Doc. 1 at 18, ¶ 56.) He was fingerprinted, photographed, and his personal belongings were placed in a bag. (Doc. 15-9 at 3, ¶ 8.) He asked an agent if he could call his daughter, and the request was granted, after which agents also took his cell phone. (*Id.*) Morales Cisneros estimates there were "about 40 people on the bus" when it "left the station late in the evening." (*Id.*, ¶ 9.) His bus arrived at the El Centro Station, a detention center in Imperial County, "in the early morning hours" of January 8, 2025." (*Id.*; *see also* Doc. 1 at 17, ¶ 58.)

After processing, Morales Cisneros saw an agent who presented two options: (1) "agree to voluntary departure" or (2) "wait to see a judge." (Doc. 15-9 at 4, ¶ 11.) Through the next two days, Morales Cisneros maintained he wished to see a judge and speak to a lawyer. (*Id.* at 5, ¶ 17; *see also id.* at 4-5 ¶¶ 13-14.) On January 10, 2025, an agent instructed Morales Cisneros "to sign [his] name on a small electronic pad to be released." (*Id.*, ¶ 18.) He alleges the agent also indicated the signature was required "to see a judge and be put on a monitoring device." (*Id.*) Morales Cisneros signed as directed. (*Id.*) Morales Cisneros "was fitted with a monitoring device on [his] wrist," and released by Border Patrol that evening. (*Id.* at 5-6, ¶¶ 18-19.)

According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Morales Cisneros did not have reasonable suspicion that he was unlawfully present in the United States." (Doc. 1 at 19, ¶ 69.) Plaintiffs also contend that Border Patrol "did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 70.)

**B. Wilder Munguia Esquivel**

Wilder Munguia Esquivel is 38 years old. (Doc. 15-10 at 2, Decl. ¶ 2.) He has lived in Bakersfield for about 12 years with his brother and his family, all of whom are U.S. citizens. (*Id.*) He is a licensed handyman and works as a day laborer. (*Id.*, ¶ 3.) Munguia Esquivel had "a pending family petition" at the time of the relevant events. (*Id.*, ¶ 8.) He has no criminal history. (*Id.*)

He reports that on January 7, 2025, around 12:00 p.m., he was standing with a group of other day laborers outside Home Depot on Ming Avenue in Bakersfield when "[s]everal unmarked vehicles pulled up." (Doc. 15-10 at 2, ¶ 4.) At least 10 men—most of whom had "masks covering their faces, with holes only for their eyes"—got out of the vehicles and "aggressively swarmed" around the day laborers. (*Id.*, ¶¶ 4-5.) The men "wore civilian clothing and [he] did not see any badges." (*Id.*) Munguia Esquivel "first thought … [the men] might be terrorists mugging or kidnapping [the day laborers]." (*Id.*, ¶ 5.) He also wondered if he would be murdered. (*Id.*) He reports the men "wore civilian clothing and [he] did not see any badges." (*Id.*)

The unidentified agents demanded the day laborers' "papers." (Doc. 15-10 at 2, ¶ 5.) The agents "did not seem to be targeting specific individuals." (*Id.* at 3, ¶ 10.) An agent asked Munguia Esquivel,

"directly in Spanish, 'Do you have papers? Do you have identification? Where are you from?'" (*Id.* at 2, ¶ 5.) The agent questioning him wore a mask covering his face, hat, and thick sunglasses. (*Id.*) Munguia Esquivel had no idea who the man was, and he did not respond to the questioning. (*Id.*) They "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from. (*Id.*) Munguia Esquivel "began to slowly walk away," but the agent followed and continued yelling. (*Id.*) Munguia Esquivel "stayed quiet." (*Id.*) In Spanish, the agent then ordered him to "turn around" to be handcuffed. (*Id.*) According to Munguia Esquivel, "[i]t was around this time that [he] realized the men were federal immigration agents." (*Id.*)

He told the agent, "I have the right to remain silent," but the agent ignored him. (Doc. 15-10 at 2, ¶ 6.) The agent directed Munguia Esquivel to pull out his wallet but, before he could comply, the agent "forcefully yanked [his] left arm" and removed the wallet from Munguia Esquivel's back pocket. (*Id.* at 2-3, ¶¶ 6-7.) Munguia Esquivel believes that "[t]he agent who arrested [him] did not know" who he was. (*Id.* at 3, ¶ 10.) The agent did not ask about his "community ties, such as [his] family, work history, or how long" Munguia Esquivel had been living in Bakersfield. (*Id.*, ¶ 8.)

Munguia Esquivel was warned to call a family member to pick up his truck within 20 minutes from Home Depot, or the truck would be towed. (Doc. 15-10 at 3, ¶ 7.) He reports that when his sister-in-law and niece came to get the truck, they told Border Patrol agents that he "was in the process of regularizing [his] immigration status." (*Id.*, ¶ 9.) However, "[t]he agents did not care and said they were taking [him] anyway." (*Id.*)

Border Patrol agents first drove Munguia Esquivel to the back lot of Home Depot, where he "saw several vehicles and over ten people who had been detained, including some who were elderly." (Doc. 15-10 at 3, Decl. ¶ 10.) He estimates that after about 15 to 20 minutes, the agents transported him "to a makeshift facility on 7th Standard Road in Bakersfield." (*Id.*) He saw "[o]ne bus … already full of people who had been detained," and "[a] second bus arrived." (*Id.*, ¶ 11.) While at the facility, agents fingerprinted and photographed Munguia Esquivel and ordered him to place belongings in a bag. (*Id.*, ¶ 12.) He remained at the 7th Standard Road facility until the evening, at which time Border Patrol agents placed him on a bus to "a detention facility in Imperial County." (*Id.* at 4, ¶ 13.)

Munguia Esquivel reports that on January 10, an agent informed him that he could leave that day, but he would "have conditions." (Doc. 15-10 at 5, ¶ 17.) However, he is unsure of the conditions imposed. (*Id.*, ¶¶ 17-18.) He was released and returned to Bakersfield. (*See id.*, ¶ 19; Doc. 1 at 22, ¶ 86.) This experience "was deeply traumatizing." (*Id.* at 6, ¶ 20.) He states that he feels terrified when he goes near the Home Depot. (*Id.*) He asks himself "if it is really necessary" when he leaves the house because he "fear[s] that immigration agents will stop, arrest, and detain [him] again." (*Id.*) He also fears Border Patrol "will try again to pressure [him] to agree to deportation." (*Id.*)

According to Plaintiffs, "the Border Patrol agents who stopped and detained [] Munguia Esquivel did not have reasonable suspicion that he was unlawfully present in the United States." (Doc. 1 at 23, ¶ 88.) Plaintiffs also contend the agents "did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 89.)

**C. Yolanda Aguilera Martinez**

Yolanda Aguilera Martinez is 56 years old and has "lived in Kern County for close to 45 years." (Doc. 15-11 at 2, Decl. ¶¶ 2-3.) She immigrated to the United States "when [she] was around six years old and became a lawful permanent resident at around 20 years old." (*Id.*, ¶ 2.) She has no criminal history. (*Id.*)

On January 8, 2025, around 4:30 p.m., Aguilera Martinez was driving when she saw two unmarked vehicles pulled over to the right side of the road, with lights flashing, and "three men standing near the vehicles." (Doc. 15-11 at 2, ¶ 4.) The license plate on her vehicle was current and she "was not speeding" when a "man raised his hand to flag [her] down" and signaled for her to pull over. (*Id.*) She "thought [the men] might be police officers," and pulled over. (*Id.*, ¶¶ 4-5.)

When "[t]he man who flagged [her] down walked over … "[h]e did not identify himself or seem to know who she was." (Doc. 15-11 at 2, ¶ 6; *see also* Doc. 1 at 23, ¶ 92.) The agent said, "I need to see your papers." (*Id.*) Aguilera Martinez handed him a "valid, current, California driver's license." (*Id.*) The agent looked at the license and said, "This shit is fuckin' fake." (*Id.*) The agent threw her license to her lap and ordered her to get out of the vehicle. (*Id.*, ¶¶ 6-7.) She "still did not know who these men were," but compiled because she "felt [she] had no choice." (*Id.* at 2-3, ¶ 7.) After she opened the door, the agent grabbed her arm, "pushed [her] down to the ground," and placed her in handcuffs. (*Id.* at 3, ¶ 7.) The agent then took her to an SUV and sat her in the backseat. (*Id.* ¶¶ 7-9.)

When the agent returned to the SUV, Aguilera Martinez asked if she could contact someone to send a photo of her green card, and the agent agreed. (Doc. 15-11 at 3, ¶ 10.) He removed the handcuffs and Aguilera Martinez called a friend who sent a photo of the green card via text message. (*Id.*) The agent "quickly scanned" the photo before telling her: "Get the fuck out of here." (*Id.*) She "got in [her] car and drove away." (*Id.*)

Aguilera Martinez was "very stressed and in shock," and "did not know why [she] had been stopped, nor who those men were." (Doc. 15-11 at 4, ¶ 11.) She later saw "multiple videos and photos on social media of Border Patrol agents arresting people, including at Home Depot and along Highway 99." (*Id.*) She believes the men who stopped her, and the vehicles they used, "looked just like some of the Border Patrol agents and vehicles [she] saw on social media." (*Id.*) Thus, Plaintiffs contend that "[u]pon information and belief, the men were Border Patrol agents." (Doc. 1 at 23, ¶ 91.)

Aguilera Martinez had bruises on her wrists from the handcuffs and bruises on her legs from being "shoved … to the ground." (Doc. 15-11 at 4, ¶ 14.) She now feels "extremely worried and nervous this could happen to [her] again," and when driving near where the location of the encounter, she feels queasy and her heart beats faster. (*Id.* at 3-4, ¶ 12.) She is unable to avoid driving to run errands, go to appointments, and attend church," but she tries to avoid the "areas where other people were arrested by Border Patrol" during the operation. (*Id.*)

**D. Juan Vargas Mendez**

Juan Vargas Mendez is 37 years old and was a Kern County resident for approximately 20 years. (Doc. 15-6 at 2, ¶ 2.) He lived in Bakersfield with his wife and children, who are U.S. citizens. (*Id.*) Vargas Mendez reports he "worked as a farmworker at the same ranch for more than 10 years" and "sometimes worked as a gardener." (*Id.*, ¶ 3.) He has no criminal history. (*Id.*, ¶ 2.)

On the evening of January 8, 2025, Vargas Mendez left work as a passenger in a van with five co-workers. (Doc. 15-6 at 2, ¶ 4.) They traveled along Maricopa Highway, which he describes as "a central highway for farmworkers in southwest Kern County, especially to get to many orange and almond fields." (*Id.*) While traveling toward home, he heard sirens. (*Id.*, ¶ 5.) He looked at the speedometer and saw the vehicle was going "under 40 miles an hour, well within the speed limit." (*Id.*, ¶ 5.) An unmarked SUV forced the van to stop by stopping in front of the van, while another SUV stopped behind it. (*Id.*) Vargas Mendez believed the people who stopped them "might be the police because their vehicles had sirens and flashing lights." (*Id.* at 2-3, ¶ 6.) However, he now knows they were Border Patrol agents. (*Id.* at 4, ¶ 12.)

He states an agent approached the driver's window and "demanded the driver and front passenger show their license and proof of residency." (Doc. 15-6 at 3, ¶ 7.) He reports that as an agent reviewed the identification produced by the driver and front passenger, "two other agents flung open the door on the right side of the van" without consent. (*Id.*, ¶ 8.) The agents shouted in Spanish that they all needed to show their identification and to "tell the truth." (*Id.*)

Vargas Mendez was not carrying any identification. (Doc. 15-6 at 3, ¶ 9.) Border Patrol agents "dragged [him] out of the van" and demanded that he hand over personal belongings before handcuffing him. (*Id.*) One of his coworkers was also dragged out of the van. (*Id.*) The agents mocked them, calling them "Mexican bitches." (*Id.*, ¶ 10.) The Border Patrol agents did not explain why they were being arrested or show them any warrants. (*Id.*) The agents did not ask about his ties to Kern County, such as his family, employment, or how long he had lived there. (*Id.*) Vargas Mendez reports: "I told him I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record." (*Id.*, ¶ 11.) However, he reports the agent "responded he did not care and that [Vargas Mendez] was 'going to Mexico.'" (*Id.*)

The agents drove them to "a large white warehouse with barbed wire." (Doc. 15-6 at 4, ¶ 12.) Agents photographed and fingerprinted him, and then transported him to a detention facility, where they arrived around 1:00 a.m. on January 9. (*Id.*, ¶¶ 12-14.) The agents did not tell them where they were, but other detainees later informed him it was the El Centro Station. (*Id.*, ¶¶ 14, 16.)

Vargas Mendez reports an agent at El Centro said he was arrested because he was "illegal" and would be deported. (Doc. 15-6 at 4, ¶ 14.) Vargas Mendez responded that he had been in the area for 20 years, had a family, was hardworking, and had no criminal record. (*Id.*, ¶ 15.) This agent said that "he didn't care" and that Vargas Mendez "would be deported anyway." (*Id.*) Later that day, Vargas Mendez electronically signed a document, but he did not know what he signed. (*Id.* at 5, ¶¶ 18-19.) About two hours after Vargas Mendez signed the tablet, Border Patrol drove him "to the border across from Mexicali, Mexico." (*Id.*, ¶ 20.) At the time the complaint was filed, Vargas Mendez was still in Mexico. (*Id.* at 2, ¶ 2; Doc. 1 at 28, ¶ 125.)

Plaintiffs contend the Border Patrol agents "did not have reasonable suspicion that [Vargas Mendez] or anyone else in the vehicle was unlawfully present in the United States." (Doc. 1 at 28, ¶ 126.) Plaintiffs allege "the Border Patrol agents who arrested [him] did not have probable cause to believe he was likely to escape before a warrant could be obtained for his arrest." (*Id.*, ¶ 127.)

E. Maria Guadalupe Hernandez Espinoza

Maria Guadalupe Hernandez Espinoza is 46 years old and "lived in Bakersfield for about 10 years." (Doc. 15-8 at 2, Decl. ¶ 2.) She has "worked in the agricultural sector for close to 20 years." (*Id.*, ¶ 3.) She has no criminal history. (*Id.*, ¶ 2.)

On January 7, 2025, Hernandez Espinoza was a passenger in a car driven by her partner. (Doc. 15-8 at 2, ¶ 4.) The car was registered under her partner's name, "ha[d] no stickers or decals, and the license plate and registration were current." (*Id.*) At about 5:30 p.m., they were on Highway 58, heading toward Bakersfield with a coworker after working in Tehachapi. (*Id.*) Her partner did not violate any traffic laws as he drove on the highway. (*Id.*) As they prepared to exit the highway, they "were approached from behind by an unmarked white Ford pickup truck," which flashed its lights at the car and activated a siren. (*Id.*)

After her partner pulled over, "[a] man in a white shirt approached and instructed him to turn off the car." (Doc. 15-8 at 2, ¶¶ 4-5.) Turing off the car automatically unlocked the doors, after which the man opened the door and instructed the driver to exit the car. (*Id.*, ¶ 5.) "The man did not identify himself, show a warrant, or ask [them] any questions" before escorting her partner to the truck. (*Id.*) Six unmarked vehicles pulled up behind the car, each with 3-4 armed individuals. (*Id.*) Hernandez Espinoza and her coworker complied with a request to exit the car, after which they were asked to produce identification and were asked "if [they] had papers, and if [they] were

here legally.” (*Id.* at 3, ¶ 7.) Hernandez Espinoza “did not answer their questions,” and she did not produce any identification. (*Id.*) At this point, Hernandez Espinoza believed the individuals who stopped the vehicle were law enforcement, but she “had no inkling they were affiliated with immigration.” (*Id.*, ¶ 9.)

The agents informed the trio that they “were under arrest,” and transported them “to a makeshift processing area on 7th Standard Road in Bakersfield.” (Doc. 15-8 at 3, ¶ 10.) Hernandez Espinoza first realized they were in Border Patrol custody while at the processing center. (*Id.*) She saw “dozens of men and just one other woman,” aside from her and her coworker. (*Id.*) She estimates they were at the processing center for about an hour before boarding a bus, which “left Bakersfield in the late evening.” (*Id.* at 4, ¶ 11.) “About three hours into the drive, the bus stopped to switch drivers,” and she heard one of the drivers laugh and say, “‘Vamos por mas mojados,’ which means ‘Let’s go for more wetbacks.’” (*Id.*)

Hernandez Espinoza reports their bus arrived at the El Centro Station early the next morning. (Doc. 15 at 4, ¶ 11.) She had “an initial interview” with a Latina Border Patrol agent, who informed her that she “could either agree to voluntary departure or see a judge.” (*Id.*, ¶ 14.) Hernandez Espinoza “impulsively” agreed to a voluntary departure, though she later changed her mind and attempted to convey this to Border Patrol agents. (*Id.*, ¶¶ 14-15.) On January 9, 2025, Border Patrol informed Hernandez Espinoza that “they were sending [her] to Mexico.” (*Id.* at 5, ¶ 20.) Border Patrol transported her via a truck to Mexicali, Mexico. (*Id.*)

## III. Community Members

Plaintiffs also identify several other members of the community, including UWF members, who they assert were stopped and/or arrested by Border Patrol during “Operation Return to Sender.”

### A. Jesus Ramirez

Jesus Ramirez is 64 years old and reports he recently moved to Bakersfield, California, where he rents a home. (Doc. 15-5 at 2, ¶ 2.) He is “the only living parent” to his daughter and son, and he is the primary caretaker for his minor son. (*Id.*) Ramirez reports that he worked “as a day laborer, fixing roofs and sprinklers and mowing grass” in Bakersfield and San Mateo, where he previously lived. (*Id.*, ¶ 3.)

Ramirez reports that on January 7, 2025, he “was standing with some other day laborers in the Home Depot parking lot when [they] were surrounded by Border Patrol agents.” (Doc. 15-5 at 2, ¶ 4.) The “agents arrived in multiple vehicles, some of which had sirens,” around 11:00 a.m. (*Id.*) Ramirez “knew they were Border Patrol agents because they had badges on their vests.” (*Id.*) He reports he “was not doing anything unlawful” when the agents surrounded them, and they “could not go anywhere because there were many agents all around….” (*Id.*)

The "Border Patrol agents repeatedly demanded" the day laborers "show [their] 'papers'." (Doc. 15-5 at 2, ¶ 5.) Ramirez reports he pulled out his wallet, after which "an agent snatched" it from him and removed his ID. (*Id.*) Ramirez states the agent returned his wallet but kept the identification. (*Id.*) It was "clear… the agents did not know [who] he was." (*Id.*, ¶ 7.) The agents "did not show [him] any document or have a warrant." (*Id.*) They "did not ask… any questions about [his] family or ties to the community." (*Id.*, ¶ 6.)

Ramirez reports he "was loaded into a vehicle in the parking lot of Home Depot and transported behind the store, where [he] was loaded into a bigger vehicle" that "was full of other people." (Doc. 15-5 at 2, ¶ 8.) A Border Patrol agent said he "was going to be taken 'home,'" and Ramirez believed that meant he was "going to be taken to [his] own home in Bakersfield." (*Id.* at 2-3, ¶ 8.) It was not until they arrived at a processing station that he realized "immigration was formally arresting [him]." (*Id.* at 3, ¶ 9.) He was at the processing station "for about 7 or 8 hours with about 12 other individuals." (*Id*, ¶ 10.) Ramirez was then loaded onto a bus "filled with people," which transported him to El Centro. (*Id.*, ¶ 12.)

He reports that at El Centro, "[a]n agent ordered [him] to sign a document and said it was required for a judge to review [his] case." (Doc. 15-5 at 3, ¶ 12.) This document was in English, which he does not read, and it "was not translated or explained." (*Id.*) Ramirez states he "requested an opportunity to make a phone call to a family member but was denied." (*Id.*) Border Patrol moved him from El Centro to Imperial Regional Detention Facility on January 9, 2025. (*Id.*, ¶ 13.) As of the declaration date of February 13, 2025, Ramirez remained detained and had "one court date with an immigration judge." (*Id.*, ¶¶ 13-14.)

**B. Luis Perez Cruz**

Luis Perez Cruz is 28 years old and has lived in Bakersfield with his mother for two years. (Doc. 15-7 at 2, ¶ 2.) His cousins also live in Bakersfield, and Perez Cruz ran into two of them on January 7, 2025, when he stopped by Home Depot on his way to work. (*Id.*, ¶ 3.)

Perez Cruz reports that he "was chatting" with his two cousins in the parking lot [of Home Dept] when "[t]wo men wearing civilian clothes walked up," announced they were with Border Patrol, and directed them "to show … IDs saying that [they] were in the United States legally or had permits to be here." (Doc. 15-7 at 2, ¶ 3.) The agents "also asked … if [they] had open immigration cases." (*Id.*) After Perez Cruz "remained silent," he states an agent then grabbed him, and said "whether or not" he showed identification, he would be arrested. (*Id.*) Perez Cruz "felt that [he] had no choice," and showed the agent his identification. (*Id.*) The agents "did not appear to have any idea who [he] was before they demanded [his] ID," and reports they did not present any warrant. (*Id.*) The agents did not ask any questions about his "family, community ties, work, or life in Bakersfield." (*Id.*)

The agents drove Perez Cruz, "along with other people they were

arresting, in a truck and drove … behind the Home Depot." (Doc. 15-7 at 2, ¶ 5.) Behind the store, he was placed into a van, and then transported to a station at 7th Standard Road. (*Id.*) At the 7th Standard station, agents took his fingerprints and noted the names of his wife and children. (*Id.*) He was then forced to travel in "a large bus that looked like a Greyhound bus," to the El Centro holding center. (*Id.*)

Perez Cruz reports that at El Centro, he "refused to sign anything until [he] saw a judge." (Doc. 15-7 at 2, ¶ 6.) "After nearly four days, the agents … fitted [him] with a wrist monitor," gave him information about immigration court, and released him. (*Id.*) He returned to Bakersfield and now has "an immigration case" pending. (*Id.* at 2-3, ¶¶ 7-8.) He is afraid Border Patrol "will pick [him] again and treat [him] even worse" with the immigration case pending. (*Id.* at 2, ¶ 7.)

**C. Ernesto Campos Gutierrez**

Ernesto Campos Gutierrez is 44 years old, and he is a citizen of the United States. (Doc. 15-4 at 2, ¶ 2.) He owns a home in Bakersfield, where he lives with his partner and children. (*Id.*) He owns a "gardening and landscaping business," for which he "haul[s] a mini trailer containing gardening equipment" behind his truck. (*Id.*, ¶¶ 2-3.)

On January 8, 2025, Campos Gutierrez was driving, with a passenger, on the way to a gardening job around 9:40 a.m. (Doc. 15-4 at 3, ¶ 3.) The truck he was driving was registered under his name, "had current license plates and registration, and had no stickers or decals." (*Id.*) He "was driving within the speed limits" and pulling the mini trailer. (*Id.*) Campos Gutierrez noticed "[a]n unmarked, white Chevrolet Tahoe follow … [him] for a couple minutes," after which it flashed lights, signaling for him to pull over. (*Id.*, ¶ 4.)

The Tahoe pulled over behind him, and "[a] black male agent … wearing a vest that said the word[] 'POLICE' in large letters" approached the driver's side door. (Doc. 15-4, ¶ 4.) The agent "tried to pull open driver's side door, but the door was locked." (*Id.*) Through the closed window, the agent asked for their IDs, and "called to another person and said he 'had two bodies.'" (*Id.*) The agent "did not identify himself," show a warrant, or explain why the truck was pulled over. (*Id.*) Campos Gutierrez lowered his window and asked the agent why he was pulled over, while handing over his REAL ID driver's license. (*Id.*, ¶ 5.) The agent glanced at the identification and directed Campos Gutierrez "to hand him the keys to [the] truck." (*Id.*) Campos Gutierrez refused, because the agent had not said "who he was" or why the truck was pulled over. (*Id.*) The agent responded that he needed the keys because Campos Gutierrez "was going to drive away." (*Id.*) However, the truck was turned off and he "had no intention of driving away and leaving [his] driver's license behind." (*Id.*) "The agent pulled out a knife and proceeded to slash both tires on the driver's side of [the] truck." (*Id.*, ¶ 6.)

Another truck arrived and blocked him in by parking right in front of

the truck. (Doc. 15-4 at 3, ¶ 7.) He states that "[a] white male agent" stood next to his truck, "while the first agent returned to his vehicle to check [his] license." (*Id.*) Campos Gutierrez reports:

> The Black agent came back to the passenger side of my vehicle and ordered my passenger to lower his window and open the door. My passenger lowered the window a few inches. The agent pulled out a handheld tool and threatened to break the window. He ordered my passenger to open the window and open the door. My passenger complied. The agent forcibly grabbed my passenger out of the truck and handcuffed him. The agent never asked my passenger any questions about his community ties. I told the agent he should not have slashed my tires. The agent said, "I'm not going to argue with you, bro. You did what you did, I did what I did."

(*Id.*, ¶ 8.) "A Hispanic agent arrived," who informed Campos Gutierrez that he "was under arrest for 'alien smuggling.'" (*Id.*, ¶ 9.) Campos Gutierrez reports he "tried to explain to the agent that [his] passenger had an open immigration case," but the agent did not respond. (*Id.*) Campos Gutierrez "videorecorded part of these interactions using [his] cell phone," which the agents took away and handcuffed him. (*Id.*, ¶ 9-10.)

Campos Gutierrez and his passenger were transported "in the back of a truck that said 'Immigration'" on it "to a facility about 20 minutes away." (Doc. 15-4 at 11, ¶ 11.) Campos Gutierrez asked why he was arrested when he is a United States citizen, and the agents "said it was because [he] had been transporting someone without documents." (*Id.*) While at the facility, he asked for a phone to call his partner, and "[t]he Hispanic agent said [he] did not have the right to make a call." (*Id.*, ¶ 12.) "At one point, the Black agent told the Hispanic agent that he had slashed [the] tires because [Campos Gutierrez] had become aggressive and 'flipped' him off." (*Id.*) Campos Gutierrez "told the Hispanic agent that was a lie, and if he wanted to find out the truth he should review the body camera footage." (*Id.*) He was detained for about four hours, after which the agents drove him home and dropped him off. (*Id.* at 3-4, ¶ 13.)

He reports that his partner "spent about $350 on the two tow trucks that towed [his] tuck and mini trailer home." (Doc. 15-4 at 4, ¶ 14.) He also spent about $500 to replace the two tires on his truck. (*Id.*) Campos Gutierrez believes Border Patrol stopped him "solely because of the color of [his] skin and [his] appearance." (*Id.*, ¶ 15.)

### D. UFW Members

Elizabeth Strater, National Vice President of the UFW, also provided a declaration reporting that "UFW members were harmed by 'Operation Return to Sender' and fear harm from future Border Patrol Operations." (Doc. 15-3 at 5, emphasis omitted.) She reports that through her role, "and in the ordinary course of UFW's business," she received reports of several UFW members who were impacted in different ways by the Operation, including "Alicia," "Benjamin," "Carlos," "Fernando" and "Gabriela." (*See id.* at 8, 11-12, Strater Decl. ¶¶ 25, 37, 42.) Strater reports the following

information—regarding Alicia, Benjamin, Carlos, Fernando, and Gabriela— from these reports. (*See id.* at 8-13, ¶¶ 24-44.)

Alicia and her husband Benjamin "lived and worked in Kern County for the past 10 years working in berry, table grape, almond, and citrus agriculture." (Doc. 15-3 at 8, Strater Decl. ¶ 25.) On January 7, 2025, around 2:00 p.m., Alicia and Benjamin were in a car with Carlos, her brother-in-law, after leaving "the citrus orchards where they all worked together." (*Id.*, ¶¶ 25-26.) They traveled on Highway 99, and "were traveling within the speed limit and obeying traffic laws." (*Id.*, ¶ 26.) "Alicia, Benjamin, and Carlos all noticed one marked and two unmarked vehicles were parked on the shoulder with police-style lights on the grill." (*Id.*, ¶ 27.) When their car passed the three vehicles, "the vehicles left the shoulder, pulled up behind them, and signaled with their lights for them to pull over." (*Id.* at 8-9, ¶ 27.) After the driver complied, "[s]everal men approached the car and asked Alicia, Benjamin, and Carlos if they had 'papers.'" (*Id.* at 9, ¶ 27.) The Border Patrol "agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for 'papers.'" (*Id.*) The agents arrested Alicia, Benjamin, and Carlos; they did not present warrants for their arrest and "did not ask any further questions." (*Id.*, ¶ 28.) After handcuffing Alicia, "agents asked [her] if she had family." (*Id.*, ¶ 29.) "When she told them she had children, an agent 'offered' to go pick up the children so they could all be taken to Mexico together." (*Id.*) The agents "did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk." (*Id.*) The agents transported the trio to a mobile processing center, but later released Alicia after confirming with a daycare that her children were there. (*Id.*, ¶ 30.) Border Patrol agents transported Benjamin and Carlos to El Centro, and ultimately deported them to Mexico. (*See id.* at 9-10, ¶¶ 31-34.) Alicia continues to work in Kern County and "feels enormous stress and anxiety that … Border Patrol agents will seize her again." (*Id.* at 10, ¶ 35.)

Fernando is also a "farm worker and UFW member," and he "has lived in Kern County for around 20 years." (Doc. 15-3 at 11, Strater Decl. ¶ 37.) On January 9, 2025, Fernando was a passenger in a car that was "traveling within the speed limit and obeying traffic laws" while on a highway "between Bakersfield and Mettler, California." (*Id.*, ¶¶ 38-39.) While on the route—which is "commonly taken by agricultural workers when traveling between orchard worksites and farm worker communities"— "a truck turned on flashing lights and signaled for their car to pull over." (*Id.*, ¶ 38.) After the car stopped, Border Patrol agents approached the vehicle, "grabbed the handles of the locked car doors and pounded on the closed windows." (*Id.*, ¶ 39.) The agents warned that if they did not open the windows, the agents would smash the glass. (*Id.*) "The passengers, including Fernando, sat still and did not respond. In Spanish, the Border Patrol agents began counting down backwards from 'five.' When they reached 'one,' they smashed the windows using a black baton-like stick, causing shards of broken glass to fall all over the car's occupants." (*Id.*) "The agents reached through the broken windows to unlock the car doors and forcefully dragged Fernando and other passengers out of the car and onto the side of the highway." (*Id.*, ¶

40.) Border Patrol arrested Fernando, and "did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk." (*Id.* at 11-12, ¶¶ 40-41.)

Gabriela is a farmworker "who has lived in Fresno for 22 years." (Doc. 15-3 at 12, Strater Decl. ¶ 42.) She "has legal authorization to work in the United States," and "has worked as a farm worker in the stone fruit, table grape, and persimmon orchards, and the bell peppers and tomato fields in the San Joaquin Valley for over 20 years." (*Id.*) She "cannot avoid traveling through and visiting the types of locations that Border Patrol targeted," such as "agricultural areas, to commute to and from work," and "businesses frequented by other farm workers." (*Id.*, ¶ 43.) Gabriela feels anxiety and fear that she will be subjected to Border Patrol's unlawful practices when Border Patrol follows through on its threat to bring 'Operation Return to Sender' to her community in Fresno." (*Id.*, ¶ 42.)

## IV. U.S. Customs and Border Protection Statistics

The U.S. Customs and Border Protection publishes data and statistics for Border Patrol. A spreadsheet titled "USBP Operation Return to Sender Arrests in January 2025"—from the official website of the agency—indicates that 78 individuals were arrested during the Operation, including 62 on January 7, 2025; 12 on January 8, 2025; and 4 on January 9, 2025. (Doc. 38-1 at 5-6.) The spreadsheet contains a column labeled "criminal history." (*Id.*) For 77 of the 78 arrested individuals, the entry in this column reads "Criminal and/or immigration history was not known prior to the encounter." (*Id.*) For one person, the criminal history indicates: "he had a final order of removal since 03/05/2024." (*Id.* at 5.)

## V. Border Patrol's Media Statements and Social Media

Following the Operation, U.S. Customs and Border Protection issued a media statement regarding the results. (Braun Decl. Exh. 17; *see also* Braun Decl. Exh. 18 [Doc. 15-2 at 72, 74].) The full statement was as follows:

> Border Patrol Agents with the El Centro Sector Border Patrol conducted an operation in and around the Bakersfield area in Kern County. Our operation focused on interdicting those who have broken U.S. federal law, trafficking of dangerous substances, non-citizen criminals, and disrupting the transportation routes used by Transnational Criminal Organizations. The U.S. Border Patrol is no stranger to operations in places like Bakersfield, Stockton, Modesto, Fresno, and Sacramento, as the now closed Livermore Border Patrol Sector regularly conducted enforcement operations over this area up to the mid 2000s. "The El Centro Sector takes all border threats seriously," said Chief Patrol Agent Gregory Bovino. "Our area of responsibility stretches from the U.S./Mexico Border, north, as mission and threat dictate, all the way to the Oregon line."

> During this three day operation we had over 60 agents on the ground, using both marked and unmarked vehicles. The results of our operation, named "Return to Sender" are as follows:
>
> 78 arrests (all subjects unlawfully present in the U.S.) The nationality/citizenship of those arrested were from Peru, Guatemala, El Salvador, Honduras, Ecuador, Mexico, and China.
>
> One subject arrested was a convicted sex offender convicted of raping an 8 year old girl.
>
> Another subject had an active warrant from the Visalia Sheriff's Department for a sex offense against a child.
>
> One subject had a warrant for being a felon in possession of a weapon out of Tulare County. He was turned over to the Kern County Sheriff's Department for extradition to Tulare County. A detainer was placed on this subject so we can take him back into custody on pending federal charges.
>
> Three separate Marijuana seizures: 33.01 lbs., 3.1 lbs., and 30.7 grams of personal use.
>
> Four separate methamphetamine seizures totaling 7.1 grams.
>
> Multiple DUI convictions among those arrested, including some that included hit and run and injury enhancements.
>
> Other criminal histories of those arrested included: failure to appear, tampering with a vehicle, petty theft, felony drug possession, vandalism, burglary, inflicting injury on spouse, and child abuse convictions amongst others.

(Doc. 15-2 at 72.)

The U.S. Border Patrol El Centro Sector ("the Sector") maintains a social media account on Facebook. (*See* Braun Decl., Exhs. 1-11 [Doc. 15-2 at 11-32].) In January 2025, the Sector commented that "what crosses the border doesn't stay at the border, making every U.S. city a border town." (*Id.* at 28 [Exh. 9].) Later in January, the Sector commented: "What happens on the border, doesn't stay on the border. Bakersfield is now a dyed in the wool a border town." (*Id.* at 24 [Exh. 7].)

The Sector also made Facebook posts and comments regarding "Operation Return to Sender." (*See* Doc. 15-2 at 11-32.) On January 9, 2025, the Sector called the Operation "an overwhelming success from day one," and indicated the Sector "continue[s] to field dozens of Border Patrol Agents in Kern County and surrounding area…" (*Id.* at 32 [Exh. 11].) In another comment on the same date, the Sector stated: "We are planning operations for other locals such as Fresno and especially Sacramento." (*Id.* at 30 [Exh. 10].) On January 12, 2025, in response to a comment stating, "Here in Bakersfield, you

> guys forgot to raid some people," the Sector stated: "We plan on coming back!!" (*Id.* at 16 [Exh. 3].) In a comment thread later in January 2025, the Sector stated: "Although serious criminals will be the first to be tracked down and removed, anyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." (*Id.* at 12 [Exh. 1].) An individual then commented "Return to sender round 2," to which the Sector replied, "You bet!" (*Id.*)
>
> In February 2025, the Sector made a Facebook post—with accompanying photos— indicating that an "illegal alien … [r]efused to open [his] window during an immigration inspection" and "[g]ot his window shattered for an extraction." (Doc. 15-2 at 20 [Exh. 5].) The Sector indicated the immigrant was then arrested and deported. (*Id.*) In a responsive comment, the Sector stated this was "[fuck around, find out] in full effect." (*Id.* at 22 [Exh. 6].)

(PI Order at 4–20 (footnotes omitted).)

### B. Post-Remand Factual Record

Upon Remand, the parties agreed that supplemental briefing would be appropriate but disputed whether the Court should accept supplemental evidence. (Doc. 207.) After considering the parties' positions on the dispute, the Court permitted the parties to supplement the record because, even though standing "turns on the facts as they existed at the time plaintiff filed the complaint," *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007), that does not necessarily preclude further development of the record. (Doc. 208 at 3 (quoting *Perdomo v. Noem*, 815 F. Supp. 3d 1057, 1074 (C.D. Cal. 2025) ("If new evidence becomes available that establishes plaintiff does not actually have standing, it is appropriate for the court to reexamine the standing issue. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) ('[P]laintiff 'bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter.'").)[3]

Plaintiffs present communications and arrest records they contend support the existence of an officially sanctioned pattern of behavior violative of Plaintiffs' rights. (*Id.* at 14.)[4] Defendants

[3] To be clear, the Court did not intend to suggest in its September 14, 2026 Order that it would be appropriate to evaluate Plaintiffs' standing based upon events that occurred after the filing of the complaint.

[4] Plaintiffs' Supplemental Exhibits are referenced herein with the suffix PX. Unredacted versions of those exhibits are located at Doc. 225-2 (PXA), 225-3 (PXB), 225-4 (PXC), 225-5 (PXD), 234-1 (PXE), 234-2 (PXF), 222-4 (PXG), 234-3 (PXH), and 234-3 (PXI).

present other communications and arrest data in an attempt to demonstrate that the events "as they occurred in January 2025, were isolated and not likely to recur" because "Operation Return to Sender was approved as a targeted operation" and when execution of the Operation "also involved non-targeted consensual encounters and warrantless arrests at local establishments [Border Patrol] headquarters-level authorities, relying on policy, intervened on the morning of the second day, ordered the consensual encounters to stop, and ordered only targeted arrests and vehicle stops." (Doc. 215 at 12–13.)[5] The Court finds it most helpful to consider the supplemental evidence in chronological order.

Planning for the Operation appears to have begun in early December 2024. (*See generally* DXA.) An Operations Order Report dated December 4, 2024, outlines a plan to have El Centro Sector and Special Operations Group personnel "conduct focused operations targeting criminal undocumented non-citizens and associates of Transnational Criminal Organizations (TCOs) with a direct border nexus throughout the city of Bakersfield, California." (DXA, UFW-0001350; *see also id.*, UFW 0001351 (describing the Operational mission as attempt[ing] to locate and arrest individuals identified as criminal undocumented non-citizens or individuals engaged in illicit activities as part of a TCO in Bakersfield").) Chief Border Patrol Agent Gregory Bovino was listed as the commander of the Operation. (*Id.*, UFW-0001352.) On various dates in early December 2024, individuals working for El Centro and Border Patrol Headquarters signed off on the Operation. (*Id.*, UFW-0001358.)

On December 17, 2024, an El Centro Sector Agent with a supervisory title undertook an advance reconnaissance trip to Bakersfield, which he memorialized in an email to others. (*See* PXA.) He visited transportation hubs, including the Greyhound and Amtrak Stations, which he described in a contemporaneous email as "promising for common carrier inspection and consensual encounters." (PXA, UFW-0000705.) He also indicated that, for purposes of "[highway] interdiction, just driving around the highways I have seen multiple vehicles that look good with possibles inside." (*Id.* at UFW-0000708.) He "checked all the Home Depots and Lowes

---

[5] Defendants' Supplemental Exhibits are referenced herein with the suffix DX. Unredacted versions of those exhibits are located at Doc. 247-1 (DXA), Doc. 247-2 (DXB), Doc. 247-3 (DXC), Doc. 247-4 (DXD).

in Bakersfield," and reported that "[o]nly two of these stores"—both Home Depots—have likely apprehendable targets loitering around," particularly at certain times of the day. (*See id*., UFW-0000710.) He then visited jail locations and even though jail staff was unwilling to provide him with information about subjects being released, he concluded "[t]here were a few targets who looked promising for consensual encounters as criminal aliens." (*Id*., UFW-0000711.) Finally, he ran plates of "people passing by" and was able to identify two noncitizens, one with a prior voluntary return; another with a criminal record. (*Id*., UFW-0000712-14.) He concluded this message with the following commentary:

> On a final note, in my opinion for this op to be successful and logistics aside, we need the right people. We need Agents who have a mix of experience and street smarts. There are plenty of aliens in Bakersfield, but we can't have guys coming up here for the per diem and hotel points. We need hunters who are proactive and not afraid to do roving patrol stops and approach people on the streets to engage in conversation. Driving around town, any decent Agent who has "the eye" will be able to spot ["]targets of opportunity" and not all PA's are created equal. Hopefully, the right personnel are chosen.

(*Id*., UFW-0000714.) It is not clear whether the authoring Agent was privy to the December 4 Report calling for a targeted operation. However, it appears that at least two recipients of the December 17 email about the reconnaissance trip previously received the December 4 Report, including at least one Agent with El Centro. (*Compare* PXA *with* DXA.)

On December 18, Another Agent involved in the reconnaissance trip sent a communication sharing information about target addresses and vehicle plates at those residences. (*Id*., UFW-0000704.)

On January 3, 2025, someone at Border Patrol headquarters sent a message to an Agent in an executive position at the El Centro Sector making a recommendation that El Centro "narrow targets," "send a collection team to the target area to establish patterns of life" and then, "after **January 20, 2025**," execute a "more targeted operation . . . for 1 day with multiple teams." (DXB, UFW-0000798 (emphasis in original).) It was further recommended that "[t]argets should include only those with a clear detention, prosecution, and/or repatriation option. For now, no family units should be part of the target deck." (*Id*.) Bovino was not copied on this email from headquarters. (*Id*.) Later that day, someone at El Centro "acknowledge[d[]" that recommendation

from headquarters. (*Id.*, UFW-0000797.)

The written communications pick up again early on January 8, 2025, after the first day of the Operation. Someone from Border Patrol headquarters emailed Bovino at 2:37 a.m., indicating: "We will need to have a call this morning when you guys come online to discuss a path forward. I have to brief out everyone up here this morning. I'll advise once that is done." (DXC, at 2.) At 6:44 a.m., a different person from Border Patrol headquarters emailed one of Bovino's subordinates at El Centro, memorializing a conversation as follows:

> [Good Morning] Chief,
>
> As discussed this morning and to ensure we are all tracking
>
> ELC Op Return to Sender immediate enforcement posture:
>
> - Target only those on the submitted target deck and any target of opportunity that are developed from these efforts (no family units should be on the target deck).
> - Highway operations may continue as per policy
> - No consensual encounters unless they are part of the submitted target deck
> - No consensual encounters at local establishments (Home Depot, convenience stores, restaurants etc.) unless the encounter is with a subject on the target deck.
>
> Can you please forward yesterday's finalized DAR to include status on current targets.
>
> Appreciate your patience and please advise if further clarification is needed
>
> Respectfully,
>
> [Redacted]

(*Id.*, UFW-00007976) The recipient then forwarded the message to Bovino at 7:40 a.m. (*Id.*)

Later on January 8, at 3:48 pm, Bovino responded to the 2:37 a.m. email, again clearly referencing a separate conversation:

> Copy all that on our conversation.
>
> From yesterday, one of the child rapists (rape of an [redacted] old) was [apprehended] at Home Depot. A second child rapist we just found out this morning was apprehended during a roving vehicle stop. This second rapist has an active warrant for that and will be

> turned over to Kern County Sheriff.
>
> With these two apprehensions alone, our children and nation are a safer place. If we hadn't thought outside the box and grabbed our…. guts ... these two child RAPISTS would still be in the community raping [redacted]olds.
>
> These apprehensions reflect the fact we NEED TO BE DOING CONSENSUAL ENCOUNTERS IN CONJUNCTION WITH TARGETING. Operation Return to Sender is truly an all threats operation designed to make America safer. The proof is in - we are doing just that.
>
> The order to ignore criminals is reprehensible [sic], and I hearby [sic] request retraction of this order. We are conducting a well planned, well thought operation many months in the planning only to be limited as the operation is bearing fruit. I have a [redacted] old that I don't want raped. Think about what that entails and then ask whoever is in charge if that sits right with them. It sure doesn't sit right with me.
>
> I'd request this recission immediately so we can get back to arresting people who shouldn't be in the United States in the first place.
>
> Gregory Bovino
> Chief Patrol Agent
> El Centro Sector

(DXC, at 2.) Shortly thereafter, at 4:09 p.m. Bovino separately responded to the individual who sent the written, bullet-pointed instructions to his subordinate:

> Mr. [redacted]:
>
> I notice I wasn't copied on this email. I am the by God on ground commander here in the now better and safer Kem County/ Bakersfield area. If you happen to decide to copy B3 on a directional email, and my staff, then you will copy me on it as well. As we operate and put bad guys in jail, including those two child rapists, an aggravated felon and a whole host of other miscreants in jail, not having to sitft through various levels of administrative or limiting bureaucracy is essential. This operation runs through Friday and our agents are working hard to arrest AS MANY BAD PEOPLE AND BAD THINGS AS IS POSSIBLE. While you're up there, I hearby request these forward thinking agents, all purveyors of CREATING border security be put in for Border Patrol Commendation Medals and then be presented with those medals on our next planned operation to Sacramento,[6] CA.
>
> Thank you.
>
> Gregory Bovino

[6] The Court recites the email here as written without corrections.

(DXD at 2.)

Contemporaneous Forms I-213 dated January 7and January 8 documenting three arrests made during the Operation fail to detail any information about pre-stop and/or pre-arrest assessments made by Agents. (*See* PXB, AR 147–49; PXC, AR 161–64; PXD, AR 485–87.)

On January 10, 2025, Border Patrol circulated a summary spreadsheet, which appears to list the individuals arrested during Operation Return to Sender. (*See generally* PXH, PHI.) The speadsheet reflects: the date (and, for some entries, the time) of each arrest; the identity and certain biographical information of the arrestee; the location of the arrest; and some details related to the arrest, including whether it was classified as a "consensual encounter" or a "vehicle stop." (PXI (UFW-0001903).) Of the 78 arrested during the entire Operation "[o]nly two pre identified targets" were apprehended. (PXH, UFW-0001901.) The following table summarizes the information in the spreadsheet.

| Date | "Consensual Encounters" | Vehicle Stops | Totals |
|---|---|---|---|
| January 7, 2025 | 34 | 28 | 62 |
| January 8, 2025 | 2 | 10 | 12 |
| January 9, 2025 | | 4 | 4 |
| Totals | 36 | 42 | 78 |

(*See* PXI.)

## III. DISCUSSION

### A. Standing Generally

Article III of the Constitution gives federal courts jurisdiction to hear "Cases" and "Controversies." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting U.S. Const. art. III, § 2). Those who invoke a federal court's jurisdiction must demonstrate three things: first, that they have suffered (or likely will suffer) an "injury in fact"; second, "that the injury likely was caused or will be caused by the defendant[(s)]"; and third, "that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. Plaintiffs must meet these requirements "'for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*,

594 U.S. 413, 431 (2021)). "[A]t the preliminary injunction stage, the plaintiff must make a clear showing that she is likely to establish each element of standing." *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (cleaned up); *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1187 (9th Cir. 2026) (reiterating that at the preliminary injunction stage, a plaintiff must "only" show that they are "likely" to establish each element of standing).

Under the first of the three standing requirements, plaintiffs must identify an injury that is both "concrete" and "particularized." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This means the injury "must be real and not abstract" and "affect the plaintiff in a personal and individual way." *Hippocratic Med.*, 602 U.S. at 381 (quoting *Lujan*, 504 U.S. at 560 n.1). It must also be "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). It "must have already occurred or be likely to occur soon." *Hippocratic Med.*, 602 U.S. at 381.

Second, for causation, plaintiffs must show their "injury likely was caused or likely will be caused by the defendant's conduct." *Hippocratic Med.*, 602 U.S. at 382 (emphasis omitted). Redressability, the third part of the test, is often the "flip side[]" of causation. *See Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Hippocratic Med.*, 602 U.S. at 381.

When plaintiffs seek prospective relief, such as an injunction, they must "establish a sufficient likelihood of future injury." *Hippocratic Med.*, 602 U.S. at 381. Put another way, the injury they fear must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Although the word "certainly" implies certainty, this is also a question of likelihoods. *See Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 401). A "substantial risk" of future harm can be enough. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

"To have standing to seek an injunction against future unlawful conduct, a plaintiff must show a 'sufficient likelihood' that they will suffer a similar injury in the future." *Vasquez*

*Perdomo v. Noem*, 148 F.4th 656, 673 (9th Cir. 2025) (quoting *Lyons*, 461 U.S. at 111). The Plaintiffs must therefore demonstrate that they are "realistically threatened" by the challenged conduct. *Lyons*, 461 U.S. at 106. In this Circuit, "a plaintiff can show that an injury is likely to recur by 'demonstrat[ing] that the harm is part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights.'" *Vasquez Perdomo*, 148 F.4th at 673 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012)).

Importantly, standing is "distinct from the merits of a claim." *Am. Encore*, 152 F.4th at 1110 (internal citations and quotations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," though "it often turns on the nature and source of the claim asserted."). Thus, for standing purposes, a court must accept the merits of the claims. *Am. Encore*, 152 F.4th at 1110 (citing *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022)).

**B. Standing of the Individual Plaintiffs**

1. Injury in Fact

*a. Lyons and Melendres*

The standing caselaw at the center of this dispute is grounded upon *Lyons*, in which the plaintiff alleged that police officers subjected him to a chokehold during a routine traffic stop. *Lyons*, 461 U.S. at 97–98. As relevant here, the Supreme Court held that Lyons lacked Article III standing to seek injunctive relief. *Id*. at 101. The Ninth Circuit, which has grappled with *Lyons* on several occasions, conveniently summarized the Supreme Court's reasoning as follows:

> "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." 461 U.S. at 105. Relying heavily on *O'Shea v. Littleton*, 414 U.S. 488 (1974) and *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court held that Lyons did not face "a real and immediate threat of again being illegally choked." *Id*. 461 U.S. at 110. Finding the plaintiff's allegation of future injury speculative, *id*. at 108, [the] Court held that the objective "reality of the threat of repeated injury," *id*. at 107 n. 8, was beyond reasonable belief given the remote probability that Lyons would once again violate the law and incite an unjustifiable response by Los Angeles police. Finally, the Court found probative the fact that the district court had made "no finding that Lyons faced a real and immediate threat of again being illegally choked." *Id*. at 110.

*LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985), *amended*, 796 F.2d 309 (9th Cir. 1986).

More recently, the Ninth Circuit explained that "in *Lyon*s and other cases where the asserted future injury was insufficient to confer standing," there was "either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the challenged governmental action, or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the challenged governmental action." *Vasquez Perdomo*, 148 F.4th at 675 (internal citations and quotations omitted). *Vasquez Perdomo* also reiterated that "the district court in *Lyons* did not make an explicit finding about the likelihood of recurrence, and the record in *Lyons* did not establish a policy of chokeholds 'authorized absent some resistance or other provocation.'" (*Id*. (quoting *Lyons*, 461 U.S. at 110)).

In *Melendres*, the Ninth Circuit reiterated that, to have standing to seek prospective injunctive relief, "a plaintiff must demonstrate 'that he is realistically threatened by a repetition [of the violation.]'" 695 F.3d at 997 (alterations in the original) (citing *Lyons*, 461 U.S. at 109). A plaintiff may demonstrate that such injury is "likely to recur" by showing "that the harm is part of a 'pattern of officially sanctioned behavior violative of the plaintiffs' federal rights." *Id*. (cleaned up) (quoting *LaDuke*, 762 F.2d at 1323).

*Melendres* concerned an injunction entered by a district court precluding local law enforcement officials and entities from detaining any individual "based only on knowledge and reasonable belief, without more, that the person is unlawfully present within the United States." *Id*. at 994. The district court found that the named plaintiffs, five individuals who were stopped in three separate traffic incidents over the course of approximately six months, had standing to pursue prospective injunctive relief. *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979–85 (D. Ariz. 2011). As the Ninth Circuit explained, its standing finding rested on a combination of factors. First, the defendants <u>expressly</u> claimed authority to detain persons they believed were not authorized to be in the United States based only upon reasonable suspicion, without more, that the person was not legally present. *Melendres*, 695 F.3d at 998. In addition, the record contained evidence that the defendants "engaged in a pattern or practice of conducting traffic stops as part of 'saturation patrols' or 'sweeps' targeting Latinos suspected of being illegally present in the

country." *Id*. Finally, the plaintiffs could not avoid being detained simply by avoiding criminal activity because (1) the activity they were stopped for (suspected unlawful presence in the United States) was not a crime and (2) there was no claim that they violated any traffic law to trigger the stops. *Id*.

Defendants spend considerable energy in their supplemental brief arguing why this case "is *Lyons*." (Doc. 215 at 10–11.) According to Defendants, Plaintiffs "have no concrete basis, beyond speculation, to believe that Border Patrol will subject them to suspicionless stops or unlawful arrests in the future." (Doc. 215 at 10.) Defendants emphasize that Plaintiffs "have not identified a single instance of anyone being stopped more than once by Border Patrol"; nor have they "alleged even a single instance of Border Patrol visiting the same place repeatedly." (Doc. 215 at 11.) Moreover, Defendants point out that "in the two months between their alleged injuries and filing their complaint, Plaintiffs cited no further instances of stops or arrests." (*Id*.)

As Plaintiffs point out (Doc. 222 at 11), *Lyons* itself is distinguishable because that case involved a neutral chokehold policy applied in an unconstitutional manner to a single individual, *Lyons*, 461 U.S. at 110, whereas Plaintiffs assert here that Defendants engaged in officially sanctioned unconstitutional conduct that violated Plaintiffs' rights. Moreover, Lyons was subjected to the chokehold after a traffic stop that was itself not questioned, and the Supreme Court suggested he could avoid future encounters by obeying the law. 461 U.S. at 103, 106. Here, Plaintiffs were going about their daily lives at the time of the challenged interactions, and there is no suggestion Plaintiffs could have avoided the interactions by behaving differently.

The Court believes the more pertinent question is whether this case satisfies the standing pathway articulated in *Melendres*, which, as mentioned, permits a plaintiff to demonstrate that their asserted injuries are "likely to recur" by showing "that the harm is part of a 'pattern of officially sanctioned . . . behavior violative of the plaintiffs' [federal] rights." *Melendres*, 695 F.3d at 998.[7]

---

[7] Attempting to distinguish *Melendres*, Defendants make the point that Melendres involved an expressly stated legally erroneous policy. (Doc. 215 at 14.) But, as the Ninth Circuit has explained "no official statement or express policy is required to demonstrate a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." *Vasquez Perdomo*, 148 F.4th at 675–76.

*b. Continued Applicability of Melendres*

As a threshold matter, Defendants' post-remand brief (*see* Doc. 215 at 15) questions the continued applicability of *Melendres* to cases like this one given Justice Kavanaugh's solo concurrence in *Noem v. Perdomo*, 146 S. Ct. 1 (Sept. 8, 2025), in which the Supreme Court stayed a similar, but not identical, preliminary injunction order entered in the Central District of California addressing an alleged pattern of USBP agents engaging in detentive stops without reasonable suspicion in that jurisdiction. The Ninth Circuit had refused to stay operation of the preliminary injunction issued by the district court, reiterating that under *Melendres*, 695 F.3d at 998, a plaintiff can satisfy *Lyons*' requirement of a "realistic[ ] threat[ ]" of being injured again by "demonstrat[ing] that the harm is part of a pattern of officially sanctioned behavior, violative of the plaintiffs' federal rights." *Vasquez Perdomo*, 148 F.4th at 674. The Ninth Circuit emphasized that at the preliminary injunction stage, the *Perdomo* plaintiffs demonstrated such a "a pattern of conduct," because "'a plethora of statements suggest[ed] approval or authorization' of the challenged stop-and-arrest practices, including a recent statement by Defendant Gregory K. Bovino, the Chief Patrol Agent for the El Centro Sector of the CBP." *Id.* As was the case here at the preliminary injunction stage, (Doc. 47 at 82–84), the government "[did] not meaningfully dispute these findings," which were "well supported by the record." *Vasquez Perdomo*, 148 F.4th at 674.

Writing in concurrence and only for himself in relation to a stay request, Justice Kavanaugh reasoned that under *Lyons*, "plaintiffs likely lack Article III standing to seek a broad injunction restricting immigration officers from making . . . investigative stops," because they had "no good basis to believe that law enforcement will unlawfully stop them in the future ... and certainly no good basis for believing that any stop of the plaintiffs is imminent." *Id.* Alternatively, "even if plaintiffs had standing" Justice Kavanaugh reasoned that the Government has a "fair prospect" of succeeding on the Fourth Amendment issue. *Id.* at 3.

Defendant points out that in its January 25, 2026 Order staying the pending motion to dismiss in part, this Court observed that "the Supreme Court stayed the operation of the preliminary injunction, with the only written explanation suggesting that at least one justice is not

convinced by the Ninth Circuit's reliance on *Melendres* in substantially identical standing circumstances." *United Farm Workers v. Noem*, 823 F. Supp. 3d, 1112, 1129 (E.D. Cal. 2026). But in that order, the Court was evaluating the extent to which the standing issues on appeal were intertwined with the standing issues raised in the motion to dismiss. (*Id.*) It was not examining the continued applicability of *Melendres*. To the contrary, the Court agrees with the district court's conclusion in *Vasquez Perdomo v. Mullin*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 2751388, at *16 (C.D. Cal. Sept. 2, 2026), that it is inappropriate for a trial court to "speculate as to the unspoken logic behind the Supreme Court's decision to stay the Fourth Amendment TRO." As that court explained:

> Because there is no associated majority opinion, the Justices may well have disagreed on the reasons for the stay, even if they agreed that a stay should issue. To that end, Defendants do not persuade this Court that the stay order conveys binding authority or guidance on how to approach standing.

*Id.*

Nor is the Court persuaded by Defendants' citation to *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025), (Doc. 215 at 11), where the Supreme Court granted a request to stay a lower court order preventing the President from firing without cause a Commissioner of the Consumer Product Safety Commission. In *Boyle*, a Supreme Court majority indicated that the stay application was "squarely controlled" by *Trump v. Wilcox*, 605 U. S. ——, 145 S. Ct. 1415 (2025), in which the Court stayed operation of a similar order related to the firing of a member of the National Labor Relations Board for reasons other than neglect of duty or malfeasance in office. 145 S. Ct. at 2654. *Boyle* reasoned that even though the Court's "interim order" in *Wilcox* was not "conclusive as to the merits," it should "inform how a court should exercise its equitable jurisdiction in like cases," and then found that *Boyle* did not "differ from *Wilcox* in any pertinent respect." 145 S. Ct. 2653. Here, however, the remand calls upon this Court to evaluate a legal question—Plaintiffs' standing to sue—not to exercise its equitable jurisdiction. This Court is bound by *Melendres*, which remains good law.

*c. Overlap of Prior Findings and Melendres' Requirements*

As is discussed in greater detail below, the Court previously found that the Operation

involved (1) "a pattern and practice of agents performing detentive stops without reasonable suspicion in this District," and (2) "a pattern and practice of warrantless arrests" without individualized assessments of whether the persons arrested were "likely to escape," as required by 8 U.S.C. § 1357(a)(2). (PI Order at 76.)

The Court recognizes that these findings were made in a slightly different context, as the issue discussed was whether, for class certification purposes, Plaintiffs had demonstrated by a preponderance of the evidence that there were "common questions of law and fact" among the class members. (PI Order at 54, 59.) Generally, the law recognizes that there is overlap between the "rigorous analysis" required under Rule 23(a) and merits issues. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011) (discussing overlap between proof of commonality and plaintiffs' merits contention that defendant engaged in a pattern and practice of discrimination); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (noting that the question of commonality overlaps with plaintiffs' claim that defendant's system of promotion and corporate culture constitutes a pattern or practice of discrimination). There is undoubtedly some overlap, therefore, between the Court's prior pattern findings and the requirements of *Melendres*, but the extent of the overlap depends in part on what a "pattern of officially sanctioned behavior" means for purposes of standing under *Melendres*.

Defendants suggest that *Melendres* requires more than the patterns already identified in the PI Order. (*See* Doc. 215 at 12.) Specifically, Defendants argue that their supplemental evidence demonstrates that the events that occurred in January 2025 "were isolated and not likely to recur," or that "at the very least . . . it was unclear, at the time of the complaint and the PI motion, that Border patrol would concretely 'replicate' Operation Return to Sender in the same manner it unfolded, given the Operation as executed was halted after the first day." (*Id.*)[8]

---

[8] Defendants also make a somewhat confusing argument (*see* Doc. 215 at 12) based on the following footnote from this Court's January 25, 2026 Order:

> It is theoretically possible that factual developments in this case might render the *Melendres* "pattern of officially sanctioned behavior" irrelevant, such as if Plaintiffs are able to demonstrate that class members have been subjected to the challenged conduct on numerous occasions. But the present record does not suggest such a pattern is likely to develop. (*See* Def.

*Melendres* itself, as mentioned, involved both an express policy and a related pattern of incidents. Defendants expressly asserted "authority to detain 'individuals based only on reasonable suspicion or probable cause," without more, "that a person is not authorized to be in the United States." *Melendres*, 695 F.3d at 998. The record before the district court detailed the experiences of the five named individual plaintiffs in that case, with the court considering the detention of one plaintiff on September 27, 2007; another two on December 7, 2007; and two more on March 28, 2008. *Ortega-Melendres*, 836 F. Supp. 2d at 980–85. Plaintiffs also presented extensive, independent evidence that defendants were engaging in racial profiling. *Id*. at 986–87. Considering the entire record, the district court found (and the Ninth Circuit affirmed) that "if such a policy [of racial profiling] exists," it presented a "sufficient likelihood" that the named plaintiffs "will suffer ongoing harm" satisfactory to establish standing. *Id*. at 987.

The circumstances of recent district court cases where plaintiffs had standing under *Melendres* (or *Melendres* analogues that exist in other Circuits) in the immigration context are somewhat instructive. For example, in entering its preliminary injunction order, the district court in *Vasquez Perdomo* considered: sworn declarations of five named plaintiffs describing how they were stopped by defendants; five from individuals who were seized during immigration patrols, five from others who witnessed such seizures; two from representatives of the plaintiff

---

> Opening Appellate Brief at 1–2 (government appellate brief arguing "Plaintiffs' evidence underscores how any likelihood of future harm to them is irredeemably speculative. Plaintiffs have not identified a single instance of anyone being stopped more than once by Border Patrol. Nor is there even a single instance of Border Patrol visiting the same place repeatedly. And in the two months between their alleged injuries and filing their complaint, Plaintiffs cited no further instances of stops or arrests.").)

*United Farm Workers v. Noem*, 823 F. Supp. 3d at 1129 n.9. Citing this footnote, Defendants appear to be suggesting that the Court previously questioned Plaintiffs' ability to demonstrate standing. (Doc. 215 at 11–12 (arguing that the Court previously noted "the record in fact does not show, for prospective standing purposes, that 'class members have been subjected to the challenged conduct on numerous occasions' and 'the present record does not suggest such a pattern is likely to develop'").) Defendants take the Court's comment out of context. There, as mentioned, the Court was addressing whether the standing issues raised on appeal were inextricably intertwined with the standing issues raised in the motion to dismiss. Because all those arguments appeared to assume Plaintiffs would be relying on a *Melendres*-based theory of standing, the Court briefly addressed whether factual developments could render *Melendres* irrelevant but ultimately found that unlikely. The Court, which is in the best position to interpret its own order, was not trying to comment on Plaintiffs' ability to satisfy *Melendres*' "pattern of officially sanctioned behavior" test.

organizations describing the effect of immigration enforcement operations on their members; and social media posts and news articles that documented the relevant immigration enforcement activities. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 665 (9th Cir. 2025). The encounters took place over a several week period in June 2025. *Id*. at 666–71.

*Escobar Molina v. U.S. Dep't of Homeland Sec*., 811 F. Supp. 3d 1, 17–26, 33 (D.D.C. 2025), considered evidence of "defendants' own public statements acknowledging the use of a standard lower than probable cause to make warrantless immigration arrests . . . as well as over two dozen sworn declarations from plaintiffs recounting examples where defendants' agents failed to make any inquiry to evaluate escape risk before making warrantless arrests," with the incidents spread out over a period of at least a month in the summer of 2025. *M-J-M-A- v. Hermosillo*, 822 F. Supp. 3d 1147, 1160–70 (D. Or. 2026), considered evidence of immigration encounters between ICE and ten individuals over the course of more than a month in the fall of 2025. And in *Kariye v. Mayorkas*, No. 23-55790, 2024 WL 4403870, at *2 (9th Cir. Oct. 4, 2024), the plaintiffs recounted "ten incidents of religious-based questioning" experienced by three plaintiffs, some of whom were stopped multiple times. These encounters took place over the course of several years. *See Kariye v. Mayorkas*, No. 2:22-CV-01916-FWS (GJSX), 2023 WL 11951659, at *3–*11 (C.D. Cal. July 19, 2023), *aff'd in part, vacated in part, rev'd in part*, 2024 WL 4403870; *see also Index Newspapers LLC v. U.S. Marshals Serv*., 977 F.3d 817, 826 (9th Cir. 2020) (sufficient pattern of conduct for standing purposes where plaintiffs presented evidence of numerous injuries to members of the press that "persisted for weeks and was ongoing"). Thus, generally, cases finding pattern-based standing to seek prospective relief have tended to involve conduct that spanned longer than a few days.

But shorter time horizons are not precluded. To reach this conclusion, the Court draws guidance from the larger body of caselaw about *Monell* pattern and practice claims. Generally, "[a]bsent a formal governmental policy, [a *Monell* plaintiff] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the local government entity.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Id.*

(quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). "[A]n isolated or sporadic incident [ ] cannot form the basis of *Monell* liability for an improper custom." *Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) (citation omitted). But *Monell* liability can exist based on a series of events over a short period of time. *See Menotti v. Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005) (concluding that "a policy may be inferred due to the widespread practices or evidence of repeated constitutional violations" that occurred during protests on a single day, alongside the fact that none of the involved officers were discharged or reprimanded for their conduct). In *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 749–50 (N.D. Cal. 2020), for example, the district court found a pattern sufficient for *Monell* liability purposes where, over a three-night period of interactions between police and Black Lives Matter protestors, the defendant police department was "executing an organized, department-wide response." This allowed the court to "presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates" and therefore made it "easier to infer that the repeated conduct of individual police officers is really the conduct of the department, particularly when the police chief makes comments that could be interpreted as suggesting that the officers who used force did not meaningfully deviate from the department's plan for how to control the crowds." *Id*. at 750. *But see White v. Sacramento Police Dep't*, No. 2:21-CV-02211-JAM-SCR, 2025 WL 1440308, at *1, *6–*9 (E.D. Cal. May 20, 2025) (citing *Menotti* when finding municipal defendants were liable under *Monell* for protest-related conduct over the course of a four-day period, but ultimately finding no standing to seek a prospective injunction because of subsequent "significant policy changes" that made repeat violations unlikely). In sum, drawing guidance from these cases, the Court sees no reason why, on an appropriate record, Plaintiffs could not establish standing under *Melendres* based upon a series of encounters over the course of a few days—the duration at issue here.

*d. Applying Melendres to this Record*

Because standing must be evaluated on a claim-by-claim basis, *Murthy*, 603 U.S. at 61, each of two the claims on which Plaintiffs seek prospective injunctive are evaluated in turn.

i. Detentive Stops

The PI Order found "a pattern and practice of agents performing detentive stops without reasonable suspicion in this District," for purposes of class certification, and provided the following detailed analysis:

> Proposed class representative Wilder Munguia Esquivel reports that he was standing with a group of day laborers outside Home Depot when several unmarked vehicles arrived, and agents "aggressively swarmed" around the day laborers. (Doc. 15-10 at 2, ¶¶ 4-5.) Munguia Esquivel states the agents "did not seem to be targeting specific individuals," but demanded "papers" from the group. (*Id.*, ¶ 4.) He states that an agent directly asked him in Spanish: "Do you have papers? Do you have identification? Where are you from?" (*Id.*, ¶ 5.) When Munguia Esquivel did not respond, the agents "kept yelling … louder and louder," asking if Munguia Esquivel had papers and where he was from. (*Id.*) When he did not respond and attempted to walk away, the agent followed and then ordered him to "turn around" to be handcuffed. (*Id.*) Munguia Esquivel believes the agent who arrested him did not know who he was, and that they were "targeted at Home Depot because many day laborers gather to get work there. (*Id.*, ¶ 10.)
>
> Putative class members Jesus Ramirez and Luis Perez Cruz—who were also detained by Border Patrol agents in the parking lot of Home Depot—echo the claims of Munguia Esquivel. (*See* Doc. 15-5 at 2, Ramirez Decl. ¶ 3; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 3.) Ramirez asserts that he "was not doing anything unlawful" when the agents arrived and surrounded the group of day laborers. (Doc. 15-5 at 2, ¶ 4.) Ramirez also asserts the Border Patrol agents demanded they show "papers," and Ramirez pulled out his identification from his wallet. (*Id.*, ¶ 5.) Ramirez reports the agent took his identification and believes "[i]t was clear … the agents did not know who [he] was." (*Id.*, ¶¶ 5-6.) Perez Cruz reports that he was talking to his cousins in the Home Depot parking lot when two agents walked up to them, said they were from Border Patrol, and directed the group "to show … IDs saying that [they] were in the United States legally or had permits to be here." (Doc. 15-7 at 2, ¶ 3.) Perez Cruz also believes the agents "did not appear to have any idea who [he] was before they demanded [his] ID." (*Id.*, ¶ 4.)
>
> Yolanda Aguilera Martinez, a proposed class representative, reports she was driving in her car when she "saw two vehicles pulled over to the right side of the road and three men standing near the vehicles." (Doc. 15-11 at 2, Aguilera Martinez Decl. ¶ 4.) She states that one of the men "raised his hand to flag [her] down and signaled for [her] to pull over," which she did. (*Id.*) Aguilera Martinez reports that she "was not speeding," and her car's registration and license plate were current. (*Id.*) She asserts the Border Patrol agent who approached her vehicle "did not seem to know who [she] was," and said, "I need to see your papers." (*Id.*, ¶ 6.)
>
> Named plaintiffs, and putative class members, Juan Vargas Mendez

and Maria Guadalupe Hernandez Espinoza each report they were passengers in vehicles that Border Patrol stopped while they were driving home after work. Like Aguilera Martinez, they report the drivers of the vehicles were not speeding or breaking traffic laws. (Doc. 15-6 at 2, Vargas Mendez Decl. ¶ 4; Doc. 15-8 at 2, Hernandez Espinoza Decl. ¶ 4.) Hernandez Espinoza states her partner was driving his vehicle and "not breaking any traffic laws" when Border Patrol pulled them over. (Doc. 15-8 at 2, ¶ 4.) She reports agents approached the car and directed the occupants to get out. (*Id.*, ¶¶ 5-6.) Hernandez Espinoza reports, "The agents asked us for our IDs, if we had papers, and if we were here legally. I did not answer their questions, and I did not produce an ID because I was not carrying one with me. The agents did not explain why they had pulled us over." (*Id.* at 3, ¶ 7.) Similarly, Vargas Mendez reports he was a passenger in a van that Border Patrol stopped. (Doc. 15-6 at 2, ¶ 4.) He reports that when he heard sirens, he "looked at the speedometer and saw [they] were driving under 40 miles an hour, well below the speed limit." (*Id.*, ¶ 5.) Vargas Mendez states agents opened the van door, and "shouted in Spanish that [they] needed to show him [their] IDs, and warned [the passengers] had better 'tell the truth.'" (*Id.*, ¶ 8.) Vargas Mendez states he did not produce identification because he was not carrying it, and the agents "dragged" him out of the van and handcuffed him. (*Id.*, ¶¶ 9-10.)

Ernesto Campos Gutierrez was driving his truck—with a passenger in the front seat—and towing a mini trailer with gardening equipment when Border Patrol stopped him on January 8, 2025. (Doc. 15-4 at 3, ¶ 3.) He reports he was driving the speed limit and his truck "had current license plates and registration, and had no stickers or decals." (*Id.*) Campos Gutierrez pulled over when directed, and a Border Patrol agent asked for his identification through the window, which remained closed. (*Id.*, ¶ 4.) Campos Gutierrez heard the agent tell another person that that he "had two bodies" before Campos Gutierrez lowered the window and provided his REAL ID driver's license. (*Id.*)

UFW members also reported being pulled over in a vehicle "traveling within the speed limit and obeying traffic laws." (Doc. 15-3 at 8, ¶ 26.) Alicia, Benjamin, and Carlos passed Border Patrol vehicles that were parked on the shoulder of a road, after which Border Patrol left the shoulder and signaled for them to pull over. (*Id.*, ¶¶ 26-27.) Agents "approached the car and asked Alicia, Benjamin, and Carlos if they had 'papers.'" (*Id.* at 9, ¶ 27.) They believe that "[t]he agents did not appear to know who was in the car, and did not appear to have any reason for pulling the car over, other than to ask for 'papers.'" (*Id.*)

Oscar Morales Cisneros, also one of the three proposed representatives, reports that while in his truck outside a liquor store "located in a predominantly Latino-populated neighborhood," Border Patrol agents pulled behind his vehicle—which had current registration and no stickers or decals on it—and blocked him in. (Doc. 15-9 at 2, ¶ 4.) The agents approached his truck and asked if he "had papers and was here legally." (*Id.*, ¶ 5.) He did not answer the questions but provided his driver's license when asked. (*Id.*)

> After the agents arrested Morales Cisneros, they drove around Bakersfield. (*Id*. at 3, ¶ 7.) He reports that at one point, the agents stopped at a gas station where they "pulled up behind a vehicle to block it in," as they had done to him, and spoke to a person in the vehicle. (*Id*.) Morales Cisneros heard an agent say "We're doing our job" before they let the unidentified person go. (*Id*.)
>
> Plaintiffs provide news articles regarding the Operation, which include statements by Sara Fuentes. (Doc. 15-2 at 68, 98.) Fuentes is not a putative class member, but she witnessed Border Patrol agents in action during the Operation, as manager of a gas station where Border Patrol agents detained the station's customers. (*Id*.) She saw agents arrive in civilian clothes and unmarked vehicles. (*Id*. at 98.) At first, Fuentes thought the agents were serving a warrant, but then she noticed "it was only Hispanics and field workers that they were putting aside." (*Id*. at 68.) Fuentes saw that the agents "didn't stop people with FedEx uniforms, they were stopping people who looked like they worked in the fields." (*Id*. at 98.) Fuentes witnessed the agents approach customers, ask about their immigration status, and arrest individuals. (*Id*.; *see also id*. at 7, ¶ 17.) Fuentes saw Border Patrol agents parked behind a woman's car to block her in, but the agents "allowed the woman to leave" when a local news entity arrived at the gas station. (*Id*.; *see also id*. at 69.)
>
> Plaintiffs and putative class members report facts indicating they were engaged in ordinary activities—such as talking with family members and others or driving home from work in vehicles that were not violating traffic laws—when Border Patrol stopped them, demanded their "papers" and questioned them about whether they were in the country legally. Collectively, Plaintiffs present evidence that is "more likely than not" Border Patrol agents engaged in a practice of performing detentive stops without knowledge of who they were stopping, and without reasonable suspicion to perform the stop. Although Defendants contend there were "various facts and circumstances concerning each detention" (Doc. 32 at 19), the circumstances identified by Defendants constitute a distinction without a difference. Whether Border Patrol agents wore uniforms or plain clothes does not change whether the agents had reasonable suspicion to perform the stops. Whether a person handed over identification while being detained does not address whether the Border Patrol agents engaged in a practice of performing stops without reasonable suspicion. Ultimately, there is no substantive conflict in the evidence regarding the alleged practice.
>
> With the anecdotal evidence—from named Plaintiffs, putative class members, and a third party—Plaintiffs have met their burden of establishing by a preponderance of the evidence that putative class members "suffered the same injury" imposed by Border Patrol, which engaged in a practice of performing detentive stops without individualized assessments of reasonable suspicion during "Operation Return to Sender."

(PI Order at 55–58.)

Building upon its prior discussion above and for the additional reasons below, the Court concludes the evidence also supports the related finding that Defendants' performance of these detentive stops without individualized assessments of reasonable suspicion was part of a pattern of officially sanctioned behavior that is likely to recur. Crucially, the Court is not persuaded by Defendants' efforts to use the supplemental evidence to demonstrate that the conduct was "isolated and not likely to recur." (Doc. 215 at 12.)

The Operation involved a variety of encounters over the course of three days, resulting in 78 total arrests and numerous other stops. (*See* PXI; Doc. 1 at ¶ 4 (discussing local news reports suggesting 200 stops).) The overwhelming majority of the stops involved individuals whose immigration status was not known prior to the arrest. (PI Order at 58.) Plaintiffs present detailed information about the experiences of more than ten individuals encountered on January 7[9], 8[10], and 9[11]. Their encounters, which encompass some arrests labeled as "consensual" and some labeled as "vehicle stops" in Defendants' spreadsheet, all shared common characteristics, such as being approached or having their vehicles stopped for no apparent reason other than their appearance and/or their general location, followed by Agents demanding to see "papers."

Central to Defendants' argument against standing is their contention that orders from headquarters "halted" the "Operation as executed" on the first day. (Doc. 215 at 13.) Indeed, early on the morning of January 8, headquarters-level authorities issued an order to stop the "consensual" encounters but permitted "targeted arrests and vehicle stops" to continue. But for several reasons, the Court is not convinced that the headquarters' instructions cut off the pattern of unconstitutional conduct in a material way.

First, the order from headquarters issued early in the morning on January 8, 2026 was not

---

[9] Stops on January 7 included Plaintiffs Morales Cisneros (encountered in a parking lot), Munguia Esquivel (encountered at Home Depot), and Hernandez Espinoza (encountered during a traffic stop), as well as community members Ramirez and Perez Cruz (both encountered at Home Depot), and UFW members Alica and Benjamin (encountered during a traffic stop).

[10] Stops on January 8 included Plaintiffs Aguilera Martinez (encountered during a traffic stop) and Vargas Mendez (same), as well as community member Campos Gutierrez (same).

[11] UFW member Fernando was encountered during a traffic stop on January 9.

the first time headquarters attempted to define "Return to Sender" as a targeted Operation. The December 4 Operations Order Report—the only formal description of the Operation presented to the Court thus far—clearly defines the mission: to "attempt to locate and arrest individuals identified as criminal undocumented non-citizens or individuals engaged in illicit activities." (DXA, UFW-0001351.) Yet almost immediately, El Centro Agents took the Operation in a very different direction. As mentioned, at least one supervisor-level Agent spent time specifically gathering advance reconnaissance in the Bakersfield area relevant to engaging in "consensual" encounters. He checked local businesses, transit hubs, and other locations for "targets who looked promising for consensual encounters as criminal aliens." (PXA, UFW-0000711.) He also emphasized his belief that the Operation needed "hunters who are proactive and not afraid to do roving patrol stops and approach people on the streets to engage in conversation"; Agents who have "the eye" and can spot "targets of opportunity." (*Id.*, UFW-0000714.)

Moreover, even though the formal Operation plan calling for targeted actions was widely distributed (*see* DXA), the first day of the Operation resulted in more "consensual" encounters (34) than vehicle stops (28), (*see* PXI), and the entire Operation resulted in the arrest of only two pre-identified targets. This suggests that despite having instructions from headquarters since early December to focus on targeted individuals, those instructions were not being followed on the ground. There is reason to believe this did not change upon the issuance of the January 8 order from headquarters.[12] For one thing, the on-the-ground commander of the Operation was expressly outraged by headquarters' order, called for its recission[13], and demanded that the "forward

---

[12] The Court also is not blind to the fact that Defendants did in fact engage in a subsequent operation in Sacramento, where they again detained individuals in a parking lot of a Home Depot without having reasonable suspicion for doing so, relying instead "on unsupported assumptions, hunches and generalizations about the relationship between a person's apparent status as a day laborer and their immigration status." (Doc. 176 at 3.) Though the Court will not evaluate Plaintiffs' standing based upon events that occurred after the filing of the complaint, the Court does find this subsequent information is at least marginally helpful in evaluating the impact of the order from headquarters.

[13] The Court does not see any obvious support for Defendants' assertion that Bovino's "request for recission of the order" from headquarters was "denied." (*See* Doc. 215 at 13 (citing DXC and DXD).) Neither cited exhibit contains any express denial of Bovino's request.

thinking" Agents involved in the first day of operations be awarded commendations.[14] Moreover, though the arrest records from the second and third days of the Operation are generally consistent with a shift of strategy away from encounters at local businesses,[15] the record does not rule out other explanations for the shifting patterns of attention, such as resource availability and/or prioritization.

Additionally, the Court is not convinced that the order from headquarters, even if uniformly accepted and obeyed, demonstrates what the Defense argues. This is because headquarters drew a line between "consensual" encounters and "vehicle stops" that appears to be immaterial to the constitutional violation alleged by Plaintiffs. To reiterate, as the PI Order explained:

> Plaintiffs and putative class members report facts indicating they were engaged in ordinary activities—such as talking with family members and others or driving home from work in vehicles that were not violating traffic laws—when Border Patrol stopped them, demanded their "papers" and questioned them about whether they were in the country legally. Collectively, Plaintiffs present evidence that is "more likely than not" Border Patrol agents engaged in a practice of performing detentive stops without knowledge of who they were stopping, and without reasonable suspicion to perform the stop.

(PI order at 57.) Put another way, the pattern of unconstitutional conduct spanned the full breadth of the contacts Agents made during the Operation, whether on foot or after a traffic stop.[16] Defendants have never sought to provide a legal basis for either form of detentive stop.

[14] Bovino's comments on January 8 make this case somewhat analogous to *Martinez*, 499 F. Supp. 3d 749–50, discussed above, where the court assumed the "police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates" which in turn made it "easier to infer that the repeated conduct of individual police officers is really the conduct of the department, particularly when the police chief makes comments that could be interpreted as suggesting that the officers who used force did not meaningfully deviate from the department's plan for how to control the crowds." Obviously, given the evidence of contrary instructions from headquarters-level officials, the analogy is an imperfect one.

[15] The spreadsheet does indicate that two arrests resulting from encounters designated as "consensual" took place early on January 8, 2026, shortly after headquarters issued its order to refrain from such encounters. (*See* PXI; Doc. 232 at 5.)

[16] To reiterate, the Operation resulted in 78 arrests overall. (PXI.) Of those, more than half (42) were classified by Defendants as vehicle stops. Thus, even if future consensual encounters were made far less likely by the order from headquarters, this would not eliminate the risk of future encounters following the overall pattern identified here.

The record also demonstrates that the pattern identified above was officially sanctioned and likely to recur. Bovino—the "on the ground commander"—explicitly endorsed the use of non-targeted (i.e., "consensual") encounters and called for Agents involved in such "forward thinking" activities to be given commendations. In addition, as previously discussed, El Centro publicly endorsed the Operation as "an overwhelming success from day one," while also indicating that they "are planning operations for other locals such as Fresno and especially Sacramento" and that they "plan on coming back" to Bakersfield.

ii. Warrantless Arrests

A similar conclusion is appropriate in relation to the warrantless arrest claim. As mentioned, the PI Order found in the context of the class certification analysis that Plaintiffs demonstrated "a pattern and practice of warrantless arrests without Border Patrol Agents performing individualized flight risk assessments." (Doc. 47 at 76.) Specifically,

> The three proposed class representatives report they were placed under arrest, without a warrant and without Border Patrol agents asking any information to assess their flight risk. (Doc. 15-9 at 3, Morales Cisneros Decl. ¶ 6; Doc. 15-10 at 2-3, Munguia Esquivel Decl. ¶¶ 6-8; Doc. 15-11 at 3, Aguilera Martinez Decl. ¶ 8.) Morales Cisneros reports the agents told his daughter that he "was detained by Border Patrol for being here illegally without documents." (Doc. 15-9 at 3, ¶ 6.) He states, "[Agents] did not ask about my ties to the community, such as my family members, my work history, or how long I have lived in the neighborhood." (*Id.*) Munguia Esquivel also asserts the Border Patrol agent did not "ask me about my community ties, such as my family, work history, or how long I have been living here." (Doc. 15-10 at 3, ¶ 8.) Likewise, Aguilera Martinez reports, "The agent never asked me about my community ties to Kern County, like how long I have lived and worked here and all the family members I have who live here." (Doc. 15-11 at 3, ¶ 8.)
>
> Elizabeth Strater reports that when UFW Members Alicia, Benjamin, and Carlos were arrested, Border Patrol agents asked for their "papers" and "did not present a warrant for arrest … [or] ask any further questions." (Doc. 15-3 at 9, Strater Decl. ¶ 28.) Strater reports, "After they had handcuffed [Alicia], the agents asked Alicia if she had family. When she told them she had children, an agent 'offered' to go pick up the children so they could all be taken to Mexico together. The men did not ask Benjamin or Carlos about their ties to the community or otherwise conduct an assessment of flight risk." (*Id.*) Strater also reports that when UFW Member Fernando was arrested, "The agents did not present a warrant for arrest or ask Fernando anything about his family, community ties, employment, or other factors related to his likelihood of flight risk." (*Id.* at 12, ¶ 41.)

> The other putative class members uniformly report that Border Patrol agents arrested them without warrants and without asking any questions to assess their individual flight risk. (Doc. 15-6 at 3, Vargas Mendez Decl. ¶ 10 [“They did not show us any warrants. They never asked about my community ties to Kern County, such as how long I had lived there, my family, or my employment.”]; Doc. 15-7 at 2, Perez Cruz Decl. ¶ 4 [“None of the agents asked me anything about my family, community ties, work, or life in Bakersfield. The agents did not present me with a warrant of any kind and did not appear to have any idea who I was before they demanded by ID.”]; Doc. 15-8 at 3, Hernandez Espinoza Decl. ¶ 7 [“The agents never asked me questions about my community ties, such as the many years I lived here, my work history, or my children and grandson.”]; Doc. 15-5 at 2, Ramirez Decl. ¶¶ 6-7 [reporting the agent did not have a warrant and “[t]he agent did not ask me any questions about my family or ties to the community. If he had asked, I would have told him I have family in Bakersfield and elsewhere in California. I would have told him my children live in California, and my son is still a minor.”].)
>
> Even when information regarding family and community ties was volunteered to Border Patrol agents following arrests of putative class members, the agents expressly disregarded it. For example, Munguia Esquivel reports that his family members spoke to Border Patrol when they came to get his truck and said Munguia Esquivel “was in the process of regularizing [his] immigration status.” (Doc. 15-10 at 3, ¶ 9.) He states, “The agents did not care and said they were taking me anyway.” (*Id.*) Similarly, Vargas Mendez reports what while in the Border Patrol vehicle after his arrest: “I told [an agent] I have lived in the area for 20 years; I have a wife and four kids who are all citizens; I have no criminal record.” (Doc. 15-6 at 3, ¶ 11.) The agent “responded he did not care and that [Vargas Mendez] was ‘going to Mexico.’” (*Id.*)
>
> . . . . Plaintiffs do not contend Border Patrol erred in assessing flight risks; they contend that the probable cause determinations were not performed at all. (*See* Doc. 1 at 65-76; Doc. 37 at 7.)

(PI Order at 59–61.)

Here, the patterns described by declarants are particularly consistent. Morales Cisneros, Ramirez, Perez Cruz, Campos Gutierrez, and UFW members Benjamin and Carlos were never asked any questions related to their ties to the community or any other flight risk factor; Vargas Mendez and Munguia Esquivel indicated that they offered information about their community ties and/or pathways to regularize their status but agents responded that they “didn’t care.” Moreover, the anecdotal evidence suggests flight risk assessments were absent across both “categories” of encounters—“consensual” and vehicular—a conclusion that is bolstered by the three Forms I-213s prepared during the Operation and submitted by Plaintiffs as supplemental evidence, all of

which are devoid of any mention of the required pre-arrest inquiry. (PXB, PXC, PXD.) In sum, Defendants engaged in a consistent, sufficiently widespread pattern of warrantless arrests without performing individualized flight risk assessments throughout the three-day Operation. The supplemental evidence presented by Defendants has essentially no bearing on these findings. The order issued by headquarters on January 8 did not address flight risk determinations at all.

This record also supports a finding that Defendants' arrest-related conduct was officially sanctioned. Bovino's emails again provide this information. He repeatedly emphasized that Agents were "working hard to arrest AS MANY BAD PEOPLE . . . AS POSSIBLE," (DXD), and requested rescission of the order from headquarters so his Agents could "get back to arresting people who shouldn't be in the United States in the first place." (DXC) In addition, as mentioned the Operation was hailed as an "overwhelming success" in official Border Patrol social media, which also indicated that "anyone we encounter who doesn't have the legal right to be in or remain in the U.S. will be arrested." Finally, as discussed above, the record suggests that the conduct likely would be repeated, given promised plans to return to the Bakersfield, Fresno, and Sacramento[17] areas.

In sum, the Court finds that Plaintiffs have made a sufficiently clear showing that they are likely to be harmed in the future by two patterns of officially sanctioned behavior violative of their constitutional rights: (1) Agents performing detentive stops without reasonable suspicion, and (2) Agents performing warrantless arrests without individualized assessments of whether the persons arrested were "likely to escape," as required by 8 U.S.C. § 1357(a)(2). Though "the likelihood of a future stop of a particular individual plaintiff may not be 'high,'" the court finds it is "nevertheless 'sufficiently likely'" given the entirety of the record. *See Melendres*, 695 F.3d at 998. Finally, to the extent the Court's discussion above regarding Defendants' attempts to analogize this case to *Lyons* was not sufficiently clear on this point: Plaintiffs cannot avoid Defendants' conduct by adjusting their own behavior. As the district court in *M-J-M-A* indicated "ICE officers are stopping class members without regard to any alleged traffic violation, so Plaintiffs are in danger the moment they open their front doors." 822 F. Supp. 3d at 1174.

[17] Which, as noted above, *did* occur.

2. Remaining Standing Factors

The Court agrees with Plaintiffs (Doc. 225 at 18)—and Defendants do not meaningfully dispute—that the named Plaintiffs also satisfy the remaining elements of Article III standing. Plaintiffs' injuries are directly traceable to Defendants' conduct, thus they satisfy the second element of standing which requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). The injunctive relief sought by Plaintiffs—including enjoining the unlawful detention and arrest practices, as well as requiring guidance, training, and documentation (*see* PI Order at 87–88)—likely would meaningfully reduce the risk future injury. *See id.*

**C. UFW's Standing**

In the interest of expedience, the Court declines to separately address whether UFW has standing to sue for prospective injunctive relief. "In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed." *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022); *see also Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1187 (9th Cir. 2026) (same).

## IV. CONCLUSION AND ORDER

In response to the Ninth Circuit's limited remand, the Court finds that the named individual Plaintiffs have standing to seek prospective relief. The Clerk of Court is directed to transmit a copy of this order to the Court of Appeals for the Ninth Circuit.

In an abundance of caution, the Court directs that this order be temporarily filed under seal. **Within seven days of the date of this order**, after meeting and conferring, the parties shall file a stipulation or joint report indicating whether the entire order can be filed on the public docket or whether any redactions are needed.

IT IS SO ORDERED.

Dated: November 6, 2026

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

## Index of Supplemental Exhibits on Remand

| Document | File Date | USDC Docket No. | USDC's Naming Convention (ECF No. 251) |
|---|---|---|---|
| Plaintiffs' Supplemental Exhibit A | 10/20/26 | 225-2 | PXA |
| Plaintiffs' Supplemental Exhibit B | 10/20/26 | 225-3 | PXB |
| Plaintiffs' Supplemental Exhibit C | 10/20/26 | 225-4 | PXC |
| Plaintiffs' Supplemental Exhibit D | 10/20/26 | 225-5 | PXD |
| Plaintiffs' Supplemental Exhibit E | 10/27/26 | 234-1 | PXE |
| Plaintiffs' Supplemental Exhibit F | 10/27/26 | 234-2 | PXF |
| Plaintiffs' Supplemental Exhibit G | 10/15/26 | 222-4 | PXG |
| Plaintiffs' Supplemental Exhibit H | 10/27/26 | 234-3 | PXH |
| Plaintiffs' Supplemental Exhibit I | 10/27/26 | 234-4 | PXI |
| Defendants' Supplement Exhibit A | 11/5/26 | 247-1 | DXA |
| Defendants' Supplement Exhibit B | 11/5/26 | 247-2 | DXB |
| Defendants' Supplement Exhibit C | 11/5/26 | 247-3 | DXC |
| Defendants' Supplement Exhibit D | 11/5/26 | 247-4 | DXD |